Case No.:

# UNITED STATES DISTRICT COURT
## FOR THE
## SOUTHERN DISTRICT OF NEW YORK
## MANHATTAN DIVISION

SHERLY CADET,

Plaintiff,

**-v-**

ALLIANCE NURSING STAFFING OF NEW YORK, INC.

Defendant,

## COMPLAINT

Plaintiff - Sherly Cadet (pro se)
P.O. Box 390
New York, NY 10040
(347) 323-5946
SherlyCadet1@Outlook.com

# TABLE OF CONTENTS

**Page No.**

I. INTRODUCTION.................................................................1

    i.      Preliminary Statement of Claims Against Alliance....................4

    ii.     Summary of Introduction...................................................8

II. JURISDICTION AND VENUE.....................................................8

III. PARTIES OF THE CASE........................................................8

IV. DESCRIPTION OF EXHIBITS....................................................8

V. FACTS OF THE CASE...........................................................10

    i.      The February 26th, 2019 Arbitration Agreement Was Mandatory.........26

    ii.     As A Term & Condition of Continued Employment, Alliance Required the Plaintiff to Relinquish Her Constitutional Right to Bring Legal Action Against Alliance for Racially Discriminatory Conduct in the Workplace.........................29

    iii.   As A Term & Condition of Continued Employment, Alliance Required the Plaintiff to Relinquish Specific Constitutional Rights Relating to Racially Discriminatory Conduct in the Workplace.............................31

    iv.    Alliance Wrongfully Terminated the Plaintiff's Employment.............34

    v.     The Plaintiff Was Similarly Situated as the Caucasian Caregiver on January 24th, 2019 & the Plaintiff Was Also Similarly Situated as the Black Caregivers Who Were Previously Targeted by Schwartz with Malicious and Hateful/Racist Conduct.................................................................34

VI. CLAIMS.....................................................................35

    FIRST (1ST) CAUSE OF ACTION: 'RACIALLY HOSTILE WORK ENVIRONMENT' AGAINST DEFENDANT ALLIANCE PURSUANT TO 42 U.S.C. § 1981 AND THE NEW YORK CITY ADMINISTRATIVE CODE § 8-107 (1)(A)...................36

        A. The Plaintiff is a Member of a Class of People Protected Under 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (1)(a)................................................................37

        B. The Plaintiff Was Qualified to Hold the Position of Home Health Aide (Caregiver) at Alliance Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (1)(a)................................................................37

i

C. Alliance Maliciously, Intentionally, Knowingly, and Willfully Subjected the Plaintiff to Insults, Ridicule, and Intimidation in Relation to Her Skin Color and Race Because the Plaintiff Is A Black Person......................................................39

      i.      January 23rd, 2019.........................................................................39

      ii.     January 24th, 2019.........................................................................41

      iii.    February 1st, 2019.........................................................................47

      iv.   February 26th, 2019.......................................................................53

D. Alliance's Conduct of Subjecting the Plaintiff to Insults, Ridicule, and Intimidation in the Workplace in Relation to Her Race and Skin Color Because She Is A Black Person Both Subjectively and Objectively Created A Racially Hostile Work Environment for the Plaintiff at Alliance.....................................................................................................................56

E. 'But For' Alliance Having a Complete Disregard for the Safety Along with the Emotional and Psychological Well-Being of the Plaintiff Because She Is A Black Person, Alliance Would Have Not Engaged in the Condonation, Approval, Encouragement, and Normalization of Schwartz' Hateful/Racist Conduct of Subjecting the Plaintiff to Racially Motivated Ridicule, Insults, and Intimidation, and Neither Would Alliance Directly Engage in the Same Conduct Against the Plaintiff.................................................................................................................59

F. Causation for the Cause of Action of 'Racially Hostile Work Environment' Against Alliance Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107(1)(a).........................................................................61

G. Plaintiff's Damages Against Alliance for this Cause of Action for 'Racially Hostile Work Environment' Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107(1)(a).........................................................................63

SECOND (2ND) CAUSE OF ACTION: 'RETALIATION MOTIVATED BY RACIAL DISCRIMINATION' AGAINST DEFENDANT ALLIANCE FOR ADVERSE ALTERATIONS TO THE TERMS AND CONDITIONS OF CONTINUED EMPLOYMENT THROUGH THE FEBRUARY 26TH, 2019 ARBITRATION AGREEMENT PURSUANT TO THE NEW YORK CITY ADMINISTRATIVE CODE § 8-107 (7) & 42 U.S.C. § 1981.......................................................................63

A. The Plaintiff is a Member of a Class of People Protected Under 42 U.S.C. § 1981 & The New York City Administrative Code § 8-107 (7).............................64

B. The Plaintiff Was Qualified to Hold the Position of Home Health Aide (Caregiver) at Alliance Pursuant to 42 U.S.C. § 1981 & the New York City Administrative Code § 8-107 (7)....................................................................65

C. The Plaintiff Was Engaged in Protected Activity Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7) and Alliance Was Aware of It...................................................................................................................66

      i.    On January 24th, 2019, February 1st, 2019, and February 13th, 2019, the Plaintiff Opposed and Complained About Schwartz' Frivolous 911 Report. This Constituted Protected Activity Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7)..............................................................................67

      ii.    On February 1st, 2019, the Plaintiff Opposed and Complained About Schwartz' Assault. This Constituted Protected Activity Pursuant to 42 U.S.C. § 1981 & the New York City Administrative Code § 8-107 (7)...............................................70

      iii.    On February 1st, 2019, the Plaintiff Opposed and Complained About Schwartz' Favorable Treatment of the Similarly Situated Caucasian Caregiver. This Constituted Protected Activity Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7).........................................................................71

      iv.    On February 1st, 2019, the Plaintiff Opposed and Complained About Schwartz' Steady Barrage of Opprobrious Racial Verbal Comments Against the Plaintiff. This Constituted Protected Activity Pursuant to 42 U.S.C. § 1981 & the New York City Administrative Code § 8-107 (7)....................................................75

D. Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7), The Plaintiff Was Subjected to An Adverse Employment Action on February 26th, 2019 When Alliance Adversely Altered the Terms and Conditions of Continued Employment for the Plaintiff Through a Mandatory Arbitration Agreement in Retaliation for the Plaintiff's Complaints and Oppositions About Racially Discriminatory Conduct in the Workplace..............................................77

E. Alliance's Retaliatory Act Against the Plaintiff Occurred Under Circumstances Demonstrating Racial Discrimination....................................................................85

F. Causation for the Cause of Action of 'Retaliation Motivated by Racial Discrimination' Against Alliance Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107(7)....................................................................86

G. Plaintiff's Damages Against Defendant Alliance for this Cause of Action for 'Retaliation Motivated by Racial Discrimination' Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7).....................................88

THIRD (3RD) CAUSE OF ACTION: 'RETALIATION MOTIVATED BY RACIAL DISCRIMINATION' AGAINST DEFENDANT ALLIANCE FOR THE WRONGFUL TERMINATION OF THE PLAINTIFF'S EMPLOYMENT PURSUANT TO THE NEW YORK CITY ADMINISTRATIVE CODE § 8-107 (7) & 42 U.S.C. § 1981..................88

A. The Plaintiff is a Member of a Class of People Protected Under 42 U.S.C. § 1981 & The New York City Administrative Code § 8-107 (7)............................89

B. The Plaintiff Was Qualified to Hold the Position of Home Health Aide (Caregiver) at Alliance Pursuant to 42 U.S.C. § 1981 & the New York City Administrative Code § 8-107 (7)..........................................................................90

C. The Plaintiff Was Engaged in Protected Activity Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7) and Alliance Was Aware of It....................................................................................................................91

    i.    On January 24th, 2019, February 1st, 2019, and February 13th, 2019, the Plaintiff Opposed and Complained About Schwartz' Frivolous 911 Report. This Constituted Protected Activity Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7).............................................................................................92

    ii.    On February 1st, 2019, the Plaintiff Opposed and Complained About Schwartz' Assault. This Constituted Protected Activity Pursuant to 42 U.S.C. § 1981 & the New York City Administrative Code § 8-107 (7)..............................................................................95

    iii.    On February 1st, 2019, the Plaintiff Opposed and Complained About Schwartz' Favorable Treatment of the Similarly Situated Caucasian Caregiver. This Constituted Protected Activity Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7)........................................................................96

    iv.    On February 1st, 2019, the Plaintiff Opposed and Complained About Schwartz' Steady Barrage of Opprobrious Racial Verbal Comments Against the Plaintiff. This Constituted Protected Activity Pursuant to 42 U.S.C. § 1981 & the New York City Administrative Code § 8-107 (7)...............................................100

D. Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7), The Plaintiff Was Subjected to An Adverse Employment Action on February 26th, 2019 When Alliance Wrongfully Terminated the Plaintiff's

Employment in Retaliation for the Plaintiff's Complaints & Oppositions and for Not Agreeing to Sign the February 26th, 2019 Arbitration Agreement..................................................................................................102

E. Alliance's Retaliatory Act Against the Plaintiff Occurred Under Circumstances Demonstrating Racial Discrimination..................................................................104

F. Causation for the Cause of Action of 'Retaliation Motivated by Racial Discrimination' Against Alliance Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107(7)..................................................................106

G. Plaintiff's Damages Against Defendant Alliance for this Cause of Action for 'Retaliation Motivated by Racial Discrimination' Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7)...................................107

FOURTH (4TH) CAUSE OF ACTION: 'INTERFERENCE WITH PROTECTED RIGHTS MOTIVATED BY RACIAL DISCRIMINATION' AGAINST DEFENDANT ALLIANCE PURSUANT TO THE NEW YORK CITY ADMINISTRATIVE CODE § 8-107 (19)........................................................................................................107

A. The Plaintiff is a Member of a Class of People Protected Under the New York City Administrative Code § 8-107 (19)..............................................................108

B. The Plaintiff Was Qualified to Hold the Position of Home Health Aide (Caregiver) at Alliance Pursuant to the New York City Administrative Code § 8-107 (19)..................................................................................................109

C. The Plaintiff Was Engaged in Protected Activity Pursuant to the New York City Administrative Code § 8-107 (7) and Alliance Was Aware of It...............110

i.     On January 24th, 2019, February 1st, 2019, and February 13th, 2019, the Plaintiff Opposed and Complained About Schwartz' Frivolous 911 Report. This Constituted Protected Activity Pursuant to the New York City Administrative Code § 8-107 (7)......................111

ii.    On February 1st, 2019, the Plaintiff Opposed and Complained About Schwartz' Assault. This Constituted Protected Activity Pursuant to the New York City Administrative Code § 8-107 (7)............................................................................................114

iii.   On February 1st, 2019, the Plaintiff Opposed and Complained About Schwartz' Favorable Treatment of the Similarly Situated Caucasian Caregiver. This Constituted Protected Activity Pursuant to the New York City Administrative Code § 8-107 (7)............115

iv.     On February 1st, 2019, the Plaintiff Opposed and Complained About Schwartz' Steady Barrage of Opprobrious Racial Verbal Comments Against the Plaintiff. This Constituted Protected Activity Pursuant to the New York City Administrative Code § 8-107 (7)..........................................................................................119

D. Pursuant to the New York City Administrative Code § 8-107 (19), Alliance Interfered with the Plaintiff's Protected Right Under the New York City Administrative Code § 8-107 (7) to Complain and Oppose About Racially Discriminatory Conduct in the Workplace By Threatening to Withhold Continued Employment for the Plaintiff at Alliance With the Intent of Coercing and Intimidating the Plaintiff Into Signing the February 26th, 2019 Arbitration Agreement in Furtherance of Alliance's Condonation of Schwartz' Malicious and Hateful/Racist Conduct Against the Plaintiff......................................................121

E. Causation for the Cause of Action of 'Interference with Protected Rights Motivated by Racial Discrimination' Against Alliance Pursuant to the New York City Administrative Code § 8-107 (19)..............................................................125

F. Plaintiff's Damages Against Defendant Alliance for this Cause of Action for 'Interference with Protected Rights Motivated by Racial Discrimination' Pursuant to the New York City Administrative Code § 8-107 (19)...................................126

FIFTH (5TH) CAUSE OF ACTION: 'RACIAL DISCRIMINATION' AGAINST DEFENDANT ALLIANCE FOR FAILURE TO DISCLOSE THE PLAINTIFF'S EMPLOYMENT TERMINATION AND FOR FAILURE TO DISCLOSE THE PLAINTIFF'S EMPLOYMENT TERMINATION DATE PURSUANT TO 42 U.S.C. § 1981 AND THE NEW YORK CITY ADMINISTRATIVE CODE 8-107 (1)(A)..........127

A. The Plaintiff is a Member of a Class of People Protected Under 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (1)(a)....................128

B. The Plaintiff Was Qualified to Hold the Position of Home Health Aide (Caregiver) at Alliance Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (1)(a)...................................................................129

C. Alliance's Malicious Conduct of Intentionally, Knowingly, and Willfully Failing to Disclose that the Plaintiff's Employment Was Terminated and Alliance's Failure to Disclose the Plaintiff's Termination Date Constituted an Adverse Employment Action...............................................................................130

D. Alliance's Adverse Employment Action Occurred Under Circumstances Demonstrating Race Discrimination...................................................................132

E. Causation for the Cause of Action of 'Racial Discrimination' Against Alliance Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107(1)(a)................................................................................................135

F. Plaintiff's Damages Against Alliance for this Cause of Action for 'Racial Discrimination' Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107(1)(a)......................................................................136

SIXTH (6ᵀᴴ) CAUSE OF ACTION: 'RETALIATION MOTIVATED BY RACIAL DISCRIMINATION' AGAINST DEFENDANT ALLIANCE FOR FAILURE TO DISCLOSE THE PLAINTIFF'S EMPLOYMENT TERMINATION AND FOR FAILURE TO DISCLOSE EMPLOYMENT TERMINATION DATE PURSUANT TO THE NEW YORK CITY ADMINISTRATIVE CODE § 8-107 (7) & 42 U.S.C. § 1981........................................................................................................................136

A. The Plaintiff is a Member of a Class of People Protected Under 42 U.S.C. § 1981 & The New York City Administrative Code § 8-107 (7)................................................................................................................................138

B. The Plaintiff Was Qualified to Hold the Position of Home Health Aide (Caregiver) at Alliance Pursuant to 42 U.S.C. § 1981 & the New York City Administrative Code § 8-107 (7).........................................................................139

C. The Plaintiff Was Engaged in Protected Activity Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7) and Alliance Was Aware of It...............................................................................................................140

 i. On January 24ᵗʰ, 2019, February 1ˢᵗ, 2019, and February 13ᵗʰ, 2019, the Plaintiff Opposed and Complained About Schwartz' Frivolous 911 Report. This Constituted Protected Activity Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7)......................................................................................141

 ii. On February 1ˢᵗ, 2019, the Plaintiff Opposed and Complained About Schwartz' Assault. This Constituted Protected Activity Pursuant to 42 U.S.C. § 1981 & the New York City Administrative Code § 8-107 (7)........................................................................144

 iii. On February 1ˢᵗ, 2019, the Plaintiff Opposed and Complained About Schwartz' Favorable Treatment of the Similarly Situated Caucasian Caregiver. This Constituted Protected Activity Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7)..................................................................145

 iv. On February 1ˢᵗ, 2019, the Plaintiff Opposed and Complained About Schwartz' Steady Barrage of Opprobrious Racial Verbal

Comments Against the Plaintiff. This Constituted Protected
Activity Pursuant to 42 U.S.C. § 1981 & the New York City
Administrative Code § 8-107 (7).................................................149

D. Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7), the Plaintiff Was Subjected to Adverse Employment Action Because Alliance Deliberately Failed to Disclose the Plaintiff's Employment Termination Along with Her Employment Termination Date in Retaliation for the Plaintiff's Complaints and Oppositions About Racially Discriminatory Conduct in the Workplace and For the Plaintiff Not Agreeing to Sign the February 26th, 2019 Arbitration Agreement......................................................................................151

E. Alliance's Retaliatory Conduct Against the Plaintiff Occurred Under Circumstances Demonstrating Race Discrimination...........................................154

F. Causation for the Cause of Action of 'Retaliation Motivated by Racial Discrimination' Against Alliance Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107(7)..................................................................157

G. Plaintiff's Damages Against Defendant Alliance for this Cause of Action for 'Retaliation Motivated by Racial Discrimination' Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7)...................................158

SEVENTH (7TH) CAUSE OF ACTION: 'DISABILITY DISCRIMINATION' AGAINST DEFENDANT ALLIANCE PURSUANT TO THE NEW YORK CITY ADMINISTRATIVE CODE § 8-107 (28)....................................................................158

A. The Plaintiff is a Member of a Class of People Protected Under the New York City Administrative Code § 8-107 (28)..............................................................159

B. The Plaintiff Was Qualified to Hold the Position of Home Health Aide (caregiver) at Alliance Pursuant to the New York City Administrative Code § 8-107 (28).............................................................................................................160

C. Pursuant to the New York City Administrative Code § 8-107 (28), Alliance Was Aware that the Plaintiff Developed a Disability and This Disability Caused the Plaintiff to Oppose and Complain About it to Alliance.................................162

D. Pursuant to the New York City Administrative Code § 8-107 (28), Alliance Engaged in Disability Discrimination by Failing to Engage in a Good Faith Dialogue to Attempt to Determine a Reasonable Accommodation for the Plaintiff's Disability..............................................................................................165

E. Causation for the Cause of Action of 'Disability Discrimination' Against Alliance, Pursuant to the New York City Administrative Code § 8-107 (28)..........................................................................................................168

F. Plaintiff's Damages Against Defendant Alliance for the Cause of Action of 'Disability Discrimination' Pursuant to the New York City Administrative Code § 8-107 (28)...........................................................................................................169

EIGHTH (8TH) CAUSE OF ACTION: 'DEPRIVATION OF CONSTITUTIONAL RIGHT TO BE FREE OF INVOLUNTARY SERVITUDE MOTIVATED BY RACIAL DISCRIMINATION' AGAINST DEFENDANT ALLIANCE PURSUANT TO THE 13TH AMENDMENT OF THE UNITED STATES CONSTITUTION & 42 U.S.C. § 1981...............................................................................................................169

A. The Plaintiff is a Member of a Class of People Protected Under the 13th Amendment of the United States Constitution and 42 U.S.C. § 1981.................171

B. The Plaintiff Was Qualified to Hold the Position of Home Health Aide (Caregiver) at Alliance........................................................................................172

C. The Plaintiff Was Subject to the Penalties of Patient Abandonment/Neglect Laws...............................................................................................................173

D. Pursuant to the 13th Amendment of the United States Constitution, Alliance Maliciously, Intentionally, Knowingly, and Willfully Used Patient Neglect/Abandonment Penal Laws to Compel/Coerce the Plaintiff to Remain on the Schwartz Home Care Assignment Against the Plaintiff's Will..................................................................................................................175

E. Alliance's Malicious and Intentional Conduct of Depriving the Plaintiff of Her Constitutional Right to Be Free of Involuntary Servitude Constituted an Adverse Employment Action Which Occurred Under Circumstances Giving Rise to An Inference of Racial Discrimination....................................................................187

F. Causation for the Cause of Action of 'Deprivation of Constitutional Right to Be Free of Involuntary Servitude Motivated by Racial Discrimination' Pursuant to the 13th, Amendment of the United States Constitution and 42 U.S.C. § 1981...............................................................................................................191

G. Plaintiff's Damages Against Defendant Alliance for this Cause of Action for 'Deprivation of Constitutional Right to Be Free of Involuntary Servitude Motivated by Racial Discrimination' Pursuant to the 13th Amendment of the United States Constitution and 42 U.S.C. § 1981...............................................192

NINTH (9TH) CAUSE OF ACTION: 'DISPARATE TREATMENT' AGAINST DEFENDANT ALLIANCE PURSUANT TO 42 U.S.C. § 1981 AND THE NEW YORK CITY ADMINISTRATIVE CODE § 8-107 (1)(A)........................................................193

A. The Plaintiff is a Member of a Class of People Protected Under 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (1)(a)....................194

B. The Plaintiff Was Qualified to Hold the Position of Home Health Aide (Caregiver) at Alliance Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (1)(a)..................................................................195

C. Alliance's Malicious Conduct of Intentionally, Knowingly, and Willfully depriving the Plaintiff of her Constitutional Right to Enforce Her Contractual Relationship with Alliance on the Same Footing as the Caucasian 'White' Caregiver Constituted an Adverse Employment Action.....................................196

    i.       January 23rd, 2019........................................................................196

    ii.      January 24th, 2019........................................................................201

    iii.     February 1st, 2019........................................................................202

    iv.     February 26th, 2019.....................................................................203

D. Causation for the Cause of Action of 'Disparate Treatment' Against Alliance Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107(1)(a)..........................................................................................................207

E. Plaintiff's Damages Against Alliance for this Cause of Action for 'Disparate Treatment' Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107(1)(a)...............................................................................................208

VII. BRIEF DESCRIPTION OF PLAINTIFF'S PAIN AND SUFFERING: SEVERE EMOTIONAL DISTRESS, MENTAL ANGUISH (PSYCHOLOGICAL TRAUMA), AND RELATED PHYSICAL AILMENTS.........................................................................209

VIII. PRAYER FOR RELIEF.........................................................................................211

IX. DEMAND FOR JURY TRIAL...............................................................................212

X. VERIFICATION.....................................................................................................212

**UNITED STATES DISTRICT COURT**
**FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**
**MANHATTAN DIVISION**

| | |
|---|---|
| **SHERLY CADET,** ) | **CASE NO.** |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| ) | **PLAINTIFF'S COMPLAINT** |
| **-v-** ) | **WITH REQUEST FOR JURY** |
| ) | **TRIAL** |
| ) | |
| **ALLIANCE NURSING STAFFING OF NEW YORK,** ) | |
| **INC.** ) | |
| ) | |
| ) | |
| **Defendant** ) | |
| ) | |

     **GREETINGS,** to the Honorable District Court of the United States in the Southern

District of New York (Manhattan Division). The Plaintiff, Sherly Cadet, humbly and respectfully

presents her complaint to the Hon. Court against Defendant Alliance Nursing Staffing of New

York, Inc. for civil rights violations, in connection with the Plaintiff's employment with the

Defendant, as follows:

## I. INTRODUCTION

    1.     The Plaintiff's race is Black and the Plaintiff's skin color is Black.

    2.     The Plaintiff was employed by Alliance Nursing Staffing of New York, Inc.

(Alliance) as a home health aide (caregiver) from July 2018 until February 26th, 2019. The

Plaintiff's work function was to provide Alliance's home care clients/patients with assistance

with their activities of daily living (ADL's) inside their home. The Plaintiff worked for Alliance from the 252 W 37th Street, Suite 600W, New York, NY 10018 location.

3.      Alliance Nursing Staffing of New York, Inc. is self-described as a Licensed Home Care Services Agency (LHCSA), licensed and authorized to operate by the State of New York. Alliance provides home care services. Alliance's office is located at 252 W 37th Street, Suite 600W, New York, NY 10018. Alliance has two LHCSA licenses: 1570L001 & 1570L002.

4.      Joan C. Schwartz was a home care client of Alliance. Schwartz was a Caucasian (White) woman. Schwartz requested assistance with her activities of daily living (ADL's) for January 24th, 2019 from 9am to 9pm and for January 25th, 2019 from 9am to 9pm. Schwartz resided at 945 5th Ave, Apt 16A, New York, NY 10021.

5.      On January 23rd, 2019, Alliance intentionally, maliciously, knowingly, and willfully provided the Plaintiff an adverse work assignment when Alliance assigned the Plaintiff to work on the Schwartz home care case for January 24th, 2019 and January 25th, 2019 from 9am to 9pm on both days, as it was well known to Alliance that Schwartz had a pattern of engaging in racially motivated malicious conduct targeted against Black caregivers or people of color because Schwartz did not want Black caregivers or people of color inside her apartment.

6.      The January 25th, 2019 work shift never came to fruition because shortly after the Plaintiff arrived at Schwartz' apartment at 9am on January 24th, 2019, Schwartz engaged in a steady barrage of opprobrious racial verbal comments, a violent assault, along with a frivolous 911 report against the Plaintiff out of malice and hatred/racism because Schwartz did not want the Plaintiff inside her apartment because she is a Black person.

7.      Prior to Schwartz' assault and frivolous 911 report against the Plaintiff, Schwartz verbally expressed a preference for a Caucasian caregiver who was at Schwartz' apartment for

the overnight shift (the Plaintiff was on the morning shift) because the Caucasian caregiver's skin color and race are White and Schwartz also expressed a dislike for the Plaintiff along with other people like the Plaintiff, meaning Black caregivers or people of color.

8.      Subsequent to these events, the Plaintiff made Alliance aware of Schwartz' malicious and hateful/racist conduct against her, yet Alliance engaged in the full condonation, normalization, approval, and encouragement of Schwartz' malicious and hateful/racist conduct in the workplace by Alliance repeatedly telling the Plaintiff that "it's fine" that Schwartz engaged in the frivolous 911 report against the Plaintiff. Additionally, albeit Alliance would go on to admit to the Plaintiff that Schwartz was motivated by "hatred" targeted against Black caregivers or people of color, Alliance told the Plaintiff to "accept" the fact that she was victimized in the workplace because of her skin color and race as a Black person and that the Plaintiff needed to "literally just keep it moving". Alliance's condonation of Schwartz' malicious and hateful/racist conduct constituted adverse employment action which occurred under circumstances demonstrating racial discrimination.

9.      After the Plaintiff sent a letter to Alliance on February 13th, 2019 (exhibit F) to inform the company that she could no longer continue with her work duties at Alliance as the work environment was abusive and intolerable and because the Plaintiff developed psychological trauma as a result of Schwartz' malicious conduct, which included the frivolous 911 report, Alliance engaged in adverse employment action against the Plaintiff by altering the terms and conditions of the Plaintiff's work environment at Alliance through a mandatory arbitration agreement.

10.     On February 26th, 2019, Alliance sent the Plaintiff an arbitration agreement (exhibit H) which stated that signing it was a term and condition of continued employment at

Alliance. When the Plaintiff did not agree to sign the arbitration agreement, Alliance terminated the Plaintiff's employment on the same day of February 26th, 2019, in fact, within hours of sending the Plaintiff the arbitration agreement. This termination constituted an adverse employment action.

11.     After terminating the Plaintiff's employment, Alliance did not even bother to communicate to the Plaintiff that her employment was terminated from Alliance and neither did Alliance disclose the Plaintiff's termination date, as Alliance was required to do under New York State Labor law, which further demonstrates that Alliance had an illicit intent when Alliance terminated the Plaintiff's employment on February 26th, 2019. Based on all the circumstances, it is clear that this illicit intent was racial discrimination.

### i.     Preliminary Statement of Claims Against Alliance

12.     The Plaintiff is bringing a cause of action for 'Racially Hostile Work Environment', pursuant to 42 U.S.C. § 1981 and New York City Administrative Code § 8-107(1)(a), for Alliance's malicious act of intentionally, willfully, and knowingly subjecting the Plaintiff to ridicule, humiliation, and insults in relation to her skin color and race because she is a Black person, as Alliance engaged in the full condonation, normalization, encouragement, and approval of Schwartz' malicious and hateful/racist conduct of subjecting the Plaintiff to ridicule and insults through a steady barrage of opprobrious racial verbal comments, and intimidation through the assault and the frivolous 911 report. Furthermore, Alliance's employees also directly engaged in racially motivated ridicule, insults, and intimidation against the Plaintiff in relation to the Schwartz home care assignment because the Plaintiff's skin color and race are Black. These adverse employment actions adversely altered the Plaintiff's work environment at Alliance and they occurred under circumstances demonstrating racial discrimination.

13.     The Plaintiff is bringing a cause of action for 'Retaliation' against Alliance, pursuant to 42 U.S.C. § 1981 and New York City Administrative Code § 8-107(7), for Alliance adversely altering the terms and conditions of the Plaintiff's work environment through the February 26th, 2019 arbitration agreement in retaliation for the Plaintiff's complaints and oppositions about racially discriminatory conduct in the workplace. The arbitration agreement required the Plaintiff to sign it as a condition of continued employment. Furthermore, the arbitration agreement required the Plaintiff to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace. This adverse employment action occurred under circumstances demonstrating racial discrimination.

14.     The Plaintiff is bringing a cause of action for 'Retaliation' against Alliance, pursuant to 42 U.S.C. § 1981 and New York City Administrative Code § 8-107(7), for Alliance wrongfully terminating the Plaintiff's employment in retaliation for the Plaintiff's complaints and oppositions about racially discriminatory conduct in the workplace and for the Plaintiff not agreeing to sign the February 26th, 2019 arbitration agreement. This adverse employment action occurred under circumstances demonstrating racial discrimination.

15.     The Plaintiff is bringing a cause of action for 'Interference with protected rights' against Alliance, pursuant to New York City Administrative Code § 8-107(19), for Alliance's act of engaging in coercion and intimidation through the arbitration agreement to force the Plaintiff to sign the February 26th, 2019 arbitration agreement. Alliance set forth this coercion and intimidation by threatening not to allow the Plaintiff to continue with her employment at Alliance if the Plaintiff did not agree to sign the arbitration agreement. Alliance ultimately made good on the coercion and intimidation set forth in the February 26th, 2019 arbitration agreement by subsequently terminating the Plaintiff's employment later in the day of February 26th, 2019

for the Plaintiff not signing the arbitration agreement. This adverse employment action occurred under circumstances demonstrating racial discrimination.

16.     The Plaintiff is bringing a cause of action for 'Racial Discrimination' against Alliance, pursuant to 42 U.S.C. § 1981 and New York City Administrative Code § 8-107(1)(a), for Alliance's act of intentionally, maliciously, knowingly, and willfully failing to inform the Plaintiff that her employment was terminated from Alliance and for Alliance failing to inform the Plaintiff of her termination date in writing, as required under New York State Labor law. This constituted adverse terms and conditions of employment as being informed of her employment termination along with being notified in writing of her employment termination date were part of the terms and conditions of employment for the Plaintiff at Alliance. This adverse employment action occurred under circumstances demonstrating racial discrimination.

17.     The Plaintiff is bringing a cause of action for 'Retaliation' against Alliance, pursuant to 42 U.S.C. § 1981 and New York City Administrative Code § 8-107(7), for Alliance's act of intentionally, maliciously, knowingly, and willfully failing to inform the Plaintiff that her employment was terminated from Alliance and for Alliance failing to inform the Plaintiff of her termination date in writing, as required under New York State Labor law. Alliance subjected the Plaintiff to this adverse term and condition of employment in retaliation for the Plaintiff's complaints and oppositions about racially discriminatory conduct in the workplace and for the Plaintiff not agreeing to sign the February 26th, 2019 arbitration agreement. This retaliatory act by Alliance occurred under circumstances demonstrating racial discrimination as it was in furtherance of Alliance's condonation of Schwartz' malicious and hateful/racist conduct in the workplace, targeted against Black caregivers or people of color.

18.     The Plaintiff is bringing a cause of action for 'Disability Discrimination' against Alliance, pursuant to New York City Administrative Code § 8-107(28), for Alliance's failure to engage in a cooperative dialogue with the Plaintiff to attempt to reasonably accommodate the psychological trauma (disability) the Plaintiff developed as a result of being subjected to Schwartz' malicious and hateful/racist conduct on January 24th, 2019, which includes Schwartz' frivolous 911 report.

19.     The Plaintiff is bringing a cause of action for 'Involuntary Servitude Motivated by Racial Discrimination' against Alliance, pursuant to the 13th Amendment of the United States Constitution and 42 U.S.C. § 1981, for Alliance's act of intentionally, maliciously, knowingly, and willfully depriving the Plaintiff of her Constitutional right to be free of involuntary servitude by concealing Schwartz' pattern of malicious and hateful/racist conduct targeted against Black caregivers or people of color prior to assigning the Plaintiff to the Schwartz home care assignment, and by Alliance subsequently using legal coercion, through patient abandonment/neglect laws, to force the Plaintiff to work on the Schwartz home care assignment against the Plaintiff's will after Schwartz engaged in the racially motivated frivolous 911 report against the Plaintiff on January 24th, 2019. This adverse employment action by Alliance against the Plaintiff occurred under circumstances giving rise to an inference of racial discrimination.

20.     The Plaintiff is bringing a cause of action for 'Disparate Treatment' against Alliance, pursuant to 42 U.S.C § 1981 and the New York City Administrative Code § 8-107(1)(a), for Alliance maliciously, intentionally, knowingly, and willfully subjecting the Plaintiff to less favorable work conditions in comparison to a Caucasian 'White' caregiver on the Schwartz home care assignment and for Alliance intentionally, maliciously, knowingly, and willfully depriving the Plaintiff of her Constitutional right to enforce her contractual relationship

with Alliance on the same footing as the Caucasian 'White' caregiver. These constituted adverse

employment actions which occurred under circumstances giving rise to an inference of racial

discrimination.

    **ii.**    **Summary of Introduction**

    21.    All of the foregoing matters described herein subjected the Plaintiff to adverse

employment actions which left the Plaintiff with severe economic damages, severe emotional

distress, mental anguish (psychological trauma), and physical ailments.

    22.    But for the Plaintiff's skin color and race being Black, Alliance would have not

subjected the Plaintiff to adverse employment actions in the workplace.

## II. JURISDICTION AND VENUE

    23.    The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28

U.S.C § 1367. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1)(2).

## III. PARTIES OF THE CASE

    24.    The Plaintiff herein, Sherly Cadet, is a resident of the state of New York. Sherly

Cadet has her mailing address set as P.O. Box. 390, New York, NY 10040.

    25.    The Defendant herein, Alliance Nursing Staffing of New York, Inc. has a

principal place of business at 252 W 37th Street, Suite 600W, New York, NY 10018.

## IV. DESCRIPTION OF EXHIBITS

    26.    The Plaintiff is submitting exhibits A, B, C, D, E, F, G, and H in support of this

legal action.

    27.    Exhibit A is a recorded conversation (by the Plaintiff) between the Plaintiff and

Holly (care manager from Alliance) from January 24th, 2019, on the day of the incidents on the

Schwartz home care assignment.

28.    Exhibit B is another recorded conversation (by the Plaintiff) between the Plaintiff and Holly (care manager from Alliance) from January 24th, 2019, on the day of the incidents on the Schwartz home care assignment.

29.    Exhibit C is a recorded conversation (by the Plaintiff) between the Plaintiff and Ashley (care manager from Alliance) from February 1st, 2019, one week after the January 24th, 2019 incidents on the Schwartz home care assignment.

30.    Exhibit D is a recorded conversation (by the Plaintiff) between the Plaintiff and Ashley (care manager from Alliance) from January 23rd, 2019, one day before the January 24th, 2019 incidents on the Schwartz home care assignment.

31.    Exhibit E is a document from the New York State Department of Health which states that the Plaintiff's employment was terminated by Alliance on February 26th, 2019.

32.    Exhibit F is a letter the Plaintiff sent to Alliance on February 13th, 2019 giving Alliance notice that the Plaintiff intended on suspending her duties at Alliance as a result of being subjected to a frivolous 911 report in the workplace. This letter was sent to Susan Sugarman, who is another care manager at Alliance, and Susan Sugarman forwarded the Plaintiff's letter to Amanda Frey (Director of Human Resources at Alliance).

33.    Exhibit G is an email from the director of human resources from Alliance, Amanda Frey. This email is dated February 26th, 2019. This email from Alliance was in response to the Plaintiff's February 13th, 2019 letter (exhibit F). This February 26th, 2019 email claimed that Alliance wanted to resolve the Schwartz incident internally at Alliance with the Plaintiff as an employee of Alliance. This February 26th, 2019 email was accompanied by an arbitration agreement.

34.     Exhibit H is the arbitration agreement which was attached to the email in exhibit G. This arbitration agreement offered the Plaintiff continued employment as consideration for signing the arbitration agreement. The arbitration agreement required the Plaintiff to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace as a term and condition of continued employment .

## V. FACTS OF THE CASE

35.     The Plaintiff worked for Alliance from their location at 252 W 37th Street, Suite 600W, New York, NY 10018 from July 2018 to February 26th, 2019.

36.     The Plaintiff maintained a stellar work record of excellent home care services for both the elderly and the young with Alliance.

37.     On January 23rd, 2019 Ashley (care manager from Alliance) contacted the Plaintiff by phone to assign her the Schwartz home care assignment for Thursday, January 24th, 2019 from 9am to 9pm and for Friday, January 25th, 2019 from 9am to 9pm (see exhibit D).

38.     Notably, nowhere in exhibit D does Ashley (care manager from Alliance) discloses the material fact that Schwartz had a long pattern, over more than 2 years, of targeting Black people or people of color, who were similarly situated as the Plaintiff as caregivers, with malicious conduct, which included frivolous 911 reports motivated by hatred/racism against this class of people. If Alliance had disclosed this material fact to the Plaintiff, the Plaintiff as a Black person would have decisively rejected this home care assignment.

39.     On the following day, Thursday, January 24th, 2019, the Plaintiff went to Schwartz' apartment to provide her with home care services on behalf of Alliance. The Plaintiff was working in the capacity of home health aide (caregiver) at the apartment of Joan Schwartz

located at 945 5th Ave, Apt 16A, New York, NY 10021 at the time of the incidents described

herein.

40.     The Plaintiff's home care assignment with Schwartz was to begin from 9AM and

was to end at 9PM on Thursday, January 24th, 2019. The home care appointment was to follow

the same plan on Friday, January 25th, 2019 from 9AM to 9PM. Yet, the home care assignment

for January 25th, 2019 never came to fruition due to Schwartz' intentional, malicious, and

hateful/racist acts against the Plaintiff on January 24th, 2019.

41.     When the Plaintiff arrived at Joan Schwartz's apartment building a few minutes

before 9am on January 24th, 2019, Schwartz' two lobby security officers/attendants informed

Schwartz' apartment via phone. On this call, the person who answered the phone asked for the

Plaintiff to come up to Schwartz' apartment which was on the 16th floor.

42.     Upon entering the apartment, the Plaintiff met with the overnight caregiver who

greeted the Plaintiff warmly. The description of the overnight caregiver is as follows: Caucasian,

brown hair, green eyes, about 5 feet and 5 inches tall, about 160lbs, wearing purple scrubs. The

overnight caregiver walked the Plaintiff to Joan Schwartz' bedroom and introduced the Plaintiff

to Joan Schwartz.

43.     Once Joan Schwartz laid eyes on the Plaintiff, Joan Schwartz made a grimace,

placed her hand over her face, and turned away from the Plaintiff; a gesture which demonstrated

Schwartz' disgust with the Plaintiff at first sight. This was in fact a demonstration of racial

animus against the Plaintiff as Schwartz was very courteous to the Caucasian caregiver, yet

Schwartz reacted adversely with disgust and contempt once Schwartz saw the Plaintiff.

44.     Upon visual inspection by the Plaintiff, Schwartz appeared fully alert, lucid, and

coherent. Schwartz courteously asked the Caucasian caregiver if she would be coming back later

11

by stating "Are you coming back tonight sweetheart?", to which the Caucasian responded that it was up to Alliance if she would be coming back again. Schwartz then asked the Plaintiff to wait in the living room. The overnight caregiver exited the apartment and the Plaintiff, took a seat in the living room.

45.     Shortly after, Joan Schwartz emerged from the bedroom and she angrily told the Plaintiff that she was getting breakfast and that the Plaintiff did not need to follow her. Schwartz ambulated on her own, with a light use of her walking cane. Albeit Alliance states that Schwartz is 88 years old, Schwartz was an extremely well-functioning elderly woman. The Plaintiff did not notice any serious signs of infirmity in Schwartz, such as limping, struggling to ambulate, etc.

46.     Schwartz immediately proceeded to the kitchen and the Plaintiff observed Schwartz prepare toast (with butter and jam) and tea (hot food); both of which require alertness, lucidity, coordination, and organization. Making her own breakfast so meticulously is a clear indication that Schwartz had complete awareness and control of her environment and her actions on January 24th, 2019. Subsequent to having breakfast, Schwartz went back to her bedroom demonstrating that Schwartz was oriented.

47.     A short while later, the Plaintiff hears Schwartz screaming loudly at which point the Plaintiff knocked on the door and entered the bedroom as keeping an eye on a home care client is part of the Plaintiff's duties as a caregiver. Upon entering the bedroom, the Plaintiff noticed that Joan Schwartz was on the telephone having a conversation with someone.

48.     The conversation revolved around opprobrious racial verbal comments about the Plaintiff's appearance and falsely stating that the Plaintiff is unable to complete her work due to her appearance, stating that the Plaintiff looks like a 'little girl' and a 'schoolgirl'.

49.     The Plaintiff reasonably believes that this comment about the Plaintiff looking like a little girl and a schoolgirl was directly related to the Plaintiff's race and skin color, as a Black person, as terms such as 'little girl' or 'school girl' are historically terms used by Caucasians to diminish Black women, and to erroneously demonstrate Black women's inferior mental abilities, such as Schwartz implying that the Plaintiff had the character, demeanor, or the intelligence of a little girl or a school girl, because the Plaintiff is a Black person.

50.     The Plaintiff smiled to Joan Schwartz and asked if she wanted anything. Joan Schwartz angrily looked at the Plaintiff, rolled her eyes as to dismiss the presence of the Plaintiff and proceeded to make additional opprobrious racial verbal comments about the Plaintiff's appearance, including (but not limited to) calling the Plaintiff 'hideous', and stating that the Plaintiff looks like a 'dead body'.

51.     This pattern of conversation was intended by Schwartz to racially diminish, humiliate, insult, and ridicule the Plaintiff because the Plaintiff is a Black person.

52.     In that same moment, Schwartz told the Plaintiff that she did not want the Plaintiff to stay on the home care assignment because her overnight caregiver was a "White girl" (as Schwartz called her) and because she was a "White girl" Schwartz stated that she got along with the overnight caregiver (meaning because of the Caucasian caregiver's skin color and race), and Schwartz stated that she does not like the Plaintiff, or other aides like the Plaintiff (meaning Black people or people of color).

53.     Schwartz also added in that moment that Alliance knows exactly the type of people she (Schwartz) wants Alliance to send, and Schwartz asked the Plaintiff in that same moment: "Why did they send you?"

54.    These statements from Schwartz demonstrated racial animus against the Plaintiff, as a Black person, because Schwartz specifically stated a preference for "White" caregivers and subsequently acted out with malice and hatred/racism against the Plaintiff based upon that preference, which included Schwartz' subsequent assault with the walking cane and the frivolous 911 report.

55.    The Plaintiff said nothing and went back to the living room. A short while later, Joan Schwartz re-emerged from her bedroom and stated to the Plaintiff that the Plaintiff's face was making her nauseous and the Plaintiff should go sit in a corner where Schwartz could not see her face.

56.    The Plaintiff responded to Joan Schwartz by stating that she could not go sit in a corner because she was there to provide professional home care services. Joan Schwartz angrily responded by stating that she was going to call the police if the Plaintiff would not sit in the corner as instructed.

57.    Immediately after Schwartz made this threat against the Plaintiff, at about half-past 12pm on January 24th, 2019, the Plaintiff observed Joan Schwartz swing her walking cane in the Plaintiff's direction. The Plaintiff immediately took evasive action by taking a step back and the cane swung by Joan Schwartz barely missed the Plaintiff's head.

58.    Immediately after the assault, Schwartz quickly walked over to a phone Schwartz had hanging on a wall, and the Plaintiff observed Schwartz dialing 911. The Plaintiff also noticed that Schwartz was holding paper with the Plaintiff's name, Sherly Cadet, written on it as Schwartz read the Plaintiff's name to the police from the paper. The fact that Schwartz had the Plaintiff's name written down demonstrates that Schwartz was not only organized, but Schwartz' frivolous 911 report was premeditated, meaning that Schwartz specifically intended on calling

14

the police on the Plaintiff when Schwartz came out of her bedroom, with the intent of causing the Plaintiff to flee her apartment.

59.     Schwartz then made a false police report against the Plaintiff over the phone with the intent of racially harassing, terrorizing, and intimidating the Plaintiff. It was also done to cause the Plaintiff to feel that imminent physical and emotional danger was at hand to cause the Plaintiff to flee.

60.     On the telephone call to the police, Schwartz stated her full name, her full address, along with her apartment number. Schwartz also mentioned the Plaintiff along with Alliance. Schwartz reported to the police that the Plaintiff was at her apartment from Alliance and that she was not doing her job and as such the Plaintiff should not be inside her apartment. The worse part of the Plaintiff's ordeal was the fact that she could not simply leave the Schwartz home care assignment at will for fear of being accused of patient abandonment/neglect as the Plaintiff was instructed by Alliance at the outset of her employment that leaving a home care client, such as Schwartz, before the end of a work shift without the Plaintiff ensuring continuity of care for the home care client constitutes patient abandonment/neglect under the law.

61.     Therefore, upon hearing Schwartz filing the police report over the phone, the Plaintiff immediately called Alliance to make them aware of the situation.

62.     Alliance's care manager, 'Holly', stated the following to the Plaintiff in that moment on January 24th, 2019 at about 12:38pm (see paragraph 3 of exhibit A):

> "I'm the care manager so, it's fine, Joan does this to everyone. So, I would just go in the study, that's fine..."

15

63.     In paragraph 4 of exhibit A, the Plaintiff expressed terror to Holly (care manager from Alliance) by stating that Schwartz' conduct was done without justification. The Plaintiff stated the following in paragraph 4 of exhibit A:

"She called the police for me. Listen, I didn't do anything..."

64.     In response to the Plaintiff's complaint and opposition to Schwartz' frivolous 911 report, Alliance's care manager, 'Holly', stated the following to the Plaintiff in that moment (see paragraph 6 of exhibit A):

"She does that... No, no, no, it's fine. She calls the police every day."

65.     The Plaintiff contacted Alliance again by phone and asked Alliance if she could immediately leave because the Plaintiff felt that her life, her future, along with her daughter's future were in danger since Schwartz was making a false police report against the Plaintiff.

66.     The Plaintiff states that she felt that her daughter's future was in danger because if the Plaintiff were frivolously arrested, or severely injured by the police, due to Schwartz' frivolous 911 report, the Plaintiff's daughter would lose her mother as Schwartz' malicious and hateful/racist act would cause the Plaintiff to be taken away from her. This was a very traumatic situation for the Plaintiff.

67.     After again expressing to Holly (care manager from Alliance) that she (the Plaintiff) felt severely threatened by Schwartz' malicious behavior, Holly authorized the Plaintiff to leave the apartment and wait in the lobby.

68.     The Plaintiff immediately and quickly exited Schwartz' apartment leaving all her belongings inside the apartment, which included her umbrella and lunch. Since the Plaintiff was on the 16th floor where Schwartz' apartment was located, the Plaintiff took the elevator down to the lobby of Schwartz' building.

16

69.     Upon arriving in the lobby, two (2) lobby attendants/security officers immediately informed the Plaintiff that Joan Schwartz just called them from her apartment and told them to immediately escort the Plaintiff out of the building, at which point the Plaintiff told the security officers that she left her belongings inside Schwartz' apartment. The two security officers told the Plaintiff that she could not wait in the lobby, she had to wait outside of the building, in the rain.

70.     In that moment, the Plaintiff called Holly (care manager from Alliance) again to tell her that Schwartz ordered her lobby attendants/security officers to remove her from the lobby. This conversation is demonstrated in exhibit B, which was recorded on January 24th, 2019 at about 12:43pm.

71.     In paragraph 3 of exhibit B, Holly (care manager from Alliance) stated the following to the Plaintiff:

"Yes. Are you down in the lobby?"

72.     In paragraph 4 of exhibit B, the Plaintiff responds by stating:

"I'm in the lobby, but she called the lobby and she said no, I have to leave the building, don't stay in the lobby."

73.     As the Plaintiff was having this conversation with Holly (care manager from Alliance) in exhibit B, the Plaintiff was being ushered out the door by Schwartz' lobby security guards/attendants. The Plaintiff had to stand outside in the soaking rain as she waited for one of the security/lobby attendants to go upstairs, retrieve the items from Schwartz' apartment, come back down, and hand them to the Plaintiff.

74.     By that time, the Plaintiff was out in the rain, humiliated and in shock. Once the security officer released the items to the Plaintiff, she immediately walked away from the building.

75.     A short while later, the police arrived at Schwartz's apartment, according to Alliance (see paragraphs 22-25 of exhibit C).

76.     All the events described in this complaint occurred between about 9AM and about 1PM, within only about 4 hours from the beginning of the Plaintiff's shift on January 24th, 2019 at 9am. During this period of time, Schwartz intentionally and maliciously terrorized the Plaintiff out of hatred/racism because Schwartz did not want Black caregivers or people of color, like the Plaintiff, inside her apartment.

77.     Subsequent to these events of January 24th, 2019, about one (1) week after the incidents on the Schwartz home care assignment, Alliance's care manager, Ashley, contacted the Plaintiff by phone on February 1st, 2019 at 9:50am (exhibit C) to give her an update on the Schwartz incident of January 24th, 2019.

78.     In paragraph 26 of exhibit C, Ashley (care manager from Alliance) stated the following to the Plaintiff about Schwartz' behavior:

> "I just want you to know, I mean, of course like I said it's a scary experience when that happens and then you're like: "Did I do something wrong", like, "What did I do?" But you did absolutely nothing wrong. Alliance knows it. We've had this client for over 2 years. She has been, um, very challenging…"

79.     In paragraph 27 of exhibit C. the Plaintiff stated to Ashley (care manager from Alliance) that she believes that Schwartz' conduct against her was intentional and was motivated

by racism as Schwartz was obviously not confused in her conduct against the Plaintiff on
January 24th, 2019:

> "But I see she doing everything by herself, she went to the kitchen, make tea,
> make toast, by herself. And I see she never forget anything. She just do
> everything like she never got sick. So maybe she has a, she just, in the beginning
> got sick but she is not that sick sick [sic] cause she not like for age dementia, I
> don't know how to say that but basically I'm glad you called cause I was confused
> about the situation because I have been working with patients with dementia, they
> never act like that. They can be racist, they something like "I don't like you, blah,
> blah, blah (sic)" but call the police on me or try to beat you (Inaudible) don't do
> that to me."

80.     Notably, in paragraph 27 of exhibit C, the Plaintiff also informed Ashley that she
had experienced multiple instances of racially opprobrious verbal comments in the workplace at
Alliance in the past, yet the Schwartz home care case was the first time that a home care client
actually tried to physically assault her or call the police against her:

> "I'm glad you called cause I was confused about the situation because I have been
> working with patients with dementia, they never act like that. They can be racist,
> they something like "I don't like you, blah, blah, blah (sic)" but call the police on
> me or try to beat you (Inaudible) don't do that to me."

81.     In paragraph 28 of exhibit C, Ashley (care manager from Alliance) confirmed that
the Plaintiff was assaulted by Schwartz on January 24th, 2019:

> "Did she try to hit you?"

82.     In paragraph 29 of exhibit C, the Plaintiff confirmed that she was in fact assaulted by Schwartz on January 24th, 2019. Furthermore, the Plaintiff complained and opposed about the fact that there was a Caucasian caregiver at Schwartz' apartment when she arrived on January 24th, 2019, and that Schwartz stated a preference for the Caucasian caregiver because of her race and skin color as a White person, and the Plaintiff also complained and opposed about the fact that Schwartz stated a dislike for the Plaintiff along with other people like the Plaintiff, meaning Black people or people of color:

> "Yes, she tried to hit me and basically she just the first (Inaudible), the first step, the first, she just saw me and make a face. That's the first thing she did when she saw me, she just make a face and cover her face that she don't want me to stay cause the night aide was a White girl, she got along with her, that's what she said and me and other aides like me, she doesn't, she don't like me, I make her... She told me I'm a little girl, she keep calling me "little girl", "school girl" and I'm 33."

83.     In paragraph 31 of exhibit C, Ashley (care manager from Alliance) agreed with the Plaintiff that there was an unfavorable difference between the way Schwartz treated the Caucasian caregiver in comparison to the way Schwartz treats Black caregivers or people of color because Alliance usually only assigns non-Caucasians, meaning Black caregivers or people of color, to the Schwartz home care assignment and that Schwartz acts out of "hatred" against this class of people, in comparison to the favorable way Schwartz treated the Caucasian caregiver especially since this was the Caucasian caregiver's first time on the Schwartz home care assignment. In paragraph 31 of exhibit C, Ashley (care manager from Alliance) stated the following to the Plaintiff:

20

"So, the nurse that was there the night before that (inaudible) she was actually covering on the case too that was her first shift, um, but regularly during the night we have two LPN's, um, so Brenda, um, she works, ah, Sunday through Thursday and then we have Carline that works Friday and Saturday, um, nights, and they both are not Caucasian. So, I know that probably when you showed up that's what you thought and maybe that's what she thought at the moment but just to let you know, um, we don't have any, um, really Caucasian people on that case... you can get someone who completely agitated and has all this hatred in them. And unfortunately that is what we are dealing with Mrs. Schwartz."

84.     In paragraph 39 of exhibit C, Ashley (care manager from Alliance) explained to the Plaintiff that these Black caregivers or people of color repeatedly call Alliance to complain and oppose Schwartz' pattern of malicious and hateful/racist conduct, which included Schwartz' daily frivolous 911 reports targeted against this class of people:

"... and trust me, I'm so used to hearing caregivers and nurses and, you know, LPN's, RN's, they tell me what their experiences are with this woman and I listen to them, and we talk through it…".

85.     In paragraph 33 of exhibit C, Ashley (care manager from Alliance) engaged in the full condonation, normalization, encouragement, and approval of Schwartz' behavior by telling the Plaintiff to "accept" the fact that she was subjected to malicious conduct in the workplace, based on her skin color and race as a Black person, and to "literally just keep it moving":

"I just wanted to let you know there is a major history with this case… You know, kind of, If I were you, I would just, you know, just kind of accept it, and process it however you need to, you know... and then literally just keep it moving".

21

86.     Based on the Plaintiff's conversation with Holly (care manager from Alliance) in exhibit A and the Plaintiff's conversation with Ashley (care manager from Alliance) in exhibit C, the Plaintiff understood that Alliance had extensive prior knowledge of Schwartz' pattern of engaging in malicious conduct targeted against Black caregivers or people of color out of hatred, yet Alliance intentionally and maliciously concealed this information from the Plaintiff when Alliance was assigning the Plaintiff the Schwartz home care assignment on January 23rd, 2019 at 11:18am (see exhibit D).

87.     The fact that Alliance did not promise to take any corrective action but instead told the Plaintiff to "accept" what Schwartz did to her and to "keep it moving", albeit Alliance admitted in paragraph 31 of exhibit C that Schwartz was motivated by "hatred", demonstrated to the Plaintiff that Alliance was actively condoning, encouraging, normalizing, and approving malicious and hateful/racist conduct targeted against Black caregivers and people of color in the workplace.

88.     The Plaintiff was left psychologically traumatized by Schwartz' malicious and hateful/racist conduct of subjecting the Plaintiff to an assault and immediately following up that attack with a frivolous 911 report. Moreover, the Plaintiff's psychological trauma was a direct result of Alliance's condonation, encouragement, normalization, and approval of Schwartz' malicious and hateful/racist conduct targeted against Black caregivers or people of color.

89.     Based on all of the foregoing, the Plaintiff had to suspend her duties at Alliance because the working conditions became dangerous, intolerable, and abusive for the Plaintiff, as a Black person, as the Plaintiff was now required to "accept" violent racism in the workplace as a term and condition of employment at Alliance and to "literally just keep it moving".

90.     On February 13th, 2019, the Plaintiff sent Alliance a letter by email (see exhibit F). In this letter, the Plaintiff complained that Schwartz' frivolous 911 report on January 24th, 2019 caused her to develop psychological trauma. Furthermore, the Plaintiff stated that Schwartz' frivolous 911 report made her realize how dangerous the work environment was at Alliance. The Plaintiff made this statement because it was Alliance's encouragement, condonation, approval, and normalization of Schwartz' malicious and hateful/racist conduct that caused the Plaintiff to develop psychological trauma.

91.     In the February 13th, 2019 letter (exhibit F), the Plaintiff gave Alliance a 2-week notice for another home care client she was assigned to prior to being assigned to the Schwartz home care assignment. The home care client's name was Mr. Portera. The Plaintiff's supervisor (care manager) at Alliance for Mr. Portera was Susan Sugarman (care manager from Alliance). Subsequently, Susan Sugarman forwarded the Plaintiff's February 13th, 2019 letter to Amanda Frey who is the Director of Human Resources at Alliance.

92.     The Plaintiff stated as follows in the February 13th, 2019 letter (exhibit F):

"I would like to start this letter by expressing my appreciation for your support during the time of my employment with your company. It is with sadness that I must say that I do not feel that I can continue with my duties at Alliance since the day Ms. Schwartz called the police on me for no reason. I have been very traumatized by the event and it made me realize how dangerous this job can be. When a home health aide goes to a patient's apartment, it is a serious risk for the aide as the patient can choose to do harm to me; as Ms. Schwartz did. Therefore, I am giving you my 2 week notice for my current case with Mr. Portera because I want to end in a professional way with Alliance Home Care; and I feel a sense of

responsibility toward my current patient. Again, I would like to express my thanks to Alliance home care."

93.     Notably, the Plaintiff did not set a date for leaving Alliance in the February 13th, 2019 letter. The Plaintiff was simply informing Alliance that she intended on suspending her duties at Alliance as a result of her adverse experience on the Schwartz home care assignment. The Plaintiff started the process of suspending her work duties at Alliance by giving Alliance a 2-week notice for her current patient at the time (Mr. Portera), with the understanding that Alliance would have a professional and good faith conversation with the Plaintiff to see if any corrective action could be taken by Alliance.

94.     This conversation never happened as Amanda Frey (Director of Human Resources at Alliance) would go on to personally choose a termination date for the Plaintiff, which was February 26th, 2019, without consulting the Plaintiff about what she wanted to do and out of racial discrimination because Alliance had a complete disregard for the Plaintiff because she is a Black person and as such Alliance did not see the Plaintiff worthy of any type of good faith or professional conversation. Alliance compelled the Plaintiff's employment termination, or, in plain words, Alliance pushed the Plaintiff out of her employment out of malice and racism.

95.     In response to the Plaintiff's complaints and oppositions about Schwartz' malicious and hateful/racist conduct, Amanda Frey, director of human resources at Alliance, sent the Plaintiff an email on February 26th, 2019 (exhibit G). This email was accompanied by an arbitration agreement (exhibit H).

96.     The email stated that Alliance was offering the Plaintiff an option to resolve her grievances internally at Alliance. In order to do so, the email stated that Alliance was proposing

that the Plaintiff sign an arbitration agreement. The February 26th, 2019 email (exhibit G) stated as follows:

> "As a Company, Alliance Homecare is committed to hearing any employee concerns and trying to address them internally. As such, if you have any concerns, please bring them to myself or the HR department and we will look into and make efforts to address them.
>
> To further demonstrate our commitment to addressing employee concerns, we are providing employees with the opportunity to have an independent and neutral person review and make a decision about disputes with are not resolved internally. This would occur in an arbitration in accordance with the linked Arbitration Agreement. Please review the Agreement carefully (click here: Arbitration Agreement) and sign when you have had the opportunity to review and consider it. You will receive a copy for your records once it is signed. Again, to read and sign the Arbitration Agreement please click here: Arbitration Agreement."

97.     Yet, as soon as the Plaintiff opened the attachment of the email (exhibit G), which was the arbitration agreement (exhibit H), it was soon clear to the Plaintiff that not only was Alliance adversely altering the terms and conditions of continued employment for the Plaintiff at Alliance, but Alliance was also actively engaging in coercion against the Plaintiff through the February 26th, 2019 arbitration agreement.

98.     As a term and condition of continued employment for the Plaintiff at Alliance, the arbitration agreement required the Plaintiff to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace.

99.     The email was from Amanda Frey's email address and the arbitration agreement was signed by Amanda Frey. Therefore, it is clear that whatever adverse employment action which resulted from the arbitration agreement was adverse employment action taken directly by Amanda Frey (Director of Human Resources at Alliance) against the Plaintiff after she complained and opposed about being subjected to Schwartz' malicious and hateful/racist behavior in the workplace.

i.      **The February 26th, 2019 Arbitration Agreement Was Mandatory.**

100.    In paragraph 1 of the arbitration agreement, Alliance stated the following about the arbitration agreement being mandatory:

> "Mandatory Arbitration. Company and Employee agree that any Claim (that term defined below), complaint, or dispute that arises out of or relates in any way to the Parties' employment relationship or termination of that relationship, whether based in contract, tort, federal, state, or municipal statute, fraud, misrepresentation, or any other legal theory, shall be submitted to binding arbitration under the terms and procedures as set forth in this Agreement. Except as provided herein, the Parties agree not to initiate or prosecute any lawsuit or administrative action involving any Claims (as defined below), but rather to submit such disputes to binding arbitration."

101.    Paragraph 1 of the arbitration clearly states that this arbitration agreement was mandatory for the Plaintiff.

102.    Moreover, paragraph 1 of the February 26th, 2019 arbitration agreement made it clear that this arbitration agreement would be a permanent adverse alteration of the terms,

conditions, and privileges of employment for the Plaintiff at Alliance as it stated this arbitration agreement applied to "any claim, complaint, or dispute".

103.    The February 26th, 2019 arbitration agreement was not specifically targeted to resolve the Schwartz home care assignment incident. Instead, it was targeted at permanently changing the terms and conditions of employment for the Plaintiff at Alliance where the Plaintiff would no longer have the right to bring legal action against Alliance for any discriminatory conduct in the workplace.

104.    Alliance's February 26th, 2019 arbitration agreement (exhibit H) was severely and permanently impactful to the Plaintiff's employment due to its broad scope of alterations to the terms and conditions of employment for the Plaintiff at Alliance.

105.    Next, in paragraph 2 of Alliance's February 26th, 2019 arbitration agreement (exhibit H), Alliance stated that in order for the Plaintiff to continue working at Alliance, the Plaintiff must agree to the arbitration agreement. Alliance stated the following in paragraph 2 of the arbitration agreement:

> "Consideration... Employee understands that if Employee is currently employed by the Company, Employee's continued employment with the Company is consideration for Employee's acceptance of this Agreement."

106.    It is clear that paragraph 2 of this mandatory arbitration agreement from Alliance absolutely required the Plaintiff to agree to the terms and conditions of the arbitration agreement as a condition of continued employment at Alliance.

107.    The foregoing is true because, in the making of a contract, a party to the contract cannot offer the opposing party something of value in consideration if that thing of value being offered belonged to the opposing party to begin with.

108.    In the sense of Alliance and the Plaintiff, Alliance could not legally offer the Plaintiff continued employment at Alliance as consideration for the Plaintiff agreeing to the arbitration agreement if the Plaintiff's continued employment were already guaranteed. It was the fact that Alliance planned on terminating the Plaintiff later that same day of February 26th, 2019, if the Plaintiff did not agree to the arbitration agreement, that made Alliance offer the Plaintiff continued employment as consideration for agreeing to the arbitration agreement.

109.    Since the Plaintiff's continued employment was no longer guaranteed, it could now be offered as consideration for the arbitration agreement. That is why Alliance offered the Plaintiff's continued employment as consideration for the Plaintiff signing the arbitration agreement.

110.    Which means, Alliance was only going to extend the privilege of employment to the Plaintiff if, and only if, the Plaintiff agreed to the arbitration agreement. In exchange for the Plaintiff's agreement, the thing of value Alliance was offering to the Plaintiff was continued employment. As such, the Plaintiff not agreeing to the arbitration agreement meant no continued employment at Alliance.

111.    Being that agreeing to a mandatory arbitration agreement was absolutely not part of the original terms, conditions, and privileges of employment for the Plaintiff when she started working at Alliance in July 2018, the February 26th, 2019 mandatory arbitration agreement adversely changed the terms, conditions, and privileges of employment for the Plaintiff at Alliance as the main goal of the arbitration agreement was to take away the Plaintiff's Constitutional right to bring legal action against Alliance for any racially discriminatory conduct in the workplace, which included the incidents on the Schwartz home care assignment.

112.     Subsequently, on that same day of February 26th, 2019, because the Plaintiff did not agree to the adverse alteration of the terms, conditions, and privileges of employment set forth in the arbitration agreement, Alliance terminated the Plaintiff's employment on that same date of February 26th, 2019 (see exhibit E).

### ii.     As A Term & Condition of Continued Employment, Alliance Required the Plaintiff to Relinquish Her Constitutional Right to Bring Legal Action Against Alliance for Racially Discriminatory Conduct in the Workplace.

113.     Alliance requiring the Plaintiff to give up her constitutional right to bring legal action against Alliance as a term and condition of continued employment for the Plaintiff at Alliance was made clear in paragraph 6 of the arbitration agreement where Alliance stated the following:

> "Waiver of Trial by Jury. The Parties understand and fully agree that by entering into this Agreement to arbitrate; they are giving up their constitutional right to have a trial by jury, and are giving up their normal rights of appeal following the rendering of the arbitrator's award except as applicable law provides for judicial review of arbitration proceedings."

114.     The Court should respectfully understand that there was no "agreement" set forth in the arbitration agreement. It was a mandatory document (see paragraph 1 of the arbitration agreement) which the Plaintiff was being forced to agree to as a condition of continued employment at Alliance (see paragraph 2 of the arbitration agreement).

115.     In paragraph 17 of the mandatory arbitration agreement, Alliance stated the following:

> "Voluntary Agreement. By executing this Agreement, the Parties represent that they have each been given the opportunity to fully review, and comprehend the

terms of this Agreement. The Parties understand that they are each giving up the rights to: (1) pursue claims against the other in court; (2) pursue claims through class, collective, or any other representative action; and (3) to have those claims decided by a jury. The Parties understand the terms of this Agreement and freely and voluntarily sign it."

116.    Albeit here, in paragraph 17 of the arbitration agreement, Alliance claims that this was a "voluntary agreement", in paragraph 1 of the arbitration agreement, Alliance clearly stated that this was a "mandatory" arbitration agreement. Alliance stated in paragraph 17 of the arbitration that signing the agreement was voluntary; yet it was voluntary in the sense that the Plaintiff could voluntarily choose to sign or not sign it, but not signing would mean the Plaintiff's termination. In all, Alliance was telling the Plaintiff 'no signature, no job'.

117.    Additionally, in paragraph 2 of the arbitration agreement, the arbitration agreement stated that agreeing to the arbitration agreement is a term and condition of continued employment for the Plaintiff at Alliance:

"Consideration... Employee understands that if Employee is currently employed by the Company, Employee's continued employment with the Company is consideration for Employee's acceptance of this Agreement."

118.    Paragraph 2 of the arbitration agreement basically explained that 'Continued Employment' is what Alliance was offering the Plaintiff for agreeing to the arbitration agreement. Because the Plaintiff did not agree to sign the arbitration agreement on that same day of February 26th, 2019, Alliance terminated the Plaintiff's employment (see exhibit E).

119.    If the Plaintiff did not have the option to decline the arbitration agreement without also relinquishing her right to continued employment at Alliance, the arbitration agreement was

not voluntary, it was instead "mandatory" if the Plaintiff wanted to continue to work at Alliance, as stated in paragraph 1 of the arbitration agreement. The fact that this arbitration was mandatory is demonstrated by the fact that Alliance terminated the Plaintiff, later that same day of February 26th, 2019, for not agreeing to the arbitration agreement.

120.    The arbitration agreement constituted an ultimatum, coercion, and intimidation. The Plaintiff was basically being told by Amanda Frey (Director of Human Resources at Alliance) that the Plaintiff must keep quiet about the malicious and hateful/racist conduct the Plaintiff was subjected to on the Schwartz home care assignment on January 24th, 2019 along with any other future racially discriminatory conduct in the workplace, otherwise, the Plaintiff would not be allowed to continue with her employment at Alliance.

121.    This was a permanent alteration of the terms, conditions, and privileges of employment for the Plaintiff at Alliance as this arbitration agreement did not only apply to the discriminatory incidents on the Schwartz home care assignment, but this arbitration agreement also applied to any future discriminatory incidents relating to the Plaintiff's employment at Alliance.

### iii.    As A Term & Condition of Continued Employment, Alliance Required the Plaintiff to Relinquish Specific Constitutional Rights Relating to Racially Discriminatory Conduct in the Workplace.

122.    In paragraph 3 of the arbitration agreement, Alliance makes it clear what constitutional rights Alliance was requiring the Plaintiff to relinquish as a condition of continued employment at Alliance:

> "Claims Covered by this Agreement. This Agreement to arbitrate covers all grievances, disputes, claims, or causes of action that otherwise could be brought in a federal, state, or local court under applicable federal, state, or local laws,

31

arising out of or relating to Employee's employment with the Company and the termination thereof... The Claims covered by this Agreement include, but are not limited to, claims for... wrongful termination (constructive or actual), claims for discrimination, harassment, or retaliation... national origin... medical condition, including... psychological condition, mental condition... disability... or any other trait or characteristic protected by federal, state, or local law, claims for violation of any federal, state, local or other governmental law, statute, regulation, or ordinance, including, but not limited to, all claims arising under... the Civil Rights Act of 1991, Sections 1981 and 1983 of U.S.C. Title 42... the New York State Human Rights Law, the New York Labor Laws, the New York Civil Rights Laws, the New York City Human Rights Laws, any claims under the New York City Administrative Code."

123.    Based on paragraph 3 of the February 26th, 2019 arbitration agreement (exhibit H), it is clear that Alliance specifically sought to take away the key protections afforded to the Plaintiff under local, state, and federal laws in relation to racially discriminatory conduct in the workplace. These laws include the following, as stated in paragraph 3 of the arbitration agreement --- "the Civil Rights Act of 1991, Sections 1981 and 1983 of U.S.C. Title 42... the New York State Human Rights Law, the New York Labor Laws, the New York Civil Rights Laws, the New York City Human Rights Laws, any claims under the New York City Administrative Code."

124.    This mandatory arbitration agreement was simply unconscionable because Alliance was requiring the Plaintiff to sign a document as a term and condition of continued employment at Alliance, where the Plaintiff would have to relinquish her constitutional rights, as

32

a Black person, after the Plaintiff complained and opposed racial discrimination in the workplace.

125.    Moreover, Alliance had been actively condoning, encouraging, approving, and normalizing Schwartz' malicious behavior against Black people or people of color for over 2 years (see paragraphs 26, 33, and 39 of exhibit C & paragraphs 3 and 6 of exhibit A). This mandatory arbitration agreement was in furtherance of Alliance's condonation of Schwartz' hateful/racist conduct against the Plaintiff, as a Black person.

126.    Alliance sought to take away the Plaintiff's constitutional right to bring legal action for future discriminatory incidents in the workplace with the intent of discouraging the Plaintiff from opposing and complaining about racism in the workplace at the time and in the future, especially since the Plaintiff would be aware that she no longer had any legal recourse in a court of law.

127.    Alliance wanted to chill any intent the Plaintiff may have had to bring legal action against Alliance by threatening to withhold continued employment for the Plaintiff at Alliance if the Plaintiff did not agree to relinquish her constitutional rights.

128.    The February 26th, 2019 arbitration agreement clearly demonstrates consciousness of guilt by Alliance as but for Alliance believing that the company engaged in racially discriminatory conduct against the Plaintiff, because she is a Black person, Alliance would have never sent the Plaintiff the arbitration agreement requiring the Plaintiff to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace.

129.    Alliance knew that they had been condoning, approving, encouraging, and normalizing Schwartz' hateful/racist conduct, which includes Schwartz' pattern of engaging in

frivolous 911 reports against Black people or people of color. As such, Amanda Frey (Director of Human Resources at Alliance) swiftly moved to take away the Plaintiff's constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace.

      **iv.**    **Alliance Wrongfully Terminated the Plaintiff's Employment.**

130.    Later in the day on that same date of February 26th, 2019 that Alliance sent the Plaintiff the arbitration agreement (exhibit H), Amanda Frey (Director of Human Resources at Alliance) terminated the Plaintiff's employment without notice because the Plaintiff did not agree to sign the arbitration agreement.

131.    Furthermore, Amanda Frey (Director of Human Resources at Alliance) did not disclose the Plaintiff's employment termination date orally or in writing, as Amanda Frey was required to do pursuant to New York State Labor Law § 195(6).

132.    As such, it is clear that Alliance had an illicit intent in terminating the Plaintiff's employment on February 26th, 2019. This illicit intent was both racial discrimination and to punish the Plaintiff for her complaints and oppositions about being subjected to a steady barrage of opprobrious verbal racial comments, an assault, a frivolous 911 report, and less favorable working conditions in comparison to a similarly situated Caucasian caregiver because of the Plaintiff's skin color and race as a Black person.

133.    Furthermore, the illicit intent was also to punish the Plaintiff for not agreeing to sign the February 26th, 2019 arbitration agreement as the Plaintiff's employment was terminated within hours of Alliance sending the Plaintiff the February 26th, 2019 arbitration agreement by email.

      **v.**    **The Plaintiff Was Similarly Situated as the Caucasian Caregiver on January 24th, 2019 & the Plaintiff Was Also Similarly Situated as the Black Caregivers Who Were Previously Targeted by Schwartz with Malicious and Hateful/Racist Conduct.**

134.    The Plaintiff, as a caregiver, was similarly situated as the Caucasian caregiver on January 24th, 2019. The Plaintiff relieved the Caucasian caregiver from her work shift on the Schwartz home care assignment at 9am on January 24th, 2019. The Plaintiff had the same work duties as the Caucasian caregiver on the Schwartz home care assignment, which was to provide Schwartz with assistance with her activities of daily living (ADL's).

135.    The Plaintiff had the same supervisor as the Caucasian caregiver, and that supervisor was Ashley (care manager from Alliance). Both the Plaintiff and the Caucasian caregiver engaged in the same conduct in relation to the Schwartz home care assignment, and that was to provide Schwartz with professional home care services.

136.    Since the Caucasian caregiver was filling in on the Schwartz home care assignment between 9pm on Wednesday, January 23rd, 2019 and 9am on January 24th, 2019 as this was the Caucasian's first time on the Schwartz home care assignment and being that night work shifts were usually assigned to Black caregivers or people of color who were routinely targeted by Schwartz with malicious and hateful/racist conduct, such as frivolous 911 reports (see paragraph 31 of exhibit C and paragraphs 3 & 6 of exhibit A), it is therefore clear that the Plaintiff was also similarly situated as the prior Black caregivers or people of color who were previously targeted by Schwartz for harm.

137.    In all, it is clear that the Plaintiff was similarly situated, in all material respects, in relation to the Caucasian 'White' caregiver who was at Schwartz' apartment upon the Plaintiff's arrival on the Schwartz home care assignment at 9am on January 24th, 2019 and the Plaintiff was also similarly situated as the Black caregivers or people of color who were previously targeted by Schwartz for harm because of their race and skin color.

**VI. CLAIMS**

35

# FIRST (1ST) CAUSE OF ACTION:

## 'RACIALLY HOSTILE WORK ENVIRONMENT'

## AGAINST DEFENDANT ALLIANCE PURSUANT TO 42 U.S.C. § 1981 AND THE NEW YORK CITY ADMINISTRATIVE CODE § 8-107 (1)(A)

138.     The Plaintiff repeats and reasserts the allegations of paragraphs 1 through 137 as though fully set forth herein.

139.     The following describes and supports the cause of action of *'Racially Hostile Work Environment'* against Alliance Nursing Staffing of New York, Inc. pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (1)(a).

140.     Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (1)(a), Alliance maliciously, intentionally, knowingly, and willfully subjected the Plaintiff to racially motivated insults, ridicule, and intimidation in relation to the Schwartz home care assignment because the Plaintiff is a Black person.

141.     Alliance subjected the Plaintiff to racially motivated ridicule, insults, and intimidation by assigning the Plaintiff to the Schwartz home care assignment on January 23rd, 2019 (see exhibit D) as Alliance was well aware of Schwartz' history of racial hostilities targeted against Black caregivers or people of color, and Alliance subsequently condoned, normalized, approved, and encouraged  Schwartz' steady barrage of opprobrious racial verbal comments, Schwartz' assault, along with Schwartz' frivolous 911 report against the Plaintiff. Additionally, through Alliance's condonation of Schwartz' malicious and hateful/racist conduct, Alliance also directly subjected the Plaintiff to insults, ridicule, and intimidation in relation to her skin color and race as a Black person.

142.     Alliance's conduct against the Plaintiff unreasonably interfered with the Plaintiff's work duties at Alliance as these acts of racially motivated ridicule, insults, and intimidation against the Plaintiff were motivated by malice and racial discrimination because the Plaintiff is a Black person. Alliance's racially motivated adverse employment actions against the Plaintiff created an intolerable, abusive, and racially discriminatory work environment for the Plaintiff at Alliance, which was ultimately demonstrated by Alliance's wrongful termination of the Plaintiff's employment.

143.     But for the Plaintiff being a Black person, Alliance would have not engaged in these adverse employment actions against the Plaintiff.

**A. The Plaintiff is a Member of a Class of People Protected Under 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (1)(a).**

144.     The Plaintiff's race is Black and the Plaintiff's skin color is Black.

145.     42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (1)(a) make it unlawful for Alliance to create an abusive and racially discriminatory work environment for the Plaintiff, as a Black person, by intentionally subjecting the Plaintiff to intimidation, ridicule, and insults in the workplace based on her skin color and race.

146.     Since the Plaintiff's race is Black, her skin color is Black, and the Plaintiff was subjected to a racially hostile work environment by Alliance in relation to her skin color and race as a Black person, the Plaintiff is part of a protected class of people under 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (1)(a).

**B. The Plaintiff Was Qualified to Hold the Position of Home Health Aide (Caregiver) at Alliance Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (1)(a).**

147.    The Plaintiff was qualified to hold her position of home health aide (caregiver) at Alliance.

148.    The Plaintiff was certified and registered with the New York State Department of Health as a home health aide (a caregiver) of Alliance Nursing Staffing of New York, Inc. during her employment with Alliance.

149.    Indeed, Alliance itself, repeatedly complimented the Plaintiff on her excellent work record with Alliance.

150.    In paragraph 26 of exhibit C, Ashley (care manager from Alliance) stated the following:

> "... um, you know, I just want you to know, I mean, of course like I said it's a scary experience when that happens and then you're like: "Did I do something wrong", like, "What did I do?" But you did absolutely nothing wrong. Alliance knows it. We've had this client for over 2 years. She has been, um, very challenging."

151.    In paragraph 33 of exhibit C Ashley (care manager from Alliance) stated the following to the Plaintiff:

> "... you know, in careers we go through these moments, where there are these experiences, where you think that "is this really what I'm supposed to do?" But I've heard nothing but good things about you as a caregiver and don't let this ruin your career, you know, or your choice in staying as a caregiver... and know that you do a good job and that, you, people do love your performance."

152.    In paragraph 35 of exhibit C, Ashley (care manager from Alliance) stated the following to the Plaintiff:

"... but honestly, you are good at what you do and please just don't give up that's

all."

153.    In paragraph 39 of exhibit C, Ashley (care manager from Alliance) stated the

following to the Plaintiff:

"but if I were you I would just keep doing what you're doing you know, and don't

give up that client that loves you."

154.    As such, it is clear that the Plaintiff was qualified to hold the position of home

health aide (caregiver) at Alliance.

**C. Alliance Maliciously, Intentionally, Knowingly, and Willfully Subjected the Plaintiff to Insults, Ridicule, and Intimidation in Relation to Her Skin Color and Race Because the Plaintiff Is A Black Person.**

    **i.      January 23rd, 2019**

155.    On January 23rd, 2019 (exhibit D), Ashley (care manager from Alliance)

contacted the Plaintiff to assign her the Schwartz home care assignment.

156.    Albeit Ashley (care manager from Alliance) was fully aware of the fact that

Schwartz had a long pattern of engaging in malicious conduct targeted against Black caregivers

or people of color, such as frivolous 911 reports, out of "hatred" (see paragraphs 26, 31, 33, and

39 of exhibit C), Ashley not only failed to disclose this material fact to the Plaintiff prior to

assigning her to the Schwartz home care assignment, but Ashley (care manager from Alliance)

intentionally, maliciously, knowingly, and willfully provided the Plaintiff with an unfavorable

job assignment on the Schwartz home care assignment as Ashley was aware that Schwartz would

engage in malicious conduct against the Plaintiff based on her skin color and race as a Black

person.

157.    Therefore, it is clear that any ridicule, insults, and intimidation the Plaintiff was subjected to on the Schwartz home care assignment on January 24th, 2019 was the direct result of Alliance intentionally, maliciously, knowingly, and willfully subjecting the Plaintiff to adverse working conditions on the Schwartz home care assignment through Alliance's long term condonation, encouragement, normalization, and approval of Schwartz' pattern of malicious and hateful/racist conduct targeted against Black caregivers or people of color, long before Alliance assigned the Plaintiff to the Schwartz home care assignment.

158.    Alliance's long-term condonation, normalization, encouragement, and approval of Schwartz' malicious and hateful/racist conduct targeted against Black caregivers or people of color demonstrates that Ashley (care manager from Alliance) acted with a complete disregard for the safety along with the emotional and psychological well-being of the Plaintiff when Ashley assigned the Plaintiff to the Schwartz home care assignment as Ashley was well aware of the fact that Schwartz was targeting caregivers out of hatred based on their skin color and race as Black caregivers or people of color.

159.    Based on all of the foregoing, it is clear that Alliance's conduct of intentionally, maliciously, knowingly, and willfully assigning the Plaintiff to the adverse job assignment with Schwartz was severe enough to alter the terms and conditions of the Plaintiff's work environment as assigning the Plaintiff to the Schwartz home care assignment demonstrated a complete disregard for the safety along with the emotional and psychological well-being of the Plaintiff because she is a Black person, as Alliance was well aware that it would be the Plaintiff's skin color and race, as a Black person, that would cause Schwartz to engaged in malicious conduct against the Plaintiff, which includes Schwartz' long pattern of engaging in frivolous 911 reports against Black caregivers or people of color.

160.    Alliance deliberately delivered the Plaintiff, as a Black person, to Schwartz for harm, which demonstrates Alliance's intent to harm the Plaintiff by assigning her to the Schwartz home care assignment. The foregoing demonstrates that Alliance intentionally, maliciously, knowingly, and willfully subjected the Plaintiff to ridicule, insults, and intimidation on the Schwartz home care assignment under circumstances giving rise to an inference of racial discrimination.

**ii.    January 24th, 2019**

161.    On January 24th, 2019, in paragraphs 3 and 6 of exhibit A, Holly (care manager from Alliance) repeatedly stated that "it's fine" that Schwartz engaged in the frivolous 911 report against the Plaintiff because Schwartz does the same to "everyone", meaning Black caregivers or people of color (see paragraph 31 of exhibit C), and that Schwartz engages in this type of behavior against these Black caregivers or people of color "everyday".

162.    These statements from Holly (care manager at Alliance), within moments of Schwartz' frivolous 911 report against the Plaintiff, were insulting to the Plaintiff, as a Black person, as Alliance knew full well that Schwartz' conduct against her on January 24th, 2019 was motivated by hatred/racism, yet Holly (care manager from Alliance) was repeatedly telling the Plaintiff that "it's fine" that the Plaintiff was subjected to such malicious and hateful/racist conduct in the workplace.

163.    Furthermore, in paragraph 3 of exhibit A, Holly (care manager from Alliance) told the Plaintiff to go sit in Schwartz' "study" to wait for the police to arrive. This statement from Holly subjected the Plaintiff ridicule, as a Black person, as Alliance knew full well that Schwartz' frivolous 911 report was motivated by hatred and this frivolous 911 report had the real potential of causing the Plaintiff's arrest or even severe physical injury or death, yet Holly told

the Plaintiff to go sit in Schwartz' study to wait for the police to arrive as if a confrontation between the Plaintiff and the police was an inconsequential or trivial matter.

164.    After the Plaintiff complained again to Holly (care manager from Alliance) that she was severely terrorized by Schwartz' frivolous 911 report, Holly (care manager from Alliance) told the Plaintiff to go wait down in the lobby. Upon arriving in the lobby of Schwartz' apartment building, Schwartz' two lobby attendants/security guards told the Plaintiff that she could not stay in the lobby because Schwartz had called them, while the Plaintiff was coming down on the elevator from the 16th floor where Schwartz lives, and Schwartz told them to remove the Plaintiff from the lobby once the Plaintiff gets off the elevator.

165.    Once the lobby attendants/security guards told the Plaintiff to leave the lobby, the Plaintiff immediately called Holly (care manager from Alliance) to make her aware of the situation. Exhibit B is a conversation between Holly and the Plaintiff in that moment on January 24th, 2019, when the Plaintiff was down in Schwartz' apartment building lobby.

166.    In paragraph 2 of exhibit B, the Plaintiff started her part of the conversation by confirming that she was speaking to a representative at Alliance. The Plaintiff stated the following:

“Ah Yes, is this Alliance?”

167.    In paragraph 3 of exhibit B, Holly (care manager from Alliance) answered in the affirmative to the Plaintiff's question, and also asked the Plaintiff if she was in the lobby:

“Yes. Are you down in the lobby?”

168.    It is therefore clear that Holly (care manager from Alliance) was representing that whatever statements she made to the Plaintiff in both exhibit A and B were statements being made on behalf and at the direction of Alliance.

169.    In paragraph 4 of exhibit B, the Plaintiff confirmed that she was in the lobby yet Schwartz' lobby attendants/security guards were telling the Plaintiff to leave the lobby immediately. The Plaintiff stated the following to Holly (care manager from Alliance) in paragraph 4 of exhibit B:

"I'm in the lobby, but she called the lobby and she said no, I have to leave the building, don't stay in the lobby."

170.    Albeit the Plaintiff stated to Holly (care manager from Alliance), in paragraph 4 of exhibit B, that Schwartz' lobby attendants/security guards were telling the Plaintiff to leave the lobby, Holly (care manager from Alliance) was urging the Plaintiff to remain in the lobby. Holly (care manager from Alliance) stated the following in paragraph 6 of exhibit B:

"No, you can stay in the lobby. If you could just tell the doorman, if you could just tell the doorman what's going on, just say, you know, I'm here taking care of Joan, she's having…"

171.    In paragraph 7 of exhibit B, the Plaintiff interrupted Holly's statement in paragraph 6 of exhibit B and the Plaintiff complained and opposed about Holly's request for the Plaintiff to remain in the lobby because the Plaintiff was being humiliated by the lobby attendants/security guards in that same moment while the Plaintiff was on the phone with Holly as Schwartz' lobby attendants/security guards were ushering the Plaintiff out of Schwartz' lobby. The Plaintiff stated the following to Holly in paragraph 7 of exhibit B:

"I, I told him…"

172.    Still, Holly (care manager from Alliance) ignored the Plaintiff's complaints and oppositions about Schwartz' lobby attendants/security guards humiliating the Plaintiff by telling her to leave Schwartz' lobby, and Holly (in paragraph 8 of exhibit B) continued to demand that

43

the Plaintiff stay in the lobby under such humiliating circumstances which was causally related to the Plaintiff's race and skin color as a Black person as Alliance was well aware that Schwartz' conduct against the Plaintiff on that day of January 24th, 2019 was motivated by hatred targeted against Black caregivers or people of color.

173.    Holly (care manager from Alliance) subjected the Plaintiff to insults and ridicule by telling the Plaintiff to remain in the lobby (see paragraph 4 of exhibit B) albeit it was clear that Schwartz' demand to her lobby attendants/security guards to remove the Plaintiff from the lobby was motivated by Schwartz' pattern of malicious and hateful/racist conduct targeted against Black caregivers or people of color, such as the Plaintiff.

174.    Furthermore, Holly's demand that the Plaintiff remain the lobby subjected the Plaintiff to intimidation because Holly was already well aware (from exhibit A) that Schwartz made a frivolous 911 report against the Plaintiff and that the police were on their way to Schwartz' apartment. As such, if Holly (care manager from Alliance) had even the slightest regard for the safety along with the emotional and psychological well-being of the Plaintiff as a Black person, Holly would have not demanded that the Plaintiff remain in Schwartz' building lobby, which could have caused the Plaintiff's arrest for trespassing.

175.    The Plaintiff left Schwartz' lobby, as instructed by the lobby attendants/security guards. Notably, shortly after the Plaintiff left Schwartz' building, the police did in fact arrive at Schwartz' apartment (see paragraphs 22-25 of exhibit C).

176.    Holly (care manager from Alliance) knew full well that Schwartz' frivolous 911 report against the Plaintiff on January 24th, 2019 was motivated by "hatred" as it was well known to Alliance for over 2 years (see paragraph 26 of exhibit C) that Schwartz had a pattern of

44

engaging in malicious and hateful/racist conduct targeted against Black caregivers or people of color.

177.    In fact, Holly stated in paragraphs 3 and 6 of exhibit A that she was aware that Schwartz engages in frivolous 911 reports against caregivers "everyday" and that Schwartz does the same to "everyone", meaning Black caregivers or people of color as Ashley (care manager from Alliance) would go on to tell the Plaintiff on February 1st, 2019 that Alliance usually only assigns non-Caucasians, meaning Black caregivers or people of color, to the Schwartz home care assignment and that Schwartz usually acts out maliciously against them (see paragraph 31 of exhibit C).

178.    Moreover, Holly (care manager from Alliance) was clearly aware that Schwartz did not engage in a frivolous 911 report against the Caucasian caregiver who left Schwartz' apartment on that same morning of January 24th, 2019 upon the Plaintiff's arrival at Schwartz' apartment at 9am.

179.    As such, it is reasonable to conclude that Holly (care manager from Alliance) subjected the Plaintiff to ridicule and insults in relation to her skin color and race, because the Plaintiff is a Black person. This is a fact because Holly (care manager from Alliance) stated in paragraph 3 of exhibit A that "it's fine" that Schwartz made a frivolous 911 report against the Plaintiff because Schwartz does that to "everyone", meaning Black caregivers or people of color (see paragraph 31 of exhibit C).

180.    Any reasonable person in the Plaintiff's situation would agree that Holly (care manager from Alliance) was telling the Plaintiff that since other Black caregivers or people of color were subjected to Schwartz' malicious and hateful/racist conduct "everyday" (see

paragraph 6 of exhibit A), it is therefore "fine" for the Plaintiff, as a Black person, to be subjected to the same type of treatment by Schwartz in the workplace.

181.    Moreover, Holly's statements about "it's fine" that Schwartz engaged in the frivolous 911 report against the Plaintiff clearly demonstrates Alliance's long-term pattern of condoning, normalizing, encouraging, and approving Schwartz' malicious and hateful/racist conduct targeted against Black caregivers or people of color, such as the Plaintiff.

182.    Knowing full well that Schwartz was motivated by malice and hatred/racism when she engaged in the frivolous 911 report against the Plaintiff, Holly still repeatedly stated that "it's fine" that Schwartz engaged in this conduct and told the Plaintiff to go sit in Schwartz' study to wait for the police to arrive and Holly (care manager from Alliance) also urged the Plaintiff to remain in Schwartz' lobby under circumstances which subjected the Plaintiff to ridicule, insults, and intimidation in relation to her skin color and race as a Black person. These statements demonstrate that Alliance acted with a complete disregard for the safety along with the emotional and psychological well-being of the Plaintiff because she is a Black person.

183.    Moreover, Holly's statements exhibit A and exhibit B demonstrate that Holly engaged in the full condonation, normalization, encouragement, and approval of Schwartz' act of racial intimidation in the workplace, through the frivolous 911 report, by Holly (care manager from Alliance) repeatedly stating that "it's fine" that Schwartz engaged in the frivolous 911 report against the Plaintiff. As such, Alliance also intentionally, maliciously, knowingly, and willfully subjected the Plaintiff to racially motivated intimidation in the workplace on January 24th, 2019.

184.    Any reasonable person in the Plaintiff's position would agree that Alliance's conduct against the Plaintiff was severe enough to adversely alter the Plaintiff's work

environment as the foregoing demonstrates that Alliance intentionally, maliciously, knowingly, and willfully subjected the Plaintiff to ridicule, insults, and intimidation on the Schwartz home care assignment under circumstances giving rise to an inference of racial discrimination.

185.    Furthermore, Alliance's act of subjecting the Plaintiff to intimidation on the Schwartz home care assignment was also pervasive enough to adversely alter the terms and conditions of the Plaintiff's work environment as in paragraph 6 of exhibit A Holly (care manager from Alliance) stated that Schwartz engages in frivolous 911 reports on a daily basis against caregivers, whom the Plaintiff found out from Ashley (care manager from Alliance) were Black or people of color (see paragraph 31 of exhibit C – Feb. 1st, 2019). As such, Alliance had been condoning, normalizing, and encouraging Schwartz' malicious and hateful/racist conduct in the workplace against Black caregivers or people of color for a long time prior to assigning the Plaintiff to the Schwartz home care assignment.

### iii.    February 1st, 2019

186.    On January 24th, 2019 Schwartz subjected the Plaintiff to a steady barrage of opprobrious racial verbal comments, an assault, and a frivolous 911 report which were all motivated by malice and hatred/racism because Schwartz did not want Black caregivers inside her apartment.

187.    In paragraph 27 of exhibit C (February 1st, 2019), the Plaintiff stated the following to Ashley (care manager from Alliance):

> "But I see she doing everything by herself, she went to the kitchen, make tea, make toast, by herself. And I see she never forget anything. She just do everything like she never got sick. So maybe she has a, she just, in the beginning got sick but she is not that sick sick [sic] cause she not like for age dementia, I

don't know how to say that but basically I'm glad you called cause I was confused about the situation because I have been working with patients with dementia, they never act like that. They can be racist, they something like "I don't like you, blah, blah, blah (sic)" but call the police on me or try to beat you (Inaudible) don't do that to me."

188.    In paragraph 29 of exhibit C (February 1st, 2019), the Plaintiff stated the following to Ashley (care manager from Alliance):

"Yes, she tried to hit me and basically she just the first (Inaudible), the first step, the first, she just saw me and make a face. That's the first thing she did when she saw me, she just make a face and cover her face that she don't want me to stay cause the night aide was a White girl, she got along with her, that's what she said and me and other aides like me, she doesn't, she don't like me, I make her... She told me I'm a little girl, she keep calling me "little girl", "school girl"..."

189.    In paragraphs 27 and 29 of exhibit C (February 1st, 2019), the Plaintiff complained and opposed to Ashley (care manager from Alliance) about the fact that Schwartz subjected her to intimidation through the assault and the frivolous 911 report out of racism as Schwartz treated the Plaintiff unfavorably in comparison to the Caucasian caregiver.

190.    In paragraph 29 of exhibit C, the Plaintiff complained and opposed to Ashley (care manager from Alliance) that Schwartz verbally expressed a preference for the Caucasian caregiver, because of her skin color and race as a White person, and the Plaintiff also complained and opposed to Ashley that Schwartz stated a dislike for the Plaintiff and people like the Plaintiff (meaning Black caregivers or people of color). It is clear that such comments from Schwartz

objectively and subjectively constituted insults and ridicule based on the Plaintiff's skin color and race as a Black person.

191.    Additionally, in paragraph 29 of exhibit C, the Plaintiff also opposed and complained about Schwartz calling her 'little girl' and a 'school-girl' as the Plaintiff reasonably understood these statements from Schwartz as an insult based on the Plaintiff's race and skin color as a Black person.

192.    The Plaintiff reasonably interpreted Schwartz' statements as meaning that the Plaintiff had the intelligence or demeanor of a little girl or a school-girl because she is a Black person. Schwartz repeatedly calling the Plaintiff 'little girl' and 'school-girl' was the same as a Caucasian calling a Black man 'boy'. Therefore, to the reasonable person, these comments from Schwartz also objectively and subjectively constituted insults and ridicule based on the Plaintiff's skin color and race as a Black person, especially since in that same moment Schwartz expressed a preference for the Caucasian caregiver because of her skin color and race as a White person and stated a dislike for the Plaintiff and other people like the Plaintiff, meaning Black caregiver or people of color.

193.    In paragraph 31 of exhibit C, Ashley (care manager from Alliance) agreed with the Plaintiff that Schwartz' conduct was motivated by "hatred". Furthermore, in paragraph 31 of exhibit C, Ashley also explained to the Plaintiff that Alliance usually only assigns Black caregivers or people of color to the Schwartz home care assignment. Ashley (care manager from Alliance) stated the following to the Plaintiff in paragraph 31 of exhibit C:

> "So, the nurse that was there the night before that (inaudible) she was actually covering on the case too that was her first shift, um, but regularly during the night we have two LPN's, um, so Brenda, um, she works, ah, Sunday through Thursday

and then we have Carline that works Friday and Saturday, um, nights, and they

both are not Caucasian. So, I know that probably when you showed up that's what

you thought and maybe that's what she thought at the moment but just to let you

know, um, we don't have any, um, really Caucasian people on that case... you can

get someone who completely agitated and has all this hatred in them. And

unfortunately that is what we are dealing with Mrs. Schwartz."

194.     In paragraph 39 of exhibit C, Ashley (care manager from Alliance) explained to

the Plaintiff that these Black caregivers or people of color routinely call her (Ashley) to complain

and oppose about Schwartz' malicious and hateful/racist conduct. Ashley (care manager from

Alliance) stated the following to the Plaintiff in paragraph 39 of exhibit C:

"and trust me, I'm so used to hearing caregivers and nurses and, you know, LPN's,

RN's, they tell me what their experiences are with this woman and I listen to

them, and we talk through it..."

195.     Albeit Ashley (care manager from Alliance) stated in paragraph 31 of exhibit C

that Schwartz' conduct against the Plaintiff was in fact motivated by "hatred" targeted against

Black caregivers or people of color, in paragraph 33 of exhibit C, Ashley (care manager from

Alliance) engaged in the full condonation, normalization, encouragement, and approval of

Schwartz' acts of intimidation, insults, and ridicule against the Plaintiff by Ashley telling the

Plaintiff to "accept" everything Schwartz did to her on January 24th, 2019 and to "literally just

keep it moving". Ashley (care manager from Alliance) stated the following to the Plaintiff about

Schwartz' malicious and hateful/racist conduct in paragraph 33 of exhibit C:

"So, I just wanted to let you know there is a major history with this case... If I were you, I would just, you know, just kind of accept it, and process it however you need to... and then literally just keep it moving..."

196.     Ashley (care manager from Alliance) telling the Plaintiff to "accept" racially motivated intimidation, ridicule, and insults as a term and condition of the workplace and to "literally just keep it moving" constituted an adverse alteration of the terms and conditions of the work environment for the Plaintiff. This was an adverse employment action by Alliance against the Plaintiff  as the Plaintiff suffered a material loss of benefits as a result of Ashley's statement in paragraph 33 of exhibit C.

197.     By telling the Plaintiff to "accept" racially motivated malicious conduct in the workplace, the Plaintiff lost the benefit of performing her work duties in a work environment that is free of racially motivated insults, ridicule, or intimidation.

198.     Furthermore, by Ashley telling the Plaintiff to "accept" Schwartz' racially motivated insults, ridicule, and intimidation, the Plaintiff lost the benefit of enforcing her contractual relationship with Alliance on the same footing as the Caucasian caregiver who was not subjected to the same malicious and hateful/racist conduct that Schwartz subjected the Plaintiff to.

199.     The fact that Ashley (care manager from Alliance) told the Plaintiff to "accept" the fact that Schwartz engaged in a racially motivated assault along with a frivolous 911 report against the Plaintiff, and Schwartz expressed a preference for the Caucasian caregiver because of her race and skin color as a White person whereas Schwartz expressed a dislike for the Plaintiff along with other people like the Plaintiff (meaning Black caregivers or people of color), was in of itself an act of racially motivated insult and ridicule by Alliance against the Plaintiff because

Alliance reduced the Plaintiff to a second-class citizen status who did not deserve to enforce her contractual relationship with Alliance on the same footing as the Caucasian caregiver.

200.     Ultimately, the fact that Ashley (care manager from Alliance) admitted that Alliance had been condoning, normalizing, encouraging, and approving Schwartz' malicious and hateful/racist pattern of conduct against Black caregivers or people of color for over 2 years (see paragraph 26 of exhibit C), which included daily frivolous 911 reports, demonstrates that the workplace at Alliance was permeated with pervasive racially discriminatory conduct which had been nurtured by Alliance's policy of condoning, normalizing, encouraging, and approving Schwartz' pattern of malicious and hateful/racist behavior targeted against Black caregivers or people of color, such as the Plaintiff.

201.     Knowing full well that Schwartz was motivated by malice and hatred/racism when Schwartz engaged in the insults, ridicule, and acts of intimidation against the Plaintiff, Ashley (care manager from Alliance) still told the Plaintiff to "accept" Schwartz' conduct and to "literally just keep it moving" (see paragraph 33 of exhibit C).

202.     These statements from Ashley in paragraph 33 of exhibit C demonstrate that Alliance acted with a complete disregard for the safety along with the emotional and psychological well-being of the Plaintiff, because she is a Black person, when Alliance engaged in the condonation, normalization, approval, and encouragement of Schwartz' racially motivated insults, ridicule, and acts of intimidation as Alliance was fully aware that Schwartz subjected the Plaintiff to such malicious and hateful/racist conduct in the workplace specifically because of her skin color and race as a Black person.

203.     The foregoing demonstrates that Alliance's conduct was severe enough to adversely alter the terms and conditions of continued employment for the Plaintiff as Alliance

intentionally, maliciously, knowingly, and willfully subjected the Plaintiff to ridicule, insults, and intimidation in relation to the Schwartz home care assignment under circumstances giving rise to an inference of racial discrimination.

####    iv.    February 26th, 2019

204.    After the Plaintiff submitted the February 13th, 2019 letter (exhibit F) to Alliance to inform upper management at Alliance that she was suspending her duties at Alliance as a result of Schwartz' frivolous 911 report, Alliance engaged in further adverse employment action against the Plaintiff when Amanda Frey (Director of Human Resources) subjected the Plaintiff to intimidation through the February 26th, 2019 arbitration agreement (exhibit H).

205.    In paragraph 2 of the February 26th, 2019 arbitration agreement (exhibit H), Amanda Frey (Director of Human Resources at Alliance) stated that as a term and condition of continued employment, the Plaintiff was being required to sign the February 26th, 2019 arbitration agreement.

206.    The arbitration agreement required the Plaintiff to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace. In other words, Amanda Frey threatened to terminate the Plaintiff's employment if the Plaintiff did not agree to sign the arbitration agreement. This constituted an act of intimidation and coercion against the Plaintiff by Amanda Frey (Director of Human Resources at Alliance).

207.    This act of coercion and intimidation by Amanda Frey (Director of Human Resources at Alliance) was further demonstrated in paragraph 11 of the February 26th, 2019 arbitration agreement where it stated as follows:

> "Not an Employment Agreement. This Agreement shall not be construed to create
> any contract of employment, express or implied. Employee's employment

relationship with the Company is at-will (unless there is another agreement

executed by the parties that alters the "at will status") and this Agreement does

not alter the at-will nature of employment."

208.    The fact that the arbitration agreement did not specifically state that the Plaintiff

would not be terminated for not signing the arbitration agreement set forth coercion and

intimidation. Moreover, the fact that in paragraph 11 of the arbitration agreement it clearly states

that the Plaintiff is an "at-will" employee also sets forth coercion and intimidation as this was

reasonably interpreted by the Plaintiff as meaning that because the Plaintiff is an "at-will"

employee, the Plaintiff's employment could be terminated if the Plaintiff did not agree to sign

the February 26th, 2019 arbitration agreement.

209.    This intimidation and coercion were proven to be true because later in the day on

that same date of February 26th, 2019, Amanda Frey wrongfully terminated the Plaintiff's

employment (see exhibit E) because the Plaintiff did not agree to sign the arbitration agreement.

210.    The intimidation and coercion set forth in the February 26th, 2019 arbitration

agreement (exhibit H) by Amanda Frey was in furtherance of Holly's condonation of Schwartz'

frivolous 911 report on January 24th, 2019 where Holly (care manager from Alliance) repeatedly

stated that "it's fine" that Schwartz engaged in the frivolous 911 report against the Plaintiff, and

the intimidation and coercion was also in furtherance of Ashley's condonation of Schwartz'

malicious and hateful/racist conduct in paragraph 33 of exhibit C where Ashley (care manager

from Alliance) stated that the Plaintiff should just "accept" Schwartz' malicious and

hateful/racist behavior and to "literally just keep it moving".

211.    Ashley (care manager from Alliance) required the Plaintiff to "accept" Schwartz'

malicious and hateful/racist conduct as part of the work environment and to "literally just keep it

moving", which is pretty much exactly what Amanda Frey (Director of Human Resources at Alliance) was communicating to the Plaintiff through the February 26th, 2019 arbitration agreement because the object of the arbitration agreement was for the Plaintiff to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace; in other words, the February 26th, 2019 arbitration agreement required the Plaintiff to "accept" racially discriminatory conduct as part of the work environment at Alliance.

212.    But for the Plaintiff being a Black person who was complaining and opposing about Schwartz' malicious and hateful/racist conduct in the workplace, Amanda Frey (Director of Human Resources at Alliance) would have not sent the Plaintiff the arbitration agreement on February 26th, 2019 which required the Plaintiff to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace. Therefore, any intimidation set forth by Alliance in the February 26th, 2019 arbitration agreement was intimidation that was motivated by the Plaintiff's race and skin color as a Black person.

213.    What is clear is that through the adverse employment actions by Holly (care manager from Alliance) in exhibit A, Ashley (care manager from Alliance) in exhibit C, and Amanda Frey (Director of Human Resources at Alliance) through the February 26th, 2019 arbitration agreement (exhibit H), Alliance clearly developed a policy of condoning, normalizing, encouraging, and approving racially motivated insults, ridicule, and intimation against the Plaintiff because her skin color and race are Black.

214.    The workplace at Alliance was permeated with pervasive racially discriminatory conduct which had been nurtured by Alliance's policy of condoning, normalizing, encouraging, and approving Schwartz' pattern of malicious and hateful/racist behavior targeted against Black caregivers or people of color, such as the Plaintiff.

215.    The foregoing demonstrates that Alliance's conduct of intentionally, maliciously, knowingly, and willfully subjecting the Plaintiff to intimidation and coercion through the February 26th, 2019 arbitration agreement was severe enough to adversely alter the terms and conditions of the Plaintiff's work environment and these adverse employment actions occurred under circumstances giving rise to an inference of racial discrimination.

**D. Alliance's Conduct of Subjecting the Plaintiff to Insults, Ridicule, and Intimidation in the Workplace in Relation to Her Race and Skin Color Because She Is A Black Person Both Subjectively and Objectively Created A Racially Hostile Work Environment for the Plaintiff at Alliance.**

216.    As previously demonstrated, Alliance's adverse employment actions of intentionally, knowingly, willfully, and maliciously subjecting the Plaintiff to racially motivated insults, ridicule, and intimidation in the workplace was a team effort which included Ashley (care manager from Alliance), Holly (care manager from Alliance), and Amanda Frey (Director of Human Resources at Alliance).

217.    Based on all of the foregoing, it is clear that Alliance created a racially hostile work environment for the Plaintiff at Alliance because the workplace was permeated with discriminatory intimidation, ridicule, and insults that were sufficiently severe and pervasive to alter the terms and conditions of the Plaintiff's employment, which created an abusive and racially discriminatory work environment.

218.    The racially motivated insults, ridicule, and intimidation being referred to by the Plaintiff in this complaint occurred over a period of just over a month --- between January 23rd, 2019 and February 26th, 2019 --- and they were all related to the Schwartz home care assignment, which made these acts of insults, ridicule, and intimidation pervasive matters for the Plaintiff at Alliance.

219.     Yet, Alliance's condonation of Schwartz' malicious and hateful/racist conduct targeted against Black caregivers or people of color, such as Schwartz' daily frivolous 911 reports, had been a pervasive matter at Alliance for over two (2) years prior to Alliance assigning the Plaintiff to the Schwartz home care assignment for January 24th, 2019 (see paragraphs 3 and 6 of exhibit A --- see paragraphs 26 and 33 of exhibit C).

220.     In terms of severity, the insults, ridicule, and intimidation the Plaintiff was subjected to by Alliance were extremely severe as they were in relation to malicious conduct in the workplace by Schwartz, based on the Plaintiff's skin color and race as a Black person, which was physically threatening as it related to a violent assault and a frivolous 911 report which was intended to cause a confrontation between the Plaintiff and the police on January 24th, 2019.

221.     The Plaintiff was humiliated through the insults and ridicule Alliance subjected the Plaintiff to in relation to the Schwartz home care assignment, especially since Alliance engaged in the full condonation, encouragement, normalization, and approval of the fact that the Caucasian caregiver was treated much more favorably than the Plaintiff because Schwartz preferred the Caucasian's skin color and race as a White person, and Schwartz disliked the Plaintiff and people like the Plaintiff, meaning Black caregivers or people of color (see paragraph 27 and 29 of exhibit C), along with other statements Schwartz made about the Plaintiff's appearance as a Black person.

222.     What was even more humiliating was the fact that Alliance engaged in the full condonation, encouragement, normalization, and approval of Schwartz' conduct against the Plaintiff and even subsequently engaged in coercion and intimidation against the Plaintiff, through the February 26th, 2019 arbitration agreement (exhibit H), to keep the Plaintiff quiet in relation to the racially discriminatory conduct the Plaintiff was subjected to in the workplace.

223.     The racially motivated insults, ridicule, and intimidation the Plaintiff was subjected to by Alliance unreasonably interfered with the Plaintiff's work performance as it left the Plaintiff psychologically traumatized which caused the Plaintiff to give Alliance notice, in the February 13th, 2019 letter (exhibit F), that she was suspending her work duties at Alliance.

224.     In the February 13th, 2019 letter to Alliance, the Plaintiff complained that she developed psychological trauma as a result of Schwartz' frivolous 911 report and that the work environment at Alliance was dangerous, obviously because Alliance had been condoning, encouraging, normalizing, and approving Schwartz' malicious and hateful/racist behavior in the workplace, all of which the Plaintiff found to be abusive, in relation to her emotional and psychological well-being as a Black person.

225.     The racially motivated insults, ridicule, and intimidation the Plaintiff was subjected to by Alliance adversely altered the terms and conditions of the Plaintiff's employment at Alliance as the Plaintiff was being required to accept racially motivated insults, ridicule, and acts of intimidation as part of the terms and conditions of the work environment at Alliance.

226.     Ultimately, because the Plaintiff would not agree to "accept" racially discriminatory conduct in the workplace as a term and condition of continued employment at Alliance by signing the February 26th, 2019 arbitration agreement, Amanda Frey (Director of Human Resources at Alliance) wrongfully terminated the Plaintiff's employment later in the day on that same date of February 26th, 2019 (see exhibit E).

227.     Any reasonable person in the Plaintiff's position who was subjected to so many instances of racially motivated insults, ridicule, and acts of intimidation in the workplace, as described in these pleadings, would find the work environment to be both subjectively and objectively racially hostile for a Black person, such as the Plaintiff.

**E. 'But For' Alliance Having a Complete Disregard for the Safety Along with the Emotional and Psychological Well-Being of the Plaintiff Because She Is A Black Person, Alliance Would Have Not Engaged in the Condonation, Approval, Encouragement, and Normalization of Schwartz' Hateful/Racist Conduct of Subjecting the Plaintiff to Racially Motivated Ridicule, Insults, and Intimidation, and Neither Would Alliance Directly Engage in the Same Conduct Against the Plaintiff.**

228.    Based on all of the foregoing, it is clear that but for Alliance having a complete disregard for the safety along with the emotional and psychological well-being of the Plaintiff because she is a Black person, Alliance would have not intentionally, maliciously, knowingly, and willfully assigned the Plaintiff to this unfavorable work assignment based on her skin color and race as a Black person, as Alliance had extensive knowledge of the fact that Schwartz had a pattern of demonstrating malicious and hateful/racist behavior against Black caregivers or people of color, which included daily frivolous 911 reports.

229.    Furthermore, but for Alliance having a complete disregard for the safety along with the emotional and psychological well-being of the Plaintiff because she is a Black person, Alliance would have not engaged in the condonation, approval, encouragement, and normalization of Schwartz' malicious and hateful/racist conduct of subjecting the Plaintiff to ridicule, insults, and intimidation and neither would Alliance directly engage in the same conduct against the Plaintiff because of her skin color and race as a Black person.

230.    Alliance's complete disregard for the safety along with the emotional and psychological well-being of the Plaintiff because she is a Black person demonstrates that the adverse employment actions taken against the Plaintiff by Alliance were solely motivated by the Plaintiff's race and skin color as a Black person.

231.    Alliance's condonation, approval, encouragement, and normalization of Schwartz' hateful/racist conduct, albeit Alliance was clearly aware that Schwartz' conduct was motivated by "hatred" targeted against Black caregivers (see paragraph 31 of exhibit C), and it

59

was also clear to Alliance that Schwartz' conduct was interfering with the work duties of Black caregivers or people of color at Alliance as they routinely call Ashley (care manager from Alliance) to complain and oppose about Schwartz' malicious and hateful/racist conduct (see paragraph 39 of exhibit C), demonstrates that Alliance did not care about the Plaintiff because she is a Black person.

232.    Any reasonable person would agree that Alliance's complete disregard for the safety along with the emotional and psychological well-being of the Plaintiff can only be explained by the fact that Alliance's motivation was racial discrimination.

233.    It is clear that this racial discrimination by Alliance was solely motivated by the Plaintiff's skin color and race as a Black person. Any reasonable person would agree that once an employer discovers that a Black person or a person of color was being targeted in the workplace with ridicule, insults, and intimidation out of hatred/racism because of that Black person's race or skin color, the employer would immediately take steps to eradicate said hateful/racist conduct from the workplace, if this employer had any consideration for the safety along with the emotional and psychological well-being of that Black person or person of color.

234.    Instead of taking steps to eliminate racially discriminatory conduct in the workplace, on February 26th, 2019, Amanda Frey (Director of Human Resources at Alliance) engaged in intimidation against the Plaintiff through the February 26th, 2019 arbitration agreement by threatening to terminate the Plaintiff's employment if she did not agree to sign the arbitration agreement. Moreover, Amanda Frey made good on her threat as she terminated the Plaintiff's employment later in the day on February 26th, 2019 for the Plaintiff not signing the arbitration agreement.

235.    Ultimately, but for the Plaintiff being a Black person who complained about and opposed racially discriminatory conduct in the workplace to Alliance, Alliance would have not sent the Plaintiff the February 26th, 2019 arbitration agreement which required the Plaintiff to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace. Alliance clearly had consciousness of guilt as Alliance knew that it was their own condonation, encouragement, normalization, and approval of racially motivated ridicule, insults, and intimidation in the workplace which caused the Plaintiff to be victimized on the Schwartz home care assignment.

236.    Additionally, but for the Plaintiff being a Black person who complained about racially discriminatory conduct in the workplace and but for the Plaintiff not agreeing to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace by signing the arbitration agreement, Alliance would have not terminated the Plaintiff's employment. Therefore, the Plaintiff's skin color and race as a Black person were the sole reasons for Alliance sending the Plaintiff the February 26th, 2019 arbitration agreement and for Alliance terminating the Plaintiff's employment on that same date of February 26th, 2019.

237.    As such, but for the Plaintiff being a Black person, Alliance would have not taken adverse employment actions against the Plaintiff. Therefore, Alliance's adverse employment actions against the Plaintiff were solely motivated by the Plaintiff's skin color and race as a Black person.

**F. Causation for the Cause of Action of 'Racially Hostile Work Environment' Against Alliance Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107(1)(a).**

61

238.     Alliance was the cause in fact of the harm to the Plaintiff because Alliance maliciously, intentionally, knowingly, and willfully engaged in the condonation, encouragement, normalization, and approval of Schwartz' racially motivated intimidation, ridicule, and insults against the Plaintiff. Indeed, Alliance also maliciously, intentionally, knowingly, and willfully directly engaged in racially motivated intimidation, ridicule, and insults against the Plaintiff in relation to the Schwartz home care assignment. These adverse employment actions occurred under circumstances giving rise to an inference of race discrimination and Alliance's racially discriminatory conduct was severe and pervasive enough to adversely alter the conditions of the Plaintiff's work environment at Alliance because she is a Black person.

239.     Alliance was the proximate cause of the harm suffered by the Plaintiff as it was foreseeable that condoning, normalizing, encouraging, and approving Schwartz' racially motivated intimidation, ridicule, and insults against the Plaintiff, and also Alliance directly engaging in racially motivated intimidation, ridicule, and insults against the Plaintiff would adversely alter the Plaintiff's work conditions at Alliance, because she is a Black person, and would also cause the Plaintiff to develop severe emotional distress, and mental anguish.

240.     But for the Plaintiff being a Black person, Alliance would have not subjected the Plaintiff to racially motivated ridicule, insults, and intimidation. It was Alliance's complete disregard for the Plaintiff's safety along with her emotional and psychological well-being, because she is a Black person, which caused Alliance to engage in such malicious and intentional adverse employment actions, knowingly and willfully, against the Plaintiff in the workplace.

241.     Therefore, the Plaintiff's race and skin color as a Black person were the sole motivating factors in Alliance's adverse employment actions against the Plaintiff which adversely altered the terms and conditions of the Plaintiff's employment at Alliance and

ultimately caused the Plaintiff to develop severe emotional distress, physical ailments, and mental anguish (psychological trauma).

**G. Plaintiff's Damages Against Alliance for this Cause of Action for 'Racially Hostile Work Environment' Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107(1)(a).**

242.    For the cause of action of *'Racially Hostile Work Environment'* pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107(1)(a), the Plaintiff suffered adverse employment action, severe economic damages, severe emotional distress, mental anguish (psychological trauma), and physical ailments (see section VII of this complaint).

243.    For this cause of action of *'Racially Hostile Work Environment'*, the Plaintiff is requesting nominal, compensatory, and punitive damages.

## SECOND (2ND) CAUSE OF ACTION:

## 'RETALIATION MOTIVATED BY RACIAL DISCRIMINATION'

## AGAINST DEFENDANT ALLIANCE FOR ADVERSE ALTERATIONS TO THE TERMS AND CONDITIONS OF CONTINUED EMPLOYMENT THROUGH THE FEBRUARY 26TH, 2019 ARBITRATION AGREEMENT PURSUANT TO THE NEW YORK CITY ADMINISTRATIVE CODE § 8-107 (7) & 42 U.S.C. § 1981

244.    The Plaintiff repeats and reasserts the allegations of paragraphs 1 through 243 as though fully set forth herein.

245.    The following describes and supports the cause of action of *'Retaliation Motivated by Racial Discrimination'* against Defendant Alliance Nursing Staffing of New York, Inc. pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7).

246.     On January 24th, 2019, on February 1st, 2019, and on February 13th, 2019, the Plaintiff submitted several complaints and oppositions to Alliance concerning Schwartz' malicious and hateful/racist conduct against the Plaintiff on January 24th, 2019.

247.     On February 26th, 2019, Alliance retaliated against the Plaintiff because of her complaints and oppositions about Schwartz' malicious and hateful/racist conduct against her in the workplace. Alliance retaliated against the Plaintiff by requiring her to sign an arbitration agreement as a condition of continued employment at Alliance. The February 26th, 2019 arbitration agreement (exhibit H) required the Plaintiff to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace.

248.     This adverse employment action occurred under circumstances demonstrating racial discrimination because Alliance adversely altered the terms and conditions of the Plaintiff's employment after the Plaintiff made several complaints and oppositions about the malicious and hateful/racist conduct the Plaintiff was subjected to on the Schwartz home care assignment and after Ashley (care manager from Alliance) admitted to the Plaintiff that Schwartz' conduct against the Plaintiff was motivated by "hatred" targeted against Black caregivers or people of color.

**A. The Plaintiff is a Member of a Class of People Protected Under 42 U.S.C. § 1981 & The New York City Administrative Code § 8-107 (7).**

249.     The Plaintiff's race is Black and the Plaintiff's skin color is Black.

250.     42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7) make it unlawful for Alliance to engage in discriminatory acts related to race or skin color in retaliation for the Plaintiff complaining about and opposing racially discriminatory conduct in the workplace.

251.     Since the Plaintiff's race is Black, her skin color is Black, and Alliance took adverse employment action against the Plaintiff because of her complaints and oppositions about being subjected to malicious conduct in the workplace because of her skin color and race, the Plaintiff is in a class protected under 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7).

**B. The Plaintiff Was Qualified to Hold the Position of Home Health Aide (Caregiver) at Alliance Pursuant to 42 U.S.C. § 1981 & the New York City Administrative Code § 8-107 (7).**

252.     The Plaintiff was qualified to hold her position of home health aide (caregiver) at Alliance.

253.     The Plaintiff was certified and registered with the New York State Department of Health as a home health aide (a caregiver) of Alliance Nursing Staffing of New York, Inc. during her employment with Alliance.

254.     Indeed, Alliance itself, repeatedly complimented the Plaintiff on her excellent work record with Alliance.

255.     In paragraph 26 of exhibit C, Ashley (care manager from Alliance) stated the following:

> "um, you know, I just want you to know, I mean, of course like I said it's a scary experience when that happens and then you're like: "Did I do something wrong", like, "What did I do?" But you did absolutely nothing wrong. Alliance knows it. We've had this client for over 2 years. She has been, um, very challenging..."

256.     In paragraph 33 of exhibit C Ashley stated the following to the Plaintiff:

> "you know, in careers we go through these moments, where there are these experiences, where you think that "is this really what I'm supposed to do?" But

I've heard nothing but good things about you as a caregiver and don't let this ruin

your career, you know, or your choice in staying as a caregiver... and know that

you do a good job and that, you, people do love your performance..."

257.    In paragraph 35 of exhibit C, Ashley stated the following to the Plaintiff:

"but honestly, you are good at what you do and please just don't give up that's

all."

258.    In paragraph 39 of exhibit C, Ashley stated the following to the Plaintiff:

"but if I were you I would just keep doing what you're doing you know, and don't

give up that client that loves you."

259.    As such it is clear that the Plaintiff was qualified to hold the position of home

health aide (caregiver) at Alliance.

**C. The Plaintiff Was Engaged in Protected Activity Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7) and Alliance Was Aware of It.**

260.    After experiencing the steady barrage of racially opprobrious verbal comments by

Schwartz, the assault with the walking cane by Schwartz, the frivolous 911 report by Schwartz,

and the racially discriminatory act by Schwartz of treating the Plaintiff less favorably than the

Caucasian caregiver because the Plaintiff is a Black person on January 24th, 2019, the Plaintiff

had a conversation with Alliance on both January 24th, 2019 (exhibit A) and February 1st, 2019

(exhibit C) where the Plaintiff clearly opposed and complained about Schwartz' malicious and

hateful/racist conduct against her in the workplace.

261.    Furthermore, on February 13th, 2019, the Plaintiff sent Alliance a letter (exhibit F)

where the Plaintiff again complained about and opposed Schwartz' malicious and hateful/racist

conduct in the workplace and the Plaintiff also complained about and opposed the fact that

Alliance created dangerous working conditions by condoning Schwartz' malicious and

hateful/racist conduct against the Plaintiff (exhibit F). This letter was sent to a care manager at Alliance named Susan Sugarman who forwarded the Plaintiff's February 13th, 2019 letter to Amanda Frey (Director of Human Resources at Alliance).

      **i.**      **On January 24th, 2019, February 1st, 2019, and February 13th, 2019, the Plaintiff Opposed and Complained About Schwartz' Frivolous 911 Report. This Constituted Protected Activity Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7).**

262.     On January 24th, 2019, the Plaintiff opposed and complained about Schwartz frivolous 911 report against the Plaintiff (see exhibit A).

263.     After the Plaintiff contacted Alliance on January 24th, 2019 at about 12:38pm, which was immediately after Schwartz made the frivolous 911 report against the Plaintiff, Holly (care manager from Alliance) stated the following to the Plaintiff in paragraph 3 of exhibit A about Schwartz' frivolous 911 report:

> "I'm the care manager so, it's fine, Joan does this to everyone. So, I would just go in the study, that's fine..."

264.     In paragraph 4 of exhibit A, the Plaintiff clearly complained about and opposed Schwartz' frivolous 911 report. The Plaintiff stated the following in a terrorized tone of voice:

> "She called the police for me. Listen, I didn't do anything..."

265.     Based on the Plaintiff's statement in paragraph 4 of exhibit A, it is clear that the Plaintiff was terrorized by Schwartz' frivolous 911 report. As such, it is also clear that Schwartz' frivolous 911 report against the Plaintiff unreasonably interfered with the Plaintiff's work duties at Alliance.

266.     In paragraph 6 of exhibit A, Holly (care manager from Alliance) responded to the Plaintiff as follows:

> "She does that... No, no, no, it's fine. She calls the police every day."

267.     Based on Holly's response in paragraph 6 of exhibit A, it is clear that Alliance was aware that the Plaintiff was opposing and complaining about Schwartz' frivolous 911 report.

268.     Next, on February 1st, 2019 (exhibit C), the Plaintiff again complained to Ashley (care manager from Alliance) and opposed Schwartz' frivolous 911 report.

269.     In paragraph 27 of exhibit C, the Plaintiff stated the following to Ashley:

> "I don't know how to say that but basically I'm glad you called cause I was confused about the situation because I have been working with patients with dementia, they never act like that. They can be racist, they something like "I don't like you, blah, blah, blah (sic)" <u>but call the police on me or try to beat you (Inaudible) don't do that to me.</u>"

270.     In paragraph 27 of exhibit C, the Plaintiff clearly complained about and opposed Schwartz' frivolous 911 report as the Plaintiff clearly stated --- "don't do that to me".

271.     Moreover, in paragraph 27 of exhibit C, the Plaintiff specifically told Ashley (care manager from Alliance) that she believed that Schwartz' conduct was motivated by racism.

272.     It is clear that Ashley (care manager from Alliance) was aware of the Plaintiff's complaints and oppositions in paragraph 27 of exhibit C, as Ashley responded in paragraph 31 of exhibit C that Schwartz was motivated by "hatred".

273.     In paragraph 31 of exhibit C, Ashley (care manager from Alliance) told the Plaintiff that everything Schwartz did to her on January 24th, 2019 was motivated by hatred targeted against Black people or people of color:

> "we don't have any, um, really Caucasian people on that case... you can get someone who completely agitated and has all this hatred in them. And unfortunately that is what we are dealing with Mrs. Schwartz."

274.    Additionally, on February 13th, 2019, the Plaintiff sent Alliance a letter (exhibit F) where the Plaintiff clearly opposed and complained about Schwartz' frivolous 911 report where the Plaintiff stated that she was suspending her duties at Alliance because of this malicious and hateful/racist act by Schwartz and that Schwartz' conduct caused the Plaintiff to develop psychological trauma. The Plaintiff also stated that Schwartz' frivolous 911 report made her realize how dangerous the work environment at Alliance can be.

275.    On February 13th, 2019, the Plaintiff made this statement about the work environment at Alliance being dangerous because Alliance had already engaged in the full condonation of Schwartz' frivolous 911 report against the Plaintiff on January 24th, 2019 (see paragraphs 3 & 6 of exhibit A) and on February 1st, 2019 (see paragraph 33 of exhibit C).

276.    Since Alliance engaged in the full condonation of Schwartz' malicious and hateful/racist act of making a frivolous 911 report against the Plaintiff, it made the Plaintiff realize that Alliance created a dangerous work environment by condoning such malicious and hateful/racist conduct in the workplace, which was targeted against Black people or people of color.

277.    The Plaintiff stated the following in her February 13th, 2019 letter (exhibit F) to Alliance:

> "It is with sadness that I must say that I do not feel that I can continue with my duties at Alliance since the day Ms. Schwartz called the police on me for no reason. I have been very traumatized by the event and it made me realize how dangerous this job can be."

278.    Therefore, it is clear that Alliance was fully aware that the Plaintiff was opposing and complaining about Schwartz' malicious and hateful/racist frivolous 911 report in the

Plaintiff's conversation with Holly (care manager from Alliance) on January 24th, 2019 (exhibit A), Ashley (care manager from Alliance) on February 1st, 2019 (exhibit C), and in the Plaintiff's February 13th, 2019 letter (exhibit F).

**ii.     On February 1st, 2019, the Plaintiff Opposed and Complained About Schwartz' Assault. This Constituted Protected Activity Pursuant to 42 U.S.C. § 1981 & the New York City Administrative Code § 8-107 (7).**

279.     On February 1st, 2019 (exhibit C), the Plaintiff complained to Ashley (care manager from Alliance) and opposed Schwartz' assault against the Plaintiff.

280.     In paragraph 27 of exhibit C, the Plaintiff stated the following to Ashley:

"I don't know how to say that but basically I'm glad you called cause I was confused about the situation because I have been working with patients with dementia, they never act like that. They can be racist, they something like "I don't like you, blah, blah, blah (sic)" but call the police on me <u>or try to beat you (Inaudible) don't do that to me.</u>"

281.     In paragraph 27 of exhibit C, the Plaintiff clearly complained about and opposed Schwartz' assault as the Plaintiff clearly stated --- "don't do that to me".

282.     Moreover, in paragraph 27 of exhibit C, the Plaintiff specifically told Ashley (care manager from Alliance) that she believed that Schwartz' conduct was motivated by racism. Indeed, in paragraph 31 of exhibit C, Ashley concurred by telling the Plaintiff that Schwartz was motivated by "hatred".

283.     In paragraph 31 of exhibit C, Ashley (care manager from Alliance) told the Plaintiff that everything Schwartz did to her on January 24th, 2019 was motivated by hatred targeted against Black people or people of color:

"we don't have any, um, really Caucasian people on that case... you can get someone who completely agitated and has all this hatred in them. And unfortunately that is what we are dealing with Mrs. Schwartz."

284. It is clear that Ashley (care manager from Alliance) was aware of the Plaintiff's complaints and oppositions in paragraph 27 of exhibit C about the assault, as Ashley responded in paragraph 28 of exhibit C by asking the Plaintiff:

"Did she try to hit you?"

285. In paragraph 29 of exhibit C, the Plaintiff responded that Schwartz did in fact try to hit her:

"<u>Yes, she tried to hit me</u> and basically she just the first (Inaudible), the first step, the first, she just saw me and make a face. That's the first thing she did when she saw me, she just make a face and cover her face that she don't want me to stay cause the night aide was a White girl, she got along with her, that's what she said and me and other aides like me, she doesn't, she don't like me..."

286. Based on all of the foregoing, it is clear that Alliance was fully aware of the fact that Schwartz' assault unreasonably interfered with the Plaintiff's work duties, especially since Ashley (care manager from Alliance) admitted in paragraph 31 of exhibit C that Schwartz' conduct was motivated by "hatred" targeted against non-Caucasians, meaning Black people or people of color.

287. Therefore, it is clear that Alliance was fully aware that the Plaintiff was opposing and complaining about Schwartz' assault with the walking cane in the Plaintiff's conversation with Ashley (care manager from Alliance) on February 1st, 2019 (exhibit C).

**iii.    On February 1st, 2019, the Plaintiff Opposed and Complained About Schwartz' Favorable Treatment of the Similarly Situated Caucasian**

**Caregiver. This Constituted Protected Activity Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7).**

288.    In paragraph 29 of exhibit C, the Plaintiff specifically opposed and complained about the racially discriminatory conduct Schwartz demonstrated against the Plaintiff because Schwartz clearly provided much more favorable treatment to the Caucasian caregiver as Schwartz told the Plaintiff that she preferred the Caucasian caregiver because of the Caucasian caregiver's skin color and race as a White person, whereas Schwartz treated the Plaintiff maliciously because Schwartz stated that she did not like the Plaintiff or other people like the Plaintiff, meaning Black caregivers or people of color. The Plaintiff stated the following to Ashley (care manager from Alliance) in paragraph 29 of exhibit C:

> "Yes, she tried to hit me and basically she just the first (Inaudible), the first step, the first, she just saw me and make a face. That's the first thing she did when she saw me, she just make a face and cover her face that she don't want me to stay cause the night aide was a White girl, she got along with her, that's what she said and me and other aides like me, she doesn't, she don't like me..."

289.    In paragraph 29 of exhibit C, the Plaintiff stated to Ashley (care manager from Alliance) that Schwartz stated a preference for the Caucasian caregiver (whom Schwartz referred to as "the White girl") who was at Schwartz' apartment on the morning of January 24th, 2019 specifically because of the Caucasian's race along with her skin color.

290.    The Plaintiff stated that Schwartz specifically said that she did not want the Plaintiff or other people like the Plaintiff inside her apartment, which clearly implied that Schwartz did not want Black people or people of color inside her apartment. Additionally, the Plaintiff stated specifically that Schwartz "got along" with the Caucasian caregiver, yet Schwartz was malicious with the Plaintiff at first sight.

72

291.    Since the Plaintiff stated that Schwartz "got along" with the Caucasian caregiver, it is axiomatic that the Plaintiff complained and opposed the fact that Schwartz did not subject the Caucasian caregiver to any of the malicious acts Schwartz demonstrated against the Plaintiff on January 24th, 2019, such as Schwartz' frivolous 911 report against the Plaintiff, along with Schwartz's assault with the walking cane.

292.    Based on the Plaintiff's statement in paragraph 29 of exhibit C, it is clear that the Plaintiff found Schwartz' hateful/racist conduct of treating the Caucasian caregiver much more favorably than Schwartz treated the Plaintiff as an act that was severe enough that it unreasonably interfered with the Plaintiff's work duties at Alliance; especially since Schwartz subsequently acted out her racial animus against the Plaintiff through the assault and the subsequent frivolous 911 report.

293.    Paragraph 29 of exhibit C constituted the Plaintiff opposing and complaining about the hateful/racist treatment she experienced on the Schwartz home care assignment and since the Plaintiff was opposing and complaining about racially discriminatory treatment in the workplace at Alliance, the Plaintiff was engaged in protected activity pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7).

294.    Ashley (care manager from Alliance) was fully aware of this protected activity as Ashley directly responded to the Plaintiff's complaint and opposition about the Caucasian caregiver receiving much more favorable treatment by Schwartz because of her skin color and race as a White person because Ashley (care manager from Alliance) explained to the Plaintiff in paragraph 31 of exhibit C that Schwartz' conduct against the Plaintiff on January 24th, 2019 was motivated by "hatred" targeted against Black caregivers or people of color:

73

"So, the nurse that was there the night before that (inaudible) she was actually covering on the case too that was her first shift, um, but regularly during the night we have two LPN's, um, so Brenda, um, she works, ah, Sunday through Thursday and then we have Carline that works Friday and Saturday, um, nights, and they both are not Caucasian. So, I know that probably when you showed up that's what you thought and maybe that's what she thought at the moment but just to let you know, um, we don't have any, um, really Caucasian people on that case... you can get someone who completely agitated and has all this hatred in them. And unfortunately that is what we are dealing with Mrs. Schwartz."

295.    Furthermore, in paragraph 39 of exhibit C, Ashley (care manager from Alliance) stated that these Black people and people of color, who were similarly situated as the Plaintiff as caregivers, routinely call Alliance to complain and oppose Schwartz' hateful conduct against them:

"... and trust me, I'm so used to hearing caregivers and nurses and, you know, LPN's, RN's, they tell me what their experiences are with this woman and I listen to them, and we talk through it..."

296.    Alliance's statements in both paragraph 31 of exhibit C and paragraph 39 of exhibit C clearly demonstrate that Alliance believed that Schwartz was racially biased because Schwartz had been targeting Black people or people of color with "hatred" which routinely caused this class of people to complain and oppose Schwartz hateful behavior against them.

297.    Based on the Plaintiff's complaint and opposition in paragraph 29 of exhibit C and Ashley's response in paragraph 31 of exhibit C, Alliance was fully aware that the Plaintiff

was opposing and complaining about Schwartz' malicious and hateful/racist conduct of treating

the Caucasian caregiver much more favorably than the Plaintiff because she is a Black person.

> **iv.** **On February 1st, 2019, the Plaintiff Opposed and Complained About Schwartz' Steady Barrage of Opprobrious Racial Verbal Comments Against the Plaintiff. This Constituted Protected Activity Pursuant to 42 U.S.C. § 1981 & the New York City Administrative Code § 8-107 (7).**

298.    On February 1st, 2019 (exhibit C), the Plaintiff complained and opposed to Ashley

(care manager from Alliance) about Schwartz' steady barrage of racially opprobrious verbal

comments against the Plaintiff.

299.    In paragraph 29 of exhibit C, the Plaintiff complained and opposed to Ashley

(care manager from Alliance) that Schwartz stated that she preferred the Caucasian caregiver

(whom Schwartz referred to as "the White girl") specifically because of the Caucasian's race

along with her skin color and Schwartz stated that she does not like people like the Plaintiff,

meaning Black people or people of color. This constituted opprobrious racial verbal comments

by Schwartz against the Plaintiff based on her skin color and race as a Black person.

300.    In paragraph 29 of exhibit C, the Plaintiff complained and opposed to Ashley

(care manager from Alliance) that Schwartz kept calling her 'little girl' and 'school girl', and

since the context surrounding this complaint and opposition about Schwartz calling the Plaintiff

a 'little girl' and a 'school girl' was in reference to Schwartz' racist behavior, it is clear that the

Plaintiff construed these comments from Schwartz as demonstrating racial animus as the Plaintiff

clearly communicated to Ashley (care manager from Alliance) that she construed Schwartz'

comments about her being a 'little girl' and a 'school-girl' as racially disparaging because it

implied that the Plaintiff had the intelligence or the demeanor of a child because she is a Black

person; which is a racial epithet commonly used against Black people or people of color to make

them feel inferior, such as a Caucasian calling a Black man 'boy'.

301.   The Plaintiff stated the following to Ashley (care manager from Alliance) in paragraph 29 of exhibit C:

> "Yes, she tried to hit me and basically she just the first (Inaudible), the first step, the first, she just saw me and make a face. That's the first thing she did when she saw me, she just make a face and cover her face that she don't want me to stay cause the night aide was a White girl, she got along with her, that's what she said and me and other aides like me, she doesn't, she don't like me, I make her... She told me I'm a little girl, she keep calling me "little girl", "school girl"…"

302.   In paragraph 27 of exhibit C, the Plaintiff stated to Ashley that she construed Schwartz' verbal comments as being motivated by racism:

> "They can be racist, they something like "I don't like you, blah, blah, blah (sic)" but call the police on me or try to beat you (Inaudible) don't do that to me."

303.   Indeed, in paragraph 31 of exhibit C, Ashley concurred by telling the Plaintiff that Schwartz was motivated by "hatred".

304.   In paragraph 31 of exhibit C, Ashley (care manager from Alliance) told the Plaintiff that everything Schwartz did to her on January 24th, 2019 was motivated by hatred targeted against Black people and people of color:

> "we don't have any, um, really Caucasian people on that case... you can get someone who completely agitated and has all this hatred in them. And unfortunately that is what we are dealing with Mrs. Schwartz."

305.   Therefore, it is clear that Alliance was fully aware that the Plaintiff was opposing and complaining about the steady barrage of opprobrious racial verbal comments the Plaintiff

was subjected to on the Schwartz home care assignment, in the Plaintiff's conversation with

Ashley (care manager from Alliance) on February 1st, 2019 (exhibit C).

**D. Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7), The Plaintiff Was Subjected to An Adverse Employment Action on February 26th, 2019 When Alliance Adversely Altered the Terms and Conditions of Continued Employment for the Plaintiff Through a Mandatory Arbitration Agreement in Retaliation for the Plaintiff's Complaints and Oppositions About Racially Discriminatory Conduct in the Workplace.**

306.     As previously described, the Plaintiff made complaints and oppositions to

Alliance on January 24th, 2019, February 1st, 2019, and on February 13th, 2019 about the

malicious and hateful/racist conduct the Plaintiff was subjected to by Schwartz and Alliance's

act of creating a dangerous work environment through their condonation thereof.

307.     In response to the Plaintiff's complaints and oppositions about racially motivated

violence and intimidation in the workplace, on February 26th, 2019 the Plaintiff received an

email from Alliance (see exhibit G) which was accompanied by a mandatory arbitration

agreement from Alliance (see exhibit H). This email was sent to the Plaintiff by Amanda Frey

(Director of Human Resources at Alliance).

308.     This mandatory arbitration agreement adversely altered the terms, conditions, and

privileges of continued employment for the Plaintiff at Alliance. This adverse employment

action was in retaliation to the Plaintiff's complaints and oppositions as previously described.

309.     As a condition of continued employment with Alliance, the February 26th, 2019

arbitration agreement stated that the Plaintiff would have to agree to relinquish her constitutional

right to bring legal action against Alliance for racially discriminatory conduct in the workplace.

310.     Since relinquishing her constitutional right to bring legal action against Alliance

for racially discriminatory conduct in the workplace was not an original term or condition of the

Plaintiff's employment when the Plaintiff started working at Alliance in July 2018, Alliance

requiring the Plaintiff to relinquish her constitutional right in relation to race discrimination in the workplace as a condition of continued employment was an adverse alteration of the terms and conditions of employment for the Plaintiff at Alliance.

311.    Furthermore, since this adverse alteration of the terms, conditions, and privileges of employment for the Plaintiff was a result of the Plaintiff's complaints and oppositions about the malicious and hateful/racist conduct she was subjected to on the Schwartz home care assignment and the Plaintiff's complaint and opposition in the February 13th, 2019 letter (exhibit F) that Alliance created a dangerous work environment through their condonation of Schwartz' hateful/racist conduct, it is reasonable to state that this adverse alteration of the terms and conditions of employment for the Plaintiff at Alliance was a direct retaliatory act.

312.    To deter the Plaintiff from taking legal action against Alliance in relation to the Schwartz home care assignment and to also deter the Plaintiff from taking legal action against Alliance for any future acts of racial discrimination in the workplace, Alliance adversely altered the terms and conditions of continued employment for the Plaintiff by requiring the Plaintiff to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace.

313.    What is clear here is that, once the Plaintiff made complaints and oppositions about discriminatory conduct in the workplace on January 24th, 2019, February 1st, 2019, and on February 13th, 2019, Alliance should have refrained from taking any adverse employment actions against the Plaintiff in relation to these complaints and oppositions.

314.    Therefore, it is reasonable to state that any adverse employment action taken by Alliance against the Plaintiff as a result of the Plaintiff's complaints and oppositions about

discriminatory conduct in the workplace should be construed as retaliatory acts by Alliance against the Plaintiff for said complaints and oppositions.

315.    Furthermore, it is also clear that this retaliatory act by Alliance against the Plaintiff was motivated by Alliance's racial discrimination against the Plaintiff as the February 26th, 2019 arbitration agreement was in furtherance of Alliance's policy, as stated in paragraph 33 of exhibit C, of asking the Plaintiff to "accept" Schwartz' malicious and hateful/racist conduct against the Plaintiff and to "literally just keep it moving".

316.    It was based on these statements from paragraph 33 of exhibit C that Alliance required the Plaintiff to relinquish her constitutional right to bring legal action against Alliance through the February 26th, 2019 arbitration agreement (exhibit H). Since it is clear that the February 26th, 2019 arbitration agreement is a product of Alliance's condonation of Schwartz' hateful/racist conduct against the Plaintiff, it is also reasonable to state that the arbitration agreement was a continuation of Alliance's racial discrimination against the Plaintiff.

317.    Alliance clearly wanted to take away the Plaintiff's constitutional right to bring legal action against Alliance for discriminatory conduct in the workplace so that Alliance would be free to continue to engage in discriminatory conduct against the Plaintiff in the workplace, with impunity.

318.    As such, it is clear that the adverse employment action taken against the Plaintiff by Alliance through the February 26th, 2019 arbitration agreement was due to both retaliatory and race discrimination by Alliance against the Plaintiff.

319.    What ultimately demonstrates that Alliance required the Plaintiff to sign the arbitration agreement as a term and condition of continued employment was the fact that later in the day on February 26th, 2019, Amanda Frey (Director of Human Resources at Alliance)

wrongfully terminated the Plaintiff's employment because the Plaintiff did not agree to sign the February 26th, 2019 arbitration agreement and because the Plaintiff's complaints and oppositions about Schwartz' malicious and hateful/racist conduct against her in the workplace.

320.    Any reasonable person would agree that the Plaintiff's termination was the direct consequence of the Plaintiff not agreeing to sign the February 26th, 2019 arbitration agreement and because the Plaintiff complained and opposed multiple times about Schwartz' malicious and hateful/racist conduct in the workplace.

321.    In paragraph 1 of the arbitration agreement (exhibit H), Amanda Frey (Director of Human Resources at Alliance) stated that the arbitration agreement was mandatory. Next, in paragraph 2 of Alliance's February 26th, 2019 arbitration agreement (exhibit H), Alliance stated that in order for the Plaintiff to continue working at Alliance, the Plaintiff must agree to the arbitration agreement.

322.    Alliance stated the following in paragraph 2 of the arbitration agreement:

"Consideration... Employee understands that if Employee is currently employed by the Company, Employee's continued employment with the Company is consideration for Employee's acceptance of this Agreement."

323.    It is clear that paragraph 2 of this mandatory arbitration agreement from Alliance absolutely required the Plaintiff to agree to the terms and conditions of the arbitration agreement as a condition of continued employment at Alliance.

324.    The foregoing is true because, in the making of a contract, a party to the contract cannot offer the opposing party something of value in consideration if that thing of value being offered belonged to the opposing party to begin with.

325.    In the sense of Alliance and the Plaintiff, Alliance could not legally offer the Plaintiff continued employment at Alliance as consideration for the Plaintiff agreeing to the arbitration agreement if the Plaintiff's continued employment were already guaranteed.

326.    It was the fact that Alliance planned on terminating the Plaintiff later that same day of February 26th, 2019, if the Plaintiff did not agree to the arbitration agreement, that made Alliance offer the Plaintiff continued employment as consideration for agreeing to the arbitration agreement.

327.    Since the Plaintiff's continued employment was no longer guaranteed, it could now be offered as consideration for the arbitration agreement. That is why Alliance offered the Plaintiff's continued employment as consideration for the Plaintiff signing the arbitration agreement.

328.    Which means, Alliance was only going to extend the privilege of employment to the Plaintiff if, and only if, the Plaintiff agreed to the arbitration agreement. In exchange for the Plaintiff's agreement, the thing of value Alliance was offering to the Plaintiff was continued employment. As such, the Plaintiff not agreeing to the arbitration agreement meant no continued employment at Alliance. This demonstrates that Alliance adversely altered the terms, conditions, and privileges of employment for the Plaintiff as a condition of continued employment at Alliance.

329.    Paragraph 2 of the arbitration agreement basically stated that Alliance was offering the Plaintiff's continued employment in exchange for the Plaintiff agreeing to the arbitration agreement. Subsequently on that same day of February 26th, 2019, since the Plaintiff did not agree to the adverse alteration of the terms, conditions, and privileges of employment set

forth in the arbitration agreement, Alliance terminated the Plaintiff's employment on that same

date of February 26th, 2019 (see exhibit E).

330.    Alliance requiring the Plaintiff to give up her constitutional right to bring legal

action against Alliance as a term and condition of continued employment for the Plaintiff at

Alliance was made clear in paragraph 6 of the arbitration agreement where Alliance stated the

following:

> "Waiver of Trial by Jury. The Parties understand and fully agree that by entering
>
> into this Agreement to arbitrate; they are giving up their constitutional right to
>
> have a trial by jury, and are giving up their normal rights of appeal following the
>
> rendering of the arbitrator's award except as applicable law provides for judicial
>
> review of arbitration proceedings."

331.    The Court should respectfully understand that there was no "agreement" set forth

in the arbitration agreement. It was a mandatory document (see paragraph 1 of the arbitration

agreement) which the Plaintiff was being forced to agree to as a condition of continued

employment at Alliance (see paragraph 2 of the arbitration agreement).

332.    In paragraph 17 of the mandatory arbitration agreement, Alliance stated the

following:

> "Voluntary Agreement. By executing this Agreement, the Parties represent that
>
> they have each been given the opportunity to fully review, and comprehend the
>
> terms of this Agreement. The Parties understand that they are each giving up the
>
> rights to: (1) pursue claims against the other in court; (2) pursue claims through
>
> class, collective, or any other representative action; and (3) to have those claims

decided by a jury. The Parties understand the terms of this Agreement and freely and voluntarily sign it."

333.    Albeit here, in paragraph 17 of the arbitration agreement, Alliance claims that this was a "voluntary agreement", in paragraph 1 of the arbitration agreement, Alliance clearly stated that this was a "mandatory" arbitration agreement. Alliance stated in paragraph 17 of the arbitration that signing the agreement was voluntary; yet, it was voluntary in the sense that the Plaintiff could voluntarily choose to sign or not sign it, but not signing would mean the Plaintiff's termination. In all, Alliance was telling the Plaintiff 'no signature, no job'.

334.    If the Plaintiff did not have the option to decline the arbitration agreement without also relinquishing her right to continued employment at Alliance, the arbitration agreement was not voluntary, it was instead "mandatory" if the Plaintiff wanted to continue to work at Alliance; as stated in paragraphs 1 and 2 of the arbitration agreement. The fact that this arbitration was mandatory is demonstrated by the fact that Alliance wrongfully terminated the Plaintiff, later that same day of February 26th, 2019 (see exhibit E), for not agreeing to the arbitration agreement.

335.    In paragraph 3 of the arbitration agreement, Alliance specifically sought to take away the key protections afforded to the Plaintiff under local, state, and federal laws in relation to racially discriminatory conduct in the workplace. These laws include the following, as stated in paragraph 3 of the arbitration agreement:

> "the Civil Rights Act of 1991, Sections 1981 and 1983 of U.S.C. Title 42... the New York State Human Rights Law, the New York Labor Laws, the New York Civil Rights Laws, the New York City Human Rights Laws, any claims under the New York City Administrative Code."

336.    This mandatory arbitration agreement was simply unconscionable because Alliance was requiring the Plaintiff to sign a document as a term and condition of continued employment at Alliance, where the Plaintiff would have to relinquish her constitutional rights, as a Black person, after the Plaintiff complained and opposed about racially discriminatory conduct in the workplace.

337.    Alliance wanted to chill any intent the Plaintiff may have had to bring legal action against Alliance by threatening to withhold continued employment for the Plaintiff at Alliance if the Plaintiff did not agree to relinquish her constitutional rights.

338.    The February 26th, 2019 arbitration agreement clearly demonstrates consciousness of guilt by Alliance as but for Alliance believing that the company engaged in racially discriminatory conduct against the Plaintiff, as a Black person, Alliance would have never sent the Plaintiff the arbitration agreement requiring the Plaintiff to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace.

339.    Amanda Frey (Director of Human Resources at Alliance) knew that Alliance had been condoning, approving, encouraging, and normalizing Schwartz' hateful/racist conduct of engaging in frivolous 911 reports against Black people or people of color. As such, Amanda Frey swiftly moved to take away the Plaintiff's constitutional right to bring legal action against Alliance. When the Plaintiff did not agree to sign the arbitration agreement, Amanda Frey (Director of Human Resources at Alliance) maliciously terminated the Plaintiff's employment, in furtherance of Alliance's full condonation, normalization, approval, and encouragement of Schwartz' malicious and hateful/racist conduct against the Plaintiff on January 24th, 2019.

340.    Based on all of the foregoing, it is reasonable to conclude that Alliance retaliated against the Plaintiff through the February 26th, 2019 arbitration agreement (exhibit H) by

adversely altering the terms, conditions, and privileges of continued employment for the Plaintiff at Alliance as a result of the Plaintiff's complaints and oppositions about Schwartz' malicious and hateful/racist conduct against her in the workplace and for the Plaintiff's complaint in the February 13th, 2019 letter to Alliance (exhibit F) that Alliance created a dangerous work environment.

**E. Alliance's Retaliatory Act Against the Plaintiff Occurred Under Circumstances Demonstrating Racial Discrimination.**

341.    Alliance's February 26th, 2019 retaliatory act against the Plaintiff of altering the terms and conditions of continued employment for the Plaintiff through the arbitration agreement occurred under circumstances directly demonstrating racial discrimination because this adverse employment action of February 26th, 2019 was in furtherance of Alliance's condonation, approval, encouragement, and normalization of Schwartz' malicious and hateful/racist conduct in the workplace, which included Schwartz' malicious and hateful/racist frivolous 911 report against the Plaintiff on January 24th, 2019.

342.    In furtherance of Ashley's statement in paragraph 33 of exhibit C that the Plaintiff should "accept" Schwartz' malicious and hateful/racist conduct in the workplace and to "literally just keep it moving", Amanda Frey (Director of Human Resources at Alliance) sent the Plaintiff the February 26th, 2019 arbitration agreement which required the Plaintiff to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace as a condition of continued employment.

343.    In other words, Amanda Frey was also telling the Plaintiff, through the February 26th, 2019 mandatory arbitration agreement, to "accept" Schwartz' malicious and hateful/racist conduct as part of the work environment at Alliance and to "literally just keep it moving".

344.    Because the Plaintiff did not agree to "accept" Schwartz' malicious and hateful/racist conduct as part of the work environment at Alliance by signing the February 26th, 2019 mandatory arbitration agreement (exhibit H), Amanda Frey (Director of Human Resources at Alliance) terminated the Plaintiff's employment later in the day on February 26th, 2019.

345.    Since the February 26th, 2019 arbitration agreement required the Plaintiff to accept racially discriminatory conduct as a term and condition of the work environment at Alliance, without having recourse in a court of law, and being that Alliance subsequently terminated the Plaintiff's employment because she would not agree to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace, it is reasonable to conclude that Alliance's retaliatory act of adversely altering the terms and conditions of continued employment for the Plaintiff at Alliance was motivated solely by racial discrimination.

346.    But for the Plaintiff being a Black person who was actively complaining about and opposing Schwartz' malicious and hateful/racist conduct in the workplace, Amanda Frey would have not sent the Plaintiff the mandatory arbitration agreement which required the Plaintiff to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace.

347.    But for the Plaintiff's skin color and race being Black, Alliance would have not subjected the Plaintiff to this malicious retaliatory act through the February 26th, 2019 arbitration agreement. Therefore, it is reasonable to conclude that Alliance's adverse employment action against the Plaintiff occurred under circumstances demonstrating racial discrimination.

**F. Causation for the Cause of Action of 'Retaliation Motivated by Racial Discrimination' Against Alliance Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107(7).**

348.    Alliance was the cause in fact of the harm to the Plaintiff because Alliance maliciously, intentionally, knowingly, and willfully retaliated against the Plaintiff through the February 26th, 2019 arbitration agreement by adversely altering the terms and conditions of continued employment for the Plaintiff at Alliance for her complaints and oppositions about racially discriminatory conduct in the workplace.

349.    This adverse employment action occurred under circumstances giving rise to an inference of race discrimination as it was in furtherance of Alliance's condonation, normalization, approval, and encouragement of Schwartz' malicious and hateful/racist conduct against the Plaintiff on January 24th, 2019.

350.    Alliance was the proximate cause of the harm suffered by the Plaintiff as it was foreseeable that adversely altering the terms and conditions of continued employment for the Plaintiff at Alliance, through the February 26th, 2019 arbitration agreement, as a result of the Plaintiff's complaints and oppositions about Schwartz' malicious and hateful/racist conduct in the workplace would cause the Plaintiff adverse employment action, as a Black person, along with severe emotional distress, and mental anguish.

351.    But for the Plaintiff being a Black person who was actively complaining and opposing Schwartz' malicious and hateful/racist conduct in the workplace, Alliance would have not sent the Plaintiff a mandatory arbitration agreement requiring the Plaintiff to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace; this is an unambiguous fact.

352.    Therefore, the Plaintiff's race and skin color as a Black person were the sole motivating factors in Alliance's adverse employment action against the Plaintiff which

ultimately caused the Plaintiff to develop severe emotional distress, physical ailments, and mental anguish (psychological trauma).

**G. Plaintiff's Damages Against Defendant Alliance for this Cause of Action for 'Retaliation Motivated by Racial Discrimination' Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7).**

353.    For this cause of action of *'Retaliation Motivated by Racial Discrimination'* the Plaintiff suffered adverse employment action, severe economic damages, severe emotional distress, mental anguish, along with associated physical ailments (see section VII of this 'Complaint').

354.    For this cause of action of *'Retaliation Motivated by Racial Discrimination'*, the Plaintiff is requesting nominal, compensatory, and punitive damages.

## THIRD (3RD) CAUSE OF ACTION:

## 'RETALIATION MOTIVATED BY RACIAL DISCRIMINATION'

## AGAINST DEFENDANT ALLIANCE FOR THE WRONGFUL TERMINATION OF THE PLAINTIFF'S EMPLOYMENT PURSUANT TO THE NEW YORK CITY ADMINISTRATIVE CODE § 8-107 (7) & 42 U.S.C. § 1981

355.    The Plaintiff repeats and reasserts the allegations of paragraphs 1 through 354 as though fully set forth herein.

356.    The following describes and supports the cause of action of *'Retaliation Motivated by Racial Discrimination'* against Defendant Alliance Nursing Staffing of New York, Inc. pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7).

357.    On January 24th, 2019, on February 1st, 2019, and on February 13th, 2019, the Plaintiff submitted several complaints and oppositions to Alliance concerning Schwartz' malicious and hateful/racist conduct against the Plaintiff on January 24th, 2019.

358.    On February 26th, 2019, Alliance retaliated against the Plaintiff by wrongfully terminating the Plaintiff's employment because of her complaints and oppositions about Schwartz' malicious and hateful/racist conduct against her in the workplace and because the Plaintiff did not agree to sign the February 26th, 2019 arbitration agreement.

359.    This adverse employment action occurred under circumstances demonstrating racial discrimination because Alliance terminated the Plaintiff's employment for complaints and oppositions about racially discriminatory conduct in the workplace and because the Plaintiff was not willing to accept racially discriminatory conduct as a term and condition of the workplace at Alliance by signing the February 26th, 2019 arbitration agreement, which was all in furtherance of Alliance's long term condonation, normalization, approval, and encouragement of Schwartz' malicious and hateful/racist conduct targeted against Black caregivers or people of color who were similarly situated as the Plaintiff.

**A. The Plaintiff is a Member of a Class of People Protected Under 42 U.S.C. § 1981 & The New York City Administrative Code § 8-107 (7).**

360.    The Plaintiff's race is Black and the Plaintiff's skin color is Black.

361.    42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7) make it unlawful for Alliance to engage in racially discriminatory acts related to race or skin color in retaliation for the Plaintiff complaining about and opposing racially discriminatory conduct in the workplace.

362.    Since the Plaintiff's race is Black, her skin color is Black, and Alliance wrongfully terminated the Plaintiff's employment because of her complaints and oppositions about being subjected to malicious conduct in the workplace because of her skin color and race, the Plaintiff is in a class protected under 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7).

**B. The Plaintiff Was Qualified to Hold the Position of Home Health Aide (Caregiver) at Alliance Pursuant to 42 U.S.C. § 1981 & the New York City Administrative Code § 8-107 (7).**

363.   The Plaintiff was qualified to hold her position of home health aide (caregiver) at Alliance.

364.   The Plaintiff was certified and registered with the New York State Department of Health as a home health aide (a caregiver) of Alliance Nursing Staffing of New York, Inc. during her employment with Alliance.

365.   Indeed, Alliance itself, repeatedly complimented the Plaintiff on her excellent work record with Alliance.

366.   In paragraph 26 of exhibit C, Ashley (care manager from Alliance) stated the following:

> "um, you know, I just want you to know, I mean, of course like I said it's a scary experience when that happens and then you're like: "Did I do something wrong", like, "What did I do?" But you did absolutely nothing wrong. Alliance knows it. We've had this client for over 2 years. She has been, um, very challenging..."

367.   In paragraph 33 of exhibit C Ashley stated the following to the Plaintiff:

> "you know, in careers we go through these moments, where there are these experiences, where you think that "is this really what I'm supposed to do?" But I've heard nothing but good things about you as a caregiver and don't let this ruin your career, you know, or your choice in staying as a caregiver... and know that you do a good job and that, you, people do love your performance..."

368.   In paragraph 35 of exhibit C, Ashley stated the following to the Plaintiff:

"but honestly, you are good at what you do and please just don't give up that's

all."

369.     In paragraph 39 of exhibit C, Ashley stated the following to the Plaintiff:

"but if I were you I would just keep doing what you're doing you know, and don't

give up that client that loves you."

370.     As such it is clear that the Plaintiff was qualified to hold the position of home

health aide (caregiver) at Alliance.

**C. The Plaintiff Was Engaged in Protected Activity Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7) and Alliance Was Aware of It.**

371.     After experiencing the steady barrage of racially opprobrious verbal comments by

Schwartz, the assault with the walking cane by Schwartz, the frivolous 911 report by Schwartz,

and the racially discriminatory act by Schwartz of treating the Plaintiff less favorably than the

Caucasian caregiver because the Plaintiff is a Black person on January 24th, 2019, the Plaintiff

had a conversation with Alliance on both January 24th, 2019 (exhibit A) and February 1st, 2019

(exhibit C) where the Plaintiff clearly opposed and complained about Schwartz' malicious and

hateful/racist conduct against her in the workplace.

372.     Furthermore, on February 13th, 2019, the Plaintiff sent Alliance a letter (exhibit F)

where the Plaintiff again complained about and opposed Schwartz' malicious and hateful/racist

conduct in the workplace and the Plaintiff also complained about and opposed the fact that

Alliance created dangerous working conditions by condoning Schwartz' malicious and

hateful/racist conduct against the Plaintiff (exhibit F). This letter was sent to a care manager at

Alliance named Susan Sugarman who forwarded the Plaintiff's February 13th, 2019 letter to

Amanda Frey (Director of Human Resources at Alliance).

**i.     On January 24th, 2019, February 1st, 2019, and February 13th, 2019, the Plaintiff Opposed and Complained About Schwartz' Frivolous 911 Report. This Constituted Protected Activity Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7).**

373.     On January 24th, 2019, the Plaintiff opposed and complained about Schwartz frivolous 911 report against the Plaintiff (see exhibit A).

374.     After the Plaintiff contacted Alliance on January 24th, 2019 at about 12:38pm, which was immediately after Schwartz made the frivolous 911 report against the Plaintiff, Holly (care manager from Alliance) stated the following to the Plaintiff in paragraph 3 of exhibit A about Schwartz' frivolous 911 report:

> "I'm the care manager so, it's fine, Joan does this to everyone. So, I would just go in the study, that's fine..."

375.     In paragraph 4 of exhibit A, the Plaintiff clearly complained about and opposed Schwartz' frivolous 911 report. The Plaintiff stated the following in a terrorized tone of voice:

> "She called the police for me. Listen, I didn't do anything..."

376.     Based on the Plaintiff's statement in paragraph 4 of exhibit A, it is clear that the Plaintiff was terrorized by Schwartz' frivolous 911 report. As such, it is also clear that Schwartz' frivolous 911 report against the Plaintiff unreasonably interfered with the Plaintiff's work duties at Alliance.

377.     In paragraph 6 of exhibit A, Holly (care manager from Alliance) responded to the Plaintiff as follows:

> "She does that... No, no, no, it's fine. She calls the police every day."

378.     Based on Holly's response in paragraph 6 of exhibit A, it is clear that Alliance was aware that the Plaintiff was opposing and complaining about Schwartz' frivolous 911 report.

379.     Next, on February 1st, 2019 (exhibit C), the Plaintiff again complained to Ashley (care manager from Alliance) and opposed Schwartz' frivolous 911 report.

380.     In paragraph 27 of exhibit C, the Plaintiff stated the following to Ashley:

"I don't know how to say that but basically I'm glad you called cause I was confused about the situation because I have been working with patients with dementia, they never act like that. They can be racist, they something like "I don't like you, blah, blah, blah (sic)" but call the police on me or try to beat you (Inaudible) don't do that to me."

381.     In paragraph 27 of exhibit C, the Plaintiff clearly complained about and opposed Schwartz' frivolous 911 report as the Plaintiff clearly stated --- "don't do that to me".

382.     Moreover, in paragraph 27 of exhibit C, the Plaintiff specifically told Ashley (care manager from Alliance) that she believed that Schwartz' conduct was motivated by racism.

383.     It is clear that Ashley (care manager from Alliance) was aware of the Plaintiff's complaints and oppositions in paragraph 27 of exhibit C, as Ashley responded in paragraph 31 of exhibit C that Schwartz was motivated by "hatred".

384.     In paragraph 31 of exhibit C, Ashley (care manager from Alliance) told the Plaintiff that everything Schwartz did to her on January 24th, 2019 was motivated by hatred targeted against Black people or people of color:

"we don't have any, um, really Caucasian people on that case... you can get someone who completely agitated and has all this hatred in them. And unfortunately that is what we are dealing with Mrs. Schwartz."

385.     Additionally, on February 13th, 2019, the Plaintiff sent Alliance a letter (exhibit F) where the Plaintiff clearly opposed and complained about Schwartz' frivolous 911 report where

93

the Plaintiff stated that she was suspending her duties at Alliance because of this malicious and hateful/racist act by Schwartz and that Schwartz' conduct caused the Plaintiff to develop psychological trauma. The Plaintiff also stated that Schwartz' frivolous 911 report made her realize how dangerous the work environment at Alliance can be.

386.    On February 13th, 2019, the Plaintiff made this statement about the work environment at Alliance being dangerous because Alliance had already engaged in the full condonation of Schwartz' frivolous 911 report against the Plaintiff on January 24th, 2019 (see paragraphs 3 & 6 of exhibit A) and on February 1st, 2019 (see paragraph 33 of exhibit C).

387.    Since Alliance engaged in the full condonation of Schwartz' malicious and hateful/racist act of making a frivolous 911 report against the Plaintiff, it made the Plaintiff realize that Alliance created a dangerous work environment by condoning such malicious and hateful/racist conduct in the workplace, which was targeted against Black people or people of color.

388.    The Plaintiff stated the following in her February 13th, 2019 letter (exhibit F) to Alliance:

> "It is with sadness that I must say that I do not feel that I can continue with my duties at Alliance since the day Ms. Schwartz called the police on me for no reason. I have been very traumatized by the event and it made me realize how dangerous this job can be."

389.    Therefore, it is clear that Alliance was fully aware that the Plaintiff was opposing and complaining about Schwartz' malicious and hateful/racist frivolous 911 report in the Plaintiff's conversation with Holly (care manager from Alliance) on January 24th, 2019 (exhibit

A), Ashley (care manager from Alliance) on February 1st, 2019 (exhibit C), and in the Plaintiff's

February 13th, 2019 letter (exhibit F).

> **ii.      On February 1st, 2019, the Plaintiff Opposed and Complained About Schwartz' Assault. This Constituted Protected Activity Pursuant to 42 U.S.C. § 1981 & the New York City Administrative Code § 8-107 (7).**

390.    On February 1st, 2019 (exhibit C), the Plaintiff complained to Ashley (care manager from Alliance) and opposed Schwartz' assault against the Plaintiff.

391.    In paragraph 27 of exhibit C, the Plaintiff stated the following to Ashley:

"I don't know how to say that but basically I'm glad you called cause I was confused about the situation because I have been working with patients with dementia, they never act like that. They can be racist, they something like "I don't like you, blah, blah, blah (sic)" but call the police on me or try to beat you (Inaudible) don't do that to me."

392.    In paragraph 27 of exhibit C, the Plaintiff clearly complained about and opposed Schwartz' assault as the Plaintiff clearly stated --- "don't do that to me".

393.    Moreover, in paragraph 27 of exhibit C, the Plaintiff specifically told Ashley (care manager from Alliance) that she believed that Schwartz' conduct was motivated by racism. Indeed, in paragraph 31 of exhibit C, Ashley concurred by telling the Plaintiff that Schwartz was motivated by "hatred".

394.    In paragraph 31 of exhibit C, Ashley (care manager from Alliance) told the Plaintiff that everything Schwartz did to her on January 24th, 2019 was motivated by hatred targeted against Black people or people of color:

95

"we don't have any, um, really Caucasian people on that case... you can get someone who completely agitated and has all this hatred in them. And unfortunately that is what we are dealing with Mrs. Schwartz."

395.   It is clear that Ashley (care manager from Alliance) was aware of the Plaintiff's complaints and oppositions in paragraph 27 of exhibit C about the assault, as Ashley responded in paragraph 28 of exhibit C by asking the Plaintiff:

"Did she try to hit you?"

396.   In paragraph 29 of exhibit C, the Plaintiff responded that Schwartz did in fact try to hit her:

"<u>Yes, she tried to hit me</u> and basically she just the first (Inaudible), the first step, the first, she just saw me and make a face. That's the first thing she did when she saw me, she just make a face and cover her face that she don't want me to stay cause the night aide was a White girl, she got along with her, that's what she said and me and other aides like me, she doesn't, she don't like me..."

397.   Based on all of the foregoing, it is clear that Alliance was fully aware of the fact that Schwartz' assault unreasonably interfered with the Plaintiff's work duties, especially since Ashley (care manager from Alliance) admitted in paragraph 31 of exhibit C that Schwartz' conduct was motivated by "hatred" targeted against non-Caucasians, meaning Black people or people of color.

398.   Therefore, it is clear that Alliance was fully aware that the Plaintiff was opposing and complaining about Schwartz' assault with the walking cane in the Plaintiff's conversation with Ashley (care manager from Alliance) on February 1st, 2019 (exhibit C).

**iii.    On February 1st, 2019, the Plaintiff Opposed and Complained About Schwartz' Favorable Treatment of the Similarly Situated Caucasian**

**Caregiver. This Constituted Protected Activity Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7).**

399.    In paragraph 29 of exhibit C, the Plaintiff specifically opposed and complained about the racially discriminatory conduct Schwartz demonstrated against the Plaintiff because Schwartz clearly provided much more favorable treatment to the Caucasian caregiver as Schwartz told the Plaintiff that she preferred the Caucasian caregiver because of the Caucasian caregiver's skin color and race as a White person, whereas Schwartz treated the Plaintiff maliciously because Schwartz stated that she did not like the Plaintiff or other people like the Plaintiff, meaning Black caregivers or people of color. The Plaintiff stated the following to Ashley (care manager from Alliance) in paragraph 29 of exhibit C:

> "Yes, she tried to hit me and basically she just the first (Inaudible), the first step, the first, she just saw me and make a face. That's the first thing she did when she saw me, she just make a face and cover her face that she don't want me to stay cause the night aide was a White girl, she got along with her, that's what she said and me and other aides like me, she doesn't, she don't like me..."

400.    In paragraph 29 of exhibit C, the Plaintiff stated to Ashley (care manager from Alliance) that Schwartz stated a preference for the Caucasian caregiver (whom Schwartz referred to as "the White girl") who was at Schwartz' apartment on the morning of January 24th, 2019 specifically because of the Caucasian's race along with her skin color.

401.    The Plaintiff stated that Schwartz specifically said that she did not want the Plaintiff or other people like the Plaintiff inside her apartment, which clearly implied that Schwartz did not want Black people or people of color inside her apartment. Additionally, the Plaintiff stated specifically that Schwartz "got along" with the Caucasian caregiver, yet Schwartz was malicious with the Plaintiff at first sight.

97

402.    Since the Plaintiff stated that Schwartz "got along" with the Caucasian caregiver, it is axiomatic that the Plaintiff complained and opposed the fact that Schwartz did not subject the Caucasian caregiver to any of the malicious acts Schwartz demonstrated against the Plaintiff on January 24th, 2019, such as Schwartz' frivolous 911 report against the Plaintiff, along with Schwartz's assault with the walking cane.

403.    Based on the Plaintiff's statement in paragraph 29 of exhibit C, it is clear that the Plaintiff found Schwartz' hateful/racist conduct of treating the Caucasian caregiver much more favorably than Schwartz treated the Plaintiff as an act that was severe enough that it unreasonably interfered with the Plaintiff's work duties at Alliance; especially since Schwartz subsequently acted out her racial animus against the Plaintiff through the assault and the subsequent frivolous 911 report.

404.    Paragraph 29 of exhibit C constituted the Plaintiff opposing and complaining about the hateful/racist treatment she experienced on the Schwartz home care assignment and since the Plaintiff was opposing and complaining about racially discriminatory treatment in the workplace at Alliance, the Plaintiff was engaged in protected activity pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7).

405.    Ashley (care manager from Alliance) was fully aware of this protected activity as Ashley directly responded to the Plaintiff's complaint and opposition about the Caucasian caregiver receiving much more favorable treatment by Schwartz because of her skin color and race as a White person because Ashley (care manager from Alliance) explained to the Plaintiff in paragraph 31 of exhibit C that Schwartz' conduct against the Plaintiff on January 24th, 2019 was motivated by "hatred" targeted against Black caregivers or people of color:

> "So, the nurse that was there the night before that (inaudible) she was actually covering on the case too that was her first shift, um, but regularly during the night we have two LPN's, um, so Brenda, um, she works, ah, Sunday through Thursday and then we have Carline that works Friday and Saturday, um, nights, and they both are not Caucasian. So, I know that probably when you showed up that's what you thought and maybe that's what she thought at the moment but just to let you know, um, we don't have any, um, really Caucasian people on that case… you can get someone who completely agitated and has all this hatred in them. And unfortunately that is what we are dealing with Mrs. Schwartz."

406.   Furthermore, in paragraph 39 of exhibit C, Ashley (care manager from Alliance) stated that these Black people and people of color, who were similarly situated as the Plaintiff as caregivers, routinely call Alliance to complain and oppose Schwartz' hateful conduct against them:

> "… and trust me, I'm so used to hearing caregivers and nurses and, you know, LPN's, RN's, they tell me what their experiences are with this woman and I listen to them, and we talk through it…"

407.   Alliance's statements in both paragraph 31 of exhibit C and paragraph 39 of exhibit C clearly demonstrate that Alliance believed that Schwartz was racially biased because Schwartz had been targeting Black people or people of color with "hatred" which routinely caused this class of people to complain and oppose Schwartz hateful behavior against them.

408.   Based on the Plaintiff's complaint and opposition in paragraph 29 of exhibit C and Ashley's response in paragraph 31 of exhibit C, Alliance was fully aware that the Plaintiff

was opposing and complaining about Schwartz' malicious and hateful/racist conduct of treating

the Caucasian caregiver much more favorably than the Plaintiff because she is a Black person.

> **iv.    On February 1ˢᵗ, 2019, the Plaintiff Opposed and Complained About Schwartz' Steady Barrage of Opprobrious Racial Verbal Comments Against the Plaintiff. This Constituted Protected Activity Pursuant to 42 U.S.C. § 1981 & the New York City Administrative Code § 8-107 (7).**

409.    On February 1ˢᵗ, 2019 (exhibit C), the Plaintiff complained and opposed to Ashley

(care manager from Alliance) about Schwartz' steady barrage of racially opprobrious verbal

comments against the Plaintiff.

410.    In paragraph 29 of exhibit C, the Plaintiff complained and opposed to Ashley

(care manager from Alliance) that Schwartz stated that she preferred the Caucasian caregiver

(whom Schwartz referred to as "the White girl") specifically because of the Caucasian's race

along with her skin color and Schwartz stated that she does not like people like the Plaintiff,

meaning Black people or people of color. This constituted opprobrious racial verbal comments

by Schwartz against the Plaintiff based on her skin color and race as a Black person.

411.    In paragraph 29 of exhibit C, the Plaintiff complained and opposed to Ashley

(care manager from Alliance) that Schwartz kept calling her 'little girl' and 'school girl', and

since the context surrounding this complaint and opposition about Schwartz calling the Plaintiff

a 'little girl' and a 'school girl' was in reference to Schwartz' racist behavior, it is clear that the

Plaintiff construed these comments from Schwartz as demonstrating racial animus as the Plaintiff

clearly communicated to Ashley (care manager from Alliance) that she construed Schwartz'

comments about her being a 'little girl' and a 'school-girl' as racially disparaging because it

implied that the Plaintiff had the intelligence or the demeanor of a child because she is a Black

person; which is a racial epithet commonly used against Black people or people of color to make

them feel inferior, such as a Caucasian calling a Black man 'boy'.

412.  The Plaintiff stated the following to Ashley (care manager from Alliance) in paragraph 29 of exhibit C:

"Yes, she tried to hit me and basically she just the first (Inaudible), the first step, the first, she just saw me and make a face. That's the first thing she did when she saw me, she just make a face and cover her face that she don't want me to stay cause the night aide was a White girl, she got along with her, that's what she said and me and other aides like me, she doesn't, she don't like me, I make her... She told me I'm a little girl, she keep calling me "little girl", "school girl"…"

413.  In paragraph 27 of exhibit C, the Plaintiff stated to Ashley that she construed Schwartz' verbal comments as being motivated by racism:

"They can be racist, they something like "I don't like you, blah, blah, blah (sic)" but call the police on me or try to beat you (Inaudible) don't do that to me."

414.  Indeed, in paragraph 31 of exhibit C, Ashley concurred by telling the Plaintiff that Schwartz was motivated by "hatred".

415.  In paragraph 31 of exhibit C, Ashley (care manager from Alliance) told the Plaintiff that everything Schwartz did to her on January 24th, 2019 was motivated by hatred targeted against Black people and people of color:

"we don't have any, um, really Caucasian people on that case... you can get someone who completely agitated and has all this hatred in them. And unfortunately that is what we are dealing with Mrs. Schwartz."

416.  Therefore, it is clear that Alliance was fully aware that the Plaintiff was opposing and complaining about the steady barrage of opprobrious racial verbal comments the Plaintiff

was subjected to on the Schwartz home care assignment, in the Plaintiff's conversation with

Ashley (care manager from Alliance) on February 1st, 2019 (exhibit C).

**D. Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7), The Plaintiff Was Subjected to An Adverse Employment Action on February 26th, 2019 When Alliance Wrongfully Terminated the Plaintiff's Employment in Retaliation for the Plaintiff's Complaints & Oppositions and for Not Agreeing to Sign the February 26th, 2019 Arbitration Agreement.**

417.     As previously described, the Plaintiff made complaints and oppositions to

Alliance on January 24th, 2019, February 1st, 2019, and on February 13th, 2019 about the

malicious and hateful/racist conduct the Plaintiff was subjected to by Schwartz and Alliance's

act of creating a dangerous work environment through their condonation thereof.

418.     In response to the Plaintiff's complaints and oppositions about racially motivated

violence and intimidation in the workplace, on February 26th, 2019 the Plaintiff received an

email from Alliance (see exhibit G) which was accompanied by a mandatory arbitration

agreement from Alliance (see exhibit H). This email was sent to the Plaintiff by Amanda Frey

(Director of Human Resources at Alliance).

419.     This mandatory arbitration agreement adversely altered the terms, conditions, and

privileges of continued employment for the Plaintiff at Alliance. This adverse employment

action was in retaliation to the Plaintiff's complaints and oppositions as previously described.

420.     As a condition of continued employment with Alliance, the February 26th, 2019

arbitration agreement stated that the Plaintiff would have to agree to relinquish her constitutional

right to bring legal action against Alliance for racially discriminatory conduct in the workplace.

421.     Because the Plaintiff did not agree to sign the arbitration agreement, Amanda

Frey (Director of Human Resources at Alliance) wrongfully terminated the Plaintiff's

employment later in the day on that same date of February 26th, 2019.

422.     This was a wrongful termination because Alliance terminated the Plaintiff's employment immediately after requiring the Plaintiff to sign the mandatory arbitration agreement (exhibit H) which clearly stated in paragraph 2 that continued employment would be consideration for the Plaintiff signing the arbitration agreement.

423.     Any reasonable person in the Plaintiff's position would agree that Alliance terminating the Plaintiff's employment immediately after sending the Plaintiff a mandatory arbitration agreement worded in this manner demonstrates that Alliance clearly terminated the Plaintiff's employment for not agreeing the sign the arbitration agreement and for the Plaintiff's complaints and oppositions about racially discriminatory conduct in the workplace.

424.     Alliance was racially resentful about the Plaintiff's complaints and oppositions about racially discriminatory conduct in the workplace and about the Plaintiff not agreeing to sign the arbitration agreement to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace, as Amanda Frey (Director of Human Resources at Alliance) knew that Alliance had been condoning, normalizing, approving, and encouraging Schwartz' malicious and hateful/racist conduct targeted against Black caregivers or people of color in the workplace.

425.     But for Amanda Frey (Director of Human Resources) having consciousness of guilt for the malicious and hateful/racist conduct the Plaintiff was subjected to on the Schwartz home care assignment, Amanda Frey would have not sent the Plaintiff the arbitration agreement on February 26th, 2019 which required the Plaintiff to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace. When the Plaintiff did not sign the arbitration agreement, upper management at Alliance became

revengeful and wanted retribution for the Plaintiff, as a Black person, daring to defy Alliance's demand that she sign the arbitration agreement.

426.    To demonstrate that the Plaintiff was insignificant because she is a Black person, Alliance unnecessarily and wrongfully terminated the Plaintiff's employment on February 26th, 2019 (see exhibit E), without consulting with the Plaintiff, without ever giving the Plaintiff notice that her employment was being terminated, without ever giving the plaintiff cause for her employment termination, and without ever sending the Plaintiff a written notice stating the Plaintiff's employment termination date, as was required under New York State labor law.

**E. Alliance's Retaliatory Act Against the Plaintiff Occurred Under Circumstances Demonstrating Racial Discrimination.**

427.    Alliance's February 26th, 2019 retaliatory act of wrongfully terminating the Plaintiff's employment occurred under circumstances directly demonstrating racial discrimination because this adverse employment action of February 26th, 2019 was in furtherance of Alliance's condonation, approval, encouragement, and normalization of Schwartz' malicious and hateful/racist conduct in the workplace, which included Schwartz' malicious and hateful/racist frivolous 911 report against the Plaintiff on January 24th, 2019.

428.    In furtherance of Ashley's statement in paragraph 33 of exhibit C that the Plaintiff should "accept" Schwartz' malicious and hateful/racist conduct in the workplace and to "literally just keep it moving", Amanda Frey (Director of Human Resources at Alliance) sent the Plaintiff the February 26th, 2019 arbitration agreement which required the Plaintiff to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace as a condition of continued employment.

429.    In other words, Amanda Frey (Director of Human Resources at Alliance) was also telling the Plaintiff, through the February 26th, 2019 mandatory arbitration agreement, to

"accept" Schwartz' malicious and hateful/racist conduct as part of the work environment at Alliance and to "literally just keep it moving".

430.    Because the Plaintiff did not agree to "accept" Schwartz' malicious and hateful/racist conduct as part of the work environment at Alliance by signing the February 26th, 2019 mandatory arbitration agreement, Amanda Frey (Director of Human Resources at Alliance) wrongfully terminated the Plaintiff's employment later in the day on February 26th, 2019.

431.    Since the February 26th, 2019 arbitration agreement required the Plaintiff to accept racially discriminatory conduct as a term and condition of the work environment at Alliance, without having recourse in a court of law, and being that Alliance subsequently terminated the Plaintiff's employment because she would not agree to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace, it is reasonable to conclude that Alliance's wrongful termination of the Plaintiff's employment was the result of racial discrimination.

432.    But for the Plaintiff being a Black person who was actively complaining about and opposing Schwartz' malicious and hateful/racist conduct in the workplace, Amanda Frey (Director of Human Resources at Alliance) would have not sent the Plaintiff the mandatory arbitration agreement which required the Plaintiff to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace.

433.    But for the Plaintiff's skin color and race being Black, Alliance would have not terminated the Plaintiff's employment as it was the Plaintiff's complaints and oppositions about being victimized in the workplace because of her skin color and race which caused Alliance to wrongfully terminate the Plaintiff's employment. Therefore, it is reasonable to conclude that

Alliance's adverse employment action against the Plaintiff occurred under circumstances demonstrating racial discrimination.

**F. Causation for the Cause of Action of 'Retaliation Motivated by Racial Discrimination' Against Alliance Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107(7).**

434.    Alliance was the cause in fact of the harm to the Plaintiff because Alliance intentionally, maliciously, knowingly, and willfully wrongfully terminated the Plaintiff's employment for her complaints and oppositions about being subjected to malicious and hateful/racist conduct in the workplace because of her skin color and race as a Black person and because the Plaintiff did not agree to sign the February 26th, 2019 arbitration agreement which required the Plaintiff to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace.

435.    This adverse employment action occurred under circumstances giving rise to an inference of race discrimination as it was in furtherance of Alliance's condonation, normalization, approval, and encouragement of Schwartz' malicious and hateful/racist conduct against the Plaintiff on January 24th, 2019.

436.    Alliance was the proximate cause of the harm suffered by the Plaintiff as it was foreseeable that wrongfully terminating the Plaintiff's employment for said complaints and oppositions about racially discriminatory conduct in the workplace and because the Plaintiff did not agree to sign the February 26th, 2019 arbitration agreement would cause the Plaintiff adverse employment action, as a Black person, along with severe emotional distress, and mental anguish.

437.    But for the Plaintiff being a Black person who was actively complaining and opposing racially discriminatory conduct in the workplace and who did not agree to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct

in the workplace by signing the February 26th, 2019 arbitration agreement, Alliance would have

not terminated the Plaintiff's employment on February 26th, 2019.

438.    Therefore, the Plaintiff's race and skin color as a Black person were the sole

motivating factors in Alliance's adverse employment action against the Plaintiff which caused

the Plaintiff to develop severe emotional distress, physical ailments, and mental anguish

(psychological trauma).

**G. Plaintiff's Damages Against Defendant Alliance for this Cause of Action for 'Retaliation Motivated by Racial Discrimination' Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7).**

439.    For this cause of action of *'Retaliation Motivated by Racial Discrimination'* the

Plaintiff suffered adverse employment action, severe economic damages, severe emotional

distress, mental anguish, along with associated physical ailments (see section VII of this

'Complaint').

440.    For this cause of action of *'Retaliation Motivated by Racial Discrimination'*, the

Plaintiff is requesting nominal, compensatory, and punitive damages.

## <u>FOURTH (4TH) CAUSE OF ACTION:</u>

## 'INTERFERENCE WITH PROTECTED RIGHTS MOTIVATED BY RACIAL DISCRIMINATION' AGAINST DEFENDANT ALLIANCE PURSUANT TO THE NEW YORK CITY ADMINISTRATIVE CODE § 8-107 (19)

441.    The Plaintiff repeats and reasserts the allegations of paragraphs 1 through 440 as

though fully set forth herein.

442.    The following describes and supports the cause of action of *'Interference with*

*Protected Rights Motivated by Racial Discrimination'* against Defendant Alliance Nursing

Staffing of New York, Inc. pursuant to the New York City Administrative Code § 8-107 (19).

443.    Pursuant to New York City Administrative Code § 8-107 (19), Alliance interfered with the Plaintiff's protected right, under New York City Administrative Code § 8-107 (7), to complain about and oppose racially discriminatory conduct in the workplace. Alliance interfered with the Plaintiff's protected right by threatening to terminate the Plaintiff's employment if she did not agree to sign the February 26th, 2019 arbitration agreement (exhibit H), which constituted coercion and intimidation by Alliance against the Plaintiff.

444.    Alliance's act of coercion and intimidation against the Plaintiff was done with the intent of chilling any plans the Plaintiff may have had to participate in protected activity in a court of law for the malicious and hateful/racist conduct the Plaintiff was subjected to in relation to the Schwartz home care assignment.

445.    Since Alliance's conduct here was in furtherance of Alliance's condonation, encouragement, approval, and normalization of the malicious and hateful/racist conduct the Plaintiff was subjected to in relation to the Schwartz home care assignment, it is clear that this adverse employment action by Alliance against the Plaintiff pursuant to New York City Administrative Code § 8-107 (19) occurred under circumstances which clearly demonstrate racial discrimination.

**A. The Plaintiff is a Member of a Class of People Protected Under the New York City Administrative Code § 8-107 (19).**

446.    The Plaintiff's race is Black and the Plaintiff's skin color is Black.

447.    The New York City Administrative Code § 8-107 (19) makes it unlawful for Alliance to threaten to withhold continued employment for the Plaintiff at Alliance as coercion, intimidation, or a threat, out of racial discrimination, with the intent of interfering with the Plaintiff's protected right, under the New York City Administrative Code § 8-107 (7), to complain about and oppose racially discriminatory conduct in the workplace.

448.     Since Alliance was motivated by racial discrimination when Alliance threatened

to terminate the Plaintiff's employment with the intent of coercing, intimidating, and interfering

with the Plaintiff's protected right under the New York City Administrative Code § 8-107 (7) to

complain about and oppose the malicious and hateful/racist conduct the Plaintiff was subjected

to in relation to the Schwartz home care assignment, the Plaintiff is part of a protected class

under New York City Administrative Code § 8-107 (19).

**B. The Plaintiff Was Qualified to Hold the Position of Home Health Aide (Caregiver) at Alliance Pursuant to the New York City Administrative Code § 8-107 (19).**

449.     The Plaintiff was qualified to hold her position of home health aide (caregiver) at

Alliance.

450.     The Plaintiff was certified and registered with the New York State Department of

Health as a home health aide (a caregiver) of Alliance Nursing Staffing of New York, Inc. during

her employment with Alliance.

451.     Indeed, Alliance itself, repeatedly complimented the Plaintiff on her excellent

work record with Alliance.

452.     In paragraph 26 of exhibit C, Ashley (care manager from Alliance) stated the

following:

> "um, you know, I just want you to know, I mean, of course like I said it's a scary
>
> experience when that happens and then you're like: "Did I do something wrong",
>
> like, "What did I do?" But you did absolutely nothing wrong. Alliance knows it.
>
> We've had this client for over 2 years. She has been, um, very challenging".

453.     In paragraph 33 of exhibit C Ashley stated the following to the Plaintiff:

> "you know, in careers we go through these moments, where there are these
>
> experiences, where you think that "is this really what I'm supposed to do?" But

109

I've heard nothing but good things about you as a caregiver and don't let this ruin your career, you know, or your choice in staying as a caregiver... and know that you do a good job and that, you, people do love your performance".

454.    In paragraph 35 of exhibit C, Ashley stated the following to the Plaintiff: "but honestly, you are good at what you do and please just don't give up that's all."

455.    In paragraph 39 of exhibit C, Ashley stated the following to the Plaintiff: "but if I were you I would just keep doing what you're doing you know, and don't give up that client that loves you."

456.    As such it is clear that the Plaintiff was qualified to hold the position of home health aide (caregiver) at Alliance.

**C. The Plaintiff Was Engaged in Protected Activity Pursuant to the New York City Administrative Code § 8-107 (7) and Alliance Was Aware of It.**

457.    After experiencing the steady barrage of racially opprobrious verbal comments by Schwartz, the assault with the walking cane by Schwartz, the frivolous 911 report by Schwartz, and the racially discriminatory act by Schwartz of treating the Plaintiff less favorably than the Caucasian caregiver because the Plaintiff is a Black person on January 24th, 2019, the Plaintiff had a conversation with Alliance on both January 24th, 2019 (exhibit A) and February 1st, 2019 (exhibit C) where the Plaintiff clearly opposed and complained about Schwartz' malicious and hateful/racist conduct against her in the workplace.

458.    Furthermore, on February 13th, 2019, the Plaintiff sent Alliance a letter (exhibit F) where the Plaintiff again complained about and opposed Schwartz' malicious and hateful/racist conduct in the workplace and the Plaintiff also complained about and opposed the fact that Alliance created dangerous working conditions by condoning Schwartz' malicious and

hateful/racist conduct against the Plaintiff (exhibit F). This letter was sent to a care manager at Alliance named Susan Sugarman who forwarded the Plaintiff's February 13th, 2019 letter to Amanda Frey (Director of Human Resources at Alliance).

**i.    On January 24th, 2019, February 1st, 2019, and February 13th, 2019, the Plaintiff Opposed and Complained About Schwartz' Frivolous 911 Report. This Constituted Protected Activity Pursuant to the New York City Administrative Code § 8-107 (7).**

459.    On January 24th, 2019, the Plaintiff opposed and complained about Schwartz frivolous 911 report against the Plaintiff (see exhibit A).

460.    After the Plaintiff contacted Alliance on January 24th, 2019 at about 12:38pm, which was immediately after Schwartz made the frivolous 911 report against the Plaintiff, Holly (care manager from Alliance) stated the following to the Plaintiff in paragraph 3 of exhibit A about Schwartz' frivolous 911 report:

"I'm the care manager so, it's fine, Joan does this to everyone. So, I would just go in the study, that's fine..."

461.    In paragraph 4 of exhibit A, the Plaintiff clearly complained about and opposed Schwartz' frivolous 911 report. The Plaintiff stated the following in a terrorized tone of voice:

"She called the police for me. Listen, I didn't do anything..."

462.    Based on the Plaintiff's statement in paragraph 4 of exhibit A, it is clear that the Plaintiff was terrorized by Schwartz' frivolous 911 report. As such, it is also clear that Schwartz' frivolous 911 report against the Plaintiff unreasonably interfered with the Plaintiff's work duties at Alliance.

463.    In paragraph 6 of exhibit A, Holly (care manager from Alliance) responded to the Plaintiff as follows:

"She does that... No, no, no, it's fine. She calls the police every day."

464.     Based on Holly's response in paragraph 6 of exhibit A, it is clear that Alliance was aware that the Plaintiff was opposing and complaining about Schwartz' frivolous 911 report.

465.     Next, on February 1st, 2019 (exhibit C), the Plaintiff again complained to Ashley (care manager from Alliance) and opposed Schwartz' frivolous 911 report.

466.     In paragraph 27 of exhibit C, the Plaintiff stated the following to Ashley:

> "I don't know how to say that but basically I'm glad you called cause I was confused about the situation because I have been working with patients with dementia, they never act like that. They can be racist, they something like "I don't like you, blah, blah, blah (sic)" but call the police on me or try to beat you (Inaudible) don't do that to me."

467.     In paragraph 27 of exhibit C, the Plaintiff clearly complained about and opposed Schwartz' frivolous 911 report as the Plaintiff clearly stated --- "don't do that to me".

468.     Moreover, in paragraph 27 of exhibit C, the Plaintiff specifically told Ashley (care manager from Alliance) that she believed that Schwartz' conduct was motivated by racism.

469.     It is clear that Ashley (care manager from Alliance) was aware of the Plaintiff's complaints and oppositions in paragraph 27 of exhibit C, as Ashley responded in paragraph 31 of exhibit C that Schwartz was motivated by "hatred".

470.     In paragraph 31 of exhibit C, Ashley (care manager from Alliance) told the Plaintiff that everything Schwartz did to her on January 24th, 2019 was motivated by hatred targeted against Black people or people of color:

> "we don't have any, um, really Caucasian people on that case... you can get someone who completely agitated and has all this hatred in them. And unfortunately that is what we are dealing with Mrs. Schwartz."

471.    Additionally, on February 13th, 2019, the Plaintiff sent Alliance a letter (exhibit F) where the Plaintiff clearly opposed and complained about Schwartz' frivolous 911 report where the Plaintiff stated that she was suspending her duties at Alliance because of this malicious and hateful/racist act by Schwartz and that Schwartz' conduct caused the Plaintiff to develop psychological trauma. The Plaintiff also stated that Schwartz' frivolous 911 report made her realize how dangerous the work environment at Alliance can be.

472.    On February 13th, 2019, the Plaintiff made this statement about the work environment at Alliance being dangerous because Alliance had already engaged in the full condonation of Schwartz' frivolous 911 report against the Plaintiff on January 24th, 2019 (see paragraphs 3 & 6 of exhibit A) and on February 1st, 2019 (see paragraph 33 of exhibit C).

473.    Since Alliance engaged in the full condonation of Schwartz' malicious and hateful/racist act of making a frivolous 911 report against the Plaintiff, it made the Plaintiff realize that Alliance created a dangerous work environment by condoning such malicious and hateful/racist conduct in the workplace, which was targeted against Black people or people of color.

474.    The Plaintiff stated the following in her February 13th, 2019 letter (exhibit F) to Alliance:

> "It is with sadness that I must say that I do not feel that I can continue with my duties at Alliance since the day Ms. Schwartz called the police on me for no reason. I have been very traumatized by the event and it made me realize how dangerous this job can be."

475.    Therefore, it is clear that Alliance was fully aware that the Plaintiff was opposing and complaining about Schwartz' malicious and hateful/racist frivolous 911 report in the

Plaintiff's conversation with Holly (care manager from Alliance) on January 24th, 2019 (exhibit A), Ashley (care manager from Alliance) on February 1st, 2019 (exhibit C), and in the Plaintiff's February 13th, 2019 letter (exhibit F).

> **ii.    On February 1st, 2019, the Plaintiff Opposed and Complained About Schwartz' Assault. This Constituted Protected Activity Pursuant to the New York City Administrative Code § 8-107 (7).**

476.    On February 1st, 2019 (exhibit C), the Plaintiff complained to Ashley (care manager from Alliance) and opposed Schwartz' assault against the Plaintiff.

477.    In paragraph 27 of exhibit C, the Plaintiff stated the following to Ashley:

"I don't know how to say that but basically I'm glad you called cause I was confused about the situation because I have been working with patients with dementia, they never act like that. They can be racist, they something like "I don't like you, blah, blah, blah (sic)" but call the police on me or try to beat you (Inaudible) don't do that to me."

478.    In paragraph 27 of exhibit C, the Plaintiff clearly complained about and opposed Schwartz' assault as the Plaintiff clearly stated --- "don't do that to me".

479.    Moreover, in paragraph 27 of exhibit C, the Plaintiff specifically told Ashley (care manager from Alliance) that she believed that Schwartz' conduct was motivated by racism. Indeed, in paragraph 31 of exhibit C, Ashley concurred by telling the Plaintiff that Schwartz was motivated by "hatred".

480.    In paragraph 31 of exhibit C, Ashley (care manager from Alliance) told the Plaintiff that everything Schwartz did to her on January 24th, 2019 was motivated by hatred targeted against Black people or people of color:

> "we don't have any, um, really Caucasian people on that case... you can get someone who completely agitated and has all this hatred in them. And unfortunately that is what we are dealing with Mrs. Schwartz."

481.    It is clear that Ashley (care manager from Alliance) was aware of the Plaintiff's complaints and oppositions in paragraph 27 of exhibit C about the assault, as Ashley responded in paragraph 28 of exhibit C by asking the Plaintiff:

> "Did she try to hit you?"

482.    In paragraph 29 of exhibit C, the Plaintiff responded that Schwartz did in fact try to hit her:

> "<u>Yes, she tried to hit me</u> and basically she just the first (Inaudible), the first step, the first, she just saw me and make a face. That's the first thing she did when she saw me, she just make a face and cover her face that she don't want me to stay cause the night aide was a White girl, she got along with her, that's what she said and me and other aides like me, she doesn't, she don't like me..."

483.    Based on all of the foregoing, it is clear that Alliance was fully aware of the fact that Schwartz' assault unreasonably interfered with the Plaintiff's work duties, especially since Ashley (care manager from Alliance) admitted in paragraph 31 of exhibit C that Schwartz' conduct was motivated by "hatred" targeted against non-Caucasians, meaning Black people or people of color.

484.    Therefore, it is clear that Alliance was fully aware that the Plaintiff was opposing and complaining about Schwartz' assault with the walking cane in the Plaintiff's conversation with Ashley (care manager from Alliance) on February 1st, 2019 (exhibit C).

**iii.    On February 1st, 2019, the Plaintiff Opposed and Complained About Schwartz' Favorable Treatment of the Similarly Situated Caucasian**

**Caregiver. This Constituted Protected Activity Pursuant to the New York City Administrative Code § 8-107 (7).**

485.     In paragraph 29 of exhibit C, the Plaintiff specifically opposed and complained about the racially discriminatory conduct Schwartz demonstrated against the Plaintiff because Schwartz clearly provided much more favorable treatment to the Caucasian caregiver as Schwartz told the Plaintiff that she preferred the Caucasian caregiver because of the Caucasian caregiver's skin color and race as a White person, whereas Schwartz treated the Plaintiff maliciously because Schwartz stated that she did not like the Plaintiff or other people like the Plaintiff, meaning Black caregivers or people of color. The Plaintiff stated the following to Ashley (care manager from Alliance) in paragraph 29 of exhibit C:

> "Yes, she tried to hit me and basically she just the first (Inaudible), the first step, the first, she just saw me and make a face. That's the first thing she did when she saw me, <u>she just make a face and cover her face that she don't want me to stay cause the night aide was a White girl, she got along with her, that's what she said and me and other aides like me, she doesn't, she don't like me</u>..."

486.     In paragraph 29 of exhibit C, the Plaintiff stated to Ashley (care manager from Alliance) that Schwartz stated a preference for the Caucasian caregiver (whom Schwartz referred to as "the White girl") who was at Schwartz' apartment on the morning of January 24th, 2019 specifically because of the Caucasian's race along with her skin color.

487.     The Plaintiff stated that Schwartz specifically said that she did not want the Plaintiff or other people like the Plaintiff inside her apartment, which clearly implied that Schwartz did not want Black people or people of color inside her apartment. Additionally, the Plaintiff stated specifically that Schwartz "got along" with the Caucasian caregiver, yet Schwartz was malicious with the Plaintiff at first sight.

116

488.    Since the Plaintiff stated that Schwartz "got along" with the Caucasian caregiver, it is axiomatic that the Plaintiff complained and opposed the fact that Schwartz did not subject the Caucasian caregiver to any of the malicious acts Schwartz demonstrated against the Plaintiff on January 24th, 2019, such as Schwartz' frivolous 911 report against the Plaintiff, along with Schwartz's assault with the walking cane.

489.    Based on the Plaintiff's statement in paragraph 29 of exhibit C, it is clear that the Plaintiff found Schwartz' hateful/racist conduct of treating the Caucasian caregiver much more favorably than Schwartz treated the Plaintiff as an act that was severe enough that it unreasonably interfered with the Plaintiff's work duties at Alliance; especially since Schwartz subsequently acted out her racial animus against the Plaintiff through the assault and the subsequent frivolous 911 report.

490.    Paragraph 29 of exhibit C constituted the Plaintiff opposing and complaining about the hateful/racist treatment she experienced on the Schwartz home care assignment and since the Plaintiff was opposing and complaining about racially discriminatory treatment in the workplace at Alliance, the Plaintiff was engaged in protected activity pursuant to the New York City Administrative Code § 8-107 (7).

491.    Ashley (care manager from Alliance) was fully aware of this protected activity as Ashley directly responded to the Plaintiff's complaint and opposition about the Caucasian caregiver receiving much more favorable treatment by Schwartz because of her skin color and race as a White person because Ashley (care manager from Alliance) explained to the Plaintiff in paragraph 31 of exhibit C that Schwartz' conduct against the Plaintiff on January 24th, 2019 was motivated by "hatred" targeted against Black caregivers or people of color:

"So, the nurse that was there the night before that (inaudible) she was actually

covering on the case too that was her first shift, um, but regularly during the night

we have two LPN's, um, so Brenda, um, she works, ah, Sunday through Thursday

and then we have Carline that works Friday and Saturday, um, nights, and they

both are not Caucasian. So, I know that probably when you showed up that's what

you thought and maybe that's what she thought at the moment but just to let you

know, um, we don't have any, um, really Caucasian people on that case… you can

get someone who completely agitated and has all this hatred in them. And

unfortunately that is what we are dealing with Mrs. Schwartz."

492.    Furthermore, in paragraph 39 of exhibit C, Ashley (care manager from Alliance)

stated that these Black people and people of color, who were similarly situated as the Plaintiff as

caregivers, routinely call Alliance to complain and oppose Schwartz' hateful conduct against

them:

"… and trust me, I'm so used to hearing caregivers and nurses and, you know,

LPN's, RN's, they tell me what their experiences are with this woman and I listen

to them, and we talk through it…"

493.    Alliance's statements in both paragraph 31 of exhibit C and paragraph 39 of

exhibit C clearly demonstrate that Alliance believed that Schwartz was racially biased because

Schwartz had been targeting Black people or people of color with "hatred" which routinely

caused this class of people to complain and oppose Schwartz hateful behavior against them.

494.    Based on the Plaintiff's complaint and opposition in paragraph 29 of exhibit C

and Ashley's response in paragraph 31 of exhibit C, Alliance was fully aware that the Plaintiff

was opposing and complaining about Schwartz' malicious and hateful/racist conduct of treating

the Caucasian caregiver much more favorably than the Plaintiff because she is a Black person.

      **iv.**    **On February 1st, 2019, the Plaintiff Opposed and Complained About Schwartz' Steady Barrage of Opprobrious Racial Verbal Comments Against the Plaintiff. This Constituted Protected Activity Pursuant to the New York City Administrative Code § 8-107 (7).**

495.    On February 1st, 2019 (exhibit C), the Plaintiff complained and opposed to Ashley

(care manager from Alliance) about Schwartz' steady barrage of racially opprobrious verbal

comments against the Plaintiff.

496.    In paragraph 29 of exhibit C, the Plaintiff complained and opposed to Ashley

(care manager from Alliance) that Schwartz stated that she preferred the Caucasian caregiver

(whom Schwartz referred to as "the White girl") specifically because of the Caucasian's race

along with her skin color and Schwartz stated that she does not like people like the Plaintiff,

meaning Black people or people of color. This constituted opprobrious racial verbal comments

by Schwartz against the Plaintiff based on her skin color and race as a Black person.

497.    In paragraph 29 of exhibit C, the Plaintiff complained and opposed to Ashley

(care manager from Alliance) that Schwartz kept calling her 'little girl' and 'school girl', and

since the context surrounding this complaint and opposition about Schwartz calling the Plaintiff

a 'little girl' and a 'school girl' was in reference to Schwartz' racist behavior, it is clear that the

Plaintiff construed these comments from Schwartz as demonstrating racial animus as the Plaintiff

clearly communicated to Ashley (care manager from Alliance) that she construed Schwartz'

comments about her being a 'little girl' and a 'school-girl' as racially disparaging because it

implied that the Plaintiff had the intelligence or the demeanor of a child because she is a Black

person; which is a racial epithet commonly used against Black people or people of color to make

them feel inferior, such as a Caucasian calling a Black man 'boy'.

498.     The Plaintiff stated the following to Ashley (care manager from Alliance) in paragraph 29 of exhibit C:

> "Yes, she tried to hit me and basically she just the first (Inaudible), the first step, the first, she just saw me and make a face. That's the first thing she did when she saw me, she just make a face and cover her face that she don't want me to stay cause the night aide was a White girl, she got along with her, that's what she said and me and other aides like me, she doesn't, she don't like me, I make her... She told me I'm a little girl, she keep calling me "little girl", "school girl"…"

499.     In paragraph 27 of exhibit C, the Plaintiff stated to Ashley that she construed Schwartz' verbal comments as being motivated by racism:

> "They can be racist, they something like "I don't like you, blah, blah, blah (sic)" but call the police on me or try to beat you (Inaudible) don't do that to me."

500.     Indeed, in paragraph 31 of exhibit C, Ashley concurred by telling the Plaintiff that Schwartz was motivated by "hatred".

501.     In paragraph 31 of exhibit C, Ashley (care manager from Alliance) told the Plaintiff that everything Schwartz did to her on January 24th, 2019 was motivated by hatred targeted against Black people and people of color:

> "we don't have any, um, really Caucasian people on that case... you can get someone who completely agitated and has all this hatred in them. And unfortunately that is what we are dealing with Mrs. Schwartz."

502.     Therefore, it is clear that Alliance was fully aware that the Plaintiff was opposing and complaining about the steady barrage of opprobrious racial verbal comments the Plaintiff

was subjected to on the Schwartz home care assignment, in the Plaintiff's conversation with

Ashley (care manager from Alliance) on February 1st, 2019 (exhibit C).

**D. Pursuant to the New York City Administrative Code § 8-107 (19), Alliance Interfered with the Plaintiff's Protected Right Under the New York City Administrative Code § 8-107 (7) to Complain and Oppose About Racially Discriminatory Conduct in the Workplace By Threatening to Withhold Continued Employment for the Plaintiff at Alliance With the Intent of Coercing and Intimidating the Plaintiff Into Signing the February 26th, 2019 Arbitration Agreement in Furtherance of Alliance's Condonation of Schwartz' Malicious and Hateful/Racist Conduct Against the Plaintiff.**

503.    On February 26th, 2019, with the intent of coercing and intimidating the Plaintiff

into signing the February 26th, 2019 arbitration agreement (exhibit H), Amanda Frey (Director of

Human Resources at Alliance) threatened to withhold continued employment for the Plaintiff at

Alliance. Alliance's intent was to interfere with the Plaintiff's protected right, under the New

York City Administrative Code § 8-107 (7), to complain about and oppose racially

discriminatory conduct in the workplace.

504.    In paragraph 2 of the February 26th, 2019 arbitration agreement (see exhibit H),

Alliance stated that the Plaintiff's continued employment would be consideration for the Plaintiff

agreeing to the arbitration agreement:

>       "Consideration... Employee understands that if Employee is currently employed
>
>       by the Company, Employee's continued employment with the Company is
>
>       consideration for Employee's acceptance of this Agreement."

505.    In other words, Alliance was telling the Plaintiff that if she did not sign the

arbitration agreement, the Plaintiff would not be allowed to continue her employment with

Alliance.

506. Without the legalese and in layman's terms, paragraph 2 of Alliance's February 26th, 2019 arbitration agreement subjectively and objectively stated to the Plaintiff --- 'If you do not immediately sign the arbitration agreement, you will be fired.'

507. Alliance threatening to fire the Plaintiff if she did not agree to sign the arbitration agreement was unlawful as it constituted coercion and intimidation against the Plaintiff which unreasonably interfered with the Plaintiff's protected right to complain about and oppose discriminatory conduct in the workplace.

508. Amanda Frey's threat to withhold continued employment for the Plaintiff at Alliance was intended to chill any plans the Plaintiff may have had to bring legal action against Alliance for the malicious and hateful/racist conduct the Plaintiff was subjected to on the Schwartz home care assignment.

509. Indeed, Alliance did in fact make good on the coercion and intimidation set forth in the February 26th, 2019 arbitration agreement because Alliance subsequently terminated the Plaintiff's employment on that same day of February 26th, 2019 that Alliance sent the Plaintiff the arbitration agreement because the Plaintiff did not agree to sign the arbitration agreement and because of the Plaintiff's January 24th, 2019, February 1st, 2019, and February 13th, 2019 complaints and oppositions concerning malicious and hateful/racist conduct in the workplace, which created a dangerous work environment for the Plaintiff at Alliance as a Black person.

510. The foregoing is the definition of an employer using coercion and intimidation to get an employee to withdraw or back off complaints and oppositions about malicious and hateful/racist conduct in the workplace, as Alliance did to the Plaintiff in this matter in the February 26th, 2019 arbitration agreement (see exhibit H).

122

511.    An arbitration agreement, such as the one Alliance sent to the Plaintiff on February 26th, 2019, which offered continued employment as consideration for signing the arbitration agreement after the Plaintiff had already engaged in protected activity, can be reasonably construed as an instrument of coercion and intimidation when the employer does not clearly communicate to the employee that he or she will not be fired for not agreeing to sign the arbitration agreement.

512.    Amanda Frey (Director of Human Resources at Alliance) did not only send the Plaintiff the arbitration agreement on February 26th, 2019 where continued employment was offered as consideration for signing the agreement, but Amanda Frey (Director of Human Resources at Alliance) confirmed Alliance's intention of offering continued employment as consideration for signing the arbitration agreement by also terminating the Plaintiff's employment later on that same day of February 26th, 2019 for not agreeing to sign the arbitration agreement.

513.    Furthermore, paragraph 11 of Alliance's February 26th, 2019 arbitration agreement (exhibit H) specifically emphasized that this was 'Not an Employment Agreement' and also emphasized that the Plaintiff remains an 'at will' employee.

514.    Paragraph 11 of the February 26th, 2019 arbitration agreement stated as follows:

"Not an Employment Agreement. This Agreement shall not be construed to create any contract of employment, express or implied. Employee's employment relationship with the Company is at-will (unless there is another agreement executed by the parties that alters the "at will status") and this Agreement does not alter the at-will nature of employment."

515.    Alliance specifically stating that the Plaintiff is 'at will' is a loaded statement because it implies that the Plaintiff can be fired at any time by Alliance. This set forth coercion and intimidation because, for all intents and purposes, Alliance was specifically telling the Plaintiff that her position at Alliance was not secure and that she could be fired at any time for not signing the February 26th, 2019 arbitration agreement.

516.    Alliance's act of using coercion and intimidation in the February 26th, 2019 arbitration agreement (exhibit H) to interfere with the Plaintiff's protected right to complain about and oppose racially discriminatory conduct in the workplace was motivated by Alliance's racial discrimination against the Plaintiff as this adverse employment action was in furtherance of Alliance's condonation, normalization, approval, and encouragement of Schwartz' malicious and hateful/racist conduct against the Plaintiff, which included the steady barrage of opprobrious racial verbal comments, the assault, the frivolous 911 report, along with Schwartz' racist conduct of treating the Caucasian much more favorably than the Plaintiff because of her skin color and race as a White person.

517.    Alliance was forcing the Plaintiff to sign the February 26th, 2019 arbitration agreement which sought to take away the Plaintiff's constitutional right to bring legal action against Alliance in relation to the Schwartz home care assignment, and also for any future racially discriminatory conduct in the workplace so that home care clients, such as Schwartz, could continue to demonstrate racial hostilities against the Plaintiff, as a Black person, without any liability for Alliance. Furthermore, Alliance wanted to continue to provide Caucasian caregivers with much more favorable terms, conditions, and privileges of employment over the Plaintiff, with impunity.

518.    The February 26th, 2019 arbitration agreement clearly demonstrates consciousness

of guilt by Alliance as but for Alliance believing that the company engaged in racially

discriminatory conduct against the Plaintiff, as a Black person, Alliance would have never sent

the Plaintiff the arbitration agreement requiring the Plaintiff to relinquish her constitutional right

to bring legal action against Alliance for racially discriminatory conduct in the workplace.

519.    Alliance knew that they had been condoning, approving, encouraging, and

normalizing Schwartz' hateful/racist conduct, which includes Schwartz' routine frivolous 911

reports against Black caregivers or people of color who were similarly situated as the Plaintiff as

a caregiver. As such, Alliance swiftly moved to take away the Plaintiff's constitutional right to

bring legal action against Alliance through coercion and intimidation.

520.    As such, it is clear that Alliance's interference with the Plaintiff's protected right

under the New York City Administrative Code § 8-107 (7), in violation of the New York City

Administrative Code § 8-107 (19), was done under circumstances which demonstrate racial

discrimination.

**E. Causation for the Cause of Action of 'Interference with Protected Rights Motivated by Racial Discrimination' Against Alliance Pursuant to the New York City Administrative Code § 8-107 (19).**

521.    Alliance was the cause in fact of the harm to the Plaintiff because Alliance

maliciously, intentionally, knowingly, and willfully threatened to withhold continued

employment for the Plaintiff at Alliance with the intent of coercing and intimidating the Plaintiff

into signing the February 26th, 2019 arbitration agreement, which constituted an interference

with the Plaintiff's protected right under the New York City Administrative Code § 8-107 (7),

pursuant to the New York City Administrative Code § 8-107 (19). Alliance engaged in this

adverse employment action under circumstances demonstrating racial discrimination as this was

in furtherance of Alliance's condonation, encouragement, normalization, and approval of Schwartz' malicious and hateful/racist conduct in the workplace.

522.    Alliance was the proximate cause of the harm suffered by the Plaintiff as it was foreseeable that engaging in coercion and intimidation against the Plaintiff by threatening to withhold continued employment if she did not agree to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace would cause the Plaintiff adverse employment action, as a Black person, along with severe emotional distress, and mental anguish.

523.    But for the Plaintiff being a Black person who was actively complaining and opposing Schwartz' malicious and hateful/racist conduct in the workplace, Alliance would have not engaged in coercion and intimidation against the Plaintiff, through the February 26th, 2019 arbitration agreement, with the intent of forcing the Plaintiff to relinquish her constitutional right to bring legal action against Alliance for racially discriminatory conduct in the workplace; this is an unambiguous fact.

524.    Therefore, the Plaintiff's race and skin color as a Black person were the sole motivating factors in Alliance's adverse employment action against the Plaintiff which caused the Plaintiff to develop severe emotional distress, physical ailments, and mental anguish.

**F. Plaintiff's Damages Against Defendant Alliance for this Cause of Action for 'Interference with Protected Rights Motivated by Racial Discrimination' Pursuant to the New York City Administrative Code § 8-107 (19).**

525.    For this cause of action of *Interference with Protected Rights Motivated by Racial Discrimination'* the Plaintiff suffered adverse employment action, severe economic damages, severe emotional distress, mental anguish, along with associated physical ailments (see section VII of this 'Complaint').

526.     For this cause of action of *'Interference with Protected Rights Motivated by Racial Discrimination'*, the Plaintiff is requesting nominal, compensatory, and punitive damages.

## FIFTH (5TH) CAUSE OF ACTION:

## 'RACIAL DISCRIMINATION' AGAINST DEFENDANT ALLIANCE FOR FAILURE TO DISCLOSE THE PLAINTIFF'S EMPLOYMENT TERMINATION AND FOR FAILURE TO DISCLOSE THE PLAINTIFF'S EMPLOYMENT TERMINATION DATE PURSUANT TO 42 U.S.C. § 1981 AND THE NEW YORK CITY ADMINISTRATIVE CODE 8-107 (1)(A)

527.     The Plaintiff repeats and reasserts the allegations of paragraphs 1 through 526 as though fully set forth herein.

528.     The following describes and supports the cause of action of *'Racial Discrimination'* against Alliance Nursing Staffing of New York, Inc. pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (1)(a).

529.     Pursuant to New York State Labor Law § 195(6), Alliance had a duty, under the law, to disclose the Plaintiff's employment termination date within 5 days of Amanda Frey (Director of Human Resources at Alliance) terminating the Plaintiff's employment. Alliance failed to make such disclosure within that 5-day period, neither did Alliance do so at any time thereafter. Moreover, Alliance never officially disclosed to the Plaintiff that her employment was terminated. The Plaintiff discovered that her employment was terminated after a routine visit to the New York State Department of Health home health aide registry system website (see exhibit E).

530.     Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (1)(a), Alliance engaged in racial discrimination against the Plaintiff by Alliance

maliciously, intentionally, willfully, and knowingly providing adverse terms and conditions of employment to the Plaintiff by Alliance deliberately failing to disclose the Plaintiff's employment termination along with her employment termination date as Alliance was required to do under New York State Labor Law § 195(6).

531.    Alliance's failure to disclose that the Plaintiff's employment was terminated and Alliance's failure to disclose the Plaintiff's termination date in writing, as was required under New York State Labor Law § 195(6), constituted an adverse employment action which occurred under circumstances demonstrating racial discrimination as this was in furtherance of Alliance's condonation, normalization, approval, and encouragement of Schwartz' malicious and hateful/racist conduct against the Plaintiff, which ultimately caused Alliance to wrongfully terminate the Plaintiff's employment.

532.    But for the Plaintiff being a Black person, Alliance would have not engaged in this adverse employment action against the Plaintiff.

**A. The Plaintiff is a Member of a Class of People Protected Under 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (1)(a).**

533.    The Plaintiff's race is Black and the Plaintiff's skin color is Black.

534.    42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (1)(a) make it unlawful for Alliance to deprive the Plaintiff the benefits of the terms, conditions, and privileges of her employment at Alliance out of racial discrimination.

535.    Since the Plaintiff's race is Black, her skin color is Black, and the Plaintiff was deprived of the benefits of the terms and conditions of her employment at Alliance out of racial discrimination, more specifically, based on her skin color and race as a Black person, by Alliance deliberately failing to disclose that the Plaintiff's employment was terminated and by failing to

disclose the Plaintiff's employment termination date, the Plaintiff is part of a protected class of people under 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (1)(a).

**B. The Plaintiff Was Qualified to Hold the Position of Home Health Aide (Caregiver) at Alliance Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (1)(a).**

536.     The Plaintiff was qualified to hold her position of home health aide (caregiver) at Alliance.

537.     The Plaintiff was certified and registered with the New York State Department of Health as a home health aide (a caregiver) of Alliance Nursing Staffing of New York, Inc. during her employment with Alliance.

538.     Indeed, Alliance itself, repeatedly complimented the Plaintiff on her excellent work record with Alliance.

539.     In paragraph 26 of exhibit C, Ashley (care manager from Alliance) stated the following:

> "... um, you know, I just want you to know, I mean, of course like I said it's a scary experience when that happens and then you're like: "Did I do something wrong", like, "What did I do?" But you did absolutely nothing wrong. Alliance knows it. We've had this client for over 2 years. She has been, um, very challenging."

540.     In paragraph 33 of exhibit C Ashley (care manager from Alliance) stated the following to the Plaintiff:

> "... you know, in careers we go through these moments, where there are these experiences, where you think that "is this really what I'm supposed to do?" But I've heard nothing but good things about you as a caregiver and don't let this ruin

your career, you know, or your choice in staying as a caregiver... and know that

you do a good job and that, you, people do love your performance."

541.    In paragraph 35 of exhibit C, Ashley (care manager from Alliance) stated the

following to the Plaintiff:

"... but honestly, you are good at what you do and please just don't give up that's

all."

542.    In paragraph 39 of exhibit C, Ashley (care manager from Alliance) stated the

following to the Plaintiff:

"but if I were you I would just keep doing what you're doing you know, and don't

give up that client that loves you."

543.    As such, it is clear that the Plaintiff was qualified to hold the position of home

health aide (caregiver) at Alliance.

**C. Alliance's Malicious Conduct of Intentionally, Knowingly, and Willfully Failing to Disclose that the Plaintiff's Employment Was Terminated and Alliance's Failure to Disclose the Plaintiff's Termination Date Constituted an Adverse Employment Action.**

544.    Under New York State Labor Law § 195(6), Alliance had a duty, under the law,

to disclose the Plaintiff's employment termination date within 5 days of Amanda Frey (Director

of Human Resources at Alliance) terminating the Plaintiff's employment. Alliance maliciously,

intentionally, knowingly, and willfully failed to disclose to the Plaintiff that her employment was

terminated, and Alliance failed to disclose the Plaintiff's termination date within that 5-day

period, neither did Alliance do so at any time thereafter.

545.    Alliance's deliberate failure to make these disclosures (it has been more than 2

years since the Plaintiff was terminated on February 26th, 2019) constituted adverse employment

actions against the Plaintiff as Alliance's failure to disclose caused the Plaintiff material loss of

benefits. The Plaintiff lost the benefit of being informed, by Alliance, of her employment termination and the date on which the Plaintiff's employment was terminated.

546.    The benefit of being made aware that her employment was terminated was a benefit that was guaranteed to the Plaintiff under 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (1)(a) as Alliance failed to make this disclosure out of racial discrimination in furtherance of Alliance's condonation, normalization, encouragement, and approval of Schwartz' malicious and hateful/racist conduct in the workplace as Alliance was racially resentful for the Plaintiff's complaints and oppositions about racially discriminatory conduct in the workplace because the Plaintiff is a Black person.

547.    Furthermore, the benefit of being made aware of her employment termination date, within 5 days of the Plaintiff's employment termination, was a benefit that was guaranteed to the Plaintiff under New York State Labor Law § 195(6).

548.    Alliance deliberately not disclosing the Plaintiff's employment termination along with the Plaintiff's employment termination date constituted Alliance intentionally, knowingly, maliciously, and willfully subjecting the Plaintiff to adverse terms and conditions of employment.

549.    Alliance provided adverse terms and conditions of employment to the Plaintiff because disclosing to the Plaintiff that her employment was terminated and also disclosing to the Plaintiff her employment termination date was part of the terms and conditions of employment for the Plaintiff at Alliance under the law. Once Alliance hired the Plaintiff in July 2018, Alliance had a duty, under the law, to disclose the Plaintiff's termination date at the time of separation between the Plaintiff and Alliance, whenever that was to be, which turned out to be February 26th, 2019 because Alliance unnecessarily and wrongfully terminated the Plaintiff's

employment on that date for her complaints and oppositions about racially discriminatory conduct in the workplace and for the Plaintiff not agreeing to sign the February 26th, 2019 arbitration agreement.

550.    It is reasonable that it was extremely crucial for Alliance to have made these disclosures as not making such disclosures would cause any reasonable person, in the Plaintiff's position, severe emotional distress, and mental anguish, especially since the circumstances surrounding this adverse employment action clearly indicated racial discrimination as it was clearly in furtherance of Alliance's condonation, normalization, encouragement, and approval of Schwartz' malicious and hateful/racist conduct in the workplace. It is axiomatic that Alliance secretly terminating the Plaintiff's employment would cause the Plaintiff to continue to erroneously believe that she was still employed by Alliance long after February 26th, 2019.

551.    Furthermore, these disclosures were not optional, they were part of the terms and conditions of employment for the Plaintiff at Alliance. Therefore, making these disclosures was a routine part of the operations at Alliance, or any other employer in the state of New York.

552.    Since it was in fact Amanda Frey (Director of Human Resources at Alliance) who directly terminated the Plaintiff's employment and it was in fact Amanda Frey who also had the ultimate responsibility of making these disclosures to the Plaintiff after Alliance terminated the Plaintiff's employment on February 26th, 2019, it is clear that Amanda Frey (Director of Human Resources at Alliance) intentionally, maliciously, knowingly, and willfully chose not to disclose that the Plaintiff's employment was terminated at Alliance along with the Plaintiff's employment termination date.

**D. Alliance's Adverse Employment Action Occurred Under Circumstances Demonstrating Race Discrimination.**

553.    Alliance's adverse employment action of not disclosing the Plaintiff's employment termination and her employment termination date was motivated by racial discrimination as Alliance's failure to disclose was in furtherance of Alliance's condonation, encouragement, normalization, and approval of Schwartz' malicious and hateful/racist conduct in the workplace.

554.    Alliance was so racially resentful for the Plaintiff's complaints and oppositions about racially discriminatory conduct in the workplace and Alliance was also so racially resentful for the Plaintiff not willing to "accept" Schwartz' malicious and hateful/racist conduct as part of the work environment by signing the February 26th, 2019 mandatory arbitration agreement that Amanda Frey (Director of Human Resources at Alliance) decided to subject the Plaintiff to adverse terms and conditions of employment by not disclosing that the Plaintiff's employment was terminated and by not disclosing the Plaintiff's employment termination date.

555.    Alliance was simply angry with the Black woman (the Plaintiff) who kept complaining about and opposing malicious and hateful/racist conduct in the workplace. As such, Alliance wanted to deal harshly with the Plaintiff, because she is a Black person, for daring to speak up about racially discriminatory conduct in the workplace.

556.    Albeit Alliance stated multiple times in exhibit C that the Plaintiff was well-qualified for her position as a caregiver at Alliance, Amanda Frey (Director of Human Resources at Alliance) discarded the Plaintiff as if she did not matter.

557.    The complete disregard Alliance demonstrated against the Plaintiff by Alliance deliberately not disclosing that the Plaintiff's employment was terminated and by Alliance deliberately not disclosing the Plaintiff's termination date, albeit it was required under the law, can only be explained by reasonably concluding that the Plaintiff did not matter to Alliance

133

because her skin color and race are Black, especially when all the circumstances surrounding the Plaintiff's termination from Alliance are considered.

558.    Any reasonable person in the Plaintiff's situation would reasonably conclude that but for the Plaintiff being a Black person, Alliance would have not intentionally, maliciously, knowingly, and willfully subjected the Plaintiff to adverse terms and conditions of employment by deliberately failing to disclose that the Plaintiff's employment was terminated along with the Plaintiff's termination date as Alliance was required to do under the law.

559.    Moreover, Alliance's deliberate failure to make these required disclosures clearly demonstrates that Alliance had an illicit intent when Amanda Frey (Director of Human Resources at Alliance) terminated the Plaintiff's employment on February 26th, 2019, and based on all the circumstances in this case, it is also clear that this illicit intent was race discrimination as Alliance's act of subjecting the Plaintiff to adverse terms and conditions by deliberately failing to make these disclosures was in furtherance of Alliance's condonation, normalization, encouragement, and approval of Schwartz' malicious and hateful/racist conduct against the Plaintiff in the workplace on January 24th, 2019.

560.    Notably, Amanda Frey (Director of Human Resources at Alliance) had such low regard for the Plaintiff, because she is a Black person, that Amanda Frey did not believe that the Plaintiff was worthy of being informed that her employment was terminated along with the Plaintiff's employment termination date, as was required under the law.

561.    Alliance demonstrated severe racial animosity against the Plaintiff for her complaints and oppositions about Schwartz' malicious and hateful/racist conduct in the workplace, along with the Plaintiff's complaint and opposition in the February 13th, 2019 letter (exhibit F) that Alliance created a "dangerous" work environment.

562.    There was absolutely no reason for Amanda Frey not to make these disclosures to the Plaintiff, especially since these disclosures are part of the normal operations of any human resources department at any large-scale employer in the state of New York.

563.    This was a deliberate, calculated, malicious, and racist adverse employment action taken by Alliance against the Plaintiff, designed with the sole intent of humiliating and dismissing the Plaintiff from Alliance as harshly as possible to effectively communicate to the Plaintiff that she was insignificant and did not matter because she is a Black person and to also teach the Plaintiff a lesson in the sense that she should have stayed quiet about being subjected to racially discriminatory conduct in the workplace.

564.    Based on all of the foregoing, it is reasonable to conclude that Alliance's adverse employment action against the Plaintiff was solely motivated by the Plaintiff's skin color and race as a Black person.

**E. Causation for the Cause of Action of 'Racial Discrimination' Against Alliance Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107(1)(a).**

565.    Alliance was the cause in fact of the harm to the Plaintiff because Alliance maliciously, intentionally, knowingly, and willfully failed to disclose that the Plaintiff's employment was terminated and Alliance also failed to disclose the Plaintiff's employment termination date out of racial resentment, after Alliance wrongfully terminated the Plaintiff's employment for complaints and oppositions about racially discriminatory conduct in the workplace and for not signing the February 26th, 2019 arbitration agreement. Alliance's deliberate failure to disclose these material facts subjected the Plaintiff to adverse terms and conditions of employment based on her skin color and race as a Black person. Therefore, Alliance's adverse employment action occurred under circumstances giving rise to an inference of race discrimination.

135

566.    Alliance was the proximate cause of the harm suffered by the Plaintiff as it was foreseeable that intentionally, maliciously, knowingly, and willfully failing to disclose that the Plaintiff's employment was terminated along with the Plaintiff's employment termination date, out of racial discrimination, would cause the Plaintiff adverse employment action, and would also cause the Plaintiff severe emotional distress, and mental anguish.

567.    But for the Plaintiff being a Black person, Alliance would have not deliberately failed to disclose to the Plaintiff that her employment was terminated, along with the Plaintiff's employment termination date. It was Alliance's complete disregard for the Plaintiff, because she was a Black employee, which caused Alliance to engage in such malicious and intentional adverse employment actions, knowingly and willfully, against the Plaintiff.

568.    Therefore, the Plaintiff's race and skin color as a Black person were the sole motivating factors in Alliance's adverse employment actions against the Plaintiff which caused the Plaintiff adverse employment action, severe emotional distress, mental anguish, along with physical ailments.

**F. Plaintiff's Damages Against Alliance for this Cause of Action for 'Racial Discrimination' Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107(1)(a).**

569.    For the cause of action of *'Racial Discrimination'* pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107(1)(a), the Plaintiff suffered adverse employment action, severe economic damages, severe emotional distress, mental anguish, and physical ailments (see section VII of this complaint).

570.    For this cause of action of *'Racial Discrimination'*, the Plaintiff is requesting nominal, compensatory, and punitive damages.

## SIXTH (6TH) CAUSE OF ACTION:

### 'RETALIATION MOTIVATED BY RACIAL DISCRIMINATION'

**AGAINST DEFENDANT ALLIANCE FOR FAILURE TO DISCLOSE THE
PLAINTIFF'S EMPLOYMENT TERMINATION AND FOR FAILURE TO DISCLOSE
EMPLOYMENT TERMINATION DATE PURSUANT TO THE NEW YORK CITY
ADMINISTRATIVE CODE § 8-107 (7) & 42 U.S.C. § 1981**

571.    The Plaintiff repeats and reasserts the allegations of paragraphs 1 through 570 as though fully set forth herein.

572.    The following describes and supports the cause of action of *'Retaliation Motivated by Racial Discrimination'* against Defendant Alliance Nursing Staffing of New York, Inc. pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7).

573.    Pursuant to New York State Labor Law § 195(6), Alliance had a duty, under the law, to disclose the Plaintiff's employment termination date within 5 days of Amanda Frey (Director of Human Resources at Alliance) terminating the Plaintiff's employment. Alliance failed to make such disclosure within that 5-day period, neither did Alliance do so at any time thereafter.

574.    Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7), Alliance maliciously, intentionally, willfully, and knowingly subjected the Plaintiff to adverse terms and conditions of employment by failing to disclose the Plaintiff's employment termination and her employment termination date, as Alliance was required to do under New York State Labor Law § 195(6), in retaliation for the Plaintiff's complaints and oppositions about racially discriminatory conduct in the workplace and for the Plaintiff not agreeing to sign the February 26th, 2019 arbitration agreement.

575.    Alliance's failure to disclose the Plaintiff's employment termination along with her employment termination date constituted a retaliatory act which occurred under

circumstances giving rise to an inference of racial discrimination as Alliance engaged in this adverse employment action with the intent of punishing the Plaintiff for her complaints and oppositions about racially discriminatory conduct in the workplace and for the Plaintiff not signing the February 26th, 2019 mandatory arbitration agreement.

576.    Alliance's retaliatory act of deliberately failing to disclose the Plaintiff's employment termination along with her employment termination date was in furtherance of Alliance's condonation, normalization, approval, and encouragement of Schwartz' malicious and hateful/racist conduct against the Plaintiff, which ultimately caused Alliance to wrongfully terminate the Plaintiff's employment.

577.    But for the Plaintiff being a Black person, Alliance would have not engaged in this adverse employment action against the Plaintiff.

**A. The Plaintiff is a Member of a Class of People Protected Under 42 U.S.C. § 1981 & The New York City Administrative Code § 8-107 (7).**

578.    The Plaintiff's race is Black and the Plaintiff's skin color is Black.

579.    42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7) make it unlawful for Alliance to engage in discriminatory acts related to race or skin color in retaliation for the Plaintiff complaining about and opposing racially discriminatory conduct in the workplace.

580.    Since the Plaintiff's race is Black, her skin color is Black, and Alliance took adverse employment action against the Plaintiff because of her complaints and oppositions about being subjected to malicious conduct in the workplace because of her skin color and race, the Plaintiff is in a class protected under 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7).

**B. The Plaintiff Was Qualified to Hold the Position of Home Health Aide (Caregiver) at Alliance Pursuant to 42 U.S.C. § 1981 & the New York City Administrative Code § 8-107 (7).**

581.     The Plaintiff was qualified to hold her position of home health aide (caregiver) at Alliance.

582.     The Plaintiff was certified and registered with the New York State Department of Health as a home health aide (a caregiver) of Alliance Nursing Staffing of New York, Inc. during her employment with Alliance.

583.     Indeed, Alliance itself, repeatedly complimented the Plaintiff on her excellent work record with Alliance.

584.     In paragraph 26 of exhibit C, Ashley (care manager from Alliance) stated the following:

> "um, you know, I just want you to know, I mean, of course like I said it's a scary experience when that happens and then you're like: "Did I do something wrong", like, "What did I do?" But you did absolutely nothing wrong. Alliance knows it. We've had this client for over 2 years. She has been, um, very challenging".

585.     In paragraph 33 of exhibit C Ashley stated the following to the Plaintiff:

> "you know, in careers we go through these moments, where there are these experiences, where you think that "is this really what I'm supposed to do?" But I've heard nothing but good things about you as a caregiver and don't let this ruin your career, you know, or your choice in staying as a caregiver... and know that you do a good job and that, you, people do love your performance".

586.     In paragraph 35 of exhibit C, Ashley stated the following to the Plaintiff:

"but honestly, you are good at what you do and please just don't give up that's

all."

587.    In paragraph 39 of exhibit C, Ashley stated the following to the Plaintiff:

"but if I were you I would just keep doing what you're doing you know, and don't

give up that client that loves you."

588.    As such it is clear that the Plaintiff was qualified to hold the position of home

health aide (caregiver) at Alliance.

**C. The Plaintiff Was Engaged in Protected Activity Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7) and Alliance Was Aware of It.**

589.    After experiencing the steady barrage of racially opprobrious verbal comments by

Schwartz, the assault with the walking cane by Schwartz, the frivolous 911 report by Schwartz,

and the racially discriminatory act by Schwartz of treating the Plaintiff less favorably than the

Caucasian caregiver because the Plaintiff is a Black person on January 24th, 2019, the Plaintiff

had a conversation with Alliance on both January 24th, 2019 (exhibit A) and February 1st, 2019

(exhibit C) where the Plaintiff clearly opposed and complained about Schwartz' malicious and

hateful/racist conduct against her in the workplace.

590.    Furthermore, on February 13th, 2019, the Plaintiff sent Alliance a letter (exhibit F)

where the Plaintiff again complained about and opposed Schwartz' malicious and hateful/racist

conduct in the workplace and the Plaintiff also complained about and opposed the fact that

Alliance created dangerous working conditions by condoning Schwartz' malicious and

hateful/racist conduct against the Plaintiff (exhibit F). This letter was sent to a care manager at

Alliance named Susan Sugarman who forwarded the Plaintiff's February 13th, 2019 letter to

Amanda Frey (Director of Human Resources at Alliance).

i.     **On January 24th, 2019, February 1st, 2019, and February 13th, 2019, the Plaintiff Opposed and Complained About Schwartz' Frivolous 911 Report. This Constituted Protected Activity Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7).**

591.   On January 24th, 2019, the Plaintiff opposed and complained about Schwartz frivolous 911 report against the Plaintiff (see exhibit A).

592.   After the Plaintiff contacted Alliance on January 24th, 2019 at about 12:38pm, which was immediately after Schwartz made the frivolous 911 report against the Plaintiff, Holly (care manager from Alliance) stated the following to the Plaintiff in paragraph 3 of exhibit A about Schwartz' frivolous 911 report:

"I'm the care manager so, it's fine, Joan does this to everyone. So, I would just go in the study, that's fine..."

593.   In paragraph 4 of exhibit A, the Plaintiff clearly complained about and opposed Schwartz' frivolous 911 report. The Plaintiff stated the following in a terrorized tone of voice:

"She called the police for me. Listen, I didn't do anything..."

594.   Based on the Plaintiff's statement in paragraph 4 of exhibit A, it is clear that the Plaintiff was terrorized by Schwartz' frivolous 911 report. As such, it is also clear that Schwartz' frivolous 911 report against the Plaintiff unreasonably interfered with the Plaintiff's work duties at Alliance.

595.   In paragraph 6 of exhibit A, Holly (care manager from Alliance) responded to the Plaintiff as follows:

"She does that... No, no, no, it's fine. She calls the police every day."

596.   Based on Holly's response in paragraph 6 of exhibit A, it is clear that Alliance was aware that the Plaintiff was opposing and complaining about Schwartz' frivolous 911 report.

597.   Next, on February 1st, 2019 (exhibit C), the Plaintiff again complained to Ashley (care manager from Alliance) and opposed Schwartz' frivolous 911 report.

598.   In paragraph 27 of exhibit C, the Plaintiff stated the following to Ashley:

"I don't know how to say that but basically I'm glad you called cause I was confused about the situation because I have been working with patients with dementia, they never act like that. They can be racist, they something like "I don't like you, blah, blah, blah (sic)" but call the police on me or try to beat you (Inaudible) don't do that to me."

599.   In paragraph 27 of exhibit C, the Plaintiff clearly complained about and opposed Schwartz' frivolous 911 report as the Plaintiff clearly stated --- "don't do that to me".

600.   Moreover, in paragraph 27 of exhibit C, the Plaintiff specifically told Ashley (care manager from Alliance) that she believed that Schwartz' conduct was motivated by racism.

601.   It is clear that Ashley (care manager from Alliance) was aware of the Plaintiff's complaints and oppositions in paragraph 27 of exhibit C, as Ashley responded in paragraph 31 of exhibit C that Schwartz was motivated by "hatred".

602.   In paragraph 31 of exhibit C, Ashley (care manager from Alliance) told the Plaintiff that everything Schwartz did to her on January 24th, 2019 was motivated by hatred targeted against Black people or people of color:

"we don't have any, um, really Caucasian people on that case... you can get someone who completely agitated and has all this hatred in them. And unfortunately that is what we are dealing with Mrs. Schwartz."

603.   Additionally, on February 13th, 2019, the Plaintiff sent Alliance a letter (exhibit F) where the Plaintiff clearly opposed and complained about Schwartz' frivolous 911 report where

the Plaintiff stated that she was suspending her duties at Alliance because of this malicious and hateful/racist act by Schwartz and that Schwartz' conduct caused the Plaintiff to develop psychological trauma. The Plaintiff also stated that Schwartz' frivolous 911 report made her realize how dangerous the work environment at Alliance can be.

604.    On February 13th, 2019, the Plaintiff made this statement about the work environment at Alliance being dangerous because Alliance had already engaged in the full condonation of Schwartz' frivolous 911 report against the Plaintiff on January 24th, 2019 (see paragraphs 3 & 6 of exhibit A) and on February 1st, 2019 (see paragraph 33 of exhibit C).

605.    Since Alliance engaged in the full condonation of Schwartz' malicious and hateful/racist act of making a frivolous 911 report against the Plaintiff, it made the Plaintiff realize that Alliance created a dangerous work environment by condoning such malicious and hateful/racist conduct in the workplace, which was targeted against Black people or people of color.

606.    The Plaintiff stated the following in her February 13th, 2019 letter (exhibit F) to Alliance:

> "It is with sadness that I must say that I do not feel that I can continue with my duties at Alliance since the day Ms. Schwartz called the police on me for no reason. I have been very traumatized by the event and it made me realize how dangerous this job can be."

607.    Therefore, it is clear that Alliance was fully aware that the Plaintiff was opposing and complaining about Schwartz' malicious and hateful/racist frivolous 911 report in the Plaintiff's conversation with Holly (care manager from Alliance) on January 24th, 2019 (exhibit

A), Ashley (care manager from Alliance) on February 1st, 2019 (exhibit C), and in the Plaintiff's

February 13th, 2019 letter (exhibit F).

> **ii.     On February 1st, 2019, the Plaintiff Opposed and Complained About Schwartz' Assault. This Constituted Protected Activity Pursuant to 42 U.S.C. § 1981 & the New York City Administrative Code § 8-107 (7).**

608.     On February 1st, 2019 (exhibit C), the Plaintiff complained to Ashley (care

manager from Alliance) and opposed Schwartz' assault against the Plaintiff.

609.     In paragraph 27 of exhibit C, the Plaintiff stated the following to Ashley:

> "I don't know how to say that but basically I'm glad you called cause I was
>
> confused about the situation because I have been working with patients with
>
> dementia, they never act like that. They can be racist, they something like "I don't
>
> like you, blah, blah, blah (sic)" but call the police on me or try to beat you
>
> (Inaudible) don't do that to me."

610.     In paragraph 27 of exhibit C, the Plaintiff clearly complained about and opposed

Schwartz' assault as the Plaintiff clearly stated --- "don't do that to me".

611.     Moreover, in paragraph 27 of exhibit C, the Plaintiff specifically told Ashley (care

manager from Alliance) that she believed that Schwartz' conduct was motivated by racism.

Indeed, in paragraph 31 of exhibit C, Ashley concurred by telling the Plaintiff that Schwartz was

motivated by "hatred".

612.     In paragraph 31 of exhibit C, Ashley (care manager from Alliance) told the

Plaintiff that everything Schwartz did to her on January 24th, 2019 was motivated by hatred

targeted against Black people or people of color:

"we don't have any, um, really Caucasian people on that case... you can get someone who completely agitated and has all this hatred in them. And unfortunately that is what we are dealing with Mrs. Schwartz."

613.    It is clear that Ashley (care manager from Alliance) was aware of the Plaintiff's complaints and oppositions in paragraph 27 of exhibit C about the assault, as Ashley responded in paragraph 28 of exhibit C by asking the Plaintiff:

"Did she try to hit you?"

614.    In paragraph 29 of exhibit C, the Plaintiff responded that Schwartz did in fact try to hit her:

"<u>Yes, she tried to hit me</u> and basically she just the first (Inaudible), the first step, the first, she just saw me and make a face. That's the first thing she did when she saw me, she just make a face and cover her face that she don't want me to stay cause the night aide was a White girl, she got along with her, that's what she said and me and other aides like me, she doesn't, she don't like me..."

615.    Based on all of the foregoing, it is clear that Alliance was fully aware of the fact that Schwartz' assault unreasonably interfered with the Plaintiff's work duties, especially since Ashley (care manager from Alliance) admitted in paragraph 31 of exhibit C that Schwartz' conduct was motivated by "hatred" targeted against non-Caucasians, meaning Black people or people of color.

616.    Therefore, it is clear that Alliance was fully aware that the Plaintiff was opposing and complaining about Schwartz' assault with the walking cane in the Plaintiff's conversation with Ashley (care manager from Alliance) on February 1st, 2019 (exhibit C).

**iii.    On February 1st, 2019, the Plaintiff Opposed and Complained About Schwartz' Favorable Treatment of the Similarly Situated Caucasian**

145

**Caregiver. This Constituted Protected Activity Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7).**

617.   In paragraph 29 of exhibit C, the Plaintiff specifically opposed and complained about the racially discriminatory conduct Schwartz demonstrated against the Plaintiff because Schwartz clearly provided much more favorable treatment to the Caucasian caregiver as Schwartz told the Plaintiff that she preferred the Caucasian caregiver because of the Caucasian caregiver's skin color and race as a White person, whereas Schwartz treated the Plaintiff maliciously because Schwartz stated that she did not like the Plaintiff or other people like the Plaintiff, meaning Black caregivers or people of color. The Plaintiff stated the following to Ashley (care manager from Alliance) in paragraph 29 of exhibit C:

> "Yes, she tried to hit me and basically she just the first (Inaudible), the first step, the first, she just saw me and make a face. That's the first thing she did when she saw me, she just make a face and cover her face that she don't want me to stay cause the night aide was a White girl, she got along with her, that's what she said and me and other aides like me, she doesn't, she don't like me..."

618.   In paragraph 29 of exhibit C, the Plaintiff stated to Ashley (care manager from Alliance) that Schwartz stated a preference for the Caucasian caregiver (whom Schwartz referred to as "the White girl") who was at Schwartz' apartment on the morning of January 24th, 2019 specifically because of the Caucasian's race along with her skin color.

619.   The Plaintiff stated that Schwartz specifically said that she did not want the Plaintiff or other people like the Plaintiff inside her apartment, which clearly implied that Schwartz did not want Black people or people of color inside her apartment. Additionally, the Plaintiff stated specifically that Schwartz "got along" with the Caucasian caregiver, yet Schwartz was malicious with the Plaintiff at first sight.

146

620.     Since the Plaintiff stated that Schwartz "got along" with the Caucasian caregiver, it is axiomatic that the Plaintiff complained and opposed the fact that Schwartz did not subject the Caucasian caregiver to any of the malicious acts Schwartz demonstrated against the Plaintiff on January 24th, 2019, such as Schwartz' frivolous 911 report against the Plaintiff, along with Schwartz's assault with the walking cane.

621.     Based on the Plaintiff's statement in paragraph 29 of exhibit C, it is clear that the Plaintiff found Schwartz' hateful/racist conduct of treating the Caucasian caregiver much more favorably than Schwartz treated the Plaintiff as an act that was severe enough that it unreasonably interfered with the Plaintiff's work duties at Alliance; especially since Schwartz subsequently acted out her racial animus against the Plaintiff through the assault and the subsequent frivolous 911 report.

622.     Paragraph 29 of exhibit C constituted the Plaintiff opposing and complaining about the hateful/racist treatment she experienced on the Schwartz home care assignment and since the Plaintiff was opposing and complaining about racially discriminatory treatment in the workplace at Alliance, the Plaintiff was engaged in protected activity pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7).

623.     Ashley (care manager from Alliance) was fully aware of this protected activity as Ashley directly responded to the Plaintiff's complaint and opposition about the Caucasian caregiver receiving much more favorable treatment by Schwartz because of her skin color and race as a White person because Ashley (care manager from Alliance) explained to the Plaintiff in paragraph 31 of exhibit C that Schwartz' conduct against the Plaintiff on January 24th, 2019 was motivated by "hatred" targeted against Black caregivers or people of color:

147

"So, the nurse that was there the night before that (inaudible) she was actually covering on the case too that was her first shift, um, but regularly during the night we have two LPN's, um, so Brenda, um, she works, ah, Sunday through Thursday and then we have Carline that works Friday and Saturday, um, nights, and they both are not Caucasian. So, I know that probably when you showed up that's what you thought and maybe that's what she thought at the moment but just to let you know, um, we don't have any, um, really Caucasian people on that case… you can get someone who completely agitated and has all this hatred in them. And unfortunately that is what we are dealing with Mrs. Schwartz."

624.    Furthermore, in paragraph 39 of exhibit C, Ashley (care manager from Alliance) stated that these Black people and people of color, who were similarly situated as the Plaintiff as caregivers, routinely call Alliance to complain and oppose Schwartz' hateful conduct against them:

"… and trust me, I'm so used to hearing caregivers and nurses and, you know, LPN's, RN's, they tell me what their experiences are with this woman and I listen to them, and we talk through it…"

625.    Alliance's statements in both paragraph 31 of exhibit C and paragraph 39 of exhibit C clearly demonstrate that Alliance believed that Schwartz was racially biased because Schwartz had been targeting Black people or people of color with "hatred" which routinely caused this class of people to complain and oppose Schwartz hateful behavior against them.

626.    Based on the Plaintiff's complaint and opposition in paragraph 29 of exhibit C and Ashley's response in paragraph 31 of exhibit C, Alliance was fully aware that the Plaintiff

was opposing and complaining about Schwartz' malicious and hateful/racist conduct of treating

the Caucasian caregiver much more favorably than the Plaintiff because she is a Black person.

    **iv.    On February 1st, 2019, the Plaintiff Opposed and Complained About Schwartz' Steady Barrage of Opprobrious Racial Verbal Comments Against the Plaintiff. This Constituted Protected Activity Pursuant to 42 U.S.C. § 1981 & the New York City Administrative Code § 8-107 (7).**

627.    On February 1st, 2019 (exhibit C), the Plaintiff complained and opposed to Ashley

(care manager from Alliance) about Schwartz' steady barrage of racially opprobrious verbal

comments against the Plaintiff.

628.    In paragraph 29 of exhibit C, the Plaintiff complained and opposed to Ashley

(care manager from Alliance) that Schwartz stated that she preferred the Caucasian caregiver

(whom Schwartz referred to as "the White girl") specifically because of the Caucasian's race

along with her skin color and Schwartz stated that she does not like people like the Plaintiff,

meaning Black people or people of color. This constituted opprobrious racial verbal comments

by Schwartz against the Plaintiff based on her skin color and race as a Black person.

629.    In paragraph 29 of exhibit C, the Plaintiff complained and opposed to Ashley

(care manager from Alliance) that Schwartz kept calling her 'little girl' and 'school girl', and

since the context surrounding this complaint and opposition about Schwartz calling the Plaintiff

a 'little girl' and a 'school girl' was in reference to Schwartz' racist behavior, it is clear that the

Plaintiff construed these comments from Schwartz as demonstrating racial animus as the Plaintiff

clearly communicated to Ashley (care manager from Alliance) that she construed Schwartz'

comments about her being a 'little girl' and a 'school-girl' as racially disparaging because it

implied that the Plaintiff had the intelligence or the demeanor of a child because she is a Black

person; which is a racial epithet commonly used against Black people or people of color to make

them feel inferior, such as a Caucasian calling a Black man 'boy'.

630.    The Plaintiff stated the following to Ashley (care manager from Alliance) in paragraph 29 of exhibit C:

> "Yes, she tried to hit me and basically she just the first (Inaudible), the first step, the first, she just saw me and make a face. That's the first thing she did when she saw me, she just make a face and cover her face that she don't want me to stay cause the night aide was a White girl, she got along with her, that's what she said and me and other aides like me, she doesn't, she don't like me, I make her... She told me I'm a little girl, she keep calling me "little girl", "school girl"…"

631.    In paragraph 27 of exhibit C, the Plaintiff stated to Ashley that she construed Schwartz' verbal comments as being motivated by racism:

> "They can be racist, they something like "I don't like you, blah, blah, blah (sic)" but call the police on me or try to beat you (Inaudible) don't do that to me."

632.    Indeed, in paragraph 31 of exhibit C, Ashley concurred by telling the Plaintiff that Schwartz was motivated by "hatred".

633.    In paragraph 31 of exhibit C, Ashley (care manager from Alliance) told the Plaintiff that everything Schwartz did to her on January 24th, 2019 was motivated by hatred targeted against Black people and people of color:

> "we don't have any, um, really Caucasian people on that case... you can get someone who completely agitated and has all this hatred in them. And unfortunately that is what we are dealing with Mrs. Schwartz."

634.    Therefore, it is clear that Alliance was fully aware that the Plaintiff was opposing and complaining about the steady barrage of opprobrious racial verbal comments the Plaintiff

was subjected to on the Schwartz home care assignment, in the Plaintiff's conversation with

Ashley (care manager from Alliance) on February 1st, 2019 (exhibit C).

**D. Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7), the Plaintiff Was Subjected to Adverse Employment Action Because Alliance Deliberately Failed to Disclose the Plaintiff's Employment Termination Along with Her Employment Termination Date in Retaliation for the Plaintiff's Complaints and Oppositions About Racially Discriminatory Conduct in the Workplace and For the Plaintiff Not Agreeing to Sign the February 26th, 2019 Arbitration Agreement.**

635.    As previously stated, later in the day on February 26th, 2019, Amanda Frey

(Director of Human Resources at Alliance) wrongfully terminated the Plaintiff's employment

because the Plaintiff did not agree to sign the February 26th, 2019 arbitration agreement and

because the Plaintiff made complaints and oppositions about Schwartz' malicious and

hateful/racist conduct against her in the workplace.

636.    Any reasonable person would agree that the Plaintiff's termination was the direct

consequence of the Plaintiff not agreeing to sign the February 26th, 2019 arbitration agreement

and because the Plaintiff complained and opposed multiple times about Schwartz' malicious and

hateful/racist conduct in the workplace.

637.    Since Amanda Frey (Director of Human Resources at Alliance) wrongfully

terminated the Plaintiff's employment in furtherance of Alliance's condonation of Schwartz'

malicious and hateful/racist conduct against the Plaintiff on January 24th, 2019, it is clear that the

Plaintiff's employment termination occurred under circumstances which demonstrate racial

discrimination by Alliance against the Plaintiff.

638.    Under New York State Labor Law § 195(6), Alliance had a duty, under the law,

to disclose the Plaintiff's employment termination date within 5 days of Amanda Frey (Director

of Human Resources at Alliance) terminating the Plaintiff's employment. Alliance maliciously,

intentionally, knowingly, and willfully failed to make such disclosure within that 5-day period, neither did Alliance do so at any time thereafter.

639.    Alliance's deliberate failure to disclose the Plaintiff's employment termination along with her employment termination date within 5 days of the Plaintiff's termination, or at any time thereafter (it has been about 2 years since the Plaintiff was terminated on February 26th, 2019) constituted an adverse employment action against the Plaintiff in retaliation for the Plaintiff's complaints and oppositions about racially discriminatory conduct in the workplace and for the Plaintiff not agreeing to sign the February 26th, 2019 arbitration agreement.

640.    Alliance's failure to disclose caused the Plaintiff a material loss of benefits. The Plaintiff lost the benefit of being informed, by her former employer, that her employment was terminated and of her employment termination date, which was a benefit guaranteed to the Plaintiff under the law.

641.    Alliance deliberately not disclosing the Plaintiff's employment termination along with her employment termination date constituted Alliance intentionally, knowingly, maliciously, and willfully retaliating against the Plaintiff by subjecting the Plaintiff to adverse terms and conditions of employment because of the Plaintiff's complaints and oppositions about racially discriminatory conduct in the workplace and for the Plaintiff not agreeing to sign the February 26th, 2019 arbitration agreement (exhibit H).

642.    Alliance disclosing the Plaintiff's employment termination along with her termination date was part of the terms and conditions of employment for the Plaintiff at Alliance under the law. Once Alliance hired the Plaintiff in July 2018, Alliance had a duty, under the law, to disclose the Plaintiff's employment termination along with her employment termination date

at the time of separation between the Plaintiff and Alliance, whenever that was to be, which turned out to be February 26th, 2019.

643.    By Alliance intentionally, maliciously, knowingly, and willfully failing to make this disclosure to the Plaintiff within 5 days of her termination date of February 26th, 2019, Alliance retaliated against the Plaintiff by depriving the Plaintiff of the lawful notice of her employment termination and employment termination date because of the Plaintiff's complaints and oppositions about racially discriminatory conduct in the workplace and for the Plaintiff not agreeing to sign the February 26th, 2019 arbitration agreement.

644.    New York State Labor Law § 195(6) extend the active duties of Alliance toward the Plaintiff up to five (5) days after the end of the Plaintiff's employment with Alliance. As such, Alliance's deliberate failure to disclose the Plaintiff's employment termination along with her employment termination date constituted Alliance subjecting the Plaintiff to a severe retaliatory act by providing the Plaintiff adverse terms and conditions of employment.

645.    It is reasonable that it was extremely crucial for Alliance to have made these disclosures as not making such disclosures would cause any reasonable person, in the Plaintiff's position, severe emotional distress, and mental anguish, especially since the circumstances surrounding this adverse employment action clearly indicated racial discrimination as it was clearly in furtherance of Alliance's condonation, normalization, encouragement, and approval of Schwartz' malicious and hateful/racist conduct in the workplace. It is axiomatic that Alliance secretly terminating the Plaintiff's employment would cause the Plaintiff to continue to erroneously believe that she was still employed by Alliance long after February 26th, 2019.

646.    Furthermore, these disclosures were not optional, they were part of the terms and conditions of employment for the Plaintiff at Alliance pursuant to New York State Labor Law §

195(6). Therefore, making these disclosures was a routine part of the operations at Alliance, or any other employer in the state of New York.

647.    Since it was in fact Amanda Frey (Director of Human Resources at Alliance) who directly terminated the Plaintiff's employment and it was in fact Amanda Frey who also had the ultimate responsibility of making this disclosure to the Plaintiff after Alliance terminated the Plaintiff's employment on February 26th, 2019, it is clear that Amanda Frey (Director of Human Resources at Alliance) intentionally, maliciously, knowingly, and willfully chose not to disclose the Plaintiff's employment termination and the Plaintiff's employment termination date in retaliation for the Plaintiff's complaints and oppositions about racially discriminatory conduct in the workplace and for the Plaintiff not agreeing to sign the February 26th, 2019 mandatory arbitration agreement.

**E. Alliance's Retaliatory Conduct Against the Plaintiff Occurred Under Circumstances Demonstrating Race Discrimination.**

648.    Alliance's adverse employment action of not disclosing the Plaintiff's employment termination along with her employment termination date was motivated by racial discrimination as this retaliatory act was in furtherance of Alliance's condonation, encouragement, normalization, and approval of Schwartz' malicious and hateful/racist conduct in the workplace.

649.    Alliance was so racially resentful for the Plaintiff's complaints and oppositions about racially discriminatory conduct in the workplace and Alliance was also so racially resentful for the Plaintiff not willing to "accept" Schwartz' malicious and hateful/racist conduct as part of the work environment by signing the February 26th, 2019 mandatory arbitration agreement that Amanda Frey (Director of Human Resources at Alliance) decided to retaliate

against the Plaintiff by not disclosing the Plaintiff's employment termination and employment termination date.

650.    Alliance was simply angry with the Black woman (the Plaintiff) who kept complaining about and opposing malicious and hateful/racist conduct in the workplace. As such, Alliance wanted to deal harshly with the Plaintiff, as a Black person, for daring to speak up about racially discriminatory conduct in the workplace.

651.    Albeit Alliance stated multiple times in exhibit C that the Plaintiff was well-qualified for her position as a caregiver at Alliance, Amanda Frey (Director of Human Resources at Alliance) discarded the Plaintiff as if she did not matter, in retaliation for the Plaintiff's complaints and oppositions about racially discriminatory conduct in the workplace and for the Plaintiff not signing the February 26th, 2019 mandatory arbitration agreement.

652.    The complete disregard Alliance demonstrated against the Plaintiff by Alliance deliberately not disclosing the Plaintiff's employment termination along with employment termination date, albeit it was required under the law, can only be explained by reasonably concluding that the Plaintiff, as a Black person, did not matter to Alliance and Alliance retaliated against the Plaintiff because her skin color and race are Black.

653.    Any reasonable person in the Plaintiff's situation would reasonably conclude that but for the Plaintiff being a Black person, Alliance would have not intentionally, maliciously, knowingly, and willfully retaliated against the Plaintiff by deliberately failing to disclose the Plaintiff's termination date as Alliance was required to do pursuant to New York State Labor Law § 195(6).

654.    Moreover, Alliance's deliberate failure to make this required disclosure clearly demonstrates that Alliance had an illicit intent when Amanda Frey (Director of Human

Resources at Alliance) terminated the Plaintiff's employment on February 26th, 2019, and based

on all the circumstances in this case, it is also clear that this illicit intent was race discrimination.

655.    Notably, Amanda Frey (Director of Human Resources at Alliance) had such low

regard for the Plaintiff, as a Black person, that Amanda Frey did not believe that the Plaintiff was

worthy of being properly informed of her employment termination along with her employment

termination date, as required under the law pursuant to New York State Labor Law § 195(6).

656.    Amanda Frey (Director of Human Resources at Alliance) demonstrated severe

racial animosity against the Plaintiff for her complaints and oppositions about Schwartz'

malicious and hateful/racist conduct in the workplace, along with the Plaintiff's complaint and

opposition in the February 13th, 2019 letter (exhibit F) that Alliance created a "dangerous" work

environment.

657.    There was absolutely no reason for Amanda Frey not to make these disclosures to

the Plaintiff, especially since these disclosures are part of the normal operations of any HR

department at any large-scale employer in the state of New York.

658.    This was a deliberate, calculated, malicious, and racist adverse employment

action taken by Alliance against the Plaintiff, designed with the sole intent of humiliating and

dismissing the Plaintiff from Alliance as harshly as possible to effectively communicate to the

Plaintiff that she was insignificant and did not matter because she is a Black person and to also

teach the Plaintiff a lesson in the sense that she should have stayed quiet about being subjected to

racially discriminatory conduct in the workplace.

659.    Based on all of the foregoing, it is reasonable to conclude that Alliance's

retaliatory act of deliberately failing to disclose the Plaintiff's employment termination along

with her employment termination date was solely motivated by the Plaintiff's skin color and race as a Black person.

**F. Causation for the Cause of Action of 'Retaliation Motivated by Racial Discrimination' Against Alliance Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107(7).**

660.    Alliance was the cause in fact of the harm to the Plaintiff because Alliance maliciously, intentionally, knowingly, and willfully retaliated against the Plaintiff by deliberately failing to disclose the Plaintiff's employment termination along with her termination date, as required under the law, as punishment for the Plaintiff's complaints and oppositions about racially discriminatory conduct in the workplace and for the Plaintiff not agreeing to sign the February 26th, 2019 arbitration agreement. This adverse employment action occurred under circumstances giving rise to an inference of race discrimination as it was in furtherance of Alliance's condonation, normalization, approval, and encouragement of Schwartz' malicious and hateful/racist conduct against the Plaintiff on January 24th, 2019.

661.    Alliance was the proximate cause of the harm suffered by the Plaintiff as it was foreseeable that intentionally, maliciously, knowingly, and willfully failing to disclose the Plaintiff's employment termination along with her employment termination date, out of racial discrimination, in retaliation for the Plaintiff's complaints and oppositions about racially discriminatory conduct in the workplace and for the Plaintiff not agreeing to sign the February 26th, 2019 mandatory arbitration agreement would cause the Plaintiff to suffer adverse employment action, along with severe emotional distress, and mental anguish.

662.    But for the Plaintiff being a Black person who was actively complaining about and opposing Schwartz' malicious and hateful/racist conduct in the workplace and who would not agree to relinquish her constitutional right to bring legal action against Alliance for racially

discriminatory conduct in the workplace by signing the February 26th, 2019 arbitration agreement, Alliance would have not deliberately failed to disclose the Plaintiff's employment termination along with her employment termination date, as required under the law.

663.     Therefore, the Plaintiff's race and skin color as a Black person were the sole motivating factors in Alliance's retaliatory act against the Plaintiff which caused the Plaintiff to develop severe emotional distress, physical ailments, and mental anguish.

**G. Plaintiff's Damages Against Defendant Alliance for this Cause of Action for 'Retaliation Motivated by Racial Discrimination' Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (7).**

664.     For this cause of action of *'Retaliation Motivated by Racial Discrimination'* the Plaintiff suffered adverse employment action, severe economic damages, severe emotional distress, mental anguish, along with associated physical ailments (see section VII of this 'Complaint').

665.     For this cause of action of *'Retaliation Motivated by Racial Discrimination'*, the Plaintiff is requesting nominal, compensatory, and punitive damages.

## SEVENTH (7TH) CAUSE OF ACTION:

## 'DISABILITY DISCRIMINATION' AGAINST DEFENDANT ALLIANCE PURSUANT TO THE NEW YORK CITY ADMINISTRATIVE CODE § 8-107 (28)

666.     The Plaintiff repeats and reasserts the allegations of paragraphs 1 through 665 as though fully set forth herein.

667.     The following describes and supports the cause of action of *'Disability Discrimination'* against Defendant Alliance Nursing Staffing of New York, Inc. pursuant to the New York City Administrative Code § 8-107 (28).

668.    On February 13th, 2019, the Plaintiff submitted a letter (see exhibit F) to Alliance which stated that the Plaintiff developed psychological trauma as a result of Schwartz' frivolous 911 report against the Plaintiff which was a dangerous condition in the workplace. Psychological trauma is a defined disability under the New York City Administrative Code § 8-102.

669.    Alliance engaged in disability discrimination against the Plaintiff, pursuant to the New York City Administrative Code § 8-107 (28), by not engaging in a cooperative dialogue with the Plaintiff to attempt to find a reasonable accommodation for the Plaintiff's complaint and opposition about developing psychological trauma (disability) as a result of being subjected to dangerous work conditions at Alliance, in relation to Schwartz' frivolous 911 report which Alliance had been condoning for more than two (2) years and had extensive knowledge of being caused by Schwartz' "hatred" targeted against Black caregivers or people of color, such as the Plaintiff.

**A. The Plaintiff is a Member of a Class of People Protected Under the New York City Administrative Code § 8-107 (28).**

670.    The Plaintiff developed psychological trauma (a disability) due to the incidents on the Schwartz home care assignment on January 24th, 2019. Psychological trauma is a defined disability under the New York City Administrative Code § 8-102.

671.    In the February 13th, 2019 letter submitted to Alliance (see exhibit F), the Plaintiff specifically complained to Alliance that the Schwartz incident caused her to develop severe psychological trauma.

672.    The Plaintiff stated the following in the letter of February 13th, 2019 (exhibit F):

"It is with sadness that I must say that I do not feel that I can continue with my duties at Alliance since the day Ms. Schwartz called the police on me for no

reason. <u>I have been very traumatized by the event and it made me realize how</u>

<u>dangerous this job can be</u>."

673.     As such, it is clear that the Plaintiff complained to Alliance that she had a defined

disability under the NYCHRL by stating that she developed psychological trauma due to

Schwartz' frivolous 911 report, which created a dangerous work environment for the Plaintiff, as

a Black person, as Schwartz' frivolous 911 report was motivated by malice and "hatred" targeted

against Black caregivers or people of color.

674.     The New York City Administrative Code § 8-107 (28) creates an affirmative duty

for Alliance to engage in a cooperative dialogue with the Plaintiff to attempt to reasonably

accommodate the psychological trauma she developed as a result of being subjected to malicious

and hateful/racist conduct in the workplace. Alliance failed to comply in any way, shape, or form

with the requirements under the New York City Administrative Code § 8-107 (28) which

constituted an act of disability discrimination against the Plaintiff.

675.     Since the Plaintiff experienced adverse employment action which constituted

disability discrimination, the Plaintiff is part of a protected class of people under the New York

City Administrative Code § 8-107 (28).

**B. The Plaintiff Was Qualified to Hold the Position of Home Health Aide (caregiver) at Alliance Pursuant to the New York City Administrative Code § 8-107 (28).**

676.     The Plaintiff was qualified to hold her position of home health aide (caregiver) at

Alliance.

677.     The Plaintiff was certified and registered with the New York State Department of

Health as a home health aide (a caregiver) of Alliance Nursing Staffing of New York, Inc. during

her employment with Alliance.

678. Indeed, Alliance itself, repeatedly complimented the Plaintiff on her excellent work record with Alliance.

679. In paragraph 26 of exhibit C, Ashley (care manager from Alliance) stated the following:

> "um, you know, I just want you to know, I mean, of course like I said it's a scary experience when that happens and then you're like: "Did I do something wrong", like, "What did I do?" But you did absolutely nothing wrong. Alliance knows it. We've had this client for over 2 years. She has been, um, very challenging".

680. In paragraph 33 of exhibit C Ashley stated the following to the Plaintiff:

> "you know, in careers we go through these moments, where there are these experiences, where you think that "is this really what I'm supposed to do?" But I've heard nothing but good things about you as a caregiver and don't let this ruin your career, you know, or your choice in staying as a caregiver... and know that you do a good job and that, you, people do love your performance".

681. In paragraph 35 of exhibit C, Ashley stated the following to the Plaintiff:

> "but honestly, you are good at what you do and please just don't give up that's all."

682. In paragraph 39 of exhibit C, Ashley stated the following to the Plaintiff:

> "but if I were you I would just keep doing what you're doing you know, and don't give up that client that loves you."

683. As such it is clear that the Plaintiff was qualified to hold the position of home health aide (caregiver) at Alliance.

**C. Pursuant to the New York City Administrative Code § 8-107 (28), Alliance Was Aware that the Plaintiff Developed a Disability and This Disability Caused the Plaintiff to Oppose and Complain About it to Alliance.**

684.    Being psychologically traumatized is a defined disability under the New York City Administrative Code § 8-102.

685.    The Plaintiff specifically opposed and complained, in the February 13th, 2019 letter (exhibit F), that she had developed psychological trauma due to Schwartz' frivolous 911 report against the Plaintiff, along with Schwartz' other malicious conduct against the Plaintiff on January 24th, 2019.

686.    Moreover, the Plaintiff specifically referred to the "dangerous" conditions in the workplace in the February 13th, 2019 letter (exhibit F):

>  "It is with sadness that I must say that I do not feel that I can continue with my duties at Alliance since the day Ms. Schwartz called the police on me for no reason. I have been very traumatized by the event and it made me realize how <u>dangerous</u> this job can be."

687.    It is clear that the Plaintiff directly experienced threatened serious injury by both Schwartz' assault with the walking cane and the frivolous 911 report against the Plaintiff on January 24th, 2019.

688.    The Plaintiff's complaint that the Plaintiff was "traumatized" because the Plaintiff was directly exposed to threatened serious injury by Schwartz' frivolous 911 report constituted the Plaintiff complaining about a medically diagnosable disability, in accordance with the NYCHRL.

689.    Moreover, the Plaintiff was directly exposed to threatened death at the hands of the police through Schwartz' frivolous 911 report, as it is a well-known fact that Black people, or

people of color in general, have a long running adverse relationship with the police and it is a fact that very often Black people end up severely injured or dead after routine encounters with the police.

690.     Whereas here, the Plaintiff was inside Schwartz' apartment, a privileged Caucasian woman, who was essentially accusing the Plaintiff of trespassing because Schwartz told the police that the Plaintiff was not doing her job and as such, the Plaintiff should not be inside her apartment. For all intents and purposes, Schwartz was accusing the Plaintiff, a Black person, of engaging in a crime inside Schwartz' home, which was Schwartz' frivolous report of trespassing against the Plaintiff.

691.     This was a frivolous 911 report which was made by Schwartz with the specific intent of terrorizing the Plaintiff to the core of her being and to induce a physical confrontation between the Plaintiff and the police on January 24th, 2019.

692.     This disability also caused the Plaintiff to submit the February 13th, 2019 letter (exhibit F) to Alliance, which also included the Plaintiff's opposition and complaint about developing psychological trauma in relation to the Schwartz home care assignment.

693.     Prior to the Plaintiff submitting the February 13th, 2019 letter, Alliance had already verbally admitted to the Plaintiff on February 1st, 2019 that Alliance recognized that the Plaintiff did in fact suffer from psychological trauma and it was not the first time that Black people or people of color have complained to Alliance that they developed mental anguish after providing home care services to Schwartz.

694.     In paragraph 12 of exhibit C, Ashley (care manager from Alliance) explained to the Plaintiff that Alliance was aware that the experience she had on the Schwartz home care

assignment was horrible for the Plaintiff, which reasonably demonstrates that Alliance had notice of the Plaintiff's psychological trauma:

> "The family was mortified that she called the police. Um, and you know, I said I just wanted to call you to let you know that of course, <u>that experience, I can imagine was horrible for you</u>".

695.    In paragraph 26 of exhibit C, Ashley (care manager from Alliance) told the Plaintiff that Alliance was aware of the fact that the Schwartz home care assignment was a scary experience for her:

> "… <u>I just want you to know, I mean, of course like I said it's a scary experience when that happens </u>and then you're like: "Did I do something wrong", like, "What did I do?" But you did absolutely nothing wrong. Alliance knows it. We've had this client for over 2 years. She has been, um, very challenging".

696.    In paragraph 33 of exhibit C, Ashley (care manager from Alliance) acknowledged that Alliance was aware of the fact that her experience on the Schwartz home care assignment probably ruined the Plaintiff's career as a "caregiver":

> "So, I just wanted to let you know there is a major history with this case, and Alliance doesn't think there is nothing but sympathy that this happened to you, you know, and the family does too. <u>So I don't want you to, this is just, you know, in careers we go through these moments, where there are these experiences, where you think that "is this really what I'm supposed to do?" But I've heard nothing but good things about you as a caregiver and don't let this ruin your career, you know, or your choice in staying as a caregiver.</u>"

697.    In paragraph 39 of exhibit C, Ashley (care manager from Alliance) acknowledged that Alliance was aware of the fact that other Black people or people of color who were similarly situated as the Plaintiff as caregivers routinely reported experiencing mental anguish to Alliance after providing home care services to Schwartz. Furthermore, Ashley acknowledged that Alliance was aware of the fact that the Plaintiff's experience on the Schwartz home care assignment was "intense" and as such, Alliance clearly had notice that Schwartz' malicious, violent, hateful/racist conduct impacted the Plaintiff both psychologically and emotionally:

> "and trust me, I'm so used to hearing caregivers and nurses and, you know, LPN's, RN's, they tell me what their experiences are with this woman and I listen to them, and we talk through it... I know this woman can't necessarily help it, but, it was intense."

698.    Based on paragraphs 12, 26, 33, and 39 of exhibit C from February 1st, 2019, it is clear that Alliance knew that the Plaintiff developed psychological trauma after her adverse experience with Schwartz on January 24th, 2019. The Plaintiff's February 13th, 2019 letter (exhibit F) simply reaffirmed that the Plaintiff actually did develop psychological trauma (a disability) as a direct consequence of her adverse experience on the Schwartz home care assignment.

**D. Pursuant to the New York City Administrative Code § 8-107 (28), Alliance Engaged in Disability Discrimination by Failing to Engage in a Good Faith Dialogue to Attempt to Determine a Reasonable Accommodation for the Plaintiff's Disability.**

699.    Pursuant to the New York City Administrative Code § 8-107 (28), once Alliance became aware of the Plaintiff's psychological trauma, Alliance had an active and affirmative duty to voluntarily enter into a cooperative dialogue with the Plaintiff to attempt to provide the

Plaintiff with a reasonable accommodation to allow her to continue with her employment at Alliance.

700.    Alliance made absolutely no attempt to provide any type of reasonable accommodation to the Plaintiff after she complained that she developed psychological trauma as a consequence of being subjected to malicious conduct in the workplace in the February 13th, 2019 letter to Alliance (see exhibit F). As such, Alliance cannot claim that whatever action they could have taken to provide the Plaintiff a reasonable accommodation would have caused undue hardship for Alliance because Alliance never tried anything to reasonably accommodate the Plaintiff's disability pursuant to the NYCHRL.

701.    Alliance had a duty to engage in a good faith interactive process to accurately assess the needs of the Plaintiff. Moreover, even if the Plaintiff did not make a specific request for a reasonable accommodation, Alliance had an independent affirmative duty to investigate possible reasonable accommodations for the Plaintiff once Alliance had reason to suspect that the Plaintiff suffered from a disability, pursuant to the New York City Administrative Code § 8-107 (28).

702.    The New York City Administrative Code § 8-107 (28) did not require Alliance to pre-determine if a reasonable accommodation could be offered. The New York City Administrative Code § 8-107 (28) simply required Alliance to engage in a good faith dialogue to see if a reasonable accommodation could hopefully be found.

703.    The New York City Administrative Code § 8-107 (28) created an affirmative duty for Alliance to go on a 'fact finding mission' to see what could be done for the Plaintiff, even if at the end both the Plaintiff and Alliance concluded that nothing could be done to help the

Plaintiff stay on the job. This cannot be determined at this point as Alliance failed to engage in the cooperative dialogue required under New York City Administrative Code § 8-107 (28).

704.    It is obvious that Alliance failed to engage in a cooperative dialogue with the Plaintiff in relation to her disability because Alliance did not want to end racially discriminatory conduct in the workplace; that is a fact based on all the circumstances, as described in this complaint.

705.    Alliance knew that engaging in a cooperative dialogue to help the Plaintiff stay on the job would entail Alliance taking concrete action to put all employees and home care clients on notice that malicious conduct motivated by hatred/racism in the workplace is unacceptable.

706.    It is also clear that taking action to put everyone on notice was a heavy burden for Alliance as Alliance had a policy of actively condoning, encouraging, approving, and normalizing racially discriminatory conduct in the workplace.

707.    Engaging in a cooperative dialogue with the Plaintiff was the easiest, kindest, and most civil act Alliance could have engaged in. Alliance deliberately chose not to engage in this cooperative dialogue with the Plaintiff because Alliance did not see the Plaintiff worthy of such treatment because Alliance had a complete disregard for the emotional and psychological well-being of the Plaintiff because she is a Black person, which was ultimately demonstrated by the condonation, encouragement, normalization, and approval of Schwartz' malicious and hateful/racist conduct against the Plaintiff on all levels of management at Alliance, which of course includes the director of human resources at Alliance, Amanda Frey.

708.    Based on all of the foregoing, it is clear that Alliance engaged in disability discrimination against the Plaintiff, pursuant to the New York City Administrative Code § 8-

107(28), by failing to engage in a cooperative dialogue with the Plaintiff after she complained about developing a disability.

**E. Causation for the Cause of Action of 'Disability Discrimination' Against Alliance, Pursuant to the New York City Administrative Code § 8-107 (28).**

709.    Alliance was the cause in fact of the harm to the Plaintiff because Alliance maliciously, intentionally, knowingly, and willfully engaged in disability discrimination against the Plaintiff by deliberately failing to engage in a good faith cooperative dialogue with the Plaintiff to attempt to reasonably accommodate the Plaintiff's disability after Alliance was made aware of the Plaintiff's psychological trauma through the February 13th, 2019 letter (exhibit F).

710.    Alliance was the proximate cause of the harm suffered by the Plaintiff as it was foreseeable that deliberately failing to engage in a good faith dialogue with the Plaintiff to attempt to reasonably accommodate the Plaintiff's disability would cause the Plaintiff adverse employment action, and would exacerbate the already severe emotional distress, along with the mental anguish (psychological trauma) the Plaintiff developed as a result of being subjected to Schwartz' malicious and hateful/racist conduct in the workplace.

711.    But for Alliance having a complete disregard for the psychological trauma (disability) the Plaintiff developed as a result of being subjected to malicious and hateful/racist conduct in the workplace because of her skin color and race as a Black person, Alliance would have not intentionally, maliciously, knowingly, and willfully failed to engage in a good faith cooperative dialogue with the Plaintiff to attempt to reasonably accommodate the Plaintiff's psychological trauma, which caused the Plaintiff to suffer adverse employment action, which exacerbated the already severe emotional distress, along with the mental anguish (psychological trauma) the Plaintiff developed as a result of being subjected to Schwartz' malicious and hateful/racist conduct in the workplace.

712.     Therefore, Alliance's complete disregard for the psychological trauma (disability) the Plaintiff developed as a result of being subjected to Schwartz' malicious and hateful/racist conduct in the workplace was the sole motivating factor for this adverse employment action.

**F. Plaintiff's Damages Against Defendant Alliance for the Cause of Action of 'Disability Discrimination' Pursuant to the New York City Administrative Code § 8-107 (28).**

713.     For this cause of action of 'Disability Discrimination' the Plaintiff suffered adverse employment action, severe economic damages, severe emotional distress, mental anguish, (psychological trauma), along with associated physical ailments (see section VII of this 'Complaint').

714.     For this cause of action of 'Disability Discrimination', the Plaintiff is requesting nominal, compensatory, and punitive damages.

## EIGHTH (8TH) CAUSE OF ACTION:

## 'DEPRIVATION OF CONSTITUTIONAL RIGHT TO BE FREE OF INVOLUNTARY SERVITUDE MOTIVATED BY RACIAL DISCRIMINATION' AGAINST DEFENDANT ALLIANCE PURSUANT TO  THE 13TH AMENDMENT OF THE UNITED STATES CONSTITUTION & 42 U.S.C. § 1981

715.     The Plaintiff repeats and reasserts the allegations of paragraphs 1 through 714 as though fully set forth herein.

716.     The following describes and supports the cause of action of *'Deprivation of Constitutional Right to Be Free of Involuntary Servitude Motivated by Racial Discrimination'* against Defendant Alliance Nursing Staffing of New York, Inc. pursuant to the 13th Amendment of the United States Constitution and 42 U.S.C. § 1981.

717.     The Plaintiff is bringing a cause of action for 'Involuntary Servitude' against Alliance, pursuant to the 13th Amendment of the United States Constitution, for Alliance's act of

intentionally, maliciously, knowingly, and willfully depriving the Plaintiff of her Constitutional

right to be free of involuntary servitude by using legal coercion, through New York patient

abandonment/neglect penal laws, to force the Plaintiff to work on the Schwartz home care

assignment against the Plaintiff's will after Schwartz engaged in the racially motivated frivolous

911 report against the Plaintiff on January 24th, 2019 because the Plaintiff's skin color and race

are Black.

718.    Prior to assigning the Plaintiff to the Schwartz home care assignment, Alliance

had extensive knowledge that Schwartz had a daily malicious and hateful/racist pattern of

engaging in racially motivated frivolous 911 reports targeted against Black caregivers or people

of color. Additionally, Alliance routinely received complaints and oppositions from Black

caregivers or people of color about Schwartz' malicious and hateful/racist conduct targeted

against this class of people, yet Alliance maliciously, intentionally, knowingly, and willfully

concealed these material facts from the Plaintiff when Alliance was assigning the Plaintiff to the

Schwartz home care assignment (see exhibit D).

719.    Alliance's act of depriving the Plaintiff of her Constitutional right to be free of

involuntary servitude was motivated by racial discrimination pursuant to 42 U.S.C. § 1981,

because Alliance's deliberate concealment of Schwartz' pattern of malicious and hateful/racist

behavior and Alliance's subsequent intentional and malicious conduct of using legal coercion,

through New York patient abandonment/neglect penal laws, to force the Plaintiff to work on the

Schwartz home care assignment against her will after Schwartz engaged in the racially motivated

frivolous 911 report were acts that were in furtherance of Alliance's long term condonation,

normalization, approval, and encouragement of Schwartz' malicious and hateful/racist conduct in

the workplace. Alliance's act of depriving the Plaintiff of her Constitutional right to be free of

170

involuntary servitude constituted an adverse employment action because the Plaintiff was deprived of the material benefit of being free of involuntary servitude.

720.    But for Alliance concealing the material fact that Schwartz had a pattern of engaging in malicious and hateful/racist conduct targeted against Black caregivers or people of color and Alliance subsequently using legal coercion, through New York Patient abandonment/neglect laws, to force the Plaintiff to remain on the Schwartz home care assignment against her will, the Plaintiff would have not been deprived of her Constitutional right to be free of involuntary servitude.

721.    Additionally, but for the Plaintiff's skin color and race being Black, Alliance would have not deprived the Plaintiff of her Constitutional right to be free of involuntary servitude.

**A. The Plaintiff is a Member of a Class of People Protected Under the 13th Amendment of the United States Constitution and 42 U.S.C. § 1981.**

722.    The Plaintiff's race is Black and the Plaintiff's skin color is Black.

723.    The 13th Amendment of the United States Constitution makes it unlawful for Alliance to maliciously, intentionally, knowingly, and willfully subject the Plaintiff to forced labor under the coercion of law.

724.    42 U.S.C. § 1981 makes it unlawful for Alliance to subject the Plaintiff to adverse terms and conditions of employment because her skin color and race are Black, through the deprivation of the material benefit of being free of involuntary servitude.

725.    Because Alliance used legal coercion to force the Plaintiff to perform work on the Schwartz home care assignment against her will, the Plaintiff is part of a protected class of people under the 13th Amendment of the United States Constitution.

726.     Additionally, because the Plaintiff was deprived of her constitutional right to be free of involuntary servitude because her skin color and race are Black, the Plaintiff is part of a protected class of people under 42 U.S.C. § 1981.

**B. The Plaintiff Was Qualified to Hold the Position of Home Health Aide (Caregiver) at Alliance.**

727.     The Plaintiff was qualified to hold her position of home health aide (caregiver) at Alliance.

728.     The Plaintiff was certified and registered with the New York State Department of Health as an employee of Alliance Nursing Staffing of New York, Inc. during her employment with Alliance.

729.     Indeed, Alliance itself, repeatedly complimented the Plaintiff on her excellent work record with Alliance.

730.     In paragraph 26 of exhibit C, Ashley (care manager from Alliance) stated the following:

> "um, you know, I just want you to know, I mean, of course like I said it's a scary experience when that happens and then you're like: "Did I do something wrong", like, "What did I do?" But you did absolutely nothing wrong. Alliance knows it. We've had this client for over 2 years. She has been, um, very challenging".

731.     In paragraph 33 of exhibit C Ashley stated the following to the Plaintiff:

> "you know, in careers we go through these moments, where there are these experiences, where you think that "is this really what I'm supposed to do?" But I've heard nothing but good things about you as a caregiver and don't let this ruin your career, you know, or your choice in staying as a caregiver... and know that you do a good job and that, you, people do love your performance".

172

732.   In paragraph 35 of exhibit C, Ashley stated the following to the Plaintiff:

"but honestly, you are good at what you do and please just don't give up that's all."

733.   In paragraph 39 of exhibit C, Ashley stated the following to the Plaintiff:

"but if I were you I would just keep doing what you're doing you know, and don't give up that client that loves you."

734.   As such it is clear that the Plaintiff was qualified to hold the position of home health aide (caregiver) at Alliance.

**C. The Plaintiff Was Subject to the Penalties of Patient Abandonment/Neglect Laws.**

735.   In the Plaintiff's orientation training at Alliance at the outset of the Plaintiff's employment with Alliance around July 2018, Alliance made it clear to the Plaintiff that patient neglect or patient abandonment carries severe penalties if the home care client, such as Schwartz, were to be severely injured as a direct consequence of the Plaintiff neglecting or abandoning the home care client in the middle of a work shift without ensuring continuity of care.

736.   Alliance explained to the Plaintiff what constituted patient neglect/abandonment. Alliance explained to the Plaintiff that patient neglect/abandonment involved the Plaintiff leaving a home care client without ensuring continuity of care for the home care client.

737.   The Plaintiff's training created severe fear in the Plaintiff that any act of patient neglect or abandonment would have life altering consequences for the Plaintiff, such as facing severe criminal penalties for abandoning or neglecting a home care client, such as Schwartz. As such, Alliance's legal coercion against the Plaintiff on January 24th, 2019 was implied through the Plaintiff's training with Alliance at the outset of the Plaintiff's employment in July 2018.

738.     In the state of New York, abandoning or neglecting a home care client is in fact unlawful pursuant to several penal laws such as (a) N.Y. Penal Law § 260.32 titled Criminal Elder Abuse , (b) N.Y. Penal Law § 260.34 titled Criminal Elder Abuse, (c) N.Y. Penal Law § 260.25 titled Criminal Elder Abuse, and (d) N.Y. Penal Law § 260.24 titled Criminal Elder Abuse.

739.     Penal Law § 260.31(1) explains that the term 'Caregiver', as stated in the previous statutes, refers to the Plaintiff in her position as a home health aide from Alliance at Schwartz' apartment on January 24th, 2019:

> "Caregiver means a person who assumes responsibility for the care of a vulnerable elderly person, or an incompetent or physically disabled person pursuant to a court order or receives monetary or other valuable consideration for providing care for a vulnerable elderly person, or an incompetent or physically disabled person".

740.     Based on the foregoing, it is clear that the Plaintiff could be held criminally liable if the Plaintiff simply decided to leave the Schwartz home care assignment at will, before the end of her work shift, without clear authorization from Alliance to do so.

741.     Albeit the Plaintiff did not observe any severe infirmities in Schwartz as she ambulated on her own, was extremely well presented, made her own breakfast (hot tea, toast with butter and jam), and albeit the Plaintiff did not observe any urgent medical needs on the part of Schwartz which would cause Schwartz to be disadvantaged if the Plaintiff left the home care assignment at will after Schwartz started engaging in malicious and hateful/racist conduct against the Plaintiff, based on the Plaintiff's training with Alliance the Plaintiff felt coercion of the sort

that she did not believe that she could leave the Schwartz home care assignment without facing the possible intolerable legal consequences of patient abandonment/neglect laws.

742.    Based on all of the foregoing, it is clear that there was considerable legal coercion on the Plaintiff to remain on the Schwartz home care assignment, albeit it was a violent racially hostile and abusive work environment, permeated with racial oppression, intimidation, and abuse, along with conditions which were akin to African slavery as the Plaintiff was being required by Alliance to continue with her work duties after Schwartz had already subjected the Plaintiff to a racially motivated assault along with a frivolous 911 report and the Plaintiff was not able to leave for fear of being accused of patient abandonment/neglect. The Plaintiff's experience in involuntary servitude on the Schwartz home care assignment was extremely traumatizing.

743.    Furthermore, it is also clear that due to the intolerable criminal penalties associated with patient neglect or abandonment, there is no doubt that the legal coercion the Plaintiff was under to remain on the Schwartz home care case was of the kind that the Plaintiff could not bring herself to leave the Schwartz home care case on her own accord.

744.    Any reasonable person in the Plaintiff's position would agree that being subjected to a steady barrage of opprobrious racial verbal comments, a violent assault, along with a frivolous 911 report, all of which were clearly motivated by racism, would cause a Black person in the Plaintiff's position to immediately leave the work assignment. It was the considerable legal coercion that the Plaintiff was under which caused her to remain on the Schwartz home care assignment after Schwartz subjected the Plaintiff to so much racially motivated hostile conduct.

**D. Pursuant to the 13th Amendment of the United States Constitution, Alliance Maliciously, Intentionally, Knowingly, and Willfully Used Patient Neglect/Abandonment Penal Laws to Compel/Coerce the Plaintiff to Remain on the Schwartz Home Care Assignment Against the Plaintiff's Will.**

745.    Prior to assigning the Plaintiff to the Schwartz home care assignment on January 23rd, 2019 (see exhibit D) to work on January 24th, 2019 and January 25th, 2019, Alliance was clearly aware that the Plaintiff would want to withdraw from the Schwartz home care assignment once the Plaintiff experienced the home care assignment because Alliance was clearly aware of Schwartz' pattern of conduct of engaging in malicious and hateful/racist conduct targeted against Black caregivers or people of color, which included daily frivolous 911 reports (see paragraphs 3 and 6 of exhibit A; also see paragraphs 26 and 33 of exhibit C).

746.    Furthermore, being that Black caregivers were routinely calling Alliance to complain about and oppose Schwartz' pattern of malicious conduct (see paragraph 39 of exhibit C), it is unambiguously clear that Alliance was reasonably aware that the Plaintiff would want to withdraw from the Schwartz home care assignment.

747.    Being fully aware of these facts, on January 23rd, 2019 Ashley (care manager from Alliance) maliciously, intentionally, knowingly, and willfully concealed Schwartz' malicious and hateful/racist pattern of engaging in frivolous 911 reports targeted against Black caregivers or people of color when Ashley (care manager from Alliance) was assigning the Plaintiff to the Schwartz home care assignment (see exhibit D). Nowhere in exhibit D does Ashley (care manager from Alliance) disclose these material facts to the Plaintiff.

748.    Alliance engaged in this conduct with the intent of deceiving the Plaintiff into accepting the Schwartz home care assignment because Alliance knew that once the Plaintiff agreed to take the Schwartz home care assignment, she would not be allowed to withdraw before the end of her work shift because the Plaintiff would then be subject to the penalties of patient neglect/abandonment laws.

749.     Moreover, Alliance was aware that no reasonable Black caregiver or person of color would agree to accept the Schwartz home care assignment once Alliance disclosed that Schwartz had a malicious and hateful/racist pattern of engaging in frivolous 911 reports against Black caregivers or people of color. Therefore, it is reasonable to conclude that Alliance intentionally, maliciously, knowingly, and willfully concealed Schwartz' patter of malicious and hateful/racist behavior prior to assigning the Plaintiff to the Schwartz home care assignment with the intent of deceiving the Plaintiff into accepting the Schwartz home care assignment.

750.     Alliance clearly intended to deceive the Plaintiff by concealing Schwartz' malicious and hateful/racist behavior prior to assigning the Plaintiff to the Schwartz home care assignment as Alliance knew that the Plaintiff, as a Black person, would have decisively rejected the Schwartz home care assignment if it was disclosed to the Plaintiff that Schwartz had a daily pattern of making frivolous 911 reports targeted against Black caregivers or people of color out of malice and hatred/racism; especially since Alliance was fully aware that Schwartz' conduct routinely caused this class of people to oppose and complain to Alliance (see paragraph 39 of exhibit C).

751.     Alliance knew that no reasonable Black person would voluntarily agree to be subjected to frivolous 911 reports motivated by hatred/racism. Therefore, Alliance intentionally concealed this information from the Plaintiff to her detriment, as the Plaintiff unknowingly agreed to accept the Schwartz home care assignment where Schwartz actually did engage in the same pattern of malicious and hateful/racist behavior against the Plaintiff by subjecting her to a frivolous 911 report because of her skin color and race as a Black person.

752.    Alliance knowingly and willfully concealing Schwartz' racist behavior could have served only one purpose which was to mislead and deceive the Plaintiff into accepting the Schwartz home care assignment.

753.    Exhibit D is a conversation from January 23rd, 2019, when Alliance was assigning the Plaintiff the Schwartz home care assignment. Ashley (care manager from Alliance) was the person from Alliance who assigned the Plaintiff the Schwartz home care assignment.

754.    Notably, nowhere in exhibit D, does Ashley (care manager from Alliance) mention that Schwartz calls the police "every day" neither does Ashley state that Schwartz has all this "hatred" specifically targeted against Black caregivers or people of color.

755.    Then, on January 24th, 2019, the Plaintiff was implicitly coerced by Alliance, through patient abandonment/neglect penal laws, to remain on the Schwartz home care assignment after Schwartz engaged in the malicious and hateful/racist frivolous 911 report against the Plaintiff.

756.    Firstly, Schwartz subjected the Plaintiff to racially opprobrious verbal comments, such as Schwartz telling the Plaintiff that she (Schwartz) preferred the Caucasian caregiver (whom Schwartz referred to as "the White girl") specifically because of the Caucasian's race along with her skin color. Schwartz also added in that moment that Alliance knows exactly the type of people she (Schwartz) wants Alliance to send, and Schwartz asked the Plaintiff in that same moment: "Why did they send you?"

757.    These statements from Schwartz demonstrated racial animus against the Plaintiff as a Black person because Schwartz specifically stated a preference for "White" caregivers.

758.    Around mid-day on January 24th, 2019, Schwartz angrily told the Plaintiff to go sit in a corner because the Plaintiff's face was making Schwartz nauseous. When the Plaintiff

answered that she could not go sit in the corner because she was there to provide Schwartz with

professional home care services, Schwartz replied that if the Plaintiff did not go sit in the corner

that she (Schwartz) would call the police.

759.    Immediately after making the threat of calling the police, Schwartz assaulted the

Plaintiff with her walking cane by vigorously swinging the walking cane toward the Plaintiff's

head. The Plaintiff was placed in fear of imminent harmful and unwanted physical contact which

caused the Plaintiff to take one step back to avoid severe physical harm.

760.    Immediately after Schwartz' assault against the Plaintiff with the walking cane,

the Plaintiff immediately wanted to leave the Schwartz home care assignment. Yet, the Plaintiff

could not leave because the Plaintiff knew that she was under legal coercion to remain on the

Schwartz home care assignment pursuant to New York State penal laws against patient

neglect/abandonment, which the Plaintiff was made aware of by Alliance at the outset of the

Plaintiff's employment with Alliance in July 2018.

761.    Any reasonable person would have left the Schwartz home care assignment after

being assaulted by Schwartz, especially because it was clear that Schwartz' assault with the

walking cane was motivated by racial animus based on Schwartz' statement about preferring the

Caucasian caregiver. Therefore, it is reasonable to state that the Plaintiff believed that there was

considerable legal coercion to keep the Plaintiff inside Schwartz' apartment after such a violent

racially motivated attack by Schwartz. Indeed, this legal coercion was set forth by Alliance at the

outset of the Plaintiff's employment with Alliance in July 2018.

762.    Immediately after Schwartz assaulted the Plaintiff with the walking cane,

Schwartz walked over to her phone and called the police and made a frivolous 911 report against

the Plaintiff. In the conversation Schwartz had with the police in that moment, Schwartz stated

179

that the Plaintiff was at her apartment from Alliance, and that the Plaintiff was not doing her job therefore she should not be inside her apartment.

763.    The Plaintiff's desire to withdraw from the Schwartz home care assignment intensified as the Plaintiff observed Schwartz making the frivolous 911 report. Yet, all the Plaintiff could do in the moment was to just stand there and observe Schwartz engaging in this malicious and hateful/racist act against the Plaintiff, as the Plaintiff was under legal coercion to remain on the Schwartz home care assignment and could not leave at will.

764.    Any reasonable person would agree that a Caucasian person, such as Schwartz, engaging in so much racially hostile conduct against a Black person, such as the Plaintiff, would cause any reasonable person to immediately leave or withdraw from the Schwartz home care assignment. After all, Schwartz was essentially accusing the Plaintiff of trespassing inside her apartment through the frivolous 911 report to the police. Any reasonable person would want to immediately leave Schwartz' apartment for fear of being arrested for trespassing inside Schwartz' apartment.

765.    Yet, the Plaintiff had no free will in that moment and was effectively trapped and was compelled to remain on the Schwartz home care assignment under patient neglect/abandonment penal laws based on the Plaintiff's training from Alliance at the outset of her employment with Alliance in July 2018.

766.    Every single second the Plaintiff spent on the Schwartz home care assignment against her will, from the time of the assault to the frivolous 911 report, was time spent in involuntary servitude on the Schwartz home care assignment because the Plaintiff was under legal coercion to remain on the Schwartz home care assignment against her will.

767.     Any period of time the Plaintiff spent working on the Schwartz home care assignment involuntarily, and under legal coercion to do so from Alliance, constituted a deprivation of the Plaintiff's right to be free of involuntary servitude under the 13th Amendment of the U.S. Constitution.

768.     Moreover, in determining if the Plaintiff's service on the Schwartz home care assignment was involuntary, it does not matter if the Plaintiff initially agreed to accept the Schwartz home care assignment. What matters was that once the Plaintiff wanted to withdraw from the Schwartz home care assignment, the Plaintiff could not do so based on the Plaintiff's training at the outset of her employment in July 2018.

769.     Subsequently, on January 24th, 2019 Alliance engaged in verbal legal coercion against the Plaintiff which caused the Plaintiff to believe that she had no way to avoid continued service on the Schwartz home care assignment because the Plaintiff would be subject to intolerable and life altering consequences under New York State penal laws for patient abandonment/neglect.

770.     After Schwartz engaged in the frivolous 911 report against the Plaintiff on January 24th, 2019, the Plaintiff immediately contacted Alliance to make Alliance aware of the situation. The Plaintiff spoke to Holly (care manager from Alliance) immediately after Schwartz' malicious and hateful/racist frivolous 911 report. During this conversation, the Plaintiff was still inside Schwartz' apartment because the Plaintiff was under legal coercion, under New York patient neglect/abandonment penal laws, to remain on the Schwartz home care assignment until Alliance actually authorized the Plaintiff to leave.

771.     In paragraph 3 of exhibit A (January 24th, 2019), Holly stated the following to the Plaintiff about Schwartz' frivolous 911 report:

"I'm the care manager so, it's fine, Joan does this to everyone. So, I would just go

in the study, that's fine..."

772.   By Alliance stating that "it's fine" that Schwartz made the frivolous 911 report

against the Plaintiff, Alliance reaffirmed the legal coercion against the Plaintiff. Once Alliance

stated to the Plaintiff that "it's fine" that Schwartz made the frivolous 911 report against her,

Alliance, as the employer, officially certified that there was nothing wrong with the Schwartz

home care assignment, therefore the Plaintiff had to remain on the Schwartz home care

assignment against her will. Once Alliance stated that "it's fine", the Plaintiff would have been

accused of patient abandonment/neglect if the Plaintiff decided to leave Schwartz' apartment at

will.

773.   In paragraph 4 of exhibit A, the Plaintiff made it clear to Holly (care manager

from Alliance) that she was terrorized by Schwartz' frivolous 911 report and the Plaintiff

reasonably implied that she wanted to withdraw from the Schwartz home care assignment as the

Plaintiff expressed concern that the police were on their way to Schwartz' apartment to possibly

harm her:

"She called the police for me. Listen, I didn't do anything..."

774.   Albeit in paragraph 4 of exhibit A the Plaintiff clearly expressed terror to Alliance

based on the fact that Schwartz had engaged in a frivolous 911 report against her, in paragraph 6

of exhibit A Holly (care manager from Alliance) reconfirmed that the Plaintiff had to stay on the

Schwartz home care assignment by again stating to the Plaintiff that "it's fine" that Schwartz

engaged in the frivolous 911 report against the Plaintiff:

"She does that... No, no, no, it's fine. She calls the police every day."

775.    The fact of the matter is that every time Alliance stated that "it's fine" that Schwartz engaged in the frivolous 911 report against the Plaintiff, Alliance was exercising significant legal coercion against the Plaintiff to remain on the Schwartz home care assignment against her will. Moreover, during the time the Plaintiff was engaged in this phone conversation with Holly (care manager from Alliance) in exhibit A, the Plaintiff was already in a state of involuntary servitude on the Schwartz home care assignment.

776.    When it comes to involuntary servitude, the period of time the Plaintiff was held on the Schwartz home care assignment was insignificant. What matters was that the Plaintiff was held for a period of time by Alliance on the Schwartz home care assignment against the Plaintiff's will and any period of time that the Plaintiff was held against her will on the Schwartz home care assignment constituted a period of involuntary servitude.

777.    Alliance did eventually authorize the Plaintiff to leave Schwartz' apartment and wait in Schwartz' lobby. Yet, that still did not remove the Plaintiff from involuntary servitude as the Plaintiff was still inside Schwartz' lobby and still on the job. In fact, Alliance only authorized the Plaintiff to the lobby to allow Schwartz to calm down. Alliance's intent clearly was to have the Plaintiff go back upstairs to Schwartz' apartment.

778.    It was only when Schwartz called her building lobby attendants/security guards to tell them to remove the Plaintiff from the lobby (exhibit B), that the Plaintiff was actually removed from involuntary servitude on the Schwartz home care assignment.

779.    The foregoing is demonstrated in exhibit B which was recorded on January 24th, 2019 at about 12:43pm. Exhibit B demonstrates that the Plaintiff was still in a state of involuntary servitude while the Plaintiff was down in Schwartz' lobby because the Plaintiff was being forced, against her will, to remain in Schwartz' lobby by Holly (care manager from

Alliance). As long as the Plaintiff was being held against her will by Alliance, and the Plaintiff

believed that she could not leave due to legal coercion through patient abandonment/neglect

laws, the Plaintiff remained in a state of involuntary servitude in relation to her employment with

Alliance.

780.    In paragraph 3 of exhibit B, Holly (care manager from Alliance) asked the

Plaintiff if she was in the lobby:

> "Yes. Are you down in the lobby?"

781.    In paragraph 4 of exhibit B, the Plaintiff nervously explained to Holly (care

manager from Alliance) that she was in the lobby as instructed, yet Schwartz called her lobby

attendants/security guards and told them to remove the Plaintiff from the lobby:

> "I'm in the lobby, but she called the lobby and she said no, I have to leave the
>
> building, don't stay in the lobby."

782.    Albeit Holly (care manager from Alliance) heard the Plaintiff tell her in paragraph

4 of exhibit B that Schwartz was still targeting her with racially motivated harassment by having

her lobby attendants/security guards remove her from the lobby, in paragraph 6 of exhibit B

Holly (care manager from Alliance) was still pressuring the Plaintiff to remain in the lobby under

the penalty of New York patient neglect/abandonment penal laws as Holly was well aware that

the Plaintiff knew that she could not leave Schwartz' building until Alliance actually released her

from the home care assignment.

783.    In paragraph 6 of exhibit B, Holly (care manager from Alliance) engaged in

pressure tactics to keep the Plaintiff on the Schwartz home care assignment because Holly

refused to allow the Plaintiff to leave Schwartz' building albeit Holly clearly heard and

understood that Schwartz had already ordered her lobby attendants/security guards to remove her

from the building lobby and Holly (care manager from Alliance) clearly already knew that the police were on their way to Schwartz' building due to Schwartz frivolous 911 report against the Plaintiff.

784.    Holly stated the following in paragraph 6 of exhibit B:

"No, you can stay in the lobby. If you could just tell the doorman, if you could just tell the doorman what's going on, just say, you know, I'm here taking care of Joan, she's having…"

785.    When the Plaintiff heard Holly (care manager from Alliance) trying to convince her to stay in involuntary servitude on the Schwartz home care assignment, the Plaintiff objected and stated the following in paragraph 7 of exhibit B:

"I, I told him…"

786.    Yet in paragraph 8 of exhibit B, Holly (care manager from Alliance) ignored the Plaintiff's wish to withdraw from the Schwartz home care assignment by leaving Schwartz' building lobby, as was being demanded by Schwartz' building security guards/lobby attendants, and Holly simply continued making her statement from paragraph 6 of exhibit B to the Plaintiff demanding that the Plaintiff remain in Schwartz' building lobby until Alliance actually authorized the Plaintiff to leave, which placed the Plaintiff at risk of being arrested for trespassing as Schwartz had already made a frivolous 911 report against the Plaintiff earlier and Schwartz had already called her building lobby security guards/lobby attendants to demand that the Plaintiff be removed from her apartment building lobby.

787.    Based on these circumstances, any reasonable person in the Plaintiff's situation would feel compelled to immediately leave Schwartz' building, yet here the Plaintiff was still in Schwartz' building lobby trying to convince Alliance to allow her to withdraw from the

Schwartz home care assignment. It is therefore reasonable to conclude that the Plaintiff was under legal coercion of the kind that the Plaintiff could not bring herself to leave the Schwartz home care assignment of her own free will.

788.    Holly (care manager from Alliance) stated the following in paragraph 8 of exhibit B:

> "… a little episode, um, I mean, I can call her daughter too and see what she wants me to do. Let me do that, I'll call her daughter and I'll call you back."

789.    Being that Holly (care manager from Alliance) exercised dominance over the Plaintiff as a care manager from Alliance along with having the power of legal coercion through New York Patient Abandonment/Neglect penal laws, the Plaintiff simply acquiesced by stating the following in paragraph 9 of exhibit B:

> "Ok, ok, no problem."

790.    Therefore, up to about 12:43pm on January 24th, 2019, Alliance was using legal coercion under patient abandonment/neglect laws to keep the Plaintiff in involuntary servitude on the Schwartz home care assignment.

791.    May the Court please note that Holly (care manager from Alliance) is the same Caucasian person who made the racist statement to the Plaintiff in paragraph 3 and 6 of exhibit A that "it's fine" that Schwartz made the frivolous 911 report against the Plaintiff and that the Plaintiff should just go in the "study" and wait for the police to arrive.

792.    What is clear here is that the Plaintiff clearly found the work environment on the Schwartz home care case intolerable, abusive, racially discriminatory, and akin to slavery to a point that any reasonable person in the Plaintiff's position would be compelled to leave the Schwartz home care assignment.

793.     After all, the Plaintiff was subjected to a steady barrage of opprobrious racial verbal comments and an assault by Schwartz along with a frivolous 911 report in the workplace out of malice and hatred/racism based on all of the surrounding circumstances. Such racially discriminatory, abusive, and violent working conditions would have been enough to compel any reasonable person to leave the Schwartz home care assignment.

794.     Therefore, it is clear that the Plaintiff believed that she was being compelled to remain on the Schwartz home care assignment by Alliance through legal coercion under New York patient abandonment/neglect penal laws. As such, the Plaintiff was in a state of involuntary servitude on the Schwartz home care assignment on January 24th, 2019. The Plaintiff clearly believed that Alliance had the legal authority to detain her on the Schwartz home care assignment through legal coercion.

795.     Notably, throughout the assault and the frivolous 911 report, the Plaintiff was helplessly standing inside Schwartz' apartment waiting for everything to happen to her. The Plaintiff clearly felt legal coercion of the kind that the Plaintiff could not bring herself to leave the Schwartz home care assignment.

796.     Being that Alliance intentionally, maliciously, knowingly, and willfully concealed Schwartz' malicious and hateful/racist pattern of engaging in frivolous 911 reports targeted against Black caregivers or people of color with the intent of subjecting the Plaintiff to forced labor on the Schwartz home care assignment, Alliance intentionally, maliciously, knowingly, and willfully deprived the Plaintiff of her constitutional right to be free of involuntary servitude pursuant to the 13th Amendment of the United States Constitution.

**E. Alliance's Malicious and Intentional Conduct of Depriving the Plaintiff of Her Constitutional Right to Be Free of Involuntary Servitude Constituted an Adverse Employment Action Which Occurred Under Circumstances Giving Rise to An Inference of Racial Discrimination Pursuant to 42 U.S.C. § 1981.**

797.    Alliance's act of depriving the Plaintiff of her constitutional right to be free of involuntary servitude constituted an adverse employment action because the Plaintiff was deprived of the material benefit of being free of involuntary servitude in the workplace.

798.    Alliance's malicious and deliberate conduct of concealing Schwartz' pattern of malicious and hateful/racist behavior targeted against Black caregivers or people of color was in furtherance of Alliance's condonation, normalization, encouragement, and approval of Schwartz' malicious and hateful/racist conduct targeted against Black caregivers or people of color in the workplace.

799.    As demonstrated in paragraphs 26 and 33 of exhibit C, Alliance has known about Schwartz' pattern of malicious and hateful/racist conduct targeted against Black caregivers or people of color for over 2 years and Alliance was also aware that Schwartz' conduct was causing "major" problems for Black caregivers or people of color at Alliance. This was also clearly demonstrated in paragraph 39 of exhibit C where Alliance admitted that Black caregivers or people of color routinely call Alliance to complain about and oppose Schwartz' malicious and hateful/racist conduct targeted against them.

800.    Despite Alliance's extensive knowledge of Schwartz' malicious and hateful/racist conduct targeted against Black caregivers or people of color, which also included Schwartz' pattern of engaging in frivolous 911 reports against this class of people, Alliance took absolutely no corrective action to eliminate such racially discriminatory conduct in the workplace and instead intentionally, maliciously, knowingly, and willfully concealed these material facts from the Plaintiff when Alliance was assigning the Plaintiff to the Schwartz home care assignment for January 24th, 2019 (see exhibit D), knowing full well that no reasonable Black caregiver would accept a job assignment after being informed by the employer that the home care client has a

pattern of engaging such malicious and hateful/racist conduct targeted against Black caregivers or people of color.

801.    Alliance's condonation, normalization, encouragement, and approval of Schwartz' malicious and hateful/racist conduct was clearly demonstrated immediately after Schwartz engaged in the frivolous 911 report against the Plaintiff on January 24th, 2019 when Holly (care manager from Alliance) repeatedly stated that "it's fine" that Schwartz engaged in the frivolous 911 report against the Plaintiff.

802.    In paragraph 3 of exhibit A, Holly (care manager from Alliance) stated that "it's fine" that Schwartz engaged in the frivolous 911 report against the Plaintiff and that Schwartz does the same to "everyone". Notably, at the time Holly (care manager from Alliance) made this statement to the Plaintiff, Alliance was aware that the Caucasian caregiver who left Schwartz' apartment that same morning of January 24th, 2019 was not subjected to a frivolous 911 report by Schwartz. The Plaintiff would come to find out on February 1st, 2019, in paragraph 31 of exhibit C, that Alliance usually only assigns Black caregivers or people of color to the Schwartz home care assignment and Schwartz usually acts out of "hatred" against this class of people.

803.    Therefore, it is reasonable to conclude that when Holly (care manager from Alliance) stated in paragraph 3 of exhibit A that Schwartz does the same to "everyone", Holly was directly referring to other similarly situated Black caregivers or people of color. As such, it is also reasonable to conclude that in paragraph 3 of exhibit A, Holly (care manager from Alliance) was telling the Plaintiff that because other Black caregivers or people of color have been routinely subjected to Schwartz' malicious and frivolous 911 reports, the Plaintiff, as a Black caregiver, should accept the same treatment in the workplace. This was akin to Holly (care

manager from Alliance) telling the Plaintiff that because her ancestors were slaves, the Plaintiff, as a Black person, should also agree to be subjected to slavery.

804.   In paragraph 6 of exhibit A, Holly (care manager from Alliance) again engaged in the full condonation, approval, encouragement, and normalization of Schwartz' malicious and racist/hateful conduct against the Plaintiff by again stating that "it's fine" that Schwartz engaged in the frivolous 911 report against the Plaintiff, and Holly added in that same moment that Schwartz calls the police "every day". This unambiguously demonstrates that Alliance had a long pattern of intentionally, maliciously, knowingly, and willfully condoning, encouraging, normalizing, and approving Schwartz' malicious and hateful/racist conduct in the workplace as Holly acknowledged that Alliance was fully aware of the fact that Schwartz engages in this type of conduct against Black caregivers or people of color on a daily basis.

805.   It is therefore reasonable to conclude that but for Alliance having a complete disregard for the safety along with the emotional and psychological well-being of Black caregivers or people of color in the workplace, Alliance would have not concealed Schwartz' malicious and hateful/racist conduct from the Plaintiff prior to assigning her to the Schwartz home care assignment and Alliance would have not engaged in the full condonation, encouragement, approval, and normalization of Schwartz' malicious and hateful/racist conduct in the workplace for over 2 years, prior to Alliance engaging in the same condonation of Schwartz' conduct against the Plaintiff on January 24th, 2019.

806.   Being that it is the fact that Alliance concealed Schwartz' pattern of malicious and hateful/racist conduct against other similarly situated Black caregivers or people of color and Alliance's subsequent condonation of Schwartz' malicious and hateful/racist conduct against the Plaintiff which caused the Plaintiff to be deprived of her Constitutional right to be free of

involuntary servitude, it is therefore reasonable to conclude that but for the Plaintiff's skin color

and race being Black, Alliance would have not deprived the Plaintiff of her Constitutional right

to be free of involuntary servitude on January 24th, 2019.

**F. Causation for the Cause of Action of 'Deprivation of Constitutional Right to Be Free of Involuntary Servitude Motivated by Racial Discrimination' Pursuant to the 13th, Amendment of the United States Constitution and 42 U.S.C. § 1981.**

807.    Alliance was the cause in fact of the Plaintiff's harm because Alliance

intentionally, maliciously, knowingly, and willfully concealed, from the Plaintiff, Schwartz' long

term hateful/racist pattern of making daily frivolous 911 reports targeted against Black

caregivers or people of color, who were similarly situated as the Plaintiff as caregivers, and

subsequently used legal coercion through patient abandonment/neglect laws to deprive the

Plaintiff of her Constitutional right to be free of involuntary servitude. This adverse employment

action by Alliance against the Plaintiff occurred under circumstances giving rise to an inference

of racial discrimination.

808.    Alliance was the proximate cause of the Plaintiff's harm as it was foreseeable for

Alliance that concealing Schwartz' hateful/racist pattern of targeting Black people or people of

color with frivolous 911 reports and subsequently using patient abandonment/neglect laws to

force the Plaintiff to remain on the Schwartz home care assignment against her will, out of racial

discrimination, would cause the Plaintiff to be deprived of her Constitutional right to be free of

involuntary servitude, which would also cause the Plaintiff adverse employment action, severe

emotional distress, and mental anguish (psychological trauma).

809.    But for Alliance maliciously, intentionally, knowingly, and willfully concealing

Schwartz' malicious and hateful/racist pattern of behavior targeted against Black caregivers or

people of color, which included Schwartz' pattern of racially motivated frivolous 911 reports

specifically targeted against this class of people, and Alliance subsequently using legal coercion through New York Patient Abandonment/Neglect laws to force the Plaintiff to remain on the Schwartz home care assignment against her will, the Plaintiff would have not been deprived of her Constitutional right to be free of involuntary servitude on January 24th, 2019.

810.    Being that it is the fact that Alliance concealed Schwartz' pattern of malicious and hateful/racist conduct against other Black caregivers or people of color and Alliance's subsequent condonation of Schwartz' malicious and hateful/racist conduct against the Plaintiff which caused the Plaintiff to be deprived of her Constitutional right to be free of involuntary servitude, it is therefore reasonable to conclude that but for the Plaintiff's skin color and race being Black, Alliance would have not deprived the Plaintiff of her Constitutional right to be free of involuntary servitude on January 24th, 2019.

811.    Therefore, the Plaintiff's skin color and race as a Black person were the sole reasons for Alliance's conduct of maliciously, intentionally, knowingly, and willfully concealing Schwartz' pattern of malicious and hateful/racist behavior of targeting Black caregivers or people of color for harm in the workplace, and for Alliance's act of subsequently using legal coercion through New York Patient abandonment/neglect penal laws to force the Plaintiff to work on the Schwartz home care assignment against her will, which ultimately caused the Plaintiff to be deprived of her Constitutional right to be free of involuntary servitude in relation to the Schwartz home care assignment on January 24th, 2019.

**G. Plaintiff's Damages Against Defendant Alliance for this Cause of Action for 'Deprivation of Constitutional Right to Be Free of Involuntary Servitude Motivated by Racial Discrimination' Pursuant to the 13th Amendment of the United States Constitution and 42 U.S.C. § 1981.**

812.    For this cause of action of *'Deprivation of Constitutional Right to Be Free of Involuntary Servitude Motivated by Racial Discrimination'* pursuant to the 13th Amendment of

the United States Constitution and 42 U.S.C. § 1981, the Plaintiff suffered adverse employment

action, severe economic damages, severe emotional distress, mental anguish (psychological

trauma), and physical ailments (see section VII of this 'Complaint').

813.    For this cause of action of *'Deprivation of Constitutional Right to Be Free of*

*Involuntary Servitude Motivated by Racial Discrimination'*, the Plaintiff is requesting nominal,

compensatory, and punitive damages.

## NINTH (9TH) CAUSE OF ACTION:

## 'DISPARATE TREATMENT' AGAINST DEFENDANT ALLIANCE PURSUANT TO 42

## U.S.C. § 1981 AND THE NEW YORK CITY ADMINISTRATIVE CODE § 8-107 (1)(A)

814.    The Plaintiff repeats and reasserts the allegations of paragraphs 1 through 813 as

though fully set forth herein.

815.    The following describes and supports the cause of action of *'Disparate*

*Treatment'* against Alliance Nursing Staffing of New York, Inc. pursuant to 42 U.S.C. § 1981

and the New York City Administrative Code § 8-107 (1)(a).

816.    Alliance intentionally, maliciously, knowingly, and willfully subjected the

Plaintiff to an unfavorable work assignment on the Schwartz home care assignment in

comparison to a similarly situated Caucasian 'White' caregiver, because Alliance was well aware

that the Plaintiff would not be able to enforce her contractual relationship with Alliance as

Schwartz had a long running pattern of routinely subjecting Black caregivers or people of color

to malicious and hateful/racist conduct in the workplace because of their race and skin color,

whereas Alliance knew that the Caucasian 'White' caregiver would be able to enforce her

contractual relationship with Alliance because Schwartz favored Caucasian 'White' caregivers.

817.    Furthermore, Alliance intentionally, maliciously, knowingly, and willfully deprived the Plaintiff of her Constitutional right to enforce her contractual relationship with Alliance on the same footing as the Caucasian caregiver as Alliance engaged in the full condonation, encouragement, normalization, and approval of Schwartz' malicious and hateful/racist conduct after the Plaintiff complained to Alliance that she was subjected to an assault along with a frivolous 911 report by Schwartz because of her race and skin color as a Black person in comparison to the Caucasian 'White' caregiver who was not subjected to any malicious conduct by Schwartz because Schwartz stated a preference for the Caucasian 'White' caregiver because of her skin color and race as a White person.

818.    Moreover, Alliance intentionally, maliciously, knowingly, and willfully terminated the Plaintiff's employment because of her complaint and opposition about being subjected to malicious and racist conduct in the workplace.

819.    All of the foregoing constituted disparate treatment against the Plaintiff by Alliance. But for the Plaintiff being a Black person, Alliance would have not engaged in this adverse employment action against the Plaintiff.

**A. The Plaintiff is a Member of a Class of People Protected Under 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (1)(a).**

820.    The Plaintiff's race is Black and the Plaintiff's skin color is Black.

821.    42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (1)(a) make it unlawful for Alliance to deprive the Plaintiff of her Constitutional right to enforce her contractual relationship with Alliance on the same footing as the similarly situated Caucasian 'White' caregiver.

822.    Since the Plaintiff's race is Black, her skin color is Black, and the Plaintiff was deprived of her Constitutional right to enforce her contractual relationship with Alliance on the

same footing as the similarly situated Caucasian 'White' caregiver, the Plaintiff is part of a

protected class of people under 42 U.S.C. § 1981 and the New York City Administrative Code §

8-107 (1)(a).

**B. The Plaintiff Was Qualified to Hold the Position of Home Health Aide (Caregiver) at Alliance Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107 (1)(a).**

823.    The Plaintiff was qualified to hold her position of home health aide (caregiver) at

Alliance.

824.    The Plaintiff was certified and registered with the New York State Department of

Health as a home health aide (a caregiver) of Alliance Nursing Staffing of New York, Inc. during

her employment with Alliance.

825.    Indeed, Alliance itself, repeatedly complimented the Plaintiff on her excellent

work record with Alliance.

826.    In paragraph 26 of exhibit C, Ashley (care manager from Alliance) stated the

following:

> "... um, you know, I just want you to know, I mean, of course like I said it's a
>
> scary experience when that happens and then you're like: "Did I do something
>
> wrong", like, "What did I do?" But you did absolutely nothing wrong. Alliance
>
> knows it. We've had this client for over 2 years. She has been, um, very
>
> challenging."

827.    In paragraph 33 of exhibit C Ashley (care manager from Alliance) stated the

following to the Plaintiff:

> "... you know, in careers we go through these moments, where there are these
>
> experiences, where you think that "is this really what I'm supposed to do?" But

195

I've heard nothing but good things about you as a caregiver and don't let this ruin

your career, you know, or your choice in staying as a caregiver... and know that

you do a good job and that, you, people do love your performance."

828.     In paragraph 35 of exhibit C, Ashley (care manager from Alliance) stated the

following to the Plaintiff:

"... but honestly, you are good at what you do and please just don't give up that's

all."

829.     In paragraph 39 of exhibit C, Ashley (care manager from Alliance) stated the

following to the Plaintiff:

"but if I were you I would just keep doing what you're doing you know, and don't

give up that client that loves you."

830.     As such, it is clear that the Plaintiff was qualified to hold the position of home

health aide (caregiver) at Alliance.

**C. Alliance's Malicious Conduct of Intentionally, Knowingly, and Willfully depriving the Plaintiff of her Constitutional Right to Enforce Her Contractual Relationship with Alliance on the Same Footing as the Caucasian 'White' Caregiver Constituted an Adverse Employment Action.**

**i.     January 23rd, 2019**

831.     On January 23rd, 2019, Ashley (care manager from Alliance) called the Plaintiff to

assign her the Schwartz home care assignment for the morning shift for Thursday, January 24th,

2019, and Friday January 25th, 2019 from 9am to 9pm on both days (see exhibit D).

832.     Yet, Ashley (care manager from Alliance) deliberately concealed Schwartz'

pattern of engaging in malicious and hateful/racist conduct targeted against Black caregivers or

people of color, which included Schwartz' routine frivolous 911 reports against this class of

people albeit Ashley (care manager from Alliance) had extensive knowledge of Schwartz'

pattern of conduct (see paragraphs 26, 31, 33, and 39 of exhibit C).

833.    Therefore, it is reasonable to conclude that Alliance knew that the Plaintiff would

not be able to enforce her contractual relationship with Alliance as Alliance knew that the

Plaintiff would be subjected to malicious and hateful/racist conduct in the workplace, by

Schwartz, because her race and skin color as a Black person.

834.    Prior to assigning the Plaintiff to the morning shift on the Schwartz home care

assignment, Ashley (care manager from Alliance) assigned the Caucasian 'White' caregiver to

the Schwartz home care assignment for the overnight shift from 9pm on January 23rd, 2019 to

9am on January 24th, 2019. The Plaintiff relieved the Caucasian caregiver from the Schwartz

home care assignment at 9am on January 24th, 2019.

835.    In paragraph 27 of exhibit C, the Plaintiff complained and opposed to Ashley

about the opprobrious racial verbal comments, assault, and frivolous 911 report the Plaintiff was

subjected to by Schwartz in the workplace:

> "But I see she doing everything by herself, she went to the kitchen, make tea,
> make toast, by herself. And I see she never forget anything. She just do
> everything like she never got sick. So maybe she has a, she just, in the beginning
> got sick but she is not that sick sick [sic] cause she not like for age dementia, I
> don't know how to say that but basically I'm glad you called cause I was confused
> about the situation because I have been working with patients with dementia, they
> never act like that. They can be racist, they something like "I don't like you, blah,
> blah, blah (sic)" but call the police on me or try to beat you (Inaudible) don't do
> that to me."

836.   In paragraph 28 of exhibit C, Ashley (care manager from Alliance) confirmed that the Plaintiff was assaulted by Schwartz on January 24th, 2019:

"Did she try to hit you?"

837.   In paragraph 29 of exhibit C, the Plaintiff confirmed that she was in fact assaulted by Schwartz on January 24th, 2019. Furthermore, the Plaintiff complained and opposed about the fact that there was a Caucasian caregiver at Schwartz' apartment when she arrived on January 24th, 2019, and that Schwartz stated a preference for the Caucasian caregiver because of her race and skin color as a White person, and the Plaintiff also complained and opposed about the fact that Schwartz stated a dislike for the Plaintiff along with other people like the Plaintiff, meaning Black people or people of color:

"Yes, she tried to hit me and basically she just the first (Inaudible), the first step, the first, she just saw me and make a face. That's the first thing she did when she saw me, she just make a face and cover her face that she don't want me to stay cause the night aide was a White girl, she got along with her, that's what she said and me and other aides like me, she doesn't, she don't like me, I make her... She told me I'm a little girl, she keep calling me "little girl", "school girl" and I'm 33."

838.   After the Plaintiff complained and opposed to Ashley (care manager from Alliance) on February 1st, 2019 that Schwartz treated the Caucasian caregiver much more favorably than Schwartz treated the Plaintiff (see paragraphs 27 and 29 of exhibit C), in paragraph 31 of exhibit C, Ashley (care manager from Alliance) told the Plaintiff that this was the first time that Alliance assigned the Caucasian caregiver to the Schwartz home care assignment and that usually Alliance assigns non-Caucasian caregivers to the Schwartz home

care assignment, meaning Black caregivers or people of color, and that Schwartz usually acts out of "hatred" against this class of people.

839.    In paragraph 31 of exhibit C, Ashley (care manager from Alliance) stated the following to the Plaintiff about the Schwartz home care assignment:

> "So, the nurse that was there the night before that (inaudible) she was actually covering on the case too that was her first shift, um, but regularly during the night we have two LPN's, um, so Brenda, um, she works, ah, Sunday through Thursday and then we have Carline that works Friday and Saturday, um, nights, and they both are not Caucasian. So, I know that probably when you showed up that's what you thought and maybe that's what she thought at the moment but just to let you know, um, we don't have any, um, really Caucasian people on that case... you can get someone who completely agitated and has all this hatred in them. And unfortunately that is what we are dealing with Mrs. Schwartz."

840.    In paragraph 33 of exhibit C, Ashley (care manager from Alliance) engaged in the full condonation, encouragement, normalization, and approval of Schwartz' hateful/racist conduct of treating the Caucasian 'White' caregiver much more favorably than the Plaintiff. Ashley stated the following to the Plaintiff in paragraph 33 exhibit C:

> "... you know, in careers we go through these moments, where there are these experiences, where you think that "is this really what I'm supposed to do?" But I've heard nothing but good things about you as a caregiver and don't let this ruin your career, you know, or your choice in staying as a caregiver... and know that you do a good job and that, you, people do love your performance."

841.     Additionally, in paragraph 39 of exhibit C, Ashley (care manager from Alliance) stated that Black caregivers or people of color routinely call Alliance to complain and oppose about Schwartz' malicious and hateful/racist conduct targeted against this class of people, which includes routine frivolous 911 reports against this class of people. Ashley stated the following to the Plaintiff in paragraph 39 of exhibit C:

> "... and trust me, I'm so used to hearing caregivers and nurses and, you know, LPN's, RN's, they tell me what their experiences are with this woman and I listen to them, and we talk through it…"

842.     Based on the Plaintiff's conversation with Ashley (care manager from Alliance) in paragraphs 27, 29, 31, 33, and 39 of exhibit C, it is reasonable to conclude that Alliance assigned the Caucasian caregiver to the Schwartz home care assignment from 9pm on January 23rd, 2019 to 9am on January 24th, 2019, instead of the regular Black caregivers or people of color because Alliance was fully aware that Schwartz preferred Caucasian 'White' caregivers over Black caregivers or people of color; especially since Ashley (care manager from Alliance) engaged in the full condonation of Schwartz' January 24th, 2019 racist conduct against the Plaintiff.

843.     Therefore, it is also reasonable to conclude that Alliance deliberately provided a favorable work assignment to the Caucasian 'White' caregiver on the Schwartz home care assignment because Alliance knew that the Caucasian caregiver would be able to enforce her contractual relationship with Alliance.

844.     As such, it is also reasonable to conclude that Alliance engaged in disparate treatment against the Plaintiff by intentionally, maliciously, knowingly, and willfully subjecting the Plaintiff to an unfavorable job assignment based on her race and skin color as a Black person

in comparison to the similarly situated Caucasian caregiver who was deliberately provided a favorable job assignment based on her race and skin color as a White person.

### ii.   January 24th, 2019

845.    On January 24th, 2019, immediately after Schwartz' frivolous 911 report against the Plaintiff, the Plaintiff spoke to Holly (care manager from Alliance) who repeatedly told the Plaintiff that "it's fine" that Schwartz made a frivolous 911 report against the Plaintiff, that Schwartz engages in the same type of behavior against "everyone" (meaning Black caregivers or people of color), and that Schwartz engages in frivolous 911 reports against this class people "everyday" (see paragraphs 3, 4, and 6 of exhibit A).

846.    Holly (care manager from Alliance) engaged in the full condonation, encouragement, normalization, and approval of Schwartz' malicious conduct against the Plaintiff albeit Holly (care manager from Alliance) was fully aware of the fact that the Caucasian caregiver who left Schwartz' apartment on that same morning of January 24th, 2019 was not subjected to any malicious conduct by Schwartz, such as a frivolous 911 report. Indeed, Holly (care manager from Alliance) was also aware of the fact that Schwartz' prior frivolous 911 reports were targeted against Black caregivers or people of color.

847.    Therefore, it is reasonable to conclude that by Holly (care manager from Alliance) repeatedly stating that "it's fine" that Schwartz engaged in the frivolous 911 report against the Plaintiff in paragraphs 3 and 6 of exhibit A, albeit Holly was aware that the Caucasian caregiver was not harmed by Schwartz and that all of Schwartz' prior frivolous 911 reports were targeted against Black caregivers or people of color, Alliance engaged in disparate treatment against the Plaintiff as Holly (care manager from Alliance) implicitly treated the Caucasian caregiver much

more favorably than the Plaintiff, as a Black person, because the Caucasian caregiver's race and skin color as a White person.

### iii.    February 1st, 2019

848.    On February 1st, 2019 (exhibit C), the Plaintiff complained and opposed to Ashley (care manager from Alliance) about the fact that she was subjected to less favorable work conditions in comparison to the similarly situated Caucasian 'White' caregiver.

849.    In paragraphs 27 and 29 of exhibit C, the Plaintiff complained and opposed to Ashley (care manager from Alliance) that she was subjected to an assault along with a frivolous 911 report by Schwartz, out of racism, and that prior to engaging in these malicious and hateful/racist acts against the Plaintiff, Schwartz expressed a preference for the Caucasian 'White' caregiver who was at Schwartz' apartment upon the Plaintiff's arrival at 9am and that Schwartz specifically cited the Caucasian caregiver's skin color and race being 'White' as the reason why she preferred the Caucasian caregiver. Additionally, the Plaintiff complained and opposed to Ashley (care manager from Alliance) that Schwartz stated that she did not like the Plaintiff or other people like the Plaintiff, meaning Black caregivers or people of color.

850.    Albeit in paragraph 31 of exhibit C Ashley (care manager from Alliance) explained to the Plaintiff that this was the first time that Alliance assigned the Caucasian caregiver to the Schwartz home care assignment and that usually Alliance only assigns non-Caucasians, meaning Black caregivers or people of color, to the Schwartz home care assignment and that Schwartz usually acts out of "hatred" against this class of people, Ashley (care manager from Alliance) told the Plaintiff in paragraph 33 of exhibit C to "accept" the fact that the Caucasian 'White' caregiver was treated much more favorably than the Plaintiff because of the

202

Caucasian's skin color and race as a 'White' person and Ashley added that the Plaintiff should "literally just keep it moving".

851.     Ashley's statements to the Plaintiff in paragraph 33 of exhibit C demonstrates that Alliance engaged in the full condonation, approval, normalization, and encouragement of Schwartz' conduct of treating the Plaintiff less favorably than the Caucasian 'White' caregiver in the workplace because Schwartz hated the Plaintiff along with other people like the Plaintiff, meaning Black caregivers or people of color.

852.     Through Ashley's (care manager from Alliance) condonation of Schwartz' malicious and hateful/racist conduct against the Plaintiff, Alliance intentionally, maliciously, knowingly, and willfully subjected the Plaintiff to less favorable terms and conditions of work in comparison to the similarly situated Caucasian 'White' caregiver.

### iv.     February 26th, 2019

853.     On February 26th, 2019, Amanda Frey (Director of Human Resources at Alliance) adversely altered the terms and conditions of continued employment for the Plaintiff through the February 26th, 2019 arbitration agreement (exhibit H), as a consequence of the Plaintiff's complaints and oppositions about racially discriminatory conduct in the workplace, which included the Plaintiff's complaint and opposition to Ashley (care manager from Alliance) in paragraphs 27 and 29 of exhibit C (February 1st, 2019) that the Plaintiff received unfavorable treatment in the workplace because she was subjected to an assault and a frivolous 911 report in comparison to the Caucasian caregiver who was treated favorably by Schwartz because of her race and skin color as a White person.

854.     Amanda Frey (Director of Human Resources at Alliance) adversely altered the terms and conditions of continued employment for the Plaintiff at Alliance through the

arbitration agreement as it was a mandatory document which required the Plaintiff to relinquish her constitutional right to enforce her contractual relationship with Alliance in a court of law, and the document made signing it a term and condition of continued employment.

855.    On that same day of February 26th, 2019, Amanda Frey (Director of Human Resources at Alliance) terminated the Plaintiff's employment because the Plaintiff did not agree to sign the arbitration agreement and because of the Plaintiff's complaints and oppositions about racially discriminatory conduct in the workplace, which included the Plaintiff's complaint and opposition about being treated less favorably than the similarly situated Caucasian caregiver.

856.    The foregoing is a fact because Amanda Frey (Director of Human Resources at Alliance) engaged in adverse employment actions against the Plaintiff on February 26th, 2019 after the Plaintiff submitted a letter to Alliance on February 13th, 2019 (exhibit F) where the Plaintiff complained and opposed about Schwartz' frivolous 911 report.

857.    It was after Amanda Frey (Director of Human Resources at Alliance) received this complaint and opposition from the Plaintiff that Amanda Frey both sent the Plaintiff the arbitration agreement and terminated the Plaintiff's employment on February 26th, 2019.

858.    The adverse employment actions taken against the Plaintiff by Amanda Frey (Director of Human Resources at Alliance) on February 26th, 2019 were in support of Alliance's policy of treating the Caucasian caregiver much more favorably than Alliance treated the Plaintiff.

859.    The fact that the February 26th, 2019 arbitration agreement required the Plaintiff to relinquish her constitutional right to enforce her contractual relationship with Alliance on the same footing as a White caregiver is demonstrated by the fact that the arbitration agreement demanded that the Plaintiff relinquish her constitutional right under 42 U.S.C. §1981 (see

paragraph 3 of the arbitration agreement – exhibit H), which is a statute which specifically gives all people the right to make and enforce contracts on the same footing as White people.

860.    In paragraph 3 of the arbitration agreement (exhibit H), Alliance makes it clear what constitutional rights Alliance was requiring the Plaintiff to relinquish as a condition of continued employment at Alliance:

> "Claims Covered by this Agreement. This Agreement to arbitrate covers all grievances, disputes, claims, or causes of action that otherwise could be brought in a federal, state, or local court under applicable federal, state, or local laws, arising out of or relating to Employee's employment with the Company and the termination thereof... The Claims covered by this Agreement include, but are not limited to, claims for... wrongful termination (constructive or actual), claims for discrimination, harassment, or retaliation... national origin... medical condition, including... psychological condition, mental condition... disability... or any other trait or characteristic protected by federal, state, or local law, claims for violation of any federal, state, local or other governmental law, statute, regulation, or ordinance, including, but not limited to, all claims arising under... the Civil Rights Act of 1991, Sections 1981 and 1983 of U.S.C. Title 42... the New York State Human Rights Law, the New York Labor Laws, the New York Civil Rights Laws, the New York City Human Rights Laws, any claims under the New York City Administrative Code."

861.    This adverse employment action against the Plaintiff by Amanda Frey (Director of Human Resources at Alliance) was in furtherance of Ashley's (care manager at Alliance) statement in paragraph 33 of exhibit C that the Plaintiff needed to "accept" the fact that Schwartz

treated the Caucasian 'White' caregiver much more favorably than the Plaintiff and that the Plaintiff needed to "literally just keep it moving".

862.    Because the Plaintiff was not willing to sign the February 26th, 2019 arbitration agreement, which demanded the Plaintiff "accept" the fact she would not be treated on the same footing as a Caucasian caregiver in the workplace at Alliance, Amanda Frey (Director of Human Resources at Alliance) terminated the Plaintiff's employment later in the day on that same date of February 26th, 2019.

863.    Furthermore, the fact that Amanda Frey (Director of Human Resources at Alliance) sent the Plaintiff the arbitration agreement after the Plaintiff complained and opposed about the frivolous 911 report in the February 13th, 2019 letter (see exhibit F) demonstrates that Amanda Frey was not only aware that Schwartz' frivolous 911 report was motivated by malice and hatred/racism, but it is also reasonable to conclude that Amanda Frey spoke to Ashley (care manager from Alliance) who explained to Amanda Frey that the Plaintiff complained and opposed about being treated less favorably than the similarly situated Caucasian caregiver, based on Ashley's conversation with the Plaintiff in paragraphs 27 and 29 of exhibit C.

   **v.    Summary**

864.    Overall, Alliance intentionally, maliciously, knowingly, and willfully subjected the Plaintiff to much less favorable terms and conditions of employment in comparison to the Caucasian 'White' caregiver because the Plaintiff's skin color and race are Black.

865.    Alliance's whole conduct against the Plaintiff on January 23rd, 2019, January 24th, 2019, February 1st, 2019, and February 26th, 2019 demonstrated that Alliance deliberately nurtured a policy of treating the Plaintiff less favorably in comparison to the similarly situated Caucasian 'White' caregiver and this policy constituted an adverse employment action because it

deprived the Plaintiff of her Constitutional right to enforce her contractual relationship on the same footing as a White caregiver, which clearly demonstrates racial discrimination.

866.    But for the Plaintiff's skin color and race being Black, Alliance would have not engaged in this adverse employment action of disparate treatment against the Plaintiff. This is a fact because Alliance's overall position was that "it's fine" that the Plaintiff was treated less favorably than the Caucasian 'White' caregiver (see paragraphs 3 and 6 of exhibit A), that the Plaintiff needed to "accept" the fact that the Plaintiff was treated less well than the Caucasian caregiver in the workplace and that the Plaintiff should "literally just keep it moving" (see paragraph 33 of exhibit C), and that the Plaintiff needed to sign the February 26th, 2019 arbitration agreement to relinquish her Constitutional right under 42 U.S.C. § 1981 to enforce her contractual relationship with Alliance on the same footing as a Caucasian 'White' caregiver as a term and condition of continued employment.

867.    Based on all of the foregoing actions by Ashley (care manager from Alliance), Holly (care manager from Alliance), and Amanda Frey (Director of Human Resources at Alliance), where they all condoned, encouraged, approved, and normalized the fact that the Caucasian caregiver received favorable treatment in the workplace because of her skin color and race as a White person whereas the Plaintiff was treated with malice and hatred/racism by Schwartz because the Plaintiff's skin color and race are Black, it is clear that this adverse employment action of disparate treatment was motivated by racial discrimination as it was intended to deprive the Plaintiff of her Constitutional right to enforce her contractual relationship with Alliance on the same footing as the Caucasian 'White' caregiver.

**D. Causation for the Cause of Action of 'Disparate Treatment' Against Alliance Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107(1)(a).**

868.    Alliance was the cause in fact of the harm to the Plaintiff because Alliance maliciously, intentionally, knowingly, and willfully subjected the Plaintiff to less favorable terms and conditions of employment in comparison to a similarly situated Caucasian caregiver.

869.    Alliance was the proximate cause of the harm suffered by the Plaintiff as it was foreseeable that intentionally, maliciously, knowingly, and willfully subjecting the Plaintiff to less favorable terms and conditions of employment in comparison to the similarly situated Caucasian caregiver, would cause the Plaintiff adverse employment action, and would also cause the Plaintiff severe emotional distress, and mental anguish.

870.    But for the Plaintiff being a Black person, Alliance would have not treated the Plaintiff less favorably than the similarly situated Caucasian 'White' caregiver. It was Alliance's complete disregard for the Plaintiff, because she was a Black employee, that caused Alliance to engage in this adverse employment action, knowingly and willfully, against the Plaintiff.

871.    Therefore, the Plaintiff's race and skin color as a Black person were the sole motivating factors in Alliance's adverse employment action against the Plaintiff which caused the Plaintiff, severe emotional distress, mental anguish, along with physical ailments.

**E. Plaintiff's Damages Against Alliance for this Cause of Action for 'Disparate Treatment' Pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107(1)(a).**

872.    For the cause of action of *'Disparate Treatment'* pursuant to 42 U.S.C. § 1981 and the New York City Administrative Code § 8-107(1)(a), the Plaintiff suffered adverse employment action, severe economic damages severe emotional distress, mental anguish, and physical ailments (see section VII of this complaint).

873.    For this cause of action of *'Disparate Treatment'*, the Plaintiff is requesting nominal, compensatory, and punitive damages.

## VII. BRIEF DESCRIPTION OF PLAINTIFF'S PAIN AND SUFFERING: SEVERE EMOTIONAL DISTRESS, MENTAL ANGUISH (PSYCHOLOGICAL TRAUMA), AND RELATED PHYSICAL AILMENTS.

874.     Due to the intentional, malicious, and discriminatory acts described herein by the Plaintiff against Defendant Alliance Nursing Staffing of New York, Inc., the Plaintiff has been left with severe emotional distress, physical ailments, and mental anguish (psychological trauma) which includes:

a)      Severe anxiety attacks due to the Plaintiff's adverse experience on the Schwartz home care assignment on January 24th, 2019, and also due to the subsequent malicious and discriminatory treatment the Plaintiff received from Alliance, along with the fact that the Plaintiff has been out of work for over 2 years as a result of Alliance's adverse employment actions and the Plaintiff does not foresee her return to work in the immediate future due to the severe emotional distress, mental anguish (psychological trauma), and physical ailments the Plaintiff still suffers from to this day.

b)      Distressing memories (intense flashbacks) of the traumatic events of January 24th, 2019 where Schwartz subjected the Plaintiff to racially motivated intimidation, ridicule, and insults, which left the Plaintiff humiliated and psychologically traumatized, especially because the Plaintiff was subjected to a violent assault and the intimidating frivolous 911 report by Schwartz which completely terrorized the Plaintiff. The Plaintiff also suffers from distressing memories caused by Alliance's subsequent malicious and discriminatory conduct against the Plaintiff.

c)      General fear/apprehension of being alone with strangers, which was a requirement of the Plaintiff's job as a home health aide (caregiver).

d)      Nausea which develops as a result of the Plaintiff simply thinking about her

ordeal related to the matters in this complaint.

e)      Severe insomnia and nightmares caused by the events of January 24th, 2019, such

as nightmares about Schwartz successfully inflicting severe physical harm to the Plaintiff

through Schwartz' assault with the walking cane, along with nightmares about the police

causing physical harm to the Plaintiff at Schwartz' apartment on January 24th, 2019, and

nightmares about the police searching for the Plaintiff and arresting the Plaintiff at her

home in her daughter's presence. Furthermore, the Plaintiff suffers from severe insomnia

caused by Alliance's subsequent malicious and discriminatory treatment of the Plaintiff

after the events of January 24th, 2019 as described herein.

f)      Migraines along with other related physical ailments caused by the events of

January 24th, 2019 along with the malicious and discriminatory treatment subsequently

received by the Plaintiff from Alliance; moreover, migraines related to the fact that the

Plaintiff has been unemployed for over 2 years as a result of the damages done to her by

the malicious and discriminatory treatment the Plaintiff received from Alliance.

g)      Loss of enjoyment of professional activities, such as being a companion and a

caregiver to elderly home care clients.

h)      Loss of enjoyment of regular activities such as participating in recreational

activities with her daughter, which is severely disruptive to the Plaintiff and to her

daughter.

i)      Severe humiliation and depression in direct relation to the intentional, malicious,

and discriminatory conduct the Plaintiff was subjected to by Alliance in relation to the

Schwartz home care assignment on January 24th, 2019, along with Alliance's subsequent

malicious and discriminatory conduct against the Plaintiff as described herein.

j)      Fear of the future due to the Plaintiff being worried about future employers

engaging in similar behavior against her because of the Plaintiff's race and skin color as a

Black person.

k)      In all, the Plaintiff developed psychological trauma caused by the intentional,

malicious, and discriminatory acts by Alliance against the Plaintiff, as described herein.

### VIII. PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff Sherly Cadet respectfully prays for relief against Defendant

Alliance Nursing Staffing of New York, Inc. and for judgment to be entered against the

Defendant as follows:

i.      $1.00 for nominal damages on each cause of action herein ($9.00 total --- 2 claims
        under eighth cause of action for 'Deprivation of Constitutional Right to Be Free
        of Involuntary Servitude Motivated by Racial Discrimination).

ii.     $62,400.00 for past lost wages (approximately 2 years and 2 months as of April
        2021).

iii.    $86,400.00 for future lost wages (approximately 3 years).

iv.     $120,000.00 for potential medical cost in relation to the Plaintiff's need for
        medical treatment as a direct consequence of the severe emotional distress, mental
        anguish (psychological trauma), and physical ailments the Plaintiff developed as a
        direct result of being subjected to such an unreasonable level of racially motivated
        violent, hostile, humiliating, oppressive, and malicious conduct in the workplace.

v.      $12,096,405.00 for pain and suffering.

vi.    $9,677,124.00 for punitive damages.

vii.    For all of the Plaintiff's court costs, expenses, and attorney fees incurred in relation to this legal action.

viii.    And all such other and further relief that the Court deems just and proper.

## IX. DEMAND FOR JURY TRIAL

The Plaintiff respectfully and humbly demands a trial by jury for all issues so triable in this action, without relinquishing her right to move the Honorable District Court for summary judgment against Defendant Alliance Nursing Staffing of New York, Inc. on all claims herein.

## X. VERIFICATION

I, Sherly Cadet, being duly sworn, deposes and says: I am the Plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. The same are true to my knowledge, except as to matters therein stated to be alleged on the information and belief and as to those matters I believe them to be true.

Date: May 1st, 2021
New York, NY

RICARDO S. CASTRO
NOTARY PUBLIC, STATE OF NY
NO. 01CA5041272
QUALIFIED BRONX COUNTY
COMM EXP 03/21/2023
5/1/2021

By: Sherly Cadet
Sherly Cadet (pro se)
P.O. Box 390
New York, NY 10040
(347) 323-5946
SherlyCadet1@outlook.com

212