UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHERLY CADET,

                                    Plaintiff,

                    -v.-

ALLIANCE NURSING STAFFING OF
NEW YORK, INC.,

                                    Defendant.

21 Civ. 3994 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Sherly Cadet is a former home health aide who has sued Alliance Nursing Staffing of New York, Inc. ("Alliance" or "Defendant"), alleging myriad federal and New York City civil rights violations, including claims for retaliation, hostile work environment, and disparate treatment pursuant to 42 U.S.C. § 1981 and the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code §§ 8-101 to 8-134; disability discrimination and interference with protected rights under the NYCHRL; and violation of the Thirteenth Amendment of the Constitution, U.S. Const. amend. XIII.  Alliance now moves to dismiss the case for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth below, the Court finds that Plaintiff has adequately stated claims for hostile work environment, retaliation, and disparate treatment under Section 1981 and the NYCHRL, and thus grants in part and denies in part Alliance's motion to dismiss.

## BACKGROUND[1]

### A.    Factual Background

### 1.    Plaintiff's Employment with Defendant

Plaintiff Sherly Cadet is a Black woman who was employed by Alliance as a home health aide from July 2018 to February 26, 2019.  (Compl. ¶¶ 1-2).  Plaintiff's job responsibilities included providing assistance to Alliance's clients with their activities of daily living ("ADLs") in their homes.  (*Id.* at ¶ 2).  Throughout her employ with Alliance, "Plaintiff maintained a stellar work record of excellent home care services for both the elderly and the young[.]"  (*Id.* at ¶ 36).

On January 23, 2019, an Alliance care manager identified in the Complaint as "Ashley" contacted Plaintiff by phone and assigned her to two 12-

---

[1]    This Opinion draws its facts from the Complaint ("Compl." (Dkt. #2)), the well-pleaded allegations of which are taken as true on this motion.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  The Court also relies, as appropriate, on certain exhibits attached to the Complaint ("Compl., Ex. [ ]" (Dkt. #2)).

For ease of reference, the Court refers to Defendant's memorandum of law in support of its motion to dismiss as "Def. Br." (Dkt. #25) and its reply memorandum of law as "Def. Reply" (Dkt. #34), and to Plaintiff's memorandum of law in opposition to Defendant's motion to dismiss as "Pl. Opp." (Dkt. #27).

In addition to filing an opposition brief, Plaintiff also submitted an affidavit in opposition to Defendant's motion to dismiss.  (Dkt. #26).  The Court refers to this document as "Pl. Aff."  Plaintiff attached various exhibits to this affidavit as well, which the Court refers to using the convention "Pl. Aff., Ex. []."  Because Plaintiff is *pro se*, the Court considers the factual allegations made in her opposition submissions in addition to those made in the Complaint.  *See, e.g.*, *Wimberly* v. *Experian Info. Sols., Inc.*, No. 18 Civ. 6058 (KPF), 2019 WL 6895751, at *5 (S.D.N.Y. Dec. 18, 2019) ("The Court's inquiry does not end there, though, as Plaintiff has also raised additional allegations ... in his opposing brief, which the Court is obliged to consider given Plaintiff's *pro se* status." (citing *Rogers* v. *Fashion Inst. of Tech.*, No. 14 Civ. 6420 (AT), 2016 WL 889590, at *1 (S.D.N.Y. Feb. 26, 2016))); *see also Azor* v. *City of New York*, No. 08 Civ. 4473 (RJD) (LB), 2012 WL 1117256, at *5 (E.D.N.Y. Mar. 30, 2012) ("Recognizing the liberal pleading standard allowed *pro se* plaintiffs, this Court considers [plaintiff's] additional factual allegations in his opposition brief.").  The Court refers to Plaintiff's opposition affidavit where it contains new allegations that were not included in the Complaint.

hour shifts at the home of Joan Schwartz over the course of the following two days.  (Compl. ¶ 37).  Plaintiff avers that while Ashley informed Plaintiff that Schwartz could "become very agitated very quickly" due to her dementia (*id.*, Ex. D at ¶ 12), Ashley did not disclose the fact that Alliance had a record spanning multiple years of Schwartz "targeting Black people or people of color … with malicious conduct, which included frivolous 911 reports motivated by" racial animus (*id.* at ¶ 38; *see also, e.g., id.* at ¶¶ 156 (Ashley "was fully aware of the fact that Schwartz had a long pattern of engaging in malicious conduct targeted against Black caregivers or people of color, such as frivolous 911 reports, out of 'hatred'"), 718 (same, and noting that Alliance received complaints from Black caregivers about Schwartz's behavior).

Plaintiff further alleges that Ashley "willfully provided [her] with an unfavorable job assignment on the Schwartz home care assignment as Ashley was aware that Schwartz would engage in malicious conduct against [her] based on her skin color and race as a Black person." (Compl. ¶ 156).  Plaintiff claims that had she known about Schwartz's history of racially-motivated conduct, she would have rejected the assignment.  (*Id.* at ¶ 38; *see also, e.g., id.* at ¶ 750 ("Alliance clearly intended to deceive the Plaintiff by concealing Schwartz['s] malicious and hateful/racist behavior prior to assigning the Plaintiff to the Schwartz home care assignment as Alliance knew that the Plaintiff, as a Black person, would have decisively rejected the Schwartz home care assignment[.]")).

### 2.    The January 24, 2019 Incident

Plaintiff arrived for her assignment at Schwartz's residence in Manhattan at 9:00 a.m. on January 24, 2019.  (Compl. ¶¶ 39, 41).  Plaintiff relieved a white caregiver who was at the end of her overnight shift and who introduced Plaintiff to Schwartz prior to leaving.  (*Id.* at ¶ 42).  Immediately, Plaintiff sensed hostility from Schwartz.  For instance, "[o]nce Joan Schwartz laid eyes on [Plaintiff], [she] made a grimace, placed her hand over her face, and turned away … which demonstrated Schwartz['s] disgust with [Plaintiff][.]"  (*Id.* at ¶ 43).  Plaintiff perceived that this reaction was racially motivated, as Schwartz had treated the white caregiver with kindness and had wished her well at the end of her shift.  (*Id.* at ¶¶ 43-44).  Plaintiff further observed that Schwartz was "an extremely well-functioning elderly woman[,]" despite being 88 years old.  (*Id.* at ¶ 45).  That Schwartz made herself breakfast in front of Plaintiff corroborated this observation, as it demonstrated "alertness, lucidity, coordination, and organization."  (*Id.* at ¶ 46).

From there, the interactions between Plaintiff and Schwartz only worsened.  Following breakfast, Schwartz went to her bedroom, and Plaintiff heard her screaming loudly.  (Compl. ¶¶ 46-47).  When Plaintiff entered Schwartz's room, she found Schwartz on the phone, engaged in a "conversation [that] revolved around opprobrious racial verbal comments about the Plaintiff's appearance and falsely stating that the Plaintiff is unable to complete her work due to her appearance, stating that the Plaintiff looks like a 'little girl' and a 'schoolgirl.'"  (*Id.* at ¶ 48).  Plaintiff understood these comments to be racially

motivated, as such terms have been used historically to diminish Black women.  (*Id.* at ¶ 49).  Schwartz further commented that Plaintiff was "hideous" and that she looked like a "dead body."  (*Id.* at ¶ 50).  Schwartz then stated that she did not want Plaintiff to remain on her assignment, because (i) she got along better with the overnight caregiver who was a "[w]hite girl" and (ii) she "[did] not like the Plaintiff, or other aides like the Plaintiff[.]"  (*Id.* at ¶ 52). Plaintiff took each of these comments to be disparaging of Black people.  (*Id.*).

Soon after Plaintiff left Schwartz's bedroom, Schwartz emerged in the living room and stated that Plaintiff was making her feel nauseated and that she should sit in a corner out of view.  (Compl. ¶ 55).  When Plaintiff protested this instruction by noting that she was at the apartment to provide services to Schwartz, Schwartz threatened to call the police on Plaintiff.  (*Id.* at ¶ 56). Immediately after making this threat, at about 12:30 p.m., Schwartz swung her walking cane in Plaintiff's direction; Plaintiff was only able to avoid being struck in the head by taking "evasive action."  (*Id.* at ¶ 57).  Schwartz then called the police and gave them Plaintiff's name, which she had written down on a piece of paper.  (*Id.* at ¶ 58).  Plaintiff avers that this sequence of events indicated that Schwartz "was not only organized," but also that the "frivolous 911 report was premeditated[.]"  (*Id.*).  Although Plaintiff wanted to leave the apartment at this point, she was afraid that she might be accused of abandoning or neglecting Schwartz; after all, Alliance had instructed Plaintiff at the beginning of her employment that leaving a client prior to the end of an assignment could be a violation of the law.  (*Id.* at ¶ 60; *see also, e.g., id.* at

¶ 737 (noting that Alliance's training on this point had "created severe fear in the Plaintiff")).  Plaintiff claims that she had "no free will" during this period and "was effectively trapped" at Schwartz's apartment due to the threat of prosecution under patient neglect and abandonment laws.  (*Id.* at ¶ 765).

Instead of immediately leaving, Plaintiff called Alliance "to make them aware of the situation." (Compl. ¶ 61).  An Alliance care manager identified in the Complaint as "Holly" answered the phone and tried to assuage Plaintiff's concerns.  (*Id.* at ¶ 62).  She stated that Schwartz "does this to everyone" and that she "calls the police every day." (*Id.* at ¶¶ 62, 64; *id.*, Ex. A at ¶¶ 3, 6).  Holly also suggested to Plaintiff that she go to the study, presumably to escape Schwartz's direct vitriol.  (*Id.* at ¶ 62; *id.*, Ex. A at ¶ 3).  According to Plaintiff, Holly's response to the escalating situation "reconfirmed that [] Plaintiff had to stay on the Schwartz home care assignment" and demonstrated that Alliance condoned Schwartz's conduct.  (*Id.* at ¶ 774).

Dissatisfied with Holly's response, Plaintiff called Alliance again, and requested to leave the apartment immediately because she "felt that her life, her future, along with her daughter's future were in danger since Schwartz was making a false police report against" her.  (Compl. ¶ 65).  This time, Holly authorized Plaintiff to leave the apartment and to wait in the building lobby. (*Id.* at ¶ 67).  When Plaintiff made it to the lobby, she was informed by two lobby attendants that Schwartz had instructed them to escort her from the building.  (*Id.* at ¶ 69).  These attendants told Plaintiff that she had to wait outside in the rain, rather than in the lobby.  (*Id.*).  Plaintiff made a final phone

6

call to Alliance at this point, to inform the company that she was in the lobby and was being forced to wait outside. (*Id.* at ¶ 70; *see generally id.*, Ex. B). Plaintiff subsequently left the building and waited in the rain while the lobby attendants retrieved the items that she had left in Schwartz's apartment and returned them to her. (*Id.* at ¶ 73). Even though Plaintiff had left Schwartz's apartment at this point, she alleges that Holly was still "forc[ing her], against her will" to remain on the premises. (*Id.* at ¶ 779). Following the attendants' retrieval of Plaintiff's belongings, Plaintiff left the scene. (*Id.* at ¶ 74). The police arrived at Schwartz's apartment shortly thereafter, as Alliance confirmed to Plaintiff about a week after the incident. (*Id.* at ¶ 75; *id.*, Ex. C at ¶¶ 22-25). Plaintiff summarizes that "[a]ll the[se] events … occurred between about 9[:00 a.m.] and about 1[:00 p.m.], within only about 4 hours from the beginning of the Plaintiff's shift on January 24th, 2019 at 9[:00 a.m.]" (*Id.* at ¶ 76).

### 3. The February 1, 2019 Conversation

About one week later, on February 1, 2019, Alliance care manager Ashley, who had been out of town when the Schwartz incident occurred, called Plaintiff to debrief her regarding the incident. (Compl. ¶ 77; *id.*, Ex. C at ¶ 10). Plaintiff informed Ashley that Schwartz had attempted to assault Plaintiff, a fact Ashley appeared not to have known. (*Id.*, Ex. C at ¶¶ 27-29). Plaintiff also told Ashley that she had worked with patients with dementia before, and that none had ever reacted like Schwartz (*id.* at ¶ 27); and she remarked that her observation of Schwartz operating fairly independently, including making her own breakfast, gave Plaintiff the impression that Schwartz was "not that sick"

7

(*id.*).  Ashley responded, "You can either get someone who is pleasantly demented and friendly, or you can get someone who [is] completely agitated and has all this hatred in them.  And unfortunately that is what we are dealing with Mrs. Schwartz."  (*Id.* at ¶ 31).  Ashley then sought to give Plaintiff further background on Schwartz and her history with Alliance.  She told Plaintiff that the white overnight caregiver whom Plaintiff had relieved was not regularly staffed on the Schwartz assignment, and had been covering for someone else.  (*Id.*).  Instead, two non-white nurses generally cared for Schwartz.  (*Id.*).  Plaintiff alleges that these representations and others indicate that "Alliance had extensive prior knowledge of Schwartz['s] pattern of engaging in malicious conduct targeted against Black caregivers or people of color out of hatred, yet Alliance intentionally and maliciously concealed this information from the Plaintiff when Alliance was assigning the Plaintiff the Schwartz home care assignment[.]"  (*Id.* at ¶ 86).

Plaintiff noted that during this conversation, Ashley made various reassurances that made Plaintiff feel better.  (*See, e.g.*, Compl., Ex. C at ¶ 17).  During the call, Ashley told Plaintiff that she "did nothing wrong[,]" and hypothesized that Schwartz's conduct stemmed from the fact that she has dementia that is "only progressively getting worse."  (*Id.* at ¶ 12).  Further, she sympathized with Plaintiff, stating that she could imagine that the experience was horrible for her.  (*Id.*).  Ashley also communicated to Plaintiff that Schwartz's family was mortified by the fact that Schwartz had called the police on Plaintiff.  (*Id.*).  She noted that Alliance had been in touch with Schwartz's

doctors in order to "get her on some medicine to stabilize her[.]" (*Id.*).  Ashley stated that "this [behavior] is part of [Schwartz's] disease and it's nothing personal on you." (*Id.* at ¶ 14).  And she noted that Schwartz's dementia was only getting worse, so the incident "has nothing to do with you [] at all." (*Id.* at ¶ 18; *see also id.* at ¶ 26 ("[Y]ou did absolutely nothing wrong.  Alliance knows it.  We've had this client for over 2 years.  She has been, um, very challenging[.]")).

Further, Ashley told Plaintiff that she had "heard nothing but good things about [Plaintiff] as a caregiver[,]" and Plaintiff should "process [the incident] however you need to … and then literally just keep it moving and know that you do a good job and that … people do love your performance[.]" (Compl., Ex. C at ¶ 33).  In the Complaint, Plaintiff characterizes this "keep it moving" comment as "full condonation, normalization, encouragement, and approval of Schwartz['s] behavior by telling the Plaintiff to 'accept' the fact that she was subject to malicious conduct in the workplace, based on her skin color and race as a Black person[.]" (*Id.* at ¶ 85; *see also id.* at ¶¶ 87 (same), 196 ("Ashley … telling the Plaintiff to 'accept' racially motivated intimidation, ridicule, and insults as a term and condition of the workplace and to 'literally just keep it moving' constituted an adverse alteration of the terms and conditions of the work environment for the Plaintiff."), 202 (noting this comment also reflected Alliance's disregard for Plaintiff's safety and wellbeing)).

Ashley concluded the conversation by letting Plaintiff know that Plaintiff should call her if something like this were to happen again, and that "you are

good at what you do[.]"  (Compl., Ex. C at ¶ 35).  She also noted that "I'm so used to hearing caregivers and nurses … tell me what their experiences are with this woman and I listen to them, and we talk through it, like, it's just sometimes, in this kind of health care environment you need to talk to someone to, you know, kind of vent[.]"  (*Id.* at ¶ 39).  In the Complaint, Plaintiff states that this was an admission by Ashley that Black caregivers "repeatedly call[ed] Alliance to complain and oppose Schwartz['s] pattern of malicious and hateful/racist conduct[.]"  (*Id.* at ¶ 84). During the phone call, Plaintiff let Ashley know that "[t]his call makes a difference for me" (*id.*, Ex. C at ¶ 38) and that she "already got [her] smile back" (*id.* at ¶ 43).

### 4.    The Aftermath: Plaintiff's February 13, 2019 Letter, the Arbitration Agreement, and the End of Plaintiff's Employment with Defendant

On February 13, 2019, Plaintiff sent Alliance a letter via email.  (Compl. ¶ 90).  The letter reads:

> I would like to start this letter by expressing my appreciation for your support during the time of my employment with your company.  It is with sadness that I must say that I do not feel that I can continue with my duties at Alliance since the day Ms. Schwartz called the police on me for no reason.  I have been very traumatized by the event and it made me realize how dangerous this job can be.  When a home health aide goes to a patient's apartment, it is a serious risk for the aide as the patient can choose to do harm to me; as Ms. Schwartz did.  Therefore, I am giving you my 2 week notice for my current case with Mr. Portera because I want to end in a professional way with Alliance Home Care; and I feel a sense of responsibility toward my current patient.  Again, I would like to express my thanks to Alliance home care.

(*Id.,* Ex. F).  In her Complaint, Plaintiff clarifies that she referred to the "dangerous" work environment in this letter because Alliance's condonation and approval of Schwartz's behavior had led her "to develop psychological trauma."  (*Id.* at ¶ 90; *see also, e.g.*, *id.* at ¶¶ 223 ("The racially motivated insults, ridicule, and intimidation the Plaintiff was subjected to by Alliance unreasonably interfered with the Plaintiff's work performance as it left the Plaintiff psychologically traumatized which caused the Plaintiff to give Alliance notice … that she was suspending her work duties at Alliance."), 386 ("Plaintiff made this statement about the work environment at Alliance being dangerous because Alliance had already engaged in the full condonation of Schwartz['s] frivolous 911 report[.]")).

Plaintiff states that this letter "did not set a date for leaving Alliance[.]" (Compl. ¶ 93).  Instead, Plaintiff claims that she intended to *suspend,* not terminate, her employment at Alliance by giving Alliance "a 2-week notice for her current patient," with the expectation that Alliance would subsequently initiate a conversation with Plaintiff "to see if any corrective action could be taken by Alliance."  (*Id.*; *see also* Pl. Aff. ¶¶ 16, 17 ("My February 13th, 2019 letter was clearly a request for medical leave because I stated that I could not continue with my duties because I was traumatized as a direct result of the adverse terms and conditions in the workplace, and not because I simply decided to leave the job.")).  As evidence of this intent, Plaintiff notes that on February 5, 2019, Plaintiff signed up for a training which was to occur on February 26, 2019 — thirteen days after she sent her letter to Alliance — which

11

she would not have done had she intended to quit.  (Pl. Aff. ¶¶ 19-21; *id.*, Ex. I).

Despite Plaintiff's alleged intent to initiate a "good faith" dialogue with Alliance about her continued employment, such conversation never took place. (Compl. ¶ 94).  Instead, Plaintiff claims that Amanda Frey, Alliance's Director of Human Resources, chose February 26, 2019, as Plaintiff's termination date. (*Id.*).[2]  Plaintiff claims that Frey did this without consulting her "out of racial discrimination because Alliance had a complete disregard for the Plaintiff because she is a Black person[.]"  (*Id.*).

On February 26, 2019, Plaintiff received an email from Frey (Compl. ¶ 95; *id.*, Ex. G), which linked to an arbitration agreement (*id.*, Ex. H (the "Agreement")).  Plaintiff claims that the email and Agreement were sent "[i]n response to the Plaintiff's complaints and oppositions about Schwartz['s] malicious and hateful/racist conduct[.]"  (*Id.* at ¶ 95).  The Agreement was not addressed to Plaintiff specifically, but could be used for other Alliance employees.  (*Id.*, Ex. H)  It recited that, upon signing, any covered claims — which included "all grievances, disputes, claims, or causes of action that otherwise could be brought in a federal, state, or local court under applicable

---

[2]      Plaintiff pleads somewhat inconsistent facts about her termination in the Complaint. For example, Plaintiff alleges that Frey selected February 26, 2019, as Plaintiff's termination date.  (Compl. ¶ 94).  However, later in the Complaint, Plaintiff states that she was terminated on February 26, 2019, "without notice" for failure to sign an arbitration agreement.  (*Id.* at ¶ 130).  The Court notes that February 26, 2019, is two weeks from the date of Plaintiff's February 13, 2019 letter to Alliance stating "I am giving you my 2 week notice for my current case … because I want to end in a professional way with Alliance Home Care."  (*Id.*, Ex. F).

federal, state, or local laws, arising out of or relating to Employee's employment" (*id.* at § 3) — brought by an employee against Alliance would be subject to mandatory arbitration (*id.* at § 1).  Section 2 of the Agreement provided that an employee's continued employment with Alliance would serve as consideration for the employee's acceptance of the Agreement.  (*Id.* at § 2). Plaintiff claims that Section 2 necessarily implies that Alliance planned on terminating Plaintiff on February 26 — the same day the Agreement was sent and the date that Frey had previously set as Plaintiff's termination date — if she refused to sign the Agreement because Alliance could not otherwise offer her continued employment as consideration for the Agreement.  (Compl. ¶ 108). Section H of the Agreement further stated that an employee's relationship with Alliance was at-will unless otherwise altered by agreement (*id.*, Ex. H at § 11), which Plaintiff found to be a "coerc[ive] and intimidat[ing]" threat to terminate Plaintiff's employment if she did not agree to sign the Agreement.  (Compl. ¶ 208).

In essence, Plaintiff claims that the Agreement was a mandate to "keep quiet about the malicious and hateful/racist conduct the Plaintiff was subjected to" by Schwartz and any future incidents.  (Compl. ¶ 120; *see also, e.g.*, *id.* at ¶¶ 247 ("On February 26th, 2019, Alliance retaliated against the Plaintiff because of her complaints and oppositions about Schwartz['s] malicious and hateful/racist conduct against her in the workplace.  Alliance retaliated against the Plaintiff by requiring her to sign an arbitration agreement as a condition of continued employment at Alliance."), 307 (same), 418 (same)).

According to Plaintiff, Alliance required Plaintiff to sign the Agreement so that it could "be free to continue to engage in discriminatory conduct against the Plaintiff in the workplace [] with impunity." (*Id.* at ¶ 317; *see also, e.g.*, *id.* at ¶ 508 (alleging that tying Plaintiff's continued employment to the Agreement "was intended to chill any plans the Plaintiff may have had to bring legal action against Alliance for the malicious and hateful/racist conduct the Plaintiff was subjected to on the Schwartz home care assignment")). Together with the comments Ashley made during the February 1, 2019 conversation, Plaintiff alleges that the Agreement was a further example of Alliance's willingness to overlook or condone Schwartz's malicious and hateful conduct. (*See id.* at ¶ 125). More broadly, Plaintiff alleges that the Agreement reflects Alliance's desire to "provide Caucasian caregivers with much more favorable terms, conditions, and privileges of employment [than] the Plaintiff, with impunity." (*Id.* at ¶ 517). And she states that it "demonstrates consciousness of guilt by Alliance" that it engaged in racially discriminatory conduct against Plaintiff. (*Id.* at ¶ 518).[3]

Plaintiff alleges that because she did not sign the Agreement on February 26, 2019, Alliance terminated her employment that day. (Compl. ¶¶ 112, 118). These actions, according to Plaintiff, show that Alliance "[r]etaliated against [her] … because of her complaints and oppositions"

---

[3]     In her opposition affidavit, Plaintiff further examines the terms of the Agreement and alleges that they are "unconscionable or unreasonable." (Pl. Aff. ¶ 42). Because Plaintiff did not sign the Agreement, and because Plaintiff alleges no contract claims in the Complaint, the Court only briefly discusses these arguments in this Opinion.

regarding Schwartz's hateful behavior and because she did not sign the Agreement.  (*Id.* at ¶ 358; *see also, e.g.*, *id.* at ¶ 423 ("Alliance terminating the Plaintiff's employment immediately after sending the Plaintiff a mandatory arbitration agreement … demonstrates that Alliance clearly terminated the Plaintiff's employment for not agreeing [to] sign the arbitration agreement and for the Plaintiff's complaints and oppositions about racially discriminatory conduct in the workplace.")).  As proof that Alliance's actions were premeditated and "targeted," Plaintiff states that the training in which she was scheduled to participate on February 26, 2019, was moved to February 27, 2019.  (Pl. Aff. ¶ 21; *id.*, Ex. J; *see also id.* at ¶ 22 ("To cover up their unlawful employment practices, Alliance specifically waited until my last day on [Plaintiff's other client's] home care assignment … to call me to reschedule" the training.)).

Plaintiff further states that Frey did not disclose Plaintiff's termination date to her orally or in writing within five working day following termination, as required by New York Labor Law ("NYLL") § 195(6).  (Compl. ¶ 131; *see also id.* at ¶ 529 ("Alliance failed to make such disclosure within that 5-day period" and did not "do so at any time thereafter.")).  She also alleges that Alliance's failure to follow NYLL procedures with regard to her termination "occurred under circumstances demonstrating racial discrimination as this was in furtherance of Alliance's condonation, normalization, approval, and encouragement of Schwartz['s] malicious and hateful/racist conduct against the Plaintiff[.]"  (*Id.* at ¶ 531; *see also, e.g.*, *id.* at ¶¶ 546-552 (further discussing this allegation)).

Plaintiff avers that the fact that Alliance did not follow proper termination procedures under the NYLL reflects Alliance's decision to make an example out of her to the other Black caregivers for "daring to speak up about racially discriminatory conduct in the workplace." (*Id.* at ¶ 555; *see also, e.g., id.* at ¶ 563 (same)).

As a result of the foregoing, Plaintiff alleges that she has suffered severe trauma. (Compl. ¶ 874). For example, Plaintiff notes that the assault and vitriol that she experienced from Schwartz on January 24, 2019, has caused her to suffer from anxiety attacks, distressing flashbacks, insomnia, and other physical ailments. (*Id.*).

## B.   Procedural Background

Plaintiff initiated this case by filing her Complaint on May 4, 2021. (Dkt. #2). That same day, Plaintiff filed an application to proceed *in forma pauperis* (Dkt. #1), which the Court granted on June 7, 2021 (Dkt. #6). On June 8, 2021, this case was reassigned to this Court. (Notice of Case Reassignment).

On September 10, 2021, Defendant filed a pre-motion letter, requesting a conference regarding its contemplated motion to dismiss the Complaint. (Dkt. #16). Plaintiff filed her response to Defendant's letter three days letter, on September 13, 2021. (Dkt. #17). On October 7, 2021, the Court held a pre-motion conference in this case, and the next day set forth a briefing schedule for Defendant's motion to dismiss. (Minute Entry for Oct. 7, 2021; Dkt. #19). Defendant filed its motion to dismiss and supporting papers on November 5, 2021. (Dkt. #23-25). Plaintiff filed her opposition affidavit and memorandum

16

of law on December 17, 2021.  (Dkt. #26-27).  On December 30, 2021, the Court granted Defendant's request for an extension of time to file its reply brief and for leave to file additional pages.  (Dkt. #30, *amended by* Dkt. #31).  On January 3, 2022, the Court denied Plaintiff's request to file a sur-reply brief and noted that it would not, at that point in time, convert Defendant's motion to dismiss into a motion for summary judgment as Plaintiff had suggested was necessary.  (Dkt. #32).

On January 21, 2022, Defendant filed its reply brief and a reply declaration in support of its motion to dismiss.  (Dkt. #33-34).  The reply declaration attached an affidavit from Tomer Pollatchek, owner of NYCITGUY Inc., which provides IT services to Defendant.  (Dkt. #33-1).  On January 24, 2022, Plaintiff filed a letter motion for leave to file a motion to strike Pollatchek's affidavit, and again raised the issue of conversion of the motion to dismiss to a motion for summary judgment.  (Dkt. #35).  The Court responded that it would resolve whether to consider the Pollatchek affidavit when resolving Defendant's underlying motion to dismiss.  (Dkt. #36).  Accordingly, Defendant's motion is fully briefed and ripe for the Court's consideration.

## DISCUSSION

### A.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life*

17

*Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). While the plausibility requirement "is not akin to a 'probability requirement' ... it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Toward that end, a plaintiff must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

A court adjudicating a motion to dismiss under Rule 12(b)(6) "may review only a narrow universe of materials." *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). This narrow universe includes "facts stated on the face of the complaint, ... documents appended to the complaint or incorporated in the complaint by reference, and ... matters of which judicial notice may be taken," as well as documents that can properly be considered "integral" to the complaint. *Id.* (internal citation omitted); *accord United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021).

"[C]ourts must construe *pro se* pleadings broadly, and interpret them 'to raise the strongest arguments that they suggest.'" *Cruz* v. *Gomez*, 202 F.3d 593, 597 (2d Cir. 2000) (quoting *Graham* v. *Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)). "However inartfully pleaded, a *pro se* complaint may not be dismissed under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief.'"

*Legeno* v. *Corcoran Grp.*, 308 F. App'x 495, 496 (2d Cir. 2009) (summary order) (alterations omitted) (quoting *Posr* v. *Ct. Officer Shield No. 207*, 180 F.3d 409, 413-14 (2d Cir. 1999)).  "That said, the liberal pleading standard accorded to *pro se* litigants is not without limits, and all normal rules of pleading are not absolutely suspended."  *Hill* v. *City of New York*, No. 13 Civ. 8901 (KPF), 2015 WL 246359, at *2 (S.D.N.Y. Jan. 20, 2015) (internal quotation marks and citation omitted).  To survive a Rule 12(b)(6) motion to dismiss, a *pro se* plaintiff's factual allegations still must at least "be enough to raise a right to relief above the speculative level[.]"  *Twombly*, 550 U.S. at 555 (citation omitted).  Even in the *pro se* context, the Court is not bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions."  *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (quoting *Smith* v. *Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002)); *see also Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009).  Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

## B.   Analysis

### 1.   Plaintiff Fails to State a Claim Under the Thirteenth Amendment

Plaintiff's eighth cause of action alleges that Defendant violated the Thirteenth Amendment of the United States Constitution and 42 U.S.C. § 1981. (Compl. ¶ 716).  The Thirteenth Amendment provides that "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party

shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, § 1. "[I]nvoluntary servitude[,]" as understood in the Amendment, bars more than just "chattel slavery-like conditions." *McGarry* v. *Pallito*, 687 F.3d 505, 510 (2d Cir. 2012). Instead, the Amendment condemns "all forms of involuntary labor[.]" *Id.* (citing *Slaughter-House Cases*, 83 U.S. 36, 69 (1872); *Pollock* v. *Williams*, 322 U.S. 4, 17-18 (1944)). Accordingly, the Amendment is violated where there exists "'a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process[.]'" *McGarry*, 687 F.3d at 511 (quoting *United States* v. *Kozminski*, 487 U.S. 931, 952 (1988)).

Plaintiff argues that, through the threat of prosecution under New York patient abuse and neglect laws, Alliance exerted legal coercion over her and forced her to remain on the Schwartz home care assignment. (*See, e.g.*, Compl. ¶¶ 742, 789 ("Holly … exercised dominance over the Plaintiff as a care manager from Alliance along with having the power of legal coercion through New York Patient Abandonment/Neglect penal laws[.]")). Plaintiff further contends that Holly's statement to Plaintiff that "it's fine" in reference to the traumatic incident in Schwartz's apartment confirmed that she was not permitted to leave her assignment. (*See id.* at ¶ 774). Finally, Plaintiff cites extensively to the jury instructions delivered by the trial court in *Kozminski*. (Pl. Opp. 2-3 (citing jury instructions)). *See Kozminski*, 487 U.S. at 968 n.3 (Stevens, J., concurring) (noting that the full text of the relevant jury instructions appears

20

as an appendix to the Court's opinion).  Defendant claims that Plaintiff's own Complaint suggests that she was not subject to coercion or held involuntarily at the Schwartz assignment; for example, Plaintiff was permitted to leave Schwartz's apartment soon after she informed Alliance that Schwartz had called 911.  (Def. Br. 10).

Where a plaintiff relies on a theory that her involuntary servitude was accomplished through legal coercion, the plaintiff must show that she "had no available choice but to work or be subject to legal sanction." *Singleton* v. *City of New York*, No. 21 Civ. 2893 (LTS), 2022 WL 524669, at *6 (S.D.N.Y. Feb. 22, 2022) (quoting *Kozminski*, 487 U.S. at 943).  Further, the Supreme Court has clarified that "[o]ur precedents reveal that not all situations in which labor is compelled by physical coercion or force of law violate the Thirteenth Amendment." *Kozminski*, 487 U.S. at 943.  For example, "the prohibition against involuntary servitude does not prevent the State or Federal Governments from compelling their citizens, by threat of criminal sanction, to perform certain civic duties." *Id.* at 943-44 (citations omitted).

Plaintiff fails to state a claim for violation of the Thirteenth Amendment. Plaintiff's core allegations on this point relate to New York patient neglect and abandonment laws, which may create legal exposure for caregivers who abandon their assignments.  (Compl. ¶¶ 719, 737).  Months before the January 24, 2019 incident, Alliance had included information about these laws in Plaintiff's training (*id.* at ¶ 60), and, according to Plaintiff, the specter of prosecution under them robbed her of "free will" during the Schwartz incident

(*id.* at ¶ 765).  Even crediting the possibility that Plaintiff faced potential legal exposure for leaving Schwartz's apartment, the Court finds that Plaintiff pleads no facts to suggest that *Alliance* leveraged any such threat on January 24, 2019, in order to force Plaintiff into continued labor.  The Court will not hold Defendant liable for keeping Plaintiff in a state of involuntary servitude based on a training that took place months before the relevant incident, and that merely brought to caregivers' attention rules and regulations governing their industry.

Further, Plaintiff's own Complaint and its supporting factual allegations suggest the opposite: that Alliance allowed Plaintiff to freely leave Schwartz's apartment.  Only a short period of time elapsed between Plaintiff's call to Holly and Plaintiff's eventual retreat to Schwartz's lobby.  (Compl. ¶¶ 67, 76 (noting that the entire incident spanned four hours)).  And in the context of the full conversation between Plaintiff and Holly made following Schwartz's call to the police (*id.*, Ex. A), the Court cannot find that Holly's statement "it's fine" constitutes such overwhelming coercion that Plaintiff was in a state of involuntary servitude (*id.* at ¶ 774).  In the moment, this statement by Holly may have been upsetting, given that the situation was undoubtedly not "fine," but it cannot support a claim for a violation of the Thirteenth Amendment.

Plaintiff's citations to a smattering of New York Public Health Law provisions do not alter this outcome.  (Pl. Opp. 3-6).[4]  That Alliance is a highly-

---

[4]    Plaintiff cites to N.Y. Pub. Health Law § 3611(c), as well as N.Y. Comp. Codes R. & Regs. tit. 10 §§ 766.2, 766.1, 766.3, 766.9, and 763.5.  These rules and regulations are primarily concerned with patient rights, obligations regarding care plans, and

regulated entity is undisputed.  Plaintiff's cited regulations simply do not suggest that Plaintiff was under such extreme legal coercion that she was forced into involuntary servitude, and Plaintiff has not identified a "credible threat of imprisonment" or "physical restraint" that implicates the Thirteenth Amendment.  *See Calicchio* v. *Sachem Cent. Sch. Dist.*, 185 F. Supp. 3d 303, 309 (E.D.N.Y. 2016) (finding that allegations that plaintiff "was threatened with expulsion and that he would be arrested by the FBI" were insufficient to make out Thirteenth Amendment claim because "the use or threat of coercion through law or legal process [must] involve a credible threat of imprisonment"); *United States* v. *Alzanki*, 54 F.3d 994, 1000 (1st Cir. 1995) ("Absent proof of physical restraint, a finding of involuntary servitude is not warranted, however, unless the government establishes that the victim could only extricate herself by risking 'imprisonment or worse.'" (quoting *United States* v. *Shackney*, 333 F.2d 475, 486 (2d Cir. 1964)).  Plaintiff's theory, that such regulations force a regulated entity to rely on involuntary servitude in order to remain in compliance with the law, sweeps far too broadly, and the Court agrees with Alliance that it threatens to subject regulated entities to potentially massive liability.  (Def. Reply 3).

---

requirements that the home care services agency must meet.  Plaintiff does not explain how she would be subject to criminal penalties under these provisions, nor does she flesh out how she was compelled to remain on the Schwartz assignment pursuant to Section 766.2(a)(9).  That provision provides only that "a patient is discharged by the *agency* after notification of the authorized practitioner … and consultation with the patient and any other professional staff involved in coordinating the plan of care, no less than 48 hours prior to patient discharge."  Accordingly, the Court reads these provisions to principally obligate Alliance, but not Plaintiff, to take certain steps.

As to Plaintiff's extensive quoting from the *Kozminski* jury instructions, (Pl. Opp. 1-3), the Court first clarifies that it is not bound by another district court's jury instructions.  Second, the Supreme Court did not pass on the correctness of those instructions in its decision.  Instead, the Court found that "the jury must be instructed that compulsion of services by the use or threatened use of physical or legal coercion is a necessary incident of a condition of involuntary servitude[,]" and that the court's "instruction on involuntary servitude, which encompassed other means of coercion, may have caused the [defendants] to be convicted for conduct that does not violate either statute [promulgated pursuant to the Thirteenth Amendment]."  *Kozminski*, 487 U.S. at 952-53.  The Court is guided by this holding and aided by subsequent caselaw relying on *Kozminski*, and finds that Plaintiff has failed to state a claim for a violation of the Thirteenth Amendment.

### 2.     Plaintiff Has Stated Claims Under Section 1981

Plaintiff brings Section 1981 claims across six different causes of action and three separate theories: retaliation, hostile work environment, and disparate treatment.  The relevant statute provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts[.]"  42 U.S.C. § 1981(a).  The Civil Rights Act of 1991 expanded Section 1981 to outlaw discrimination occurring after contract formation "with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship[.]"  *Patterson* v. *County of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004).  Hostile work environment, disparate

treatment, and retaliation claims are analyzed in the same manner and under the same tests under both Title VII and Section 1981. *See, e.g.*, *Littlejohn* v. *City of New York*, 795 F.3d 297, 312, 315-16, 320-21 (2d Cir. 2015); *Cano* v. *SEIU Loc. 32BJ*, No. 19 Civ. 8810 (PAE) (KHP), 2021 WL 4480274, at *9 (S.D.N.Y. Sept. 30, 2021). Accordingly, the Court relies on cases analyzing both Section 1981 and Title VII claims in this portion of its analysis.

### a.    Plaintiff States a Claim for Retaliation[5]

Plaintiff claims that Alliance retaliated against her in violation of Section 1981 and the NYCHRL in three different ways, by (i) sending her the mandatory Agreement after she had raised concerns about Schwartz to Alliance employees (Compl. ¶ 247 (summarizing second cause of action)); (ii) terminating her employment because of her protected activity and her refusal to sign the Agreement (*id.* at ¶ 358 (summarizing third cause of action)); and (iii) failing to disclose her termination date to her within five days of her termination, in violation of NYLL § 195(6) (*id.* at ¶¶ 531 (fifth cause of action), 574 (sixth cause of action)).

"'Retaliation claims under [Section 1981] are evaluated under a three-step burden-shifting analysis.'" *Hicks* v. *Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (quoting *Jute* v. *Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir.

---

[5]    The Court agrees with Defendant that, despite being styled as separate causes of action, Plaintiff's fifth and sixth causes of action ("racial discrimination" and "retaliation motivated by racial discrimination," respectively) largely overlap. For example, both are premised on Defendant's failure to provide notice of Plaintiff's termination as required by New York law. Because Plaintiff also addressed her fifth and sixth causes of action as if they were one in her opposition memorandum of law (Pl. Opp. 7), the Court will discuss these causes of action together, within the context of retaliation.

2005)); *see also McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802-05 (1973). To survive a motion to dismiss on a Section 1981 retaliation claim, "a plaintiff must present evidence that shows '[i] participation in a protected activity; [ii] that the defendant knew of the protected activity; [iii] an adverse employment action; and [iv] a causal connection between the protected activity and the adverse employment action.'" *Littlejohn*, 795 F.3d at 315-16 (quoting *Hicks*, 593 F.3d at 164); *see also Amaya* v. *Ballyshear LLC*, 295 F. Supp. 3d 204, 226 (E.D.N.Y. 2018).

As with other claims subject to the burden-shifting framework, "the allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise under *McDonnell Dougla*s[.]" *Littlejohn*, 795 F.3d at 316. In other words, "for a retaliation claim to survive ... a motion to dismiss, the plaintiff must plausibly allege that: [i] defendants discriminated — or took an adverse employment action — against [her], [ii] 'because' [she] has opposed any unlawful employment practice." *Vega* v. *Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015). "[A] 'plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as [s]he can establish that [s]he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law.'" *La Grande* v. *DeCrescente Distrib. Co.*, 370 F. App'x 206, 212 (2d Cir. 2010) (summary order) (quoting *Treglia* v. *Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)).

26

"Retaliation occurs when an employer takes action against an employee not because of his ethnicity, but because he engaged in protected activity— complaining about or otherwise opposing discrimination." *Vega*, 801 F.3d at 91. Protected activity in the context of a Section 1981 or Title VII retaliation claim may be "'informal — an employee does not need to lodge a formal complaint of discrimination.'" *Amaya*, 295 F. Supp. 3d at 227 (quoting *Bowen-Hooks* v. *City of New York,* 13 F. Supp. 3d 179, 222 (E.D.N.Y. 2014) (internal citations omitted)).

"The Supreme Court has held that in the context of a Title VII retaliation claim," which equally applies in the context of a Section 1981 claim, *see, e.g.*, *Littlejohn*, 795 F.3d at 315, "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination,'" *Vega*, 801 F.3d at 90 (quoting *Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 57 (2006)); *see also Walker* v. *Triborough Bridge & Tunnel Auth.*, No. 21 Civ. 474 (VEC), 2021 WL 5401483, at *6 (S.D.N.Y. Nov. 18, 2021). "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination … [and] 'is not limited to discriminatory actions that affect the terms and conditions of employment.'" *Vega*, 801 F.3d at 90 (quoting *Burlington*, 548 U.S. at 64); *see also Amaya*, 295 F. Supp. 3d at 227.

A plaintiff must also "plausibly plead a connection between the act and his engagement in protected activity." *Vega*, 801 F.3d at 90. "A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in

27

time by adverse employment action." *Id.* (citation omitted).  For "an adverse retaliatory action to be 'because' a plaintiff made a charge, the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." *Id.* (citing *Univ. of Tex. Sw. Med. Ctr.* v. *Nassar*, 570 U.S. 338, 360 (2013)); *see also Spratt* v. *Verizon Commc'ns Inc.*, 633 F. App'x 72, 73 (2d Cir. 2016) (summary order) ("A supervisor's retaliatory actions must be the 'but-for' cause of the employer's adverse employment action" under Section 1981. (citations omitted)).

To begin, the Court finds, despite Defendant's arguments to the contrary, that Plaintiff has adequately alleged protected activity.[6]  Defendant seeks dismissal of Plaintiff's retaliation claims on the alternative basis that Plaintiff has failed to show how any of Defendant's alleged actions would deter her from engaging in such protected activity — *i.e.*, that there is no causal connection between the protected activity and the adverse employment action.  (Def. Br. 12; Def. Reply 7-8, 16).  Defendant further argues that, as to Plaintiff's retaliation claims premised on her termination and Alliance's failure to provide Plaintiff with adequate notice of her termination as required by New York law, Plaintiff cannot show that an adverse employment action was taken.  (Def. Br. 12-13).  As explained below, while certain of Defendant's arguments

---

[6]     Alliance states that Plaintiff has not shown that she engaged in a protected activity (Def. Br. 11), but does not explain why this is the case.  The Court disagrees.  Plaintiff has alleged that she "complain[ed] about or otherwise oppos[ed] discrimination." *Vega* v. *Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015).

succeed, Plaintiff has adequately alleged several forms of retaliation at this stage of her case.

### i.  Failure to Provide Notice Under the NYLL

Turning now to Plaintiff's claim that Defendant's failure to provide notice of her termination, as required by the NYLL, constitutes retaliation (fifth and sixth causes of action), the Court agrees with Defendant that Plaintiff has not adequately shown how Defendant's alleged failure to comply with the NYLL would deter Plaintiff from engaging in protected activity.  Plaintiff premises her claim on a provision of the NYLL that requires an employer to:

> notify any employee terminated from employment, in writing, of the exact date of such termination as well as the exact date of cancellation of employee benefits connected with such termination. In no case shall notice of such termination be provided more than five working days after the date of such termination. Failure to notify an employee of cancellation of accident or health insurance subjects an employer to an additional penalty pursuant to section two hundred seventeen of this chapter.

N.Y. Lab. Law § 195(6).  By the time Plaintiff was to receive this notice, she was no longer an Alliance employee.  Other than lacking some information as required by law, Plaintiff does not explain how this omission by Alliance was actually injurious, nor how it had any deterrent effect on her protected activity.

As the Second Circuit has observed, such "'trivial harms'" cannot constitute "materially adverse employment action[s.]"  *Harewood* v. *N.Y.C. Dep't of Educ.*, No. 21-584-cv, 2022 WL 760739, at *2 (2d Cir. Mar. 14, 2022) (summary order) (affirming lower court finding that receipt of "informational disciplinary notices nearly one year after" plaintiff retired could not form basis

29

of retaliation claim because it "had no employment (or other) consequences" (citing *Rivera* v. *Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2014) (quotation marks omitted); *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68)). While it is true that post-termination actions may form the basis for retaliation claims, *see, e.g.*, *Bentivegna* v. *People's United Bank*, No. 14 Civ. 599 (ADS) (GRB), 2017 WL 4277149, at *3 (E.D.N.Y. Sept. 25, 2017) (collecting cases), Plaintiff's claim regarding the NYLL does not resemble the type of "blacklisting, or interfering with future employment opportunities" that courts within the Second Circuit have recognized as forming the basis for post-employment adverse employment actions. *See, e.g.*, *Calise* v. *Casa Redimix Concrete Corp.*, No. 20 Civ. 7164 (PAE), 2022 WL 355665, at *6 (S.D.N.Y. Feb. 4, 2022) (collecting cases discussing blacklisting, negative employment reviews, wrongful refusals to write employment recommendations, and the like). Plaintiff does not adequately explain how Alliance's failure to adhere to this provision of the Labor Law was actually adverse to her, nor how it would dissuade her from engaging in protected activity, other than pleading that she "lost the benefit of being informed[.]" (Compl. ¶ 545).[7]

---

[7]     Plaintiff cites to *Summa* v. *Hofstra University*, and in particular its language that in order to show that a plaintiff engaged in protected activity, she "'need not establish that the conduct she opposed was actually a violation of Title VII, but only that she possessed a good faith, reasonable belief that the underlying employment practice was unlawful under that statute.'" 708 F.3d 115, 126 (2d Cir. 2013) (quoting *Galdieri-Ambrosini* v. *Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)). However, this rule goes only to a showing of protected activity, and does not support Plaintiff's assertion that she "only needs to have a belief that Alliance's failure to disclose my employment termination date was an adverse employment action or a retaliatory action[.]" (Pl. Opp. 7).

Accordingly, the Court dismisses Plaintiff's retaliation claim premised under NYLL § 195(6).

ii.    **Transmission of the Agreement**

Plaintiff also argues that Alliance retaliated against her by requiring her to sign the Agreement after she complained of harassment. (Compl. ¶ 316). As an initial matter, the Agreement and its rollout are the subject of much disagreement between the parties. In response to Plaintiff's allegations in her Complaint and her Exhibit G, which is an email sent from Alliance's Director of Human Resources linking to the Agreement, Alliance submitted an email sent from Frey's account, purporting to show that this email and Agreement were sent to employees other than Plaintiff. (Doherty Decl. (Dkt. #24), Ex. B). From this, Defendant argues that Plaintiff's retaliation claim related to the Agreement fails because the email and Agreement were sent to employees other than Plaintiff at the exact same time. (Def. Br. 11-12).

In her opposition affidavit, Plaintiff disputed the authenticity of this document. (Pl. Aff. ¶ 3). In response, Alliance submitted an affidavit from Tomer Pollatchek, owner of NYCITGUY Inc., which provides IT services to Alliance. This affidavit addresses the authenticity of Defendant's Exhibit B. The Court previously advised the parties that it would resolve whether to consider the Pollatchek affidavit when resolving Defendant's underlying motion to dismiss. (Dkt. #36). It does so now.

"Even where a document is considered integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or

31

accuracy of the document.  It must also be clear that there exist[s] no material disputed issues of fact regarding the relevance of the document." *Nicosia* v. *Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016) (internal quotation marks and citations omitted).  "[T]he requirement that there be no dispute about the authenticity of documents integral to the complaint has been interpreted strictly: even implicit, conclusory, contradictory, or implausible objections to the authenticity or accuracy of a document render consideration impermissible." *Mbody Minimally Invasive Surgery, P.C.* v. *United Healthcare Ins. Co.*, No. 14 Civ. 2495 (ER), 2016 WL 4382709, at *7 (S.D.N.Y. Aug. 16, 2016) (internal quotation marks and citation omitted); *see also Savides* v. *United Healthcare Servs., Inc.*, No. 18 Civ. 4621 (LGS), 2019 WL 1173008, at *2 (S.D.N.Y. Mar. 13, 2019) (denying defendant's motion to dismiss because court could not consider insurance plan due to authenticity dispute, and plan's terms formed entire basis of motion); *Barberan* v. *Nationpoint*, 706 F. Supp. 2d 408, 416 n.4 (S.D.N.Y. 2010) ("[W]hile Plaintiffs' attempt to slalom their way through these documents may not be well-founded, and while Plaintiffs may face a rocky road in thwarting Defendants' inevitable summary judgment motion, the Court will apply [Second Circuit precedent] and decline to consider these documents at this time.").[8]

---

[8]     The Court has elected not to convert the motion into one for summary judgment at this point.  *See, e.g.*, *Stephens* v. *Bayview Nursing & Rehab. Ctr.*, No. 07 Civ. 0596 (JFB) (AKT), 2008 WL 728896, at *2 (E.D.N.Y. Mar. 17, 2008) ("Federal courts have complete discretion to determine whether or not to accept the submission of any material beyond the pleadings offered in conjunction with a Rule 12(b)(6) motion, and thus complete discretion in determining whether to convert the motion to one for summary judgment[.]" (internal quotation marks omitted)); *Groden* v. *Random House, Inc.*, 61 F.3d 1045, 1052 (2d Cir. 1995) ("A district court may not convert a motion under Fed. R. Civ.

In sum, the Court will not consider Exhibit B or any of Defendant's factual arguments in support of its motion to dismiss that are premised on Exhibit B. (*See, e.g.*, Def. Br. 11-12). The same is true of the Pollatchek Affidavit, which goes to the authenticity of Defendant's Exhibit B. Absent consideration of Exhibit B, the Court cannot dismiss Plaintiff's retaliation claims based on the Agreement. As already noted, Defendant does not meaningfully dispute that Plaintiff engaged in protected activity, and Plaintiff has identified several instances of opposing harassment in the workplace and other perceived discrimination. Defendant's arguments in favor of dismissal of this claim rest entirely on evidence that the Court cannot consider at this early stage in the litigation. (*See id.*).

Even in its reply, Defendant makes only conclusory arguments regarding the Agreement. For instance, Defendant states only that "Plaintiff fails to provide any facts to suggest the Defendant had a retaliatory motive or that retaliation was a 'but for' cause of Defendant's alleged actions." (Def. Reply 7 (citing *Comcast Corp.* v. *Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014, 1019 (2020))). To the extent that this statement refers to evidence marshaled in Defendant's opening brief that the Court cannot consider, it supplies no basis for dismissal. Otherwise, this argument is entirely conclusory, and is contradicted by factual allegations to the contrary. (*See, e.g.*, Compl. ¶¶ 307 ("In response to the Plaintiff's complaints and oppositions

---

P. 12(b)(6) into a Rule 56 motion for summary judgment without sufficient notice to an opposing party and an opportunity for that party to respond.").

about racially motivated violence and intimidation in the workplace, on February 26th, 2019 the Plaintiff received an email from Alliance which was accompanied by a mandatory arbitration agreement from Alliance[.]" (internal citations omitted)), 312 (alleging that the Agreement was rolled out to "deter the Plaintiff from taking legal action against Alliance")).  Other courts in this Circuit have found that mandatory arbitration agreements may form the basis for a retaliation claim where they are sent out close in time to the relevant protected activity.  *See, e.g., Corradino* v. *Liquidnet Holdings Inc.*, No. 19 Civ. 10434 (LGS), 2021 WL 2853362, at *6 (S.D.N.Y. July 8, 2021) ("Here, however, the timing and manner of [defendant's] implementation of a mandatory arbitration policy — just shy of one month after Plaintiff retained counsel in connection with her sexual harassment complaints — coupled with the insistence that she agree to arbitrate as a condition of employment, are sufficient to plead an adverse employment action." (citing *Gary L.* v. *CSX Transp., Inc.*, No. 18 Civ. 808 (MAD) (ATB), 2020 WL 6343289, at *5 (N.D.N.Y. Oct. 29, 2020)))).  Accordingly, the Court will not dismiss Plaintiff's retaliation claim premised on the Agreement.

### iii.        Plaintiff's Termination

Plaintiff's final retaliation claim is based on her termination from Alliance on February 26, 2019.  (Compl. ¶ 358).  Plaintiff argues that she was wrongfully terminated in retaliation for complaining about Schwartz's racist conduct and for subsequently refusing to sign the Agreement.  (*Id.*).  Defendant argues that Plaintiff's retaliation claim premised on her termination is

implausible, because there is an independent reason why Plaintiff was terminated: she sent to Alliance what appears to be a two-week notice of her resignation on February 13, 2019.  (Def. Br. 12-13; Def. Reply 7).

Defendant's argument for dismissal of this retaliation claim is essentially a factual one: Plaintiff's Exhibit F to her Complaint is a two-week notice of resignation, and thus the Complaint itself shows that there was no retaliatory motive behind Plaintiff's termination.  (*See* Def. Br. 12-13; Def. Reply 7).  *See also Soloviev* v. *Goldstein*, 104 F. Supp. 3d 232, 249 (E.D.N.Y. 2015) ("[T]he Amended Complaint itself states a basis for [plaintiff's] termination that is independent from his race, gender, and national origin[.]").  The problem with Defendant's argument is that, at various points in her Complaint and briefing, Plaintiff characterizes Exhibit F differently than Alliance does.  For instance, in her Complaint, she states that the February 13, 2019 letter was only meant to inform Alliance that she "was suspending her duties" because of Schwartz's racist behavior and its consequent trauma.  (Compl. ¶ 385).  In her opposition affidavit, Plaintiff describes the letter not as a general resignation, but as a two-week notice for her then-current client.  (Pl. Aff. ¶ 16).  She also states that "[b]ased on [Alliance's] own language … giving a 2-week notice does not constitute resigning, it only means that a caregiver is leaving a particular home care assignment."  (*Id.*).  Later on in her affidavit, Plaintiff notes that the February 13, 2019 letter was actually a "request for medical leave[.]"  (*Id.* at ¶ 17).

The text of the letter is somewhat ambiguous.  At first, Plaintiff appears to indicate that she intends to resign from Alliance: "It is with sadness that I must say that I do not feel that I can continue with my duties at Alliance since the day Ms. Schwartz called the police on me for no reason."  (Compl., Ex. F). But only three sentences later, the letter reads: "I am giving you my 2 week notice for my current case with [another client] because I want to end in a professional way with Alliance Home Care[.]"  (*Id.*).

At this early stage in the litigation, the Court will not dismiss Plaintiff's retaliation claim premised on her termination.  The Court acknowledges that Defendant's read of Plaintiff's February 13, 2019 letter is a plausible one, and notes that at a minimum, Plaintiff was unwise to submit a letter with such language merely as a way to strong-arm Defendant into a "good faith" conversation about making things right.  But as the Second Circuit has instructed, "[t]he question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible." *Anderson News, L.L.C.* v. *Am. Media, Inc.*, 680 F.3d 162, 189 (2d Cir. 2012). Accordingly, "on a Rule 12(b)(6) motion it is not the province of the court to dismiss the complaint on the basis of the court's choice among plausible alternatives….  [T]he choice between or among plausible interpretations of the evidence will be a task for the factfinder."  *Id.* at 190; *see also Confido Advisors, LLC* v. *USAA Real Est. Co.*, No. 17 Civ. 5632 (JFK), 2018 WL 4265900, at *5 (S.D.N.Y. Sept. 6, 2018) ("That two plausible inferences may be drawn from

factual allegations is not a choice to be made by the Court on a Rule 12(b)(6) motion[.]").

Here, Plaintiff has pleaded that she complained to Alliance about the racist harassment she faced during the Schwartz assignment, and that within a month she was terminated from her job.  Plaintiff specifically alleges that she was sent the Agreement, as discussed above, and that "Alliance clearly terminated the Plaintiff's employment for not agreeing [to] sign the arbitration agreement and for the Plaintiff's complaints and oppositions about racially discriminatory conduct in the workplace."  (Compl. ¶ 423).  Allegations of "[c]lose temporal proximity" between an adverse employment action like termination and the alleged protected activity are generally enough for a retaliation claim to survive a motion to dismiss.  *Kaytor* v. *Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010); *see also Brown* v. *City of New York*, No. 11 Civ. 2915 (PAE), 2013 WL 3789091, at *17 (S.D.N.Y. July 19, 2013) (collecting cases).  Resolving factual disputes regarding the import of the February 13, 2019 letter at this stage is premature, even if the Court may be able to draw inferences from the letter that are adverse to Plaintiff's claims.

      **b.**    **Plaintiff States a Claim for Hostile Work Environment**

Plaintiff next alleges that Alliance fostered a hostile work environment by both (i) subjecting her to Schwartz's vitriol and racist behavior and condoning such behavior (*see, e.g.*, Compl. ¶¶ 219-227); and (ii) failing to take corrective actions regarding Schwartz's historic hostility toward Black caregivers, despite knowing that Black caregivers frequently complained about Schwartz's

37

behavior (Pl. Aff. ¶¶ 27-29).  Defendant argues that Plaintiff's hostile work environment claim must fail because Schwartz's conduct cannot be imputed to Alliance (Def. Br. 14-15), and because Schwartz's conduct was not "sufficiently severe" to constitute a hostile work environment (*id.* at 16-18).  The Court disagrees on both counts.

"To state a claim for a hostile work environment under … Section 1981, a plaintiff must show that the complained-of conduct: [i] is objectively severe or pervasive; [ii] creates an environment that the plaintiff herself subjectively perceives as hostile or abusive; and [iii] creates such an environment because of the plaintiff's race."  *Goins* v. *Bridgeport Hosp.*, 555 F. App'x 70, 71-72 (2d Cir. 2014) (summary order) (citing *Patane* v. *Clark*, 508 F.3d 106, 113 (2d Cir. 2007); *Fincher* v. *Depository Tr. & Clearing Corp.*, 604 F.3d 712, 723-24 (2d Cir. 2010)); *see also Littlejohn*, 795 F.3d at 320-21 ("[A] plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." (quotation marks and citations omitted)).  This conduct "must be more than episodic; [it] must be sufficiently continuous and concerted in order to be deemed pervasive."  *Alfano* v. *Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks and citation omitted).  As such, a hostile work environment claim "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'"  *Mohan* v. *City of New York*, No. 17 Civ. 3820 (KPF), 2018 WL 3711821, at *13 (S.D.N.Y. Aug. 3, 2018) (quoting *Nat'l R.R. Passenger Corp.* v.

*Morgan*, 536 U.S. 101, 122 (2002)).  "It is axiomatic" that a hostile work environment claim is only actionable "when it occurs because of an employee's … protected characteristic." *LeLaurencio* v. *Brooklyn Children's Ctr., Superintendent*, 111 F. Supp. 3d 239, 248 (2d Cir. 2001) (quoting *Brown* v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)).  In evaluating "whether a plaintiff suffered a hostile work environment," a court "consider[s] the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Littlejohn*, 795 F.3d at 321 (internal quotation marks and citation omitted).  "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Id.* (internal quotation marks and citation omitted).

Although hostile work environment claims ordinally rely on a constellation of events, a single instance of conduct may constitute "harassment that is extraordinarily severe'" such that it establishes a hostile work environment. *Maron* v. *Legal Aid Soc'y*, No. 21 Civ. 5960 (KPF), 2022 WL 1910247, at *10 (S.D.N.Y. June 2, 2022) (quoting *Miller* v. *N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *2 (2d Cir. Apr. 18, 2022) (summary order)).  And courts within this Circuit routinely find that pleading allegations about an egregious single event are enough to survive a motion to dismiss or a

motion for summary judgment.  *See, e.g.*, *Howley* v. *Town of Stratford*, 217
F.3d 141, 154 (2d Cir. 2000) (holding that a single instance of verbal abuse
gave rise to a hostile work environment where co-worker went on a "tirade"
about female plaintiff being promoted to lieutenant for performing fellatio, "at
length" and "loudly" in front of large group of male subordinates); *Pryor* v. *Jaffe
& Asher, LLP*, 992 F. Supp. 2d 252, 255, 259 (S.D.N.Y. 2014) (finding single
incident to give rise to hostile work environment claim where co-worker
subjected female plaintiff to sexual advances and forcibly tried to kiss her,
despite knowing she was a recent domestic violence victim).

      Where a plaintiff relies on third-party conduct to make out a hostile work
environment claim, the plaintiff must "establish that the discriminatory
conduct may be imputed to the employer."  *Turley* v. *ISG Lackawanna, Inc.*,
774 F.3d 140, 153 (2d Cir. 2014) (citing *Summa* v. *Hofstra Univ.*, 708 F.3d 115,
124 (2d Cir. 2013)).  The rules for imputing conduct by non-employees and
conduct by non-supervisory co-workers to an employer are the same.  *Summa*,
708 F.3d at 124.  Thus, "the employer is liable only if it was negligent in
controlling working conditions."  *Dabney* v. *Christmas Tree Shops*, 958 F. Supp.
2d 439, 460 (S.D.N.Y. 2013), *aff'd sub nom. Dabney* v. *Bed Bath & Beyond*, 588
F. App'x 15 (2d Cir. 2014) (summary order).  To prove negligence in this
context, a plaintiff must show that "'the employer has either provided no
reasonable avenue for complaint or knew of the harassment but did nothing
about it.'"  *Dabney*, 958 F. Supp. at 460 (quoting *Murray* v. *N.Y. Univ. Coll. of
Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995) (emphasis and internal quotation

marks omitted)).  "[O]nce an employer has knowledge of the harassment, the law imposes upon the employer a duty to take reasonable steps to eliminate it." *Torres* v. *Pisano*, 116 F.3d 625, 636 (2d Cir. 1997) (internal quotation marks and citation omitted).

Turning first to the issue of whether Schwartz's conduct can be imputed to Alliance for purposes of Plaintiff's hostile work environment claim, the Court finds that Plaintiff has sufficiently pleaded facts to show that Alliance knew of Schwartz's harassment and failed to correct it.[9]  As to knowledge, Plaintiff pleads several facts that suggest Alliance knew that Schwartz subjected Black caregivers to horrific treatment.  *First*, Plaintiff alleges that, prior to Plaintiff's arrival at Schwartz's apartment, Alliance notified her that Schwartz could become "very agitated very quickly." (Compl., Ex. D at ¶ 12).  *Second*, Plaintiff points to a statement by Ashley, during her conversation with Plaintiff following the January 24, 2019 incident, that "[y]ou can either get someone who is pleasantly demented and friendly, or you can get someone who [is] completely agitated and has all this hatred in them.  And unfortunately that is what we

---

[9]      The parties dispute the applicability of *Leibovitz* v. *New York City Transit Authority* to this case.  252 F.3d 179 (2d Cir. 2001).  In *Leibovitz*, the Second Circuit found that a plaintiff could not rely solely on others' experience of harassment in workplace to make out a hostile work environment claim.  *See id.* at 189.  A jury rejected the plaintiff's personal claims of harassment, and thus "[e]ven assuming that Leibovitz could claim to share the same 'environment' — broadly conceived — as the women allegedly harassed, Leibovitz failed to demonstrate that their harassment adversely affected the terms and conditions of her own employment."  *Id.*  Here, Plaintiff's alleges that (i) Alliance knew of Schwartz's pattern of racial hostility and (ii) Plaintiff experienced such hostility firsthand.  Accordingly, the Court does not find that Plaintiff is merely "rel[ying] on her own conjecture about other black caregivers' work experience with Ms. Schwartz to attempt to support or establish a claim of discriminatory hostile work environment." (Def. Reply 14).

41

are dealing with Mrs. Schwartz." (*Id.*, Ex. C at ¶ 31).  And *third*, Plaintiff pleads

that Alliance had actual knowledge of the fact that Schwartz "had a long

pattern, over more than [two] years, of targeting Black people or people of color"

by, for example, making false 911 reports against Black caregivers.  (*Id.* at

¶ 38; *see also, e.g., id.* ¶ 156 (same); Pl. Aff. ¶ 28 ("Schwartz['s] pattern of

malicious and hateful/racist conduct routinely caused … Black caregivers or

people of color to complain" to Alliance)).

　　　At the motion to dismiss stage, these types of allegations are sufficient to

demonstrate that Alliance had knowledge of Schwartz's behavior.  Defendant

argues that Plaintiff's reliance on statements made by Holly and Ashley — two

Alliance employees — are "anecdotes" and "pure conjecture."  (Def. Reply 13).

But Defendant gives no reason why these statements should not be credited as

showing that Alliance had knowledge of Schwartz's harassment, if accepted as

true.  In fact, such statements might be the best indication that Schwartz was

a known quantity, and that Alliance was on notice of her abhorrent behavior;

in any event, the Court will not engage in fact-finding or credibility

determinations here, as Defendant suggests it should.  *See, e.g.*, *McArdle* v.

*Arms Acres, Inc.*, No. 03 Civ. 5721 (PGG), 2009 WL 755287, at *9 (S.D.N.Y.

Mar. 23, 2009) (denying defendant's summary judgment motion where direct

supervisor "had notice of numerous prior incidents" of harassment); *Arias* v.

*Nasdaq/Amex Mkt. Grp. d/b/a Am. Stock Exch.*, No. 00 Civ. 9827 (MBM), 2003

WL 354978, at *10 (S.D.N.Y. Feb. 18, 2003) (finding genuine issue of material

fact existed where supervisor testified to "vague awareness of a racial slur").

42

Although some of Plaintiff's cited evidence is admittedly vague, Plaintiff has adequately pleaded that Alliance knew about the conduct non-white caregivers faced while on the Schwartz assignment and did not adequately address the issue. Whether or not these statements in fact demonstrate Alliance's knowledge is not an appropriate inquiry at this stage.

Further, Defendant's arguments as to why Schwartz's conduct should not be imputed to it are unpersuasive. For example, Defendant argues that once Alliance was aware that Schwartz was berating Plaintiff and calling 911 on January 24, 2019, the company took prompt action to allow Plaintiff to leave the assignment. (Def. Reply 13). That Plaintiff was allowed to leave does nothing to redress Plaintiff's allegation that Alliance allowed this type of hostile environment to persist for years. The same is true for Defendant's argument that it had been "work[ing] with Ms. [Schwartz's] doctors" to "calm her behavior." (Def. Br. 14-15 (citing Compl., Ex. C at ¶¶ 12, 31)). Plaintiff's allegations suggest that these steps were simply not enough to redress the underlying issues, and that Defendant knew that. By the point Plaintiff left the Schwartz assignment, she had suffered multiple racist indignities and threats to her safety — the injury was already complete, and it is traceable to Defendant's failure to take sufficient proactive steps based on its knowledge of Schwartz's egregious conduct. *See, e.g.*, *Thompson* v. *Corizon Health, Inc.*, No. 18 Civ. 7139 (LGS), 2021 WL 105767, at *3 (S.D.N.Y. Jan. 12, 2021) ("Although work with mentally ill inmates can be expected to involve some degree of unwelcome conduct, employers are still required to take remedial

action within their control to address known inmate misconduct, particularly the sort of egregiously dangerous and harassing misconduct at issue in this case."); *id.* at \*4 ("Again, that [d]efendant provides evidence of some remedial measures does not address the above factual disputes regarding the availability and effectiveness of measures allegedly not taken."); *Swiderski* v. *Urb. Outfitters, Inc.*, No. 14 Civ. 6307 (JPO), 2017 WL 6502221, at \*8 (S.D.N.Y. Dec. 18, 2017) ("A reasonable jury could conclude that [d]efendant's lack of a policy was negligent, and that it contributed to a failure to take reasonable corrective action to deal with these incidents of customer harassment.");[10] *Creacy* v. *BCBG Max Azria Grp., LLC*, No. 14 Civ. 10008 (ER), 2017 WL 1216580, at \*11 (S.D.N.Y. Mar. 31, 2017) ("This evidence, taken together, raises a triable issue of fact as to whether [defendant] took proper corrective action and acquiesced in creating a hostile work environment for [the plaintiff]."). The Court rejects Defendant's theory that an employer can escape liability for a workplace it knows to be hostile so long as the employer (i) allows the employee to leave the premises when the discriminatory conduct recurs and (ii) expresses regret after the incident. That theory, if adopted, would turn the hostile work environment construct on its head.

---

[10]     Defendant suggests that *Swiderski* is factually distinguishable, because "[Alliance's] constituents are fundamentally different from those of a retail store," and because "home healthcare agencies have little control over a homecare aide's work environment, especially where the client has a mental illness." (Def. Br. 14 n.8). Although the Court is aware of the difficulties presented by mentally ill patients, it is not equipped to resolve factual issues at this stage, particularly in light of Plaintiff's vigorous opposition to Defendant's representation. (Pl. Opp. 10 ("Alliance had the power to take action long [] before assigning me to the Schwartz home care assignment.")).

Defendant also seeks to show that it did enough to proactively remedy the situation because Ashley warned Plaintiff that Schwartz could become "agitated" prior to her assignment.  (Def. Br. 15; Compl., Ex. D).  As noted above, Plaintiff pleads facts suggesting that Alliance was not forthcoming in this interaction, and that it was on notice of Schwartz's racist outbursts before. And she describes in her Complaint that Alliance knew about Schwartz's hostile treatment toward Black caregivers for years, and supports those claims with statements made by Alliance employees plausibly indicating as much. *See, e.g.*, *Swiderski* v. *Urb. Outfitters, Inc.*, No. 14 Civ. 6307 (JPO), 2015 WL 3513088, at *4 (S.D.N.Y. June 4, 2015) (finding customer's conduct could be imputed to the employer because plaintiff alleged that management had told her about "several incidents involving the same male customer"); *Dymskaya* v. *Orem's Diner of Wilton, Inc.*, No. 12 Civ. 388 (JAM), 2015 WL 1038394, at *5 (D. Conn. Mar. 10, 2015) (finding that "the evidence elicited at trial provided an ample basis for a jury to impute the conduct causing the hostile work environment to the defendant employer[,]" where plaintiff and co-workers had "lodged numerous complaints").

As to whether Schwartz's course of conduct toward Plaintiff on a single day could constitute a hostile work environment, the Court easily finds that what Plaintiff describes suffices as "extraordinarily severe."  In fact, the Court is dismayed to see Alliance suggest otherwise.  Defendant disaggregates the January 24, 2019 incident into 10 separate events as if they were snapshots, and then states that only a few comments made by Schwartz "arguably can be

linked to race." (Def. Br. 18). This conceptualization of what happened to Plaintiff is both naïve and myopic. It is naïve, because it fails to credit certain of Schwartz's statements as racially-motivated, despite Plaintiff pleading that she faced starkly different treatment as compared to the white caregiver from the moment she entered Schwartz's apartment. (*See, e.g.*, Compl. ¶¶ 43-44). Schwartz then proceeded to make a series of comments, including, but not limited to, that Plaintiff looked like a "little girl" (*id.* at ¶ 48), that she was "hideous" (*id.* at ¶ 50), and that she did not like Plaintiff or "other aides like" her (*id.* at ¶ 52). This verbal barrage was followed by a false 911 call and an attempted assault. (*Id.* at ¶¶ 56-60). The Supreme Court itself has noted that, while "it is true [a] disputed word will not always be evidence of racial animus, it does not follow that [a] term, standing alone, is always benign. The speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage." *Ash* v. *Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006); *see also Brockman* v. *NAES Corp.*, No. 19 Civ. 6 (JAM), 2021 WL 863471, at *4 (D. Conn. Mar. 8, 2021) (finding that "[a] jury could reasonably (and easily) conclude" that supervisor's comments were "racist code words"). At this stage in a litigation, where the Court is to draw "all reasonable inferences in Plaintiff['s] favor" and "assume all well-pleaded factual allegations to be true," the Court will not deem any of Schwartz's conduct to be "benign" in light of her attitude and actions toward Plaintiff. *Faber*, 648 F.3d at 104 (internal quotation marks omitted).

Defendant's approach is also myopic, as it runs contrary to the Second Circuit's instruction to take account of all of the relevant complained-of conduct. *See, e.g.*, *Littlejohn*, 795 F.3d at 321 (analyzing all of plaintiff's allegations related to hostile work environment together); *Philbert* v. *City of New York*, No. 21 Civ. 3119 (PAE), 2022 WL 94574, at *18 (S.D.N.Y. Jan. 7, 2022) ("[A] court must consider the totality of the circumstances[.]" (internal quotation marks omitted)); *Love* v. *Premier Util. Servs., LLC*, 186 F. Supp. 3d 248, 253 (E.D.N.Y. 2016) (same). Schwartz's assault alone surpasses the threshold for conduct that is "extraordinarily severe." *See, e.g.*, *Patterson*, 375 F.3d at 230 ("Although a single incident ordinarily will not give rise to a cognizable claim for hostile work environment, this alleged event included not only racial remarks but also a physical assault[.]"); *Fitzgerald* v. *We Co.*, No. 20 Civ. 5260 (AT), 2022 WL 952963, at *4 (S.D.N.Y. Mar. 30, 2022) ("[C]ourts have found that a single instance of sexual assault qualifies as 'extraordinarily severe' for purposes of establishing a hostile work environment claim." (citing *Domingues* v. *Barton Chevrolet Cadillac*, No. 18 Civ. 7772 (PMH), 2021 WL 637016, at *4-5 (S.D.N.Y. Feb. 17, 2021)). That the assault was accompanied by various racially-motivated remarks and a false 911 call only bolsters Plaintiff's claim.

Finally, the Court considers and rejects as readily distinguishable or not controlling Defendant's cited cases in support of its argument that Schwartz's conduct did not create a hostile work environment. Relying on three cases from outside of this Circuit, *E.E.O.C.* v. *Nexion Health at Broadway, Inc.*, 199 F.

App'x 351 (5th Cir. 2006) (unpublished decision), *Matu-Dadie* v. *Wernersville State Hosp.*, No. 17 Civ. 5451 (JFL), 2018 WL 3535000 (E.D. Pa. July 23, 2018), and *Cain* v. *Blackwell*, 246 F.3d 758 (5th Cir. 2001), Defendant essentially argues that Plaintiff's Section 1981 claim should be held to a higher standard given the nature of her work as a caregiver.  To be sure, caregivers may sometimes, regrettably, face unkind conduct from clients who suffer from mental illness or cognitive decline.  In this respect, the Court agrees with the Fifth Circuit's sympathy in *Nexion* that caregivers sometimes must "deal with the tragic failings of elderly people[.]"  *Nexion*, 199 F. App'x at 354.  But the Court in *Nexion* did not rely on this fact as the basis for its finding that the plaintiff could not succeed on a hostile work environment claim, and instead found that the complained-of instances of verbal harassment, use of slurs, and physical threats "were not so frequent as to pervade the work experience of a reasonable nursing home employee, especially considering their source."  *Id.* at 353; *see also Matu-Dadie*, 2018 WL 3535000, at *3 (finding "racial remarks" made during single instance insufficient to support hostile work environment claim).  This case is not those cases.  Indeed, the court in *Cain*, which analyzed a plaintiff's claims regarding verbal sexual advances and "racial epithets" made by a patient, explicitly called out the fact that the plaintiff "never alleged any physical conduct that made her feel threatened, nor did she accept [her employer's] offer of reassignment[.]"  *Cain*, 246 F.3d at 760.  Here, Plaintiff alleges severe and outrageous conduct, including a false 911 call and a physical assault.  Even though she was doubtless aware that she may face

48

difficult circumstances at work due to her patients' disabilities, the law does not require that someone in Plaintiff's field of work face such hostility.

Accordingly, the Court denies Defendant's motion to dismiss Plaintiff's hostile work environment claim.

### c.    Plaintiff States a Claim for Disparate Treatment

Plaintiff next brings a claim for disparate treatment under Section 1981 and NYCHRL § 8-107.  (Compl. ¶ 815 (discussing ninth cause of action)).  This theory of liability appears to be distinct, although it also reiterates many of the factual allegations made elsewhere in the Complaint: Plaintiff claims that Plaintiff's assignment to care for Schwartz when Alliance knew that Schwartz favored white caregivers was an "unfavorable job assignment" and evinces disparate treatment based on Plaintiff's race.  (*See, e.g.*, *id.* at ¶ 844).  In its briefing, Defendant does not independently address this claim.

"In analyzing whether a plaintiff has sufficiently alleged an employment discrimination claim, the Court must consider the three-stage, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973)."  *Sosa* v. *N.Y.C. Dep't of Educ.*, 368 F. Supp. 3d 489, 510 (E.D.N.Y. 2019) (internal quotation marks and alterations omitted); *see also Brown* v. *City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *Lopez* v. *S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987); *Moleon* v. *Alston*, No. 21 Civ. 1398 (PAE), 2021 WL 5772439, at *8 (S.D.N.Y. Dec. 3, 2021).

Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  *See Holcomb* v. *Iona Coll.*,

521 F.3d 130, 138 (2d Cir. 2008).  To do so, she must show that "'[i] [s]he belonged to a protected class; [ii] [s]he was qualified for the position [s]he held; [iii] [s]he suffered an adverse employment action; and [iv] the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.'"  *Brown*, 673 F.3d at 150 (quoting *Holcomb*, 521 F.3d at 138).

"[T]he burden of establishing [a] *prima facie* case in an employment discrimination case is minimal."  *Lenzi* v. *Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (internal quotation marks and citations omitted).  And at the motion to dismiss stage, a plaintiff "is not required to plead a *prima facie* case under *McDonnell Douglas*."  *Vega*, 801 F.3d at 84; *see also Forkin* v. *Loc. 804 Union (IBT)*, 394 F. Supp. 3d 287, 307 (E.D.N.Y. 2019) ("At the pleading stage, ... a plaintiff need not prove discrimination or even allege facts establishing every element of the *McDonnell Douglas prima facie* case.").  However, under Section 1981, a plaintiff must plausibly allege that "but for race, [she] would not have suffered the loss of a legally protected right."  *Comcast Corp.* v. *Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).  "[I]t is insufficient to merely plead that race was a motivating factor in the discriminatory action."  *Brown* v. *Montefiore Med. Ctr.*, No. 19 Civ. 11474 (ALC), 2021 WL 1163797, at *5 (S.D.N.Y. Mar. 25, 2021) (citing *Comcast Corp.*, 140 S. Ct. at 1017-18).  "[A]t the initial phase of the litigation, a plaintiff's allegations 'need only give plausible support to a minimal inference of discriminatory motivation.'"

*Franchino* v. *Terence Cardinal Cook Health Care Ctr., Inc.*, 692 F. App'x 39, 41 (2d Cir. 2017) (summary order) (quoting *Littlejohn*, 795 F.3d at 311).

"A plaintiff may demonstrate circumstances giving rise to an inference of discrimination by alleging that [s]he was treated less favorably than similarly situated employees of other races[.]" *Brown* v. *Daikin Am. Inc.*, 756 F.3d 219, 229 (2d Cir. 2014); *see also McGuinness* v. *Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) ("A showing that the employer treated a similarly situated employee differently is a common and especially effective method of establishing a *prima facie* case of discrimination." (internal quotations omitted)).  To do so, "a plaintiff must allege that 'she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'" *Brown*, 756 F.3d at 230 (quoting *Graham* v. *Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).

"[A]dverse actions taken against employees who are not similarly situated cannot establish an inference of discrimination." *Littlejohn*, 795 F.3d at 312. "Ordinarily, whether two employees are similarly situated presents a question of fact, rather than a legal question to be resolved on a motion to dismiss." *Brown*, 756 F.3d at 230 (internal quotations and alterations omitted).  An inference of discrimination can arise from:

> the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge…. In addition, [such inference arises] when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class.

51

*Franchino*, 692 F. App'x at 41-42 (quoting *Littlejohn*, 795 F.3d at 312-13).

Alliance has not independently moved to dismiss count nine of Plaintiff's Complaint.  (*See* Def. Br. 11-14; Def. Reply 7-10 (discussing only Plaintiff's retaliation and hostile work environment claims)).  Plaintiff's ninth cause of action, entitled "Disparate Treatment," alleges, *inter alia*, that Defendant subjected her to "an unfavorable job assignment based on her race and skin color as a Black person in comparison to the similarly situated Caucasian caregiver who was deliberately provided a favorable job assignment based on her race and skin color as a White person."  (Compl. ¶ 844).  Plaintiff also realleges and reiterates various theories of how Alliance took an adverse employment action against her.  (*See, e.g.*, *id.* at ¶¶ 855-857 (discussing the Agreement and her termination)).  Because Defendant has failed to address Plaintiff's ninth cause of action and has not alerted the Court to any reason to dismiss the claim in its briefing, the Court will not *sua sponte* dismiss it.

### 3. Plaintiff Has Stated NYCHRL Claims Premised on the Same Factual Allegations as Her Section 1981 Claims[11]

In her Complaint, Plaintiff pairs each Section 1981 claim that she brings — for disparate treatment, retaliation, and hostile work environment —

---

[11]   In her opposition, Plaintiff raises arguments in support of her NYCHRL hostile work environment claim based on an amendment to the NYCHRL that went into effect on March 12, 2022, and a memorandum issued by the New York City Commission on Human Rights.  (Pl. Opp. 22-25; Pl. Aff., Ex. L, M).  Defendant counters that this amendment should not apply retroactively to this case, given the relevant conduct occurred in 2019.  (Def. Reply 16-17).  Because the Court found that Plaintiff's Section 1981 hostile work environment claim is adequately pleaded, whether the amendment is retroactive would not alter the Court's outcome.  However, the Court notes that the amendment is likely not retroactive, given "there is no indication that the New York City Council intended for the amended NYCHRL to apply retroactively."  *Limauro* v. *Consol.*

with an equivalent NYCHRL claim.  (*See* Compl. ¶¶ 139, 245, 356, 528, 572, 815).  State and federal civil rights statutes serve as a "'floor below which the City's Human Rights law cannot fall[.]"  *Gonzalez* v. *City of New York*, 377 F. Supp. 3d 273, 299 (S.D.N.Y. 2019) (quoting *Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)); *see also Pardovani* v. *Crown Bldg. Maint. Co.*, No. 15 Civ. 9065 (JPO), 2020 WL 2555280, at *5 (S.D.N.Y. May 20, 2020) (finding that NYCHRL retaliation and hostile work environment claims automatically survive where federal claims survive). Accordingly, Plaintiff's claims brought under the NYCHRL related to hostile work environment (first cause of action), retaliation based on the Agreement (second cause of action), retaliation based on her termination (third cause of action), and disparate treatment (ninth cause of action) survive.

As discussed above, the Court has dismissed Plaintiff's Section 1981 claims premised on Alliance's failure to comply with NYLL § 195(6) (fifth and sixth causes of action).  District courts "must analyze NYCHRL claims separately and independently from any federal and state law claims" and "constru[e] the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik*, 715 F.3d at 109 (internal quotation marks omitted).  Under the NYCHRL, the elements of a retaliation claim are generally the same as a Section 1981 retaliation claim, though the NYCHRL is to be construed more

---

*Edison Co. of N.Y., Inc.*, No. 20 Civ. 3558 (CM), 2021 WL 466952, at *10 (S.D.N.Y. Feb. 9, 2021).

liberally than federal law. *See, e.g.*, *Smith* v. *City of New York*, 385 F. Supp. 3d 323, 345-46 (S.D.N.Y. 2019) ("The elements of a *prima facie* case of retaliation under Title VII, the NYSHRL, and the NYCHRL are 'identical,' except that the NYCHRL employs a broader standard of an 'adverse employment action' than its federal and state counterparts." (quoting *Nieblas-Love* v. *N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 70 (S.D.N.Y. 2016))).  Even under the more liberal scope of the NYCHRL, Plaintiff cannot state a retaliation claim based on Alliance's failure to provide the requisite notice of termination under NYLL § 195(6). Plaintiff has not pleaded sufficient facts as to why this omission — which occurred after Plaintiff's termination — would discourage her participation in protected activity, or why it constituted anything more than a trivial harm.  The Court thus dismisses Plaintiff's NYCHRL claims based on failure to provide notice of termination (fifth and sixth causes of action).

### 4.   Plaintiff's Two Standalone NYCHRL Claims Fail

#### a.   Interference with Protected Rights

Plaintiff's fourth cause of action is brought pursuant to NYCHRL § 8-107(19), which provides:

> It shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of such person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section.

*Id.*  Plaintiff claims that Alliance "threatened to withhold continued employment" from her in order to intimidate her into signing the Agreement.

54

(Compl. ¶ 521).  In essence, Plaintiff argues that the Agreement itself was a "threat."  For instance, Plaintiff reads the provision of the Agreement providing that her consideration for the Agreement is her "continued employment" with Alliance as a message that "[i]f you do not immediately sign the arbitration agreement, you will be fired." (*Id.* at ¶ 506).  And she notes that the Agreement specified that she was an "at will" employee, which engendered coercion by informing her that she could be fired at any time.  (*Id.* at ¶ 515).[12]  As a result, Plaintiff claims, the Agreement "was intended to chill any plans ... Plaintiff may have had to bring legal action against Alliance[.]"  (*Id.* at ¶ 508).  Defendant argues that this claim fails, because the Agreement does not, as a matter of law, constitute the requisite threat under the NYCHRL.  (Def. Br. 20).  For example, it notes that employers often use mandatory arbitration agreements in the regular course of business.  (*Id.*).

A threat is a required element of a claim a claim for violation of Section 8-107(19).  *See Roelcke* v. *Zip Aviation, LCC*, No. 15 Civ. 6284 (DAB), 2018 WL 1792374, at *9 (S.D.N.Y. Mar. 26, 2018) (citing *Sletten* v. *LiquidHub, Inc.*, No. 13 Civ. 1146 (NRB), 2014 WL 3388866, at *5 (S.D.N.Y. July 11, 2014)).  A "threat" is "the creation of '[a]n impression of impending injury.'" *Sletten*, 2014 WL 3388866, at *5 (quoting *United States* v. *Davila*, 461 F.3d 298, 302 (2d Cir. 2006)); *see also Nieblas-Love*, 165 F. Supp. 3d at 78 (dismissing Section 8-107(19) claim because plaintiff "does not allege that [City employees] ever made

---

[12]   Plaintiff also identifies other provisions of the Agreement, like the fact that it required her to pay the costs to initiate arbitration, as "unconscionable" or "unreasonable."  (Pl. Aff. ¶ 42).

any threats against him"). Although there is "scant authority on this provision of the NYCHRL," some federal courts have hesitated to construe it as coterminous or duplicative of the NYCHRL's retaliation provisions. *See, e.g.*, *Rosas* v. *Balter Sales Co. Inc.*, No. 12 Civ. 6557 (VSB), 2015 WL 12915807, at *12 n.25 (S.D.N.Y. Mar. 30, 2015).

Here, Plaintiff has failed to identify any relevant "threat" as required to plead an "interference with protected rights" claim under the NYCHRL. Although this Court agrees with Plaintiff's assessment that a threat need not imply physical violence (Pl. Aff. ¶ 39), it recognizes that there must some affirmative threat beyond the adverse employment action itself. *See, e.g.*, *Rossbach* v. *Montefiore Med. Ctr.*, No. 19 Civ. 5758 (DLC), 2021 WL 930710, at *8 (S.D.N.Y. Mar. 11, 2021) (requiring allegations of "affirmatively coercive, intimidating, or threatening" actions). To hold otherwise with regard to the mere existence of the Agreement would make Plaintiff's retaliation claim and "interference with protect rights" claim entirely duplicative, despite the fact that these are separate provisions of the NYCHRL. Although Plaintiff may disagree with certain unfavorable terms of the arbitration agreement (Pl. Aff. ¶ 42), such terms do not denote "impending injury" in the requisite sense.

Further, Plaintiff appears to confuse federal and City civil rights laws with unconscionability under contract law. For this reason, Plaintiff's citations to contract cases like *Hoffman* v. *Aaron Kamhi, Inc.*, 927 F. Supp. 640 (S.D.N.Y. 1996), or *Billingsley* v. *Citi Trends, Inc.*, 948 F. Supp. 2d 1287 (N.D. Ala. 2013), *aff'd*, 560 F. App'x 914 (11th Cir. 2014) (unpublished decision), are inapposite,

56

as the law governing procedural and substantive unconscionability in contracts is distinct from federal and City civil rights law.  Accordingly, the Court dismisses Plaintiff's NYCHRL § 8-107(19) claim.

> **b.   Disability Discrimination**

Plaintiff's seventh cause of action is for "disability discrimination," in violation of NYCHRL § 8-107(28).  In particular, Plaintiff claims that her "psychological trauma" resulting from the Schwartz incident constitutes a disability, and that Alliance discriminated against her in contravention of the NYCHRL "by not engaging in a cooperative dialogue" with her regarding her disability, and for failing to provide a reasonable accommodation for her disability.  (Compl. ¶ 669).  Essentially, Plaintiff argues that, through her February 13, 2019 letter, Alliance was on placed notice of her disability, and that it was obligated to work with her to find a reasonable accommodation for her so that she could continue working.  (*Id.* at ¶¶ 699-704; *id.*, Ex. F).  Alliance argues that Plaintiff's disability discrimination claim fails, because Plaintiff has not plausibly alleged that Alliance was on notice of her disability, and because Plaintiff has not alleged that she could continue working with a reasonable accommodation or what that accommodation would be.  (Def. Br. 22-23).

Disability discrimination claims under the NYCHRL, like race discrimination claims, are analyzed under the *McDonnell Douglas* burden-shifting test.  *See, e.g.*, *Nieblas-Love*, 165 F. Supp. 3d at 72-73; *Wagner* v. *Inter-Con Sec. Sys., Inc.*, 278 F. Supp. 3d 728, 739 (S.D.N.Y. 2017).  Such claims

57

encompass a failure to accommodate. *See Nieblas-Love*, 165 F. Supp. 3d at 73.
"A *prima facie* failure-to-accommodate claim under the … NYCHRL requires a
plaintiff to show that: '[i] plaintiff is a person with a disability under the
meaning of [the NYCHRL]; [ii] an employer covered by the statute had notice of
[her] disability; [iii] with reasonable accommodation, plaintiff could perform the
essential functions of the job at issue; and [iv] the employer has refused to
make such accommodations.'" *Gaughan* v. *Rubenstein*, 261 F. Supp. 3d 390,
405-06 (S.D.N.Y. 2017) (quoting *Nieblas-Love*, 165 F. Supp. 3d at 73).  The
NYCHRL defines disability broadly as "any physical, medical, mental or
psychological impairment, or a history or record of such impairment."  N.Y.C.
Admin. Code § 8-102; *see also Giordano* v. *City of New York*, 274 F.3d 740, 753
(2d Cir. 2001) ("[T]he definition[ ] of disability under … the New York City
Administrative Code [is] broader than the ADA definition.").  And under the
NYCHRL, once a defendant is on notice of a plaintiff's disability, it is required
to "engage in an 'interactive process with [the employee] in order to arrive at a
reasonable accommodation.'" *Amley* v. *Sumitomo Mitsui Banking Corp.*, No. 19
Civ. 3777 (CM) (BCM), 2021 WL 4429784, at *19 (S.D.N.Y. Sept. 27, 2021)
(quoting *LeBlanc* v. *United Parcel Serv.*, No. 11 Civ. 6983 (KPF), 2014 WL
1407706, at *18 (S.D.N.Y. Apr. 11, 2014)).

        Plaintiff points to a sole source that, she alleges, gave Alliance notice of
her disability: the February 13, 2019 letter in which she stated that she has
"been very traumatized" by the Schwartz incident.  (Compl., Ex. F).  Moreover,
Plaintiff alleges that Alliance was on notice, because during the debrief phone

call with Ashley, Ashley had acknowledged that what happened was a "scary experience[.]" (*Id.*, Ex. C at ¶ 26; Pl. Aff. ¶ 44). Defendant argues that these statements do not adequately suggest that Plaintiff had a "disability" as defined in the NYCHRL, and in any event that they provided insufficient notice of a covered disability. The Court agrees. *Compare LeBlanc*, 2014 WL 1407706, at *18 (finding that employer was on notice of plaintiff's heart attack, and plaintiff had made multiple requests for an accommodation), *with Karupaiyan* v. *CVS Health Corp.*, No. 19 Civ. 8814 (KPF), 2021 WL 4341132, at *19 (S.D.N.Y. Sept. 23, 2021) ("Plaintiff's vague assertion of a need to attend an unquantified number of medical appointments, for an unspecified purpose, and for an uncertain duration cannot be viewed as putting Defendants on notice of a disability requiring accommodation under any of the ADA, the NYSHRL, or the NYCHRL."); *see also Watson* v. *Arts & Ent. Television Network*, No. 04 Civ. 1932 (HBP), 2008 WL 793596, at *14 (S.D.N.Y. Mar. 26, 2008) (collecting cases in which appearances of "stress" or other behavioral issues were insufficient to put defendant on notice of disability), *aff'd*, 352 F. App'x 475 (2d Cir. 2009) (summary order).

Even accepting Plaintiff's allegations in her opposition that Frey is a licensed psychologist (Pl. Opp. 20), a single statement that Plaintiff was "traumatized," and Frey's acknowledgment of the difficult circumstances presented by Schwartz, do not rise to the level of putting Alliance on notice of Plaintiff's claimed disability. Accordingly, the Court dismisses Plaintiff's NYCHRL disability discrimination claim.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED IN PART and DENIED IN PART.  The Court GRANTS Defendant's motion as to Plaintiff's NYCHRL interference with protected rights claim (fourth cause of action), as well as her Section 1981 and NYCHRL retaliation claims premised on NYLL § 195(6) (fifth and sixth causes of action), her NYCHRL disability discrimination claim (seventh cause of action), and her Thirteenth Amendment claim (eighth cause of action).  The Court DENIES Defendant's motion as to Plaintiff's Section 1981 and NYCHRL hostile work environment claims (first cause of action), her Section 1981 and NYCHRL retaliation claims based on the Agreement (second cause of action), her Section 1981 and NYCHRL retaliation claims based on her termination (third cause of action), and her Section 1981 and NYCHRL disparate treatment claims (ninth cause of action).

Defendant is ORDERED to file its answer to the Complaint on or before **November 7, 2022**.  The parties are ORDERED to file a joint status letter regarding the next steps in this case and proposed case management plan on or before **November 14, 2022**.

The Clerk of Court is directed to terminate the pending motions at docket entries 23, 24, and 25.

SO ORDERED.

Dated:     September 29, 2022
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

60